# Exhibit 2

# Expert Report of Catherine Graeff

*Sheet Metal Workers Local No.20 Welfare and Benefit Fund, and Indiana Carpenters Welfare Fund, et al., -v- CVS Pharmacy, Inc., Caremark, L.L.C*
*Case No. 1:16-cv-00046-S*

*And*

*Plumbers Welfare Fund, Local 130, U.A., et al., - v- CVS Pharmacy, Inc., Caremark, L.L.C.*
*Case No. 1:16-cv-00447-S*

**Submitted by:**

Catherine C Graeff, RPh. MBA
Sonora Advisory Group, LLC
24539 N 115ᵗʰ Pl., Scottsdale, AZ 85255
(P) 602-228-0098
cgraeff@sonoraadvisorygroup.com

**Date:** July 17, 2019

*CONFIDENTIAL*



## I.   INTRODUCTION AND ASSIGNMENT

### A.   Background & Experience Summary

I am currently the managing partner of Sonora Advisory Group, a consulting firm offering various advisory services to healthcare industry organizations, including strategic health IT planning, new product innovation and development, operational planning and expertise in the specific area of pharmacy national technology standards.  In my capacity as managing partner, I am responsible for the management of the organization and the quality of services to our clients.  I founded Sonora Advisory Group in 2009.

I have a M.B.A and a B.S in Pharmacy. I have more than thirty years of experience in senior or executive management roles in healthcare organizations.  I am a registered pharmacist in the State of Arizona, and have worked in retail, hospital and mail service pharmacy organizations. I have also worked for pharmacy benefit managers, health IT system developers, Medicaid managed care organizations and for the National Council of Prescription Drug Programs ("NCPDP").

My career emphasis has been in health IT strategic planning, systems development and implementation, and pharmacy standards development.  I have developed and implemented information technology solutions for managed care organizations, pharmacy benefit managers ("PBMs"), and database management organizations. I have a working knowledge of administrative and medical management systems in managed care organizations, State-based health insurance exchange systems, and state health and human services eligibility systems.

I am a co-chair of the NCPDP Work Group 10 Professional Pharmacy ("WG10") Services since 2016 and was recently reelected for another term by the membership. WG10 develops and distributes standards, templates, and implementation guides related to pharmacists' direct patient care services.  I am also a Task Group Co-Lead for the Digital Therapeutics Task Group and have held other Task Group Lead roles over the course of my membership in NCPDP.  I have held a number of leadership roles at the NCPDP since becoming a member in 1989. I served over 10 years on the NCPDP Board of Trustees and held a number of offices on the Board including Treasurer, Finance Committee Chair, Education Committee Chair, Strategic Planning Committee Chair, and Nominating Committee Chair.  Between 2005 and 2009, I was employed by the NCPDP as Sr. Vice President of Communications and Industry Relations. I have submitted several expert reports and given testimony involving issues related to NCPDP standards and, more specifically, the definition of the data field 426-DQ ("Usual and Customary Charge").

A more detailed description of my experience is attached as Attachment A.

### B.   Assignment Scope

I have been engaged by Williams and Connolly LLP on behalf of CVS Pharmacy, Inc. and Caremark, L.L.C. to provide expert opinions on the NCPDP and its Claim Billing standards (referred to as the "Telecommunication Standard"), with particular emphasis on the definition and use of the data field 426-DQ ("Usual and Customary Charge") from the Telecommunication Standard.

I am being compensated for my time at a rate of $475 per hour, plus travel expenses.  My compensation is not contingent on the nature of my findings, opinions, or the outcome of any proceeding.

### C.   Materials Considered

In forming my opinions and creating this report, I have relied upon my experience in senior or executive management roles in healthcare organizations over the past thirty years, including my leadership and staff

Use or disclosure of data contained on this sheet is subject to the restriction on the title page of this document.

1



roles at the NCPDP, as well as my review of pleadings and discovery materials supplied to me by Williams and Connolly LLP.  A list of the materials I reviewed and considered is provided in Attachment B.

## II. BACKGROUND ON THE NCPDP

### A.    Purpose

The NCPDP is a Standards Development Organization ("SDO") accredited by the American National Standards Institute ("ANSI").  The NCPDP develops national standards for the electronic exchange of healthcare information. The NCPDP brings together members from across the pharmacy services sector of the healthcare industry: pharmacies, PBMs, third-party payers ("TPPs"), related information processors, systems vendors, and other interested parties.  These members bring forth business issues that can be solved through the development or modification of NCPDP standards.  Work Groups and Task Groups within the NCPDP examine these issues to create an industry-wide solution.

The NCPDP's purpose is to develop standards that deliver increased efficiency to the pharmacy services sector of the healthcare industry. The NCPDP accomplishes this purpose by establishing and maintaining a forum that facilitates development, publication, implementation, maintenance, and control of standards for information processing.  The NCPDP also promotes and monitors the use of these standards among its membership and other interested or affected parties.

### B.    History of NCPDP Standards Development

The NCPDP began developing standards in 1976 and developed the first NCPDP standard, the Universal Claim Form ("UCF"), in 1980.  The UCF was used by pharmacies to submit a claim to a TPP, and to transmit the information necessary for the TPP to adjudicate the claim.  The UCF form was created in an effort to standardize the numerous Medicaid and TPP paper claim forms utilized by pharmacies and entities who processed pharmacy benefit claims.  From the beginning, contractual agreements between pharmacies and TPPs defined which portions of the UCF, often referred to as "data fields," needed to be filled out by the pharmacies.  This varied somewhat from TPP to TPP and was usually included as part of the pharmacies' participation contracts with the TPPs.

Over time, pharmacies stopped manually preparing UCFs by hand and instead began generating UCFs through automated processes.  As technology improved, pharmacies submitted claims via print images, and by 1984 pharmacies were sending electronic claims on magnetic tape using the NCPDP's Tape Standard.

### C.    The NCPDP Organization

The NCPDP membership grew from several hundred people in the late 1980s to about 1600 members today. Members fall into three general classifications or "categories" which are comparable in member numbers. They are:

- Producers and Providers.  This classification includes drug manufacturers, wholesalers, physicians and pharmacies, and anyone involved in the provision of care or medication;

- Payers and Processors.  This classification includes insurance companies, benefit administrators, government payers, third party claims processors, and PBMs;

- Vendor and General Interest.  This classification includes hardware and software developers, database management companies, and those having a general interest in the work of the NCPDP.

Use or disclosure of data contained on this sheet is subject to the restriction on the title page of this document.



Members elect the Board of Trustees in a manner designed to obtain balance of representation between the member categories described above.  Trustees can serve up to two consecutive three-year terms.[1]

## III.       HOW NCPDP STANDARDS ARE DEVELOPED AND MODIFIED

The process for developing an NCPDP standard has remained largely unchanged from the early 1980s until today.  Minor changes to the process have been made over the years to improve efficiency, take advantage of technology advancements, address the growing membership and the resulting number of Work Groups and Task Groups, and to further support the consensus building process.

### A.     Submission of a Data Element Request Form ("DERF")

The NCPDP is a "member driven" organization which means that the standards are revised only if members or others in the industry submit a request for a new or modified standard or data field, or a request for a project to address a business need. Any individual or group may submit a request for new standards or modifications to an existing standard using the NCPDP Data Element Request Form ("DERF").  The DERF is reviewed for completeness and submitted to the Standardization Committee and Maintenance and Control Work Group Co-Chairs for Work Group assignment.  The DERF is then posted to the NCPDP website for member review.

### B.    Review

An assigned Work Group reviews and deliberates on the DERF.  The Work Group(s) may take a number of actions, such as approval as submitted, approval with modifications, no action pending further information, or denial with cause.  Only members can vote on the DERF but anyone may participate in Work Group discussions.

The Work Group then sends the DERF to the Maintenance and Control Work Group, which reviews the Work Group outcome following the same process as did the Work Group.  The Maintenance and Control Work Group submits the final resolution to the Standardization Co-Chairs.  The Standardization Co-Chairs review the resolution and supporting documents with NCPDP staff and make recommendations to the Board of Trustees regarding which upcoming Data Maintenance Ballot(s) should include the approved DERF(s).

### C.    Ballot Process

All Board-approved DERFs are included in an upcoming ballot of the relevant standard.  The modified standards are then voted on by ballot according to the NCPDP *Standard Operating Procedures.*[2]  The ballot is open to NCPDP members and all persons who express an interest in commenting on ballots related to standards-development activities.

To be approved or adopted, a ballot must first have a quorum as defined in the Standard Operating Procedures. Once the ballot has been validated, the balloted standard must then receive at least a 75% approval rate from the sum of the number of affirmative votes and negative votes with reasons.  The NCPDP strives for consensus between the categories of members attending or voting, and procedures are in place to ensure that balance is maintained.  A single member category (e.g., "Producers and Providers") cannot unilaterally force a change into the standard.

---

[1] NCPDP Bylaws published May 2019.  p. 8.
[2] NCPDP Standard Operating Procedures published October 2018. Standards Data Maintenance Process. pp. 12-15.

Use or disclosure of data contained on this sheet is subject to the restriction on the title page of this document.



## IV.     THE NCPDP TELECOMMUNICATION STANDARD

The NCPDP has developed and maintains the Telecommunication Standard for the electronic exchange of information for pharmacy-related eligibility benefit inquiry and response transactions and for pharmacy claims transactions.  Pharmacies, processors/PBMs, and other trading partners create electronic claims forms using the NCPDP's Telecommunication Standard Implementation Guide, the NCPDP Data Dictionary, and the NCPDP External Code Lists.  The electronic claims forms allow trading partners to electronically transmit information between one another.  These claims transactions contain a variety of data fields or elements that are defined in the NCPDP Data Dictionary.[3]

### A.     History of the Telecommunication Standard

In the late 1980s, the industry began to adopt technology similar to that of credit card clearinghouses. The NCPDP Telecommunication Standard Version 1.0 was developed in 1988 to expedite the verification of a customer's prescription insurance coverage and to more efficiently submit and process the resultant prescription drug claim.

Pharmacies would transmit claims and the associated data to the claims processor/PBM via direct electronic communication (such as a dial-up connection, leased line, or other means).  The processor/PBM processed the claim instantaneously, or in "real-time," and provided an electronic response back to the pharmacy in seconds.  If there was an error with the claim, the pharmacy could correct the error and resubmit the claim.

Over the years until today, there have been fifty (50) versions of the Telecommunication Standard published.  However, only three versions have been in general use since Version 1.0 was created in 1988.  Adoption of the Telecommunication Standard was not widespread until 1992 when Version 3.2 was published.  During this timeframe, contracts between trading partners (e.g., pharmacies and TPPs/PBMs) would contain "payer sheets," which are attachments that identified which version of the Standard would be used in their transactions and which data fields from the Telecommunication Standard would be transmitted.  Because the timing of adoption of the Telecommunication Standard and its updated versions varied from member to member, a processor/PBM frequently had to support multiple versions of the Telecommunication Standard at the same time to accommodate participating pharmacy system limitations.

The NCPDP Telecommunications Standard was incorporated into federal regulations promulgated by the Department of Health and Human Services pursuant to the Health Insurance Portability and Accountability Act of 1996 (HIPAA).[4]  The two versions that have been in effect during the time period at issue in this matter are Version 5.1 (2003-2011) and Version D.Ø (2012-present).[5]

---

[3] The Data Dictionary is an NCPDP publication that provides a comprehensive listing of all data fields or elements used in various NCPDP standards. The publication provides the data element format and length, a description of the meaning of the data element and examples and comments to assist analysts, system developers and programmers utilizing the standard in better understanding the standards' data elements.

[4] 42 U.S.C.§ 1320d-2; 45 C.F.R. § 162.1102

[5] 45 CFR § 162.1101(a); 45 C.F.R. § 160.103.

Use or disclosure of data contained on this sheet is subject to the restriction on the title page of this document.



Each Telecommunication Standard introduced since HIPAA's adoption includes a specific Data Dictionary that is incorporated by reference and available on the NCPDP web site.[6]  Although use of the Telecommunication Standard by pharmacies, PBMs, and TPPs for electronic transactions is mandated by HIPAA, not every data field or section of the Standard is required to be filled in a Claim Billing transaction. Some data fields are optional or required only under specific conditions or situations, such as when required by trading partner agreement (i.e., the contract between a pharmacy and PBM, or the TPP).

## B.    426-DQ "Usual and Customary Charge" Data Field

One of the many data field names included in the versions of the Telecommunication Standard is the "Usual and Customary Charge" data field.  The "Usual and Customary Charge" is often submitted by the pharmacy to a processor/PBM along with other pricing information and may be used by the processor/PBM to set the price for the prescription.  As illustrated in Sections IV.B.1 – IV.B.3 below, modifications to the Usual and Customary Charge data field name, beginning with Version 3.2 and ending with the current Version D.Ø were minor and irrelevant to the issues in this case.  The NCPDP definition and industry's understanding of the data field name "Usual and Customary Charge" has remained essentially unchanged since the data field first appeared in the Telecommunication Standard in 1992.

### 1.    Telecommunication Standard Version 3.2

The "Usual and Customary Charge" data field first appeared in the Telecommunication Standard Version 3.2, which was published in 1992 - the first widely-adopted version of the Telecommunication Standard. This data field (426—highlighted in blue below) was a required field on the pharmacy claim submission. However, the field was changed to "optional" on the next adopted version of the Telecommunication Standard.

**** **** *BEGIN REQUIRED CLAIM INFORMATION SECTION* **** ****

| FIELD # | ID | NAME | FORMAT | LENGTH | POSITION | VALUE |
|---------|----|------|--------|--------|----------|-------|
| *GS* | | *GROUP SEPARATOR* | | *1* | *13Ø - 13Ø* | *\<GS\>* |
| 426 | | USUAL & CUSTOMARY CHARGE | D | 6 | 19Ø – 195 | |

Telecommunication Standard Format Version 3, Release 2 published 1992[7]

In the Data Dictionary that was published to accompany Telecommunication Standard Version 3.2,[8] the definition of Usual and Customary Charge is the "[a]mount charged cash customers for the prescription exclusive of sales tax or postage."  The Data Dictionary did not define "cash customers."

---

[6] https://www.cms.gov/Regulations-and-Guidance/Administrative-Simplification/HIPAA-ACA/Downloads/TimelineofKeyStatutesandRegulations20160725.pdf. Accessed 03/23/18.

[7] Telecommunication Standard Version 3 Release 2 published February 1992. p. 35.

[8] Telecommunication Standard Version 3 Release 2 was the first version of the Telecom standard in widespread use to have a data dictionary.  The *NCPDP Data Dictionary Quick Reference Manual Version 3.2* was published in January 1996.  It is the first document that provided formal NCPDP definitions for Telecommunication Standard data fields.

Use or disclosure of data contained on this sheet is subject to the restriction on the title page of this document.

5



| D/D # | TRANS. DATA SET | NAME OF FIELD | DEFINITION OF FIELD | FIELD FORMAT | FIELD LENGTH | VALUES/COMMENTS |
|---|---|---|---|---|---|---|
| 426-DQ | A,B,C | USUAL AND CUSTOMARY CHARGE | AMOUNT CHARGED CASH CUSTOMERS FOR THE PRESCRIPTION EXCLUSIVE OF SALES TAX OR POSTAGE | D | 6 | FORMAT=s$$$$cc |

**NCPDP Data Dictionary Quick Reference Manual Version 3.2 published January 1996[9]**

### 2.    Telecommunication Standard Version 5.1

Telecommunication Standard Version 5.1 was published in September 1999.  It is the first Telecommunication Standard in use for claims and service billing during the time period relevant to this case.

Version 5.1 is comprised of several documents: the Standard Specification, an Implementation Guide, a Data Dictionary published September 1999, and another companion document containing Questions and Answers and Editorial Updates.

Version 5.1 reorganized the Telecommunication Standard into sections or "segments" which contained the data fields relevant to that segment. For example, the Pricing Segment is required in a Claim Billing transaction.  Not every data field within a segment, however, is required.  The Usual and Customary Charge field is designated in Version 5.1 as an optional field —denominated with an "O"—in the "Pricing Segment."[10]

| FIELD | FIELD NAME | MANDATORY OR OPTIONAL |
|---|---|---|
| **PRICING SEGMENT** | | |
| 426-DQ | USUAL AND CUSTOMARY CHARGE | O |

**Telecommunication Standard Implementation Guide 5.1 published September 1999**

The Data Dictionary associated with this version defines the data field 426-DQ ("Usual and Customary Charge") as the "[a]mount charged cash customers for the prescription exclusive or sales tax or other amounts claimed."[11]  As before, the Data Dictionary does not define "cash customers as this is not a Data Dictionary field to be defined."  The NCPDP has not changed the definition of the Usual and Customary Charge data field since the publication of Version 5.1. See excerpt below.

---

[9] NCPDP Data Dictionary Quick Reference Manual Version 3.2 published January 1996. p. 27.

[10] NCPDP Telecommunication Standard Implementation Guide v5.1 published September 1999.  p. 5-5.

[11] NCPDP Data Dictionary published September 1999. p. 71.

Use or disclosure of data contained on this sheet is subject to the restriction on the title page of this document.



| FIELD | NAME OF FIELD | DEFINITION OF FIELD | FIELD FORMAT | STANDARD FORMATS | FIELD LENGTH | VALUES/ COMMENTS |
|---|---|---|---|---|---|---|
| 426-DQ | Usual and Customary Charge | Amount charged cash customers for the prescription exclusive of sales tax or other amounts claimed. | s9(6)v99 | T | 8 | Format=s$$$$$$cc<br><br>Examples: If the usual and customary charge is $32.56, this field would reflect: 325F. REQUEST PRICING SEGMENT. |

**NCPDP Data Dictionary published September 1999**

### 3.      *Telecommunication Standard Version D.Ø*

The NCPDP Telecommunication Standard Implementation Guide Version D.Ø was published in August 2010 and further defined data fields and the conditions or "situations" under which certain segments or data fields are required to be transmitted.[12]  The concept of a situational data field provided flexibility to the industry as different prescription benefit plans relied on different data fields.  The "Q" designation indicates that a field is a qualified requirement—it is required only if a certain condition or situation exists.

The Usual and Customary Charge data field (426-DQ) has a "Q" designation under Version D.Ø. As highlighted in yellow below, a value of "Q" means that the data field is only required when a certain condition or situation calls for its use.

| DESIGNATION | VALUE | EXPLANATION |
|---|---|---|
| **MANDATORY** | M | The *Segment* is mandatory for the Transaction, *or* The *Field* is mandatory for the Segment in the Transaction. Mandatory |
| **SITUATIONAL** |  | The *Segment* has been further designated for usage for the Transaction, *or* The *Field* has been further designated for usage for the Transaction. |

---

[12] Table excerpt from the NCPDP Telecommunication Standard Implementation Guide vD.Ø published August 2010. pp. 38-39.

Use or disclosure of data contained on this sheet is subject to the restriction on the title page of this document.



| | DESIGNATION | VALUE | EXPLANATION |
|---|---|---|---|
| | **Required** | R | The *Field* has been designated with the situation of "Required" for the Segment in the Transaction. |
| | **Qualified Requirement** | Q | The situations designated have qualifications for usage ("Required if x", "Not required if y"). |

**NCPDP Telecommunication Standard Implementation Guide vD.Ø - Table Designation Legend Excerpt**

The excerpt from the Version D.Ø Implementation Guide shown below and highlighted blue describes that the "Qualified" situation for Field 426-DQ is "[r]equired if needed per the trading partner agreement."[13]  Accordingly, a pharmacy is required to populate the Usual and Customary Charge field only if the trading partner agreement requires the pharmacy to do so.

| Relevant Field | PRICING SEGMENT Field Name | Mandatory or Situational | MANDATORY SEGMENT Situation |
|---|---|---|---|
| 426-DQ | USUAL AND CUSTOMARY CHARGE | Q | Claim Billing/Encounter: Required if needed per trading partner agreement. |

**NCPDP Telecommunication Standard Implementation Guide vD.Ø published August 2010**

Because participating pharmacy agreements often require the pharmacy's Usual and Customary Charge to be submitted, some pharmacy systems may auto-populate and submit the Usual and Customary Charge on all Claim Billing transactions.  Regardless of whether a pharmacy chooses to do so, this field is not a "Mandatory" field in the standard.  Neither HIPAA regulations nor the NCPDP Telecommunication Standard itself impose an obligation on trading partners to use this field.  If the sender chooses to populate more fields than are required by HIPAA regulations or the NCPDP Telecommunication Standard, but which the sender chooses to include for its own internal business operations, the Telecommunication Standard's Implementation Guide states that the receiver is to ignore these additional data fields.[14]

When HIPAA regulations were updated to adopt the Telecommunication Standard Version D.Ø, HIPAA regulations also adopted the July 2007 version of the NCPDP Data Dictionary by reference.  The definition for the Usual and Customary Charge field did not change in this version of the Data Dictionary, and this version of the Data Dictionary continued not to define the term "cash customers."  The Usual and Customary Charge field definition is identical to the definition provided in the Data Dictionary associated with Telecommunication Standard Version 5.1.[15]  See below.

---

[13] NCPDP Telecommunication Standard Implementation Guide vD.Ø published 2010.  p. 72
[14] NCPDP Telecommunication Standard Implementation Guide vD.Ø published 2010. p. 39
[15] NCPDP Data Dictionary published July 2007. p. 107.

Use or disclosure of data contained on this sheet is subject to the restriction on the title page of this document.



| FIELD | NAME OF FIELD | DEFINITION OF FIELD | FIELD FORMAT | STANDARD FORMATS | FIELD LENGTH | VALUES | COMMENTS / EXAMPLES |
|---|---|---|---|---|---|---|---|
| 426-DQ | Usual and Customary Charge | Amount charged cash customers for the prescription exclusive of sales tax or other amounts claimed. | s9(6)v99 | T,A | 8 | | Format=s$$$$$$cc Examples: If the usual and customary charge is $32.56, this field would reflect: 325F. REQUEST PRICING SEGMENT. |

**NCPDP Data Dictionary published July 2007**

## V.    OPINIONS

As a result of reviewing the case and relevant materials listed in Attachment B and summarized above, I have formulated the following opinions:

1.  Based on my experience and my review of the relevant NCPDP Telecommunication Standard companion Data Dictionaries since 1996, it is my opinion that the NCPDP definition of Usual and Customary Charge (data field 426-DQ) has not changed substantively in meaning since first defined by the NCPDP two decades ago.  In the two versions of the NCPDP Telecommunication Standard that have been effective from 1999 until present (versions 5.1 and D.Ø) this field has been defined as the "[a]mount charged cash customers for the prescription exclusive of sales tax or other amounts claimed."

2.  The NCPDP Telecommunication Standard does not define and never has defined "cash customers."

3.  Usual and Customary Charge meant the same thing when I was beginning my professional career as a pharmacist as it does today, although at that time cash customers were much more prevalent.

4.  Neither the definition for the Usual and Customary Charge data field (426-DQ), nor any other portion of the current or prior Telecommunication Standards, states that a price provided to a membership program member is the "Usual and Customary Charge."  The introduction of these programs into the marketplace did not prompt industry participants to submit a DERF for the NCPDP to change the definition of Usual and Customary Charge in the Telecommunication Standard Data Dictionary because the industry does not regard membership programs as influencing a pharmacy's U&C prices.

5.  The Usual and Customary Charge data field on the NCPDP Telecommunication Standard is not a "Mandatory" data field, meaning that neither HIPAA regulations nor the NCPDP Telecommunication Standard imposes an obligation to use this data field.  Instead, it is a "Situational" field that is required only if contractually agreed upon by trading partners.[16]

---

[16] NCPDP Telecommunication Standard Implementation Guide v.D.Ø published 2010. Section 7.4.5. p. 72.

Use or disclosure of data contained on this sheet is subject to the restriction on the title page of this document.

9



Whether the Usual and Customary Charge data field must be sent by the pharmacy is defined in the trading partner agreement or associated Payer Sheets between the pharmacy and the Payer/PBM.  The NCPDP's definition of the Usual and Customary Charge data field does not preclude trading partners from agreeing to a more precise definition of "Usual and Customary Charge" so long as it is consistent with the NCPDP Data Dictionary definition.

6.   Pharmacies generally employ one of two different methods to process a prescription transaction.  The choice of method is determined by whether or not the customer uses a prescription benefit.

In the pharmacy workflow, the customer may hand the pharmacy staff a card or other evidence of a prescription benefit[17], or, in the case of a returning customer, be asked by the staff whether their benefit has changed since their last visit.  This interaction determines whether this prescription will be a prescription benefit transaction and, if so, begins the process of determining what benefit rules will be followed.

a.   If the customer presents a prescription benefit card or other evidence of a prescription benefit, the pharmacy enters the relevant benefit information, as well as the customer's prescription information, into the pharmacy dispensing system.  Entry of the prescription and card information initiates a process that populates the NCPDP Telecommunication Standard data fields for the Claim Billing transaction.  The dispensing system transmits the claim to the processor/PBM, usually through an entity called a "switch," which uses the card information—primarily the BIN or IIN[18] and PCN[19] numbers—to route the transaction to the appropriate processor/PBM.  The processor/PBM then verifies the customer's eligibility for the prescription benefit, processes the claim, and calculates the amount that the customer must pay for his or her prescription and the amount the third party (if any) must pay for the prescription.  The processor/PBM then creates a response transaction and, if the claim was approved, transmits the approved claim information to the pharmacy and indicates the total amount the pharmacy must collect from the customer in the "Patient Pay Amount" (data field 505-F5).[20]  Using the NCPDP Telecommunication Standard, this process occurs within seconds.

b.   If the customer does not present a prescription benefit to the pharmacy, the drug is not covered by their benefit, or the customer simply indicates they will pay cash, then the customer is a "cash customer."  Cash transactions do not involve adjudication by a third party, and use of the NCPDP Telecommunication Standard is not required to complete a

---

[17] A prescription benefit is broad term that encompasses all programs that assist customers in purchasing their prescriptions. Typical features of such programs are claim adjudication by a third party and price lists or pricing formulae that can differ from what the pharmacy would charge a customer who lacks (or chooses not to use) any form of prescription benefit.  Examples of prescription benefits include insurance, discount cards, and prescription membership programs.

[18]  The BIN Number (BIN) or IIN number is a six-digit Processor ID number that health plans can use to route and process electronic pharmacy claims. As of January 2017, the IIN length has changed from a 6-digit number to an 8-digit number.

[19] The Processor Control Number (PCN) is secondary identifier that may be used in routing of pharmacy transactions. A processor/PBM may choose to differentiate different plans/benefit packages with the use of unique PCNs. The PCN is defined by the processor/PBM, as this identifier is unique to their business needs. There is no registry of PCNs. The PCN, like the BIN, appears on the pharmacy ID card. Not all entities use the PCN to differentiate plans.

[20] NCPDP Telecommunication Standard Implementation Guide vD.Ø published 2010. Section 7.5.1.5.7. p. 89.

Use or disclosure of data contained on this sheet is subject to the restriction on the title page of this document.


Sonora Advisory Group

cash transaction.  Instead, after the pharmacy staff inputs the prescription information into the dispensing system, the system displays the pharmacy's retail price for that prescription and the pharmacy charges the cash customer that price.  The retail price is a price that is set internally by the pharmacy.  It is not calculated by a PBM or processor.

7.  In prescription benefit programs, contracted pharmacies submit information using the NCPDP Telecommunication Standard Claim Billing transaction in accordance with the payer/PBM's Payer Sheet (also known as a plan sheet).  A Payer Sheet specifies what data fields a pharmacy must submit on a Claim Billing request transaction and what data fields the payer/PBM should send in a Claim Billing response transaction.[21]  Membership programs and discount cards are processed using the NCPDP Telecommunication Standard like other prescription benefit transactions, and likewise follow the workflow described in paragraph 6.a.  They are not cash transactions.

8.  The Health Savings Pass (HSP) program was a membership program offering a prescription benefit on selected drugs.  CVS used the NCPDP Telecommunication Standard Claims Billing transaction to submit HSP program transactions to a processor/PBM where they were processed like any other prescription benefit.  HSP transactions utilized processor routing information, including BIN number: 015715 and PCN number CC or BIN number 004336 and PCN number HEALTHPASS.  This indicates HSP transactions were not cash customer transactions.

## VI.    RESERVE RIGHT TO AMEND AND SUPPLEMENT

I reserve the right to amend and supplement this report as, or if, additional information relevant to the analysis and opinions in this paper might become available.

Respectfully Submitted,

CATHERINE GRAEFF, R.Ph., MBA

---

[21] NCPDP Payer Sheet Template v1.5 published December 2012.

Use or disclosure of data contained on this sheet is subject to the restriction on the title page of this document.



## VII.   ATTACHMENT A – RESUME

## Catherine C. Graeff, R.Ph., M.B.A.

### Present Experience

<u>Founder, CEO and Managing Partner, Sonora Advisory Group, LLC</u>          2009 – present

Sonora is a consulting firm offering various advisory services to healthcare industry organizations, including strategic health IT planning, product innovation, and operational blueprints.  Specialty areas include electronic prescribing and prior authorizations, prescription drug monitoring programs, and healthcare clinical and administrative standards development.

- Responsible for the management of the organization and the quality of services to clients which have included pharmacy chains, government contractors, PBMs, consultants, trade associations, Health IT system vendors, and health information exchanges.
- In the previous 4 years, I have provided testimony at trial and/or by deposition in the following matters:
  - *Castellano, et al. v. HEB Grocery Co., LP, et al.*, Cause No. C-1166-16-H (389th Dist. Ct. Hidalgo County, TX)
  - *Corcoran, et al. v. CVS Health Corp.*, No. 4:15-cv-03504-YGR (N.D. Cal.)

### Past Professional Experience

- Director, Health Insurance Exchange Practice and Innovation Lab, Consultant
  *Cognosante, LLC*                                                                 2010 – 2016
- Sr. Vice President, Communications & Industry Relations,
  *National Council of Prescription Drug Programs (NCPDP)*          2005 – 2009
- Director, Client Services; *FourThought Group, Inc*                    2003 – 2005
- Founder & President, *CG Consulting*                                         2000 – 2003
- Vice President, Business Development and Claims Processing Center,
  *AmeriChoice, Inc. (a business unit of UnitedHealth Group)*          1992 – 2000
- Clinical Professor, *University of Southern California*
  *Graduate School of Business, Entrepreneur Program*                    1990 – 1992
- Director, Marketing, <u>Prescription Health Services (acquired by Caremark)</u>   1988 – 1990
- Vice President, Professional Services, *Nationwide Pharmacy Services*   1987 – 1988
- Vice President, *Express Scripts*                                               1986 – 1987
- Vice President, Corporate Development,
  *Owen Healthcare (division of Cardinal Health)*                          1981 – 1985
  - Director of Marketing                                                          1977 – 1981
  - Director of Pharmacy                                                           1975 – 1977
- Pharmacist, *US Veterans Health Administration*                          1973 – 1975
- Pharmacy Intern, *St. Elizabeth Hospital*                                  1970 – 1973
- Pharmacy Technician, *Bost's Drug Store*                                   1968 – 1970

Use or disclosure of data contained on this sheet is subject to the restriction on the title page of this document.



## Education

- Master of Business Administration (MBA), College of Business, University of Houston, Houston, TX
- Bachelor of Science in Pharmacy, College of Pharmacy, University of Nebraska Medical Center, Omaha, NE

## Professional Licenses

- Arizona Board of Pharmacy #7476 (active)
- Texas Board of Pharmacy #21448 (inactive)
- Nebraska Board of Pharmacy #8477 (inactive)

## Professional Affiliations

- Academy of Managed Care Pharmacy, past member
- American Pharmacists Association (APhA), past member
- American Society of Hospital Pharmacists, past member
- National Community Pharmacists Association, past member
- Member, National Council for Prescription Drug Programs
- Workgroup on Electronic Data Interchange (WEDI), past member

## Professional Recognition and Appointments

### National Council of Prescription Drug Programs

The following are elected or appointed roles and recognition as a member and not related to my staff position as Sr. Vice President, Communications & Industry Relations from 2005-2009.

- Board of Trustees (10 years), Treasurer, Finance Committee Chair, Education Committee Chair, Strategic Planning Committee Chair, Nominating Committee Chair
- Mentor Program, invited participant (current)
- Buddy Program, invited participant (current)
- Time Award Recipient – 2004
- Co-chair, Workgroup 10 Professional Pharmacy Services (2016 - current)
- Co-lead (past or present) - WG 1 Telecommunication: Vaccine Services Task Group, WG9 Government Programs: Medicaid Best Practices for Reimbursement Methods Task Group, WG10 Professional Pharmacy Services: Acetaminophen, Scope & Goals Task Groups, WG11 ePrescribing and Related Transactions: Pharmacy/Pharmacist EHR Functional Profile Task Group, Dispensed Medication Reporting Task Group, MC Digital Therapeutics Task Group

Use or disclosure of data contained on this sheet is subject to the restriction on the title page of this document.

2



### Other

- National Committee on Vital and Health Statistics (NCVHS) Hearing on NCPDP Standards Updates - testimony on behalf of the National Association of Chain Drug Stores (NACDS) on the naming of a new NCPDP Standard, the F2 Telecommunication Standard. March 26, 2018.
- CMS Advisory Panel on Medicare Education, CMS appointment 2008 – 2010
- Certification Commission on Health Information Technology (CCHIT) Foundation Work Group
- Health Information Technology Standards Panel (HITSP) Education and Outreach Committee
- Arizona Health e-Connection (AzHeC), Clinical/Technical Steering Committee
- Arizona Health e-Connection (AzHeC), EAzRx ePrescribing Steering Committee
- Workgroup on Electronic Data Interchange Strategic National Implementation Process (SNIP) Steering Committee, Education Committee Co-chair, ICD-10 Education Committee Co-chair
- Workgroup on Electronic Data Interchange (WEDI), Award of Merit, Award of Excellence, Distinguished Service Award

Use or disclosure of data contained on this sheet is subject to the restriction on the title page of this document.

3



## VIII.   ATTACHMENT B – MATERIALS CONSIDERED

In understanding the complaint, forming or validating my opinions and preparing this report, I reviewed and considered the following documents:

1. The NCPDP Telecommunication Standard Version 1.0 published in 1988.

2. The NCPDP Telecommunication Standard Format Version 3, Release 2 published February 1992, and the associated NCPDP Data Dictionary Quick Reference Manual Version 3.2 published January 1996.

3. The NCPDP Telecommunication Standard Specification Version 5, Release 1 and Implementation Guide published September 1999, and associated NCPDP Data Dictionary published September 1999. This standard included an associated document which was periodically updated titled the "Telecommunication Version 5 Question, Answers and Editorial Updates Documentation, the latest version published November 2010.

4. The NCPDP Telecommunication Standard Implementation Guide Version D.Ø published August 2010. Accompanying documents including NCPDP Data Dictionary published July 2007 and Telecommunications Version D.Ø and Above Questions, Answers and Editorial Updates Documentation published April 2019.

5. Additional NCPDP Data Dictionaries, including those published in November 2003, October 2008, April 2009, and the most recent update April 2019.

6. NCPDP Bylaws. May 2019.

7. NCPDP Standard Operating Procedures, October 2018.

8. NCPDP Payer Sheet Template v1.5 published December 2012 and used as guidance in filling out and creating a NCPDP Telecommunication Standard Implementation-based Version D.Ø Payer Sheet.

9. First Amended Complaint, Redacted Version, Case No. 1:16-cv-00046-S and Case No. 1:16-cv-00447-S

10. CVS Pharmacy, Inc.'s Answer to Plaintiff's First Amended Complaint, Case No. 1:16-cv-00046-S and Case No. 1:16-cv-00447-S

11. Caremark. L.L.C.'s Answer to Plaintiff's First Amended Complaint, Case No. 1:16-cv-00046-S and Case No. 1:16-cv-00447-S

12. HSP Enrollment Applications (CVSC-0000091, CVSC-0254314)

13. HSP Initial Marketing Materials (CVSC-0000112, CVSC-0000174, CVSC-0000190-92)

Use or disclosure of data contained on this sheet is subject to the restriction on the title page of this document.

1