# Exhibit 4

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| SHEET METAL WORKERS LOCAL NO. 20 WELFARE AND BENEFIT FUND, and INDIANA CARPENTERS WELFARE FUND, on behalf of themselves and all others similarly situated,<br><br>                      Plaintiffs,<br><br>v.<br><br>CVS PHARMACY, INC. and CAREMARK, L.L.C.,<br><br>                      Defendants. | Case No. 1:16-cv-00046-S |
| PLUMBERS WELFARE FUND, LOCAL 130, U.A., on behalf of itself and all others similarly,<br><br>                      Plaintiffs,<br><br>v.<br><br>CVS PHARMACY, INC. and CAREMARK, L.L.C.,<br><br>                      Defendants. | Case No. 1:16-cv-00447-S |

**EXPERT REPORT OF ALAN SEKULA, PHARM.D.**

Expert Report of Alan Sekula, Pharm.D.

I. Qualifications

1. I am a Consultant at Pharmacy Healthcare Solutions, LLC (PHSI) and a licensed pharmacist in the State of Pennsylvania. I have been employed at PHSI since 2005 in the role of consultant. PHSI is a business consulting organization that uses our team's retail pharmacy experience, managed care knowledge, and years of working with pharmaceutical manufacturers to help clients in these segments address specific business issues. PHSI's clients include retail pharmacies, managed care plans, third party payers (TPPs), pharmacy benefit managers (PBMs), pharmaceutical manufacturers, and software companies.

2. In my fourteen years of consulting work at PHSI, I have worked on approximately twenty projects involving contract review and claims data calculations to measure performance with respect to generic effective rate guarantees (GERs). In the course of those engagements, I have developed an understanding of GERs, how they affect the pricing of generic drugs, how to measure performance with respect to a GER using claims data, and how to calculate GER reconciliation payments.

    i. For example, in one series of engagements, I was retained to assist TPPs in evaluating contract bids by PBMs. I determined the characteristics of the contractual guarantees (including GERs) that the PBMs had proposed, calculated the TPPs' existing measured effective rates (as defined below), and compared the PBMs' bids to the TPPs' existing pricing arrangements.

    ii. In another series of engagements, I was retained by a PBM to assist in the resolution of a dispute with a pharmacy chain by reviewing contracts to determine the characteristics of the applicable GERs, identifying the claims data for the relevant transactions, calculating the measured effective rate (as defined below) for the generic drug transactions, and comparing the measured effective rate with the contracted GER to determine any variances and whether the PBM reconciliation payments were required.

3. I am a member of the Academy of Managed Care Pharmacy (AMCP). Through PHSI, I am a member the American Society for Automation in Pharmacy (ASAP), and the National Association of Chain Drug Stores (NACDS).

4. I serve as a pharmacy preceptor to managed care residency pharmacists in their first year of postgraduate education at University of Pittsburgh Medical Center (UPMC) Health Plan. The residency pharmacists take a 3-week rotation at PHSI to gain a consulting perspective of managed care and perform a data analysis project. I also serve as a pharmacy preceptor to sixth year pharmacy students at the University of Pittsburgh. Students select PHSI as a rotation where they spend 5 weeks to gain an understanding of the pharmacy market from a business perspective.

1

5. My complete CV is attached as Appendix A.

6. I have not testified in any previous case.

7. PHSI is being compensated for my work in this case, and for that of other members of PHSI who have assisted me, at the rate of $400 per hour. PHSI's compensation does not depend on my opinions in this matter or on the outcome of this litigation.

8. I have formed my opinions using the information available to me as of the date of this report, as listed in the attached Appendix B. I reserve the right to supplement or modify this report if additional information is made available to me.

II. Assignment

9. I have been asked by counsel for the Defendants CVS Pharmacy Inc. (CVS) and Caremark LLC (Caremark) to provide an opinion explaining generic effective rate guarantees. My understanding is that the opinion will support Defendants' Opposition to Plaintiffs' Motion for Class Certification in Sheet Metal Workers Local No. 20 Welfare and Benefit Fund, et al. v. CVS Pharmacy Inc., et al., Case No 1:16-cv-00046-S and Plumbers Welfare Fund, Local 130, U.A., v. CVS Pharmacy Inc., Case No 1:16-cv-00447-S.

III. Generic Effective Rate Guarantees

10. Contracts between PBMs and TPPs often contain generic effective rate guarantees (GERs). A GER is a guarantee by the PBM that the TPP will receive a minimum average discount from a benchmark list price for a set of generic drugs that are defined in the contract for a certain time period. The benchmark price used to define the GER is typically the average wholesale price (AWP). For example, a contract might define the GER to be AWP minus 65% for a list of specified generic drugs during a calendar year. For individual drug transactions, the TPP may pay AWP discounts that vary, with some individual transactions resulting in greater discounts than 65% off AWP and some individual transactions resulting in lesser discounts than 65% off AWP.

11. The parties to a contract can apply the same type of guarantee concept to any set of drugs, not just generic drugs. For example, a PBM might guarantee that the TPP will receive a minimum average discount from a benchmark price for a defined set of brand drugs, often called a brand effective rate (BER). Such guarantees can be negotiated for other types of drugs as well (e.g., specialty drugs, generic drugs that sell at a MAC price). I understand the lawsuits here relate only to generic drug pricing so the GER is the type of guarantee that I discuss in this report.

12. To determine whether the PBM has fulfilled its contractual guarantee, one must calculate the average discount actually paid by the TPP for the relevant drug

2

Expert Report of Alan Sekula, Pharm.D.

transactions, in the aggregate, during the relevant period of time. This is called the measured effective rate. By comparing the measured effective rate to the GER, one can determine whether the PBM met the GER.

13. The measured effective rate is calculated by applying the following formula to the included drug transactions over the entire time period to generate a single effective rate:

   i. 1 - (the sum of all Ingredient Costs Paid divided by the sum of all AWP)

   ii. Ingredient Cost Paid is the actual amount paid for the drug in a given transaction, which is usually (but not always) the lower of certain standard price metrics: (a) a discount off of AWP, (b) the maximum allowable cost (MAC), or (c) the U&C price reported by a pharmacy. The dispensing fee is not included in this calculation. The calculation does not split the Ingredient Cost Paid into the portion paid by the patient and the portion paid by the patient's insurance or TPP.

   iii. For example, assume that a GER applies only to the following three net paid generic drug transactions:

   (1) Generic drug #1 with a total AWP of $50.00 and an ingredient cost paid of $25.00.

   (2) Generic drug #2 with a total AWP of $110.00 and an ingredient cost paid of $30.00.

   (3) Generic drug #3 with a total AWP of $100.00 and an ingredient cost paid of $10.00.

   The measured effective rate for these three transactions would be calculated as follows:

   - The sum of all Ingredient Costs Paid is $25.00 + $30.00 + $10.00 = $65.00.

   - The sum of all AWP is $50.00 + $110.00 + $100.00 = $260.00.

   - These values are then used in the measured effective rate formula: [1 – ($65.00 / $260.00] = 75%.

   In other words, the measured effective rate is AWP minus 75%, which can then be compared to the GER in the contract to determine if the PBM has met the GER.

14. To calculate the measured effective rate for a particular TPP, one must review that TPP's contract with its PBM to determine precisely how the GER is defined and what factors are included and excluded. The GER for a particular TPP may be materially different from the GER of another TPP based on how the GER is defined and which factors are included or excluded.

   i. Typical inclusion or exclusion factors are:

      (1) Type of dispensing pharmacy (retail or mail)
      (2) Type of generic drug
      (3) Claims that adjudicate at U&C
      (4) Zero balance due claims
      (5) Vaccines
      (6) Secondary payer or Coordination of Benefits (COB) claims
      (7) Drugs sold at a MAC price or non-MAC price
      (8) Over the counter (OTC) products

   ii. The types of drugs purchased during the time period also impact the measured effective rate:

      (1) For any prescribed generic drug that is offered by different manufacturers, each manufacturer can list a unique price for the same product from a competing manufacturer.
      (2) The list prices for these drug products can also change.
      (3) The GER must take into account both the manufacturer specific list prices and the date of price changes. Any two TPPs will purchase different sets of drugs based on their membership, geographic locations, pharmacy selection, physician prescribing patterns, and unique treatment selections.

15. PBMs must reconcile with the TPP at the end of the measurement period. If the measured effective rate shows that the TPP received an actual aggregate discount that is not as favorable to the TPP as the discount that the parties agreed to in the GER, remediation is required by the PBM to satisfy the guarantee. If necessary, the PBM will make a reconciliation payment to the TPP. The amount of the payment is equal to the amount necessary to reconcile the measured effective rate and the GER. For example, if the measured effective rate is AWP minus 69% but the GER is AWP minus 70%, then the PBM must pay the TPP an amount that compensates the TPP for the 1% difference.

16. In the event the PBM overperforms the contracted GER (meaning the measured effective rate discount is more favorable to the TPP than the GER discount) the TPP is not required to remit a reconciliation payment to the PBM. The TPP realizes the additional savings above and beyond the guarantee in the contract.

Expert Report of Alan Sekula, Pharm.D.

17. At the end of the period, if permitted by the TPP–PBM contract, the PBM's underperformance on a GER may be offset against the PBM's overperformance on other guarantees.

   i. For example, if the TPP–PBM contract contains both a GER and a BER and permits offsetting, any underperformance on the GER may offset any over-performance on the BER, which could eliminate or reduce the amount of any GER reconciliation payment by the PBM to the TPP. The net result is achievement of the stated contract guarantees.

   ii. A GER is based on the Ingredient Cost Paid portion of a drug transaction. Guarantees can also apply to the dispensing fee portion of the drug cost. Depending on the language in the TPP–PBM contract, dispensing fee guarantees may be able to offset underperformance on the GER.

   iii. The same TPP and PBM may negotiate a different contracted GER value in different years. For example, the general trend is that generic drugs become cheaper over time and the GER becomes more aggressive. For a given period of time, therefore, all of the TPP–PBM contracts that are in effect during that time must be reviewed to determine the GER that applies at each particular time.

18. Where a TPP–PBM contract contains a GER that includes transactions that reimburse at the U&C price, a TPP is not necessarily harmed by paying a U&C price that is too high on an individual transaction. If the PBM is required to pay a GER reconciliation payment to the TPP, that payment could offset, in whole or in part, any U&C overcharges on individual transactions.

19. I understand that in this case the Defendants allegedly overcharged the Plaintiffs by reporting inflated U&C prices for certain generic drug transactions. To determine whether those alleged overcharges would have been offset by the application of a GER and any required reconciliation payment, one would have to analyze each of the applicable TPP–PBM contracts to determine:

   i. If there is a GER in the contract.

   ii. How the GER is defined in the contract and what factors are included or excluded (e.g., U&C transactions).

   iii. What generic drugs the GER applies to.

   iv. What the relevant time period is.

   v. How to calculate the measured effective rate (using the factors that are included or excluded) and the GER reconciliation payment (if any).

5

Expert Report of Alan Sekula, Pharm.D.

    vi. After answering each of these questions, any potential U&C overcharges could be offset depending on whether the U&C overcharges are equal to or lower than the reconciliation payments (i.e., the total offset), or higher than the reconciliation payments (i.e., a partial offset) for the contract period. If there is no reconciliation payment, U&C overcharges would not be offset by the GER at all.

20. I have reviewed the report and the testimony of the Plaintiffs' expert, Dr. Rena Conti. She attempts to calculate the Plaintiffs' "damages" based on alleged overcharges on individual generic drug transactions without considering the effect of any applicable GERs. This is a serious mistake. Any person working in the pharmacy benefits industry understands that the GER must be taken into consideration to accurately reflect the agreed upon payment factors between the TPP and PBM. Dr. Conti's calculation of damages cannot be accurate because she has not reviewed the relevant TPP–PBM contracts and calculated the effects of any applicable GERs and any reconciliation payments, as described above.

_____
Alan Sekula, Pharm.D.

7/16/2019
_____
Date

# Appendix A
to Expert Report of Alan Sekula, Pharm.D.

**Alan B. Sekula, Pharm.D.**

**Pharmacy Healthcare Solutions, Inc.**

968 Perry Highway

Pittsburgh, PA 15237

Phone (412) 635-4650

## Work Experience

**Pharmacy/Business Consultant**

Pharmacy Healthcare Solutions, Inc., Pittsburgh, Pennsylvania

May 2005 - Current

- Consulting business for pharmacy industry stakeholders such as pharmaceutical manufacturers, managed care, retail and hospital pharmacy, employer groups, and software/technology vendors

- Areas of focus include the drug compendia (Medi-Span, First Databank, and Cerner Multum) and the forecasting and interpretation of drug classification and product attributes, MAC pricing, generic effective rate guarantees, generic drug launch analysis and forecasting, data and process analysis, dynamic model creation, prescription claim adjudication and reimbursement, rebate analysis, pharmacy practice management systems, and pharmacy business processes.

## Education

**Duquesne University Mylan School of Pharmacy, Pittsburgh, Pennsylvania**

Doctor of Pharmacy - May 2005

## Professional Memberships

| | |
|---|---|
| Academy of Managed Care Pharmacy (AMCP) | 2001 - Current |
| American Society for Automation in Pharmacy (ASAP) | 2008 - Current |

## Licensure

| | |
|---|---|
| Pharmacist License, Pennsylvania State Board of Pharmacy | 2005 - Current |

1

# Appendix A
to Expert Report of Alan Sekula, Pharm.D.

**<u>Publications</u>**

Sekula, Alan.  "Medical Identity Theft: Something to Keep an Eye On".  *Computertalk for the Pharmacist*.  Volume 28 Number 2.  March/April 2008.  90-91.

Sekula, Alan, and Don Dietz.  "Interns and the Pharmacy Computer System".  *Computertalk for the Pharmacist*.  Volume 34 Number 3.  May/June 2014.  40-41.

Sekula, Alan, and Ann Johnson.  "Biosimilars: Facts and Future Decisions".  *Computertalk for the Pharmacist*.  Volume 35 Number 3.  May/June 2015.  45-46.

Sekula, Alan.  "Considerations for Opening a Specialty Pharmacy".  *Computertalk for the Pharmacist*.  Volume 39 Number 1.  January/February 2019.  34-35.

# Appendix B
to Expert Report of Alan Sekula, Pharm.D.

List of materials considered:

*Plaintiffs' PBM Contracts*

1. CAREMARKSM_0054058
2. CAREMARKSM_0054080
3. CAREMARKSM_0054105
4. CAREMARKSM_0054115
5. CAREMARKSM_0054137
6. CAREMARKSM_0054152
7. CAREMARKSM_0054155
8. CAREMARKSM_0054243
9. CAREMARKSM_0088613
10. CAREMARKSM_0088642
11. P_000001
12. P_000056
13. P_000101
14. P_000106
15. P_000115
16. P_000121
17. P_000180
18. P_000181
19. P_000647
20. P_001118
21. P_001139
22. P_001179
23. P_013321
24. P_022565

*Plaintiffs' Reconciliation Reports*

25. CAREMARKSM_0076889
26. CAREMARKSM_0076890
27. CAREMARKSM_0076891
28. CAREMARKSM_0076892
29. CAREMARKSM_0076893
30. CAREMARKSM_0076894
31. CAREMARKSM_0076895
32. CAREMARKSM_0076896
33. CAREMARKSM_0076897
34. ESI0000004

1

# Appendix B
to Expert Report of Alan Sekula, Pharm.D.

35. ESI0000005
36. ESI0000006
37. ESI0000007
38. ESI0000008
39. ESI0000009
40. ESI0000010
41. ESI0000011
42. ESI0000014
43. ESI0000015
44. ESI0000017
45. ESI0000019
46. ESI0000020
47. ESI0000021
48. ESI0000022
49. ESI0000023
50. ESI0000024
51. ESI0000025
52. ESI0000026
53. ESI0000027
54. ESI0000028
55. ESI0000029

*Other Documents*

56. First Amended Complaint
57. Plaintiffs' Memorandum in Support of Motion for Class Certification
58. Expert Report of Rena Conti, Ph.D. in Support of Plaintiffs' Motion for Class Certification
59. Transcript of May 24, 2019 Deposition of Rena Conti, Ph.D