# Exhibit 5

```
 1            UNITED STATES DISTRICT COURT
 2            FOR THE DISTRICT OF RHODE ISLAND
 3    - - - - - - - - - - - - - - - - x
 4    SHEET METAL WORKERS LOCAL NO.    :
 5    20 WELFARE and BENEFIT FUND,     :
 6    and INDIANA CARPENTERS WELFARE   :
 7    FUND, On Behalf of Themselves    :
 8    and All Others Similarly         :
 9    Situated,                        :
10              Plaintiffs,            :
11         vs.                         : Case No.
12    CVS PHARMACY, INC., et al.,      : 1:16-cv-00046-S
13              Defendants.            :
14    - - - - - - - - - - - - - - - - x
15    PLUMBERS WELFARE FUND LOCAL      :
16    130, U.A., on Behalf of All      :
17    Others Similarly Situated,       :
18              Plaintiffs,            :
19         vs.                         : Case No.
20    CVS PHARMACY, INC., et al.,      : 1:16-cv-00447-S
21              Defendants.            :
22    - - - - - - - - - - - - - - - - x
23    VIDEOTAPED
24    DEPOSITION OF: RENA CONTI
25    DATE:          Friday, May 24, 2019
```

Page 1

**Page 2**

```
 1  TIME:        9:05 a.m.
 2  LOCATION:    Williams & Connolly
 3               725 12th Street, N.W.
 4               Washington, D.C.
 5  REPORTED BY: Denise M. Brunet, RPR
 6               Reporter/Notary
 7
 8               Veritext Legal Solutions
 9               1250 Eye Street, N.W., Suite 350
10               Washington, D.C. 20005
```

**Page 3**

```
 1           A P P E A R A N C E S
 2
 3  On behalf of the Plaintiffs:
 4       ELIZABETH A. FEGAN, ESQUIRE
 5       ZORAN (ZOKI) TASIC, ESQUIRE
 6       Hagens Berman Sobol Shapiro, LLP
 7       455 N. Cityfront Plaza Drive
 8       Suite 2410
 9       Chicago, Illinois 60611
10       (708) 628-4949
11       beth@hbsslaw.com
12
13  On behalf of the Defendants:
14       JARIEL A. RENDELL, ESQUIRE
15       WILLIAM T. BURKE, ESQUIRE
16       Williams & Connolly, LLP
17       725 12th Street, Northwest
18       Washington, D.C. 20005
19       (202) 434-5299
20       jrendell@wc.com
21
22  ALSO PRESENT: Gene Aronov, Videographer
23       William Schmidt
24       Janae Staicer
25
```

**Page 4**

```
 1                C O N T E N T S
 2  EXAMINATION BY:                        PAGE:
 3  Counsel for Defendants                   8
 4  Counsel for Plaintiffs                 301
 5  Counsel for Defendants                 302
 6
 7  CONTI DEPOSITION EXHIBITS:             PAGE:
 8  Exhibit 1  Conti expert report          19
 9  Exhibit 2  Proposed first amended complaint  52
10  Exhibit 3  CVS Health Savings Pass medication  78
11  Exhibit 4  Prescription benefit services agreement
12             between CaremarkPCS and Sheet Metal
13             Workers Local 20 Welfare and Benefit
14             Fund                         81
15  Exhibit 5  Letter from Tibus to Sheet Metal
16             Workers Local 20 dated 4/18/13   90
17  Exhibit 6  Blow-up of figure 2 in expert report  191
18  Exhibit 7  Document Bates stamped CVSSM-0025171
19             through 176                 193
20  Exhibit 8  Extract of transactions
21             DCVS-00197344780 and DCVS-00411688666  203
22  Exhibit 9  Extract of transaction
23             DCVS-00333786270            239
24
25  (Exhibits continued on the next page.)
```

**Page 5**

```
 1  CONTI DEPOSITION EXHIBITS:             PAGE:
 2  Exhibit 10  Extract of transaction
 3              DCVS-00834699995           247
 4  Exhibit 11  Extract of several transactions  253
 5  Exhibit 12  Total damages per state    265
 6  Exhibit 13  Average CVS store count per month
 7              per state                  268
 8  Exhibit 14  Blow-up and re-plot of figure 1
 9              in attachment E to expert report  298
10
11  (*Exhibits attached to the transcript.)
```

**Page 102**

1 payment mechanisms are possible here, or none at
2 all.
3   Q   And just to clarify the difference, is it
4 fair to say that a deductible is generally an
5 amount that a patient must pay out of pocket
6 before their prescription benefit plan will cover
7 any of the cost of the prescription?
8   A   That's correct. That's my understanding
9 of what a deductible is.
10   Q   And a copay is a mixed or flat amount
11 that a patient pays on a per prescription basis --
12       MS. FEGAN:  Objection to form.
13 BY MR. RENDELL:
14   Q   -- is that fair?
15   A   I mean, copayments can be flat or they
16 can be percentage-based.
17   Q   Do you have -- strike that.
18       So are you saying there's -- strike that.
19       Are you using the term "copay"
20 interchangeably with coinsurance?
21   A   Yes, I already -- I already stated that,
22 that I was using this term generically.
23   Q   So in the industry isn't it fair to say
24 that a coinsurance is a variable amount, usually
25 based on a percentage that a patient must pay?

**Page 103**

1       MS. FEGAN:  Objection to form.
2       THE WITNESS:  That's my understanding,
3 yes.
4 BY MR. RENDELL:
5   Q   Wheres a copay is a fixed or flat amount
6 that a patient pays?
7   A   That's correct.
8   Q   Depending on different plan deductibles,
9 co-pays or coinsurance across different plans,
10 different patients may pay out of pocket very
11 different amounts for the same drug. Is that
12 fair?
13   A   Yes.
14   Q   A patient who goes to fill a prescription
15 for the same drug may be subject to a deductible,
16 right?
17   A   Yes.
18   Q   And another patient who walks in right
19 after that patient to fill the same drug [sic] may
20 not be subject to a deductible, right?
21   A   That's correct.
22   Q   Patients who are subject to a deductible
23 would have to pay the entire cost of the
24 prescription until they meet the deductible,
25 right?

**Page 104**

1       MS. FEGAN:  Could you read that back?  I
2 think it was the wrong negative.
3 BY MR. RENDELL:
4   Q   Patients who are subject to a deductible
5 have to pay the entire cost of the prescription
6 until they meet the deductible, right?
7   A   That's my understanding.
8   Q   So patients who are subject to
9 copayments -- and I'm using that in the industry
10 sense of a fixed or flat amount -- do you
11 understand that a copayment could vary by category
12 or tier of drug?
13   A   So, again, out-of-pocket costs associated
14 with preparation drugs in the general sense may be
15 subject to different payment amounts related to
16 formulary tiers.
17   Q   As an example, one plan could have a flat
18 $4 copay for any 30-day generic prescription while
19 another plan has a tiered structure where some
20 drugs have a $4 copay; other drugs have a $10
21 copay, et cetera, right?
22   A   Sure.
23   Q   A plan with a coinsurance could have, for
24 example, a 20 percent coinsurance across the board
25 for every type of drug.  That's a possibility,

**Page 105**

1 right?
2   A   That's possible.  Or it may be tiered as
3 well.
4   Q   And many patients may even have a mix of
5 copay and coinsurance, depending on the category
6 of drug, right?
7   A   Yes, that's why I use the more general
8 term.
9   Q   Returning to your report, if you could
10 please turn to page 10.  And looking at
11 paragraph 25 at the top of the page, do you see
12 where you wrote, "The remainder of the cost is
13 paid by the insured's health plan, which is
14 operated by an entity known as a third-party payor
15 (TPP)"?
16   A   Yes.
17   Q   The plaintiffs in this case are TPPs,
18 right?
19   A   Yes.
20   Q   As TPPs, plaintiffs operate health plans,
21 correct?
22   A   Yes.
23   Q   And then looking at paragraph 26, do you
24 see that you wrote, "PBMs are companies that serve
25 as middlemen between pharmacies and TPPs.  Their

**Page 126**

 1  and are able to potentially pass those marked-up
 2  prices to insurers and patients.
 3     Q   Now, regarding PBMs, is it fair to say
 4  that your point is that PBMs may charge their TPP
 5  clients more for a drug than the pharmacy charged
 6  the PBM for the drug?
 7     A   Yes.
 8     Q   It's also possible that a PBM would have
 9  a transparent or pass-through contract
10  relationship with their TPP such that the PBM
11  passes on exactly the price that was paid to the
12  pharmacy, right?
13     A   Yes. Exactly. Those types of
14  pass-through contracts are possible here, just
15  like they --
16         THE REPORTER: I'm sorry. You need to --
17         THE WITNESS: I'm sorry.
18         Yes, it is possible for there to be --
19  there to exist pass-through contracts, just like
20  there are in other parts of the health care
21  system.
22  BY MR. RENDELL:
23     Q   Now, as we discussed earlier, PBMs
24  provide services or some sort of value to TPPs.
25  Isn't that fair?

**Page 127**

 1     A   Right. So TPPs contract with PBMs for a
 2  variety of reasons.
 3     Q   PBMs incur costs for providing those
 4  services, right?
 5     A   Yes.
 6     Q   So you wouldn't expect PBMs to provide
 7  those service for free, would you, as an
 8  economist?
 9     A   No, of course, but the pricing of
10  drugs -- or the transaction cost associated with
11  the ingredient cost isn't the only types of fees
12  that the PBM is charging the TPP.
13     Q   Would you agree that a TPP can agree to a
14  transparent or pass-through pricing arrangement
15  with the PBM if that's what they seek?
16     A   Yes. They can also agree to pay fees on
17  top of the specific transaction price for a given
18  product in order to pay the PBM for rendering
19  other types of services.
20     Q   Right. So with a pass-through pricing
21  arrangement, the PBM doesn't add a mark-up on the
22  price of the drug, right?
23     A   That's my understanding --
24     Q   But --
25     A   -- of what it means to have transparent

**Page 128**

 1  pricing contracting.
 2     Q   But the PBM would charge for its services
 3  by adding on a fee for each prescription, right?
 4     A   Well, the fee could be -- have different
 5  structures. It doesn't need to be for each
 6  specific prescription.
 7     Q   But it wouldn't come in the form of --
 8  strike that.
 9         What you can say for sure is that it
10  wouldn't come in the form of a mark-up on the drug
11  for a transparent pricing arrangement, right?
12     A   That's correct.
13     Q   With spread pricing, the PBM charges for
14  its services through a mark-up between what the
15  PBM paid the pharmacy for a drug and what the TPP
16  pays the PBM for the same drug. Is that fair?
17     A   Yes, that's right. And then, on top of
18  that, the TPP may also pay the PBM other fees for
19  rendering services.
20     Q   You would expect the other fees to be
21  lower in a spread pricing arrangement than in a
22  transparent pricing arrangement, right?
23     A   I don't know. It really depends.
24     Q   Moving on to paragraph 51, do you see
25  where you wrote that, "There may be differences

**Page 129**

 1  between what the PBM charges a patient and a
 2  patient's TPP and what the PBM pays the pharmacy
 3  for dispensing a drug. This difference may vary
 4  depending on the drug or the drug's price. The
 5  differences tend to be more complicated than a
 6  simple flat fee per drug dispensed"?
 7     A   Yes.
 8     Q   Do you see that? So this refers to what
 9  we've been discussing, a spread pricing
10  arrangement, right?
11     A   Yes.
12     Q   With spread pricing, isn't it possible
13  that a PBM charges the TPP on a particular
14  transaction less than what the PBM actually paid
15  to the pharmacy for that specific transaction?
16     A   I'm sorry, can you restate the question?
17     Q   It's possible in a spread pricing
18  arrangement that, for a particular transaction,
19  the PBM actually charges the TPP less than what
20  the PBM paid to the pharmacy?
21     A   I don't see exactly how that would work.
22     Q   So you don't believe that in a spread
23  pricing arrangement, there could be no mark-up or
24  even a negative mark-up for certain individual
25  drug transactions over the course of, say, a full

33 (Pages 126 - 129)

Page 130

1 year?
2   A   We're talking about a specific
3 prescription. That was the hypothetical that you
4 provided to me.
5   Q   Right. I'm asking, for a specific
6 prescription, isn't it possible that there could
7 be no mark-up, or even a negative spread, on a
8 particular transaction under a spread pricing
9 arrangement?
10   A   It's possible, but it's not typical.
11   Q   Isn't it possible for certain businesses
12 to take a loss on certain products in order to
13 acquire business where they gain profit on other
14 products?
15   A   Yes, that's possible.
16   Q   Is it possible that PBMs have certain
17 drugs that are loss leaders in order to acquire a
18 TPP contract where, in fact, the PBM pays more to
19 the pharmacy for the drug than what the PBM
20 charges a TPP?
21   A   I actually typically think of pharmacies
22 as being ones that might use certain drug as being
23 loss leaders. I am not aware of PBMs using --
24 transacting on specific products as loss leaders.
25   Q   Is it possible?

Page 131

1   A   It might be.
2   Q   From an economic perspective, would it be
3 rational for a PBM to consider costs and profit in
4 the aggregate rather than focusing only on
5 individual transactions?
6       MS. FEGAN: Objection to form.
7       THE WITNESS: For what objective?
8 BY MR. RENDELL:
9   Q   For a given TPP-to-PBM contractual
10 relationship.
11   A   Can you restate the question, please?
12   Q   So considering one TPP-to-PBM contractual
13 relationship, could it be economically rational
14 for the PBM to focus on maximizing the aggregate
15 profit in that relationship rather than focusing
16 on profits for specific individual transactions?
17   A   Yes, that's possible. In a given time
18 period.
19   Q   Right. And you understand, as you
20 alluded to earlier, that PBM-to-TPP contracts may
21 often contain aggregate annual guarantees related
22 to generic drug pricing, right?
23   A   Yes.
24   Q   Generally, the way these generic
25 effective rate guarantees work is that the PBM

Page 132

1 will guarantee the TPP an average discount off of
2 AWP --
3       THE REPORTER: I'm sorry. The way these
4 generic effective rate guarantees will work, the
5 PBM --
6       MR. RENDELL: The TPP --
7       THE REPORTER: -- will guarantee the
8 TPP...
9 BY MR. RENDELL:
10   Q   -- an average discount off of AWP in
11 aggregate for all the generic drugs dispensed
12 during a particular time period. Is that fair?
13   A   So as I understand it, these rate
14 guarantees may be inclusive of certain drugs and
15 certain time periods and are essentially a type of
16 price guarantee over those drugs and those time
17 periods.
18   Q   Is it possible that some guarantees
19 include usual and customary transactions while
20 other guarantees for other clients do not?
21   A   Do you mean -- can you restate the
22 question?
23   Q   Sure. Is it possible that one PBM-to-TPP
24 relationship may have a guarantee where usual and
25 customary transactions factor into the guarantee

Page 133

1 while another PBM-to-TPP relationship may have an
2 aggregate guarantee that ignores usual and
3 customary transactions?
4   A   It's possible.
5   Q   Now, if a PBM does not meet the rate
6 guarantee, the PBM will owe money to the TPP. Is
7 that your understanding?
8   A   Yes. In aggregate, over time.
9   Q   Right. But it doesn't work the other way
10 in the sense that if the PBM does better than the
11 guarantee, the TPP doesn't owe money back to the
12 TPP [sic], right?
13       MS. FEGAN: Objection to form.
14       THE WITNESS: I'm sorry, what do you mean
15 by "does better than"?
16 BY MR. RENDELL:
17   Q   If the PBM outperforms the guarantee, in
18 other words, gives, in the aggregate, cheaper drug
19 prices than what it guaranteed, the TPP doesn't
20 owe money back to the PBM, right?
21   A   That's right.
22   Q   So from an economic perspective, isn't it
23 rational for the PBM to try to meet the GR
24 guarantee on an aggregate basis as closely as
25 possible without exceeding it?

34 (Pages 130 - 133)

Page 146

1 different health plan's agreement with a PBM?
2    MS. FEGAN: Objection to form.
3    THE WITNESS: That's not what I stated.
4 BY MR. RENDELL:
5    Q   I understand. I'm asking, when you refer
6 to the lowest possible price, are you referring
7 only to prices available through point-of-sale
8 discounts, membership card programs, or are you
9 also including discounts negotiated by PBMs for
10 specific clients?
11   A   Yeah. Thank you. The former.
12   Q   And going back to the issue of impact,
13 are you aware how many class members may have had
14 transactions adjudicated subject to U&C -- let me
15 start over. Sorry.
16      Are you aware of how many class members
17 may have been impacted without suffering an injury
18 from the scheme?
19   A   No.
20   Q   Could it be 10 percent?
21   A   I have not done that calculation.
22   Q   Thank you. We can move on to page 22.
23   A   I have a follow-up, I'm sorry, to that,
24 which is that I cannot identify plan members in
25 the data that has been produced by CVS and

Page 147

1 Caremark. But if that data was provided to me, I
2 would be able to do that calculation.
3    Q   When you say that you cannot identify
4 class members from the data produced by CVS, you
5 mean pharmacy claims data. Is that fair?
6    A   That's right. So the claims data that
7 was produced by CVS and Caremark does not include
8 the name of the health plan.
9    Q   You also referred to data produced by
10 Caremark. Are you saying that PBM data would not
11 allow you to identify health plans either?
12      MS. FEGAN: Objection to form.
13 Mischaracterizes --
14      THE WITNESS: That's not what I said.
15 BY MR. RENDELL:
16   Q   So when you say data produced by Caremark
17 did not allow you to identify the health plans,
18 what did you mean by that statement?
19   A   I'm saying the data that has been
20 produced by CVS in this specific matter does not
21 allow me to identify all class members that might
22 have been impacted by the scheme.
23   Q   So that statement doesn't necessarily
24 apply to Caremark; is that right?
25   A   That's correct. And it's entirely -- but

Page 148

1 again, it's all -- all the data that was produced.
2 There is data that was produced for me that was --
3 that allows me to identify specific transactions
4 for the three named plaintiffs, but I would need
5 similar information in order to calculate -- in
6 order to identify class members -- sorry, in order
7 to identify and also enumerate the number of class
8 members impacted by the scheme.
9    Q   Are you aware that that data was provided
10 for certain states by Caremark?
11   A   I am not. Do you mean -- I'm sorry.
12 Just to make sure that I understand that question,
13 Do you mean that it was provided across the board
14 nationwide?
15   Q   I'm asking whether you're aware whether
16 Caremark produced all of its PBM data for specific
17 states.
18      MS. FEGAN: Objection to form.
19      THE WITNESS: I'm not sure I totally -- I
20 don't completely follow your response, but we can
21 move on.
22 BY MR. RENDELL:
23   Q   Well, are you aware whether Caremark
24 produced PBM data for the State of Indiana?
25   A   I am not.

Page 149

1    Q   Are you aware of whether MedImpact
2 produced PBM data for the State of Indiana?
3    A   I am not.
4    Q   Could you please turn to page 22? And
5 I'll direct your attention to paragraph 65. Do
6 you see where you wrote, "Based on instructions
7 from counsel, HSP prices should have been included
8 in the calculation of U&C prices for each at-issue
9 drug"?
10   A   Yes.
11   Q   And then you continue, "In turn, this
12 calculation should have impacted the prices the
13 TPPs paid the PBMs for at-issue drugs."
14   A   Yes.
15   Q   Is that right? When you say HSP prices
16 should have been included in the calculation of
17 U&C prices, do you mean that HSP prices should
18 have been reported as the U&C price?
19   A   Yes.
20   Q   And in developing your damages model, is
21 it fair to say that you assumed for every
22 transaction that you looked at that the HSP price
23 should have been reported as the U&C price for
24 each at-issue drug?
25   A   Yes.

**Page 150**

Q And then you also assumed that had the HSP price been reported as the U&C price, that would have affected the price paid by every TPP in your data set. Is that fair?

A For the at-issue drugs.

Q Right. Thank you for clarifying.

A In a given time period.

Q So -- right. So just to clarify, during the class period, for each at-issue drug, you assumed that if the HSP price had been reported as the U&C price, every class member would have been entitled to receive that HSP price as the U&C price?

A This is not a statement about entitlement. This is a statement about how to think about the correct calculated price per prescription.

Q Well, in calculating the price, did you consider on a transaction-by-transaction basis whether the TPP associated with that transaction was or was not entitled to U&C price?

A So I assumed that they were entitled to U&C prices. That's part of the class definition.

Q Is that an assumption you made based on instructions from counsel or was it based on

**Page 151**

anything else?

A Based on instructions from counsel.

Q Are you offering an opinion that if HSP prices had been reported as U&C prices, every single class member would have been entitled to those HSP prices as U&C prices?

A No. It's just an assumption in my model.

Q Moving on to paragraph 66, do you see where you wrote -- and this is the second sentence -- "Actual TPP prices are given by the CVS claims data and can be assumed to be the formulaic contracted price"?

A Yes.

Q Do you mean that you assumed the price was correctly calculated by the PBM based on the formula that was being used at the time for the specific transaction?

MS. FEGAN: Objection to form.

BY MR. RENDELL:

Q Actually, let me ask this way: What do you mean by assuming to be the formulaic contracted price?

A Yes. So prices at a transaction level are calculated based on an algorithm. And -- so all I'm assuming here is that the algorithm,

**Page 152**

again, calculated a price, and that was the price that ultimately got passed through to the TPP.

Q Thank you. So in other words, is it fair to say you're not offering -- strike that.

Is it fair to say you're not offering an opinion about what any of the formulaic contracted prices were, according to given contracts between PBMs and TPPs?

A So, no. Instead, what I'm arguing is that, by revealed evidence, we can just assume that the prices paid reflect the arrangement that the TPP and the PBM made. And again, I don't need contracts in order to ascertain that because it's -- it's adjudicated in an algorithm by the computers of the pharmacies and the PBMs.

Q So if the original -- so if you looked at a transaction and the original U&C price as reported were already lower than what the TPP paid, would it be fair to assume that that TPP's formulaic contracted price did not include usual and customary price?

A No. Because all I can say is what the -- again, what the -- so again, I have pharmacy claims data. I don't have PBM data and I don't have TPP data. All I have is what the pharmacy

**Page 153**

was paid. But the pharmacy is paid as a function of their relationship with the PBM and not necessarily that of the TPP.

Q So looking at the data that you analyzed, are you saying you don't know what the TPPs actually paid for the drugs in your calculation?

A No. The TPP price, the actual price, is reflected in the claims data.

Q Is that the price that the PBM paid to the pharmacy or the price that the TPP paid to the PBM for the drug?

A The former.

Q So looking at the CVS claims data, you don't know how much the TPP actually paid for any of the drugs in your analysis; is that right?

A I can just assume that it is a reflection of that.

Q When you say a reflection, do you mean that what the TPP paid might have been higher or it might have been lower or it might have been the same?

A It was likely higher. Thank you.

Q So you would assume that the TPP would likely pay more than what the PBM paid for a particular drug --

39 (Pages 150 - 153)

| | |
|---|---|
| 1  A  That's right.<br>2  Q  -- is that right?<br>3  A  Because of the regime of spread pricing.<br>4  Q  But you would acknowledge that some TPPs<br>5  have pass-through pricing, right?<br>6  A  They may have pass-through pricing for<br>7  some drugs over some time periods.  But again, if<br>8  pass-through prices existed, they would be<br>9  reflected in the actual transactions.<br>10  Q  On both the pharmacy side and the PBM<br>11  side?<br>12  A  That's right.<br>13  Q  Now, in developing your damages model, is<br>14  it fair to say you assumed that the U&C price for<br>15  the at-issue drugs should be equal to the HSP<br>16  price regardless of quantity dispensed?<br>17  A  No.<br>18  Q  Did you prorate the HSP price based on<br>19  whether it was a 90-day supply or a less than<br>20  90-day supply?<br>21  A  No.  I only included claims that were a<br>22  90-day supply or less in my overcharge<br>23  calculation.<br>24  Q  Understood.  So looking only at claims of<br>25  90 days or less, did you assume that the U&C price<br>Page 154 | 1  supply?<br>2  A  I did not do that type of proration for<br>3  the 50 percent of claims where there was 90-day<br>4  supply or less.<br>5  Q  Okay.  And you set the U&C -- strike<br>6  that.<br>7  You assumed the new U&C price would be<br>8  equal to the HSP price regardless of what had been<br>9  in the U&C field as reported at the time; is that<br>10  right?<br>11  A  I'm not totally following.  I'm sorry.<br>12  Q  Did you look at the originally reported<br>13  U&C price as part of your analysis?<br>14  A  No.<br>15  Q  So if the --<br>16  A  And that's because the TPP wouldn't<br>17  necessarily see the U&C price.<br>18  Q  I guess I'm confused by that.  Isn't it<br>19  your understanding that U&C prices get reported<br>20  all the way through the transaction?<br>21  A  No.  That is not my understanding.<br>22  Q  So you're saying that the originally<br>23  reported U&C price would only go to the PBM?<br>24  Is --<br>25  A  That's correct.<br>Page 156 |
| 1  for those should have been the HSP price<br>2  regardless of whether it was a 90-day supply or a<br>3  30-day supply or a 15-day supply?<br>4  A  I think -- oh, I see what you mean.  As I<br>5  understand it, yes, I think we do calculate prices<br>6  that reflect quantities supplied.<br>7  Q  So just to clarify, if you looked at a<br>8  particular drug and the HSP price was 11.99 for a<br>9  90-day supply, and then you looked at a different<br>10  transaction where it was the same drug, but only a<br>11  30-day supply was dispensed, did you set the HSP<br>12  price to 11.99 or did you prorate it to the lower<br>13  30-day supply?<br>14  A  So what I did was I took this in a<br>15  step-wise fashion.  So I took 90-day supplies<br>16  alone and used the -- and swapped the actual price<br>17  for the HSP price.  And then, for the prices that<br>18  were -- for the quantities that were lower, I did<br>19  a separate transaction where I swapped the actual<br>20  price for the HSP price.<br>21  Q  That's helpful.  So in the separate --<br>22  looking only at less than 90 days, was the price<br>23  that you swapped in for the HSP the full HSP price<br>24  for the 90-day supply or did you make it<br>25  50 percent of the HSP price if it was a 45-day<br>Page 155 | 1  Q  -- that what you're saying?<br>2  And did you vary your analysis at all<br>3  based on what was in the originally reported U&C<br>4  field?<br>5  A  What do you mean by that?<br>6  Q  Well, as part of your damages<br>7  calculation, did you factor in what had been<br>8  originally reported as U&C or not?<br>9  A  No.<br>10  Q  I'd like to move on.  I think we can go<br>11  forward to page 29.  And I'll direct your<br>12  attention to paragraph 76.<br>13  A  I'm sorry, what page?<br>14  Q  Page 29.<br>15  A  Great.  Thank you.<br>16  Q  Paragraph 76.  Do you see where you<br>17  wrote, "Gaining access to the HSP price was, by<br>18  definition, associated with payment of an annual<br>19  membership fee.  Therefore, the full price a cash<br>20  payor faces for the first prescription they fill<br>21  under the HSP is the annual membership plus the<br>22  price for the particular drug"?<br>23  A  Yes.<br>24  Q  Because gaining access to the HSP price<br>25  required payment of an annual membership fee, you<br>Page 157 |

40 (Pages 154 - 157)

**Page 174**

1  any of their predecessors as PBMs, right?
2  A  Yes.
3  Q  So a TPP that had a different PBM
4  throughout the class period, other than these
5  specific PBMs, would be excluded from the class,
6  right?
7  A  That's my understanding.
8  Q  Because of that limitation, you excluded
9  transactions with other PBMs from your damages
10 calculation, right?
11 A  Yes.
12 Q  You only kept transactions where the PBM
13 was Caremark, Express Scripts, Medco, OptumRx or
14 MedImpact, right?
15 A  Through the Condor code, yes.
16    THE REPORTER: I'm sorry?
17    THE WITNESS: Yes.
18 BY MR. RENDELL:
19 Q  And that was the Condor plan codes?
20 A  Yeah. So -- scratch that, actually.
21 Just through the data that I have.
22 Q  Do you know whether Caremark, Express
23 Scripts, Medco, OptumRx or MedImpact may
24 adjudicate transactions where there is no health
25 plan involved on the other side?

**Page 175**

1  A  I am not.
2  Q  Is it possible that there may be
3  manufacturer programs where the PBM is
4  adjudicating the transaction on behalf of the
5  manufacturer and there is no health plan actually
6  paying a share of the prescription drug?
7  A  Manufacturer of what, sir?
8  Q  Of pharmaceutical products.
9  A  I'm not aware of that, sir.
10 Q  Are you aware of whether there may be
11 medical savings account programs where the
12 transaction is adjudicated through the PBM, but
13 the entire payment comes from either the patient
14 at the point of sale or the medical savings
15 account on the other end?
16 A  So medical savings accounts tend to be
17 paid for by consumers. They're a type of savings
18 account.
19 Q  Are you aware of whether medical savings
20 accounts may be adjudicated through a PBM or not?
21 A  It's possible.
22 Q  And then you --
23 A  Wait. Hold on. I'm sorry. But usually
24 people who have medical savings accounts are also
25 insured.

**Page 176**

1  Q  Now, you understand that the putative
2  class member health plans must have paid for
3  generic prescription drugs purchased from CVS that
4  were included in the Health Savings Pass program,
5  right?
6  A  Yes.
7  Q  So that's why you excluded from your
8  calculation any transactions involving non-HSP
9  drugs, right?
10 A  That's right.
11 Q  Then you also understand that the
12 putative class member health plans must have paid
13 for those drugs based on a formula containing
14 usual and customary price, right?
15 A  Yes.
16 Q  Were you able to apply this limitation
17 regarding payment on a formula containing usual
18 and customary price in your damages calculation
19 presented in your report?
20 A  No. But I reserve the right to do so at
21 a later date when I have the data.
22 Q  So to be clear, you did not review
23 contracts from across the putative class to see if
24 their contractual pricing formula contained usual
25 and customary price?

**Page 177**

1  A  I don't need contracts to do so, sir.
2  Q  Why is that?
3  A  Because there's a lot of other evidence
4  that could be used to provide that information.
5  Q  Such as what?
6  A  Computer algorithms that are used by the
7  PBM.
8  Q  So you believe -- well, strike that.
9     Did you review computer algorithms to
10 determine whether they included or excluded usual
11 and customary price?
12 A  Provide me the data and I'm more than
13 happy to provide that information.
14 Q  Are you aware whether the computer
15 algorithms that you refer to would be
16 individualized to the specific TPP involved?
17    MS. FEGAN: Objection to form.
18    THE WITNESS: They might be.
19 BY MR. RENDELL:
20 Q  Would you agree that one way you could
21 determine whether the TPP-to-PBM agreement
22 provides for a formula containing usual and
23 customary price would be to look at the health
24 plan's contract with its PBM?
25 A  It's one way, but there are many others

**Page 178**

1 as well, as I had mentioned.
2   Q   Well, you mentioned computer algorithms.
3 Are there other ways?
4   A   There may be.
5   Q   Sitting here today, are you aware of any
6 other ways?
7   A   There could be other types of documents
8 that would be helpful.
9   Q   Can you explain what type of documents
10 you'd be looking for?
11   A   There could be other documents produced
12 in discovery that would be helpful for actually
13 assessing that exclusion.
14   Q   But there's nothing specifically that
15 you're thinking of, sitting here right now.  Is
16 that fair?
17   A   No.  But again, computer algorithms would
18 help here because we know that these adjudications
19 are occurring at a -- literally a momentary basis.
20 And so -- and most of them are likely being done
21 electronically.
22   Q   As far as you know, is it fair to say
23 your damages calculation, as presented in your
24 report, may include transactions that were not
25 paid for based on a formula containing usual and

**Page 179**

1 customary price?
2   A   So the -- I present several overcharge
3 estimates.  And the overcharge estimates are
4 related to the specific TPPs.  Plaintiffs, I
5 believe, are reflective of the existence of U&C
6 contract "lower of" formulas.
7   Q   Setting aside named plaintiffs, are you
8 aware whether your damages calculation for the 14
9 states, or the statistical extrapolation, whether
10 that may include transactions that were not paid
11 for based on a formula containing usual and
12 customary price?
13   A   It's possible that they are inclusive of
14 other -- of claims that do not have that specific
15 formula applied at the point of sale or in the
16 adjudication on the back end.
17   Q   Are you aware of how many transactions in
18 the data that you reviewed and for which you
19 calculated overcharges were paid for based on a
20 formula that did not include usual and customary
21 price?
22   A   For the national estimates, right?  The
23 14 states plus the --
24   Q   Right.
25   A   -- national inflated estimates?  No, I

**Page 180**

1 don't have the data to be able to assess that.
2   Q   Could it be 5 percent of all the
3 transactions?
4   A   I don't have the data to assess that and,
5 therefore, I don't feel comfortable speculating.
6 But again, the data is available.  It's just a
7 question of it being provided to me.
8   Q   Now, when you say the data is available
9 to determine whether the adjudication is based on
10 a formula containing usual and customary price,
11 what data are you referring to?
12   A   Well, so I think of the data as being
13 different forms of evidence which could include
14 the computer algorithm that is adjudicating
15 payment between the PBM and the TPP.  That could
16 also include contracts.  It could include other
17 documents as well.
18   Q   So when you say data, you're not
19 referring to the PBM data that might be provided,
20 right?
21   A   It's inclusive of that, but it's more
22 general than that.  My point is that it's
23 knowable.
24   Q   And let me ask it more specifically to be
25 clear.  Is it knowable just looking at PBM data?

**Page 181**

1   A   I don't know what that means, sir.  Can
2 you clarify?
3   Q   If you had -- well, for the named
4 plaintiffs --
5   A   Right.
6   Q   -- were you able to determine whether
7 their pricing was based on a formula containing
8 usual and customary price by looking only at their
9 PBM claims data?
10   A   It is inclusive of data that were
11 provided in addition to other types of data, which
12 include contracts and other documents.
13   Q   To conclude that the named plaintiffs'
14 transactions were adjudicated according to a
15 formula containing usual and customary price, you
16 had to look at their contracts, right?
17   A   I looked at their contracts.  I looked at
18 other documents as well.
19   Q   What other documents did you look at?
20   A   They're -- all of the documents that are
21 contained in my report.
22   Q   If -- strike that.
23       Does the PBM claims data that you
24 reviewed state whether a transaction is
25 adjudicated according to "lower of" U&C logic or

46 (Pages 178 - 181)

**Page 182**

1 not?
2  A  No. It only contains the amount that the
3 TPP is required to pay.
4  Q  If a health plan paid for HSP drugs but
5 that health plan did not have a formula containing
6 usual and customary price, would you agree that
7 the plan's payment would have been the same
8 whether or not HSP was reported as the usual and
9 customary price?
10  A  I don't know. I haven't thought about
11 it.
12  Q  Returning to footnote 11 of your report,
13 and continuing on to the exclusions, do you see
14 where you wrote, "I understand that the following
15 payors are excluded from the classes: 1, any
16 governmental payors, including Medicare and
17 Medicaid; 2, any health plans that served on
18 Caremark's client advisory committee since
19 January 1, 2008; and, 3, any health plans that
20 have had parent, subsidiary or affiliate
21 relationships with any pharmacy benefit manager at
22 any time since January 1 of 2008"?
23  A  Yes.
24  Q  You relied in part on these exclusions in
25 developing your damages model. Is that fair?

**Page 183**

1  A  The first one.
2  Q  So you attempted to included governmental
3 payors, including Medicare and Medicaid, right?
4  A  Yes.
5  Q  And specifically you did that by
6 excluding transactions where the data field
7 AG_TYP_DCS contained a missing value or the value
8 FEDERALLY FUNDED OTHER, Medicaid, Medicare or
9 WORKERS COMP. Is that right?
10  A  Can you point me to where you're reading
11 from, sir, because it's not --
12  Q  Oh, sure. That's --
13  A  It's not contained in --
14  Q  Yeah.
15  A  -- footnote 11.
16  Q  That's a good point. Page 25,
17 paragraph 71.
18  A  Page 25, 71. Okay. No, footnote 71
19 doesn't -- page 25, footnote 71?
20  Q  Paragraph 71.
21  A  Okay. Sorry.
22  Q  And just looking at the second to last
23 sentence.
24  A  Yes, that's right.
25  Q  Do you believe that you succeeded in

**Page 184**

1 excluding all governmental payors from your
2 damages calculation?
3  A  Within the limits of the data that I have
4 available.
5  Q  Would you agree that a state government
6 is a governmental payor?
7  A  Yes.
8  Q  Would you agree that a county government
9 is a governmental payor?
10  A  Yes.
11  Q  Would you agree that a city government is
12 a governmental payor?
13  A  Yes.
14  Q  Would you agree that a public school is a
15 governmental payor?
16  A  I don't know. I haven't thought about
17 that.
18  Q  If your damages calculations include
19 transactions paid for by state governments, county
20 governments, city governments, would you agree
21 that you have not succeeded in excluding all
22 governmental payors from your damages calculation?
23  A  Sure.
24  Q  How -- if you had the PBM data, how would
25 you go about determining whether a given -- any

**Page 185**

1 given health plan was a governmental payor or not?
2  A  I'm assuming the PBM has that
3 information.
4  Q  Are you assuming that the -- well, strike
5 that, actually.
6     In the PBM claims data that you reviewed,
7 did it specify the entity type for each
8 transaction?
9  A  The PBM data that I had was specific to
10 the plaintiff TPPs.
11  Q  Well, did it have a field showing you
12 whether the payor was a governmental entity or
13 not?
14  A  It was just specific to the plaintiff
15 TPPs.
16  Q  Can you think of any specific data field
17 you might find in the PBM claims data that would
18 allow you to filter out every governmental payor?
19  A  I haven't thought about it.
20  Q  Are you aware that --
21  A  Are you saying in addition to these that
22 I've already filtered out?
23  Q  Correct.
24  A  Again, I expect those other payors to
25 be -- or those other claims to be pretty small in

**Page 186**

1 comparison to these, and I would have to think
2 about it.
3  Q  Are you aware whether state government
4 payors who are paying on behalf of state
5 employees -- are you aware whether those
6 transactions would appear in claims data as
7 employer transactions or as one of these types of
8 transactions you've referenced here?
9  A  I don't know.
10  Q  And then returning to footnote 11 on
11 page 5, I just want to ask -- strike that.
12      Just confirm that you did not attempt to
13 exclude health plans that served on Caremark's
14 client advisory committee since January 1, 2008
15 from your damages calculation, right?
16  A  That's correct.
17  Q  Are you aware of what those health plans
18 might be?
19  A  I do not know who they are.
20  Q  Are you aware of how many health plans
21 may fall into that exclusion?
22  A  No.
23  Q  And then the third exclusion of health
24 plans with parents, subsidiary or affiliate
25 relationships with any pharmacy benefit manager at

**Page 187**

1 any time since January 1, 2008, you didn't filter
2 those out either from your damages calculation,
3 right?
4  A  I don't have health plan data in the data
5 that was provided to me. So I can't filter them
6 out.
7  Q  If you knew the names of the health plans
8 in the data, how would you go about determining
9 whether a particular health plan ever had a
10 parent, subsidiary or affiliate relationship with
11 any pharmacy benefit manager at any time since
12 January 1, 2008?
13  A  Again, I'm assuming there would be
14 probably a variety of different evidence that
15 would support inclusion or exclusion.
16  Q  Would it be found in the PBM claims data
17 itself?
18  A  It might be. And it might also entail
19 the use of other information.
20  Q  So do you believe that PBM claims data
21 includes a field that says whether a particular
22 payor is or is not affiliated with any other PBM
23 at any time since January of 2 -- sorry,
24 November 2008 -- January of 2008?
25  A  So again, I don't have the data. And so

**Page 188**

1 what you're asking me to do is speculate. And
2 so -- nor have I been asked to do this in this
3 specific report.
4      My opinion is that in order to
5 operationalize this specific exclusion, I need
6 data from the PBMs that would identify the plans,
7 and that would likely need to be paired with
8 additional evidence.
9  Q  So to be clear, you don't believe you
10 could do it based solely on PBM claims data?
11  A  I don't know.
12  Q  Do you have an expert opinion of the
13 definition of affiliate relationship in the class
14 definition?
15  A  So I don't have a legal opinion. Is that
16 what you're asking?
17  Q  No. Just if you have any expert opinion.
18 As an economist or as a professor who knows a
19 great deal about the health industry, do you have
20 any expert opinion on how you would define
21 affiliate relationship in this context?
22  A  So again, this is -- this paragraph is
23 paraphrasing the complaint. And my general
24 understanding of how this would be operationalized
25 is that the health plan is an owner or a -- or the

**Page 189**

1 subsidiary itself of a given PBM.
2  Q  Well, I guess that's why I'm specifically
3 asking about affiliate relationship. So would a
4 joint venture be an affiliate relationship?
5  A  Potentially.
6  Q  Would owning a significant but
7 non-majority share of a PBM constitute an
8 affiliate relationship?
9  A  Potentially.
10  Q  How would you go about determining that
11 for any given health plan?
12  A  Again, my impression -- or the way in
13 which I would generally approach this is to look
14 at evidence to support how to operationalize the
15 term "affiliate." And I would also likely rely on
16 counsel.
17      MR. RENDELL: Okay. I think it's a good
18 time for a break.
19      THE VIDEOGRAPHER: We are going off the
20 record. This is the end of media unit number 3.
21 The time is 2:33 p.m.
22      (Whereupon, a short recess was taken.)
23      THE VIDEOGRAPHER: We are back on the
24 record. This is the beginning of media unit
25 number 4. The time is 2:50 p.m.

**Page 234**

1 Q In your damages calculation for named
2 plaintiffs, did you account for the effects of any
3 generic effective rate guarantees that they have?
4 A No.
5 Q Would you agree that having a generic
6 effective rate guarantee can affect the economic
7 relationship between a PBM and a TPP?
8 A It might.
9 Q Are you aware of how much the named
10 plaintiffs may have received in annual
11 reconciliation reports related to their generic
12 effective rate guarantees?
13 A I've seen some documents referencing it.
14 Q Have you ever calculated how factoring in
15 those reconciliation payments would affect your
16 numerical calculations in footnote 79 of your
17 report?
18 A No, I have not calculated -- I have not
19 done that calculation at this time. Again, I view
20 it as an offset, and it requires some thinking
21 because I would need to understand how those
22 specific drugs did or did not factor into the
23 generic reconciliation rate.
24 Q For the named plaintiffs, you had copies
25 of contracts between them and their PBMs, right?

**Page 235**

1 A Yes.
2 Q And you had access to all of their PBM
3 claim data, right?
4 A As I understand it.
5 Q Based on that information, could you
6 calculate the effect of their generic effective
7 rate offset or would you require more information?
8 A It's possible. I'd have to think about
9 it.
10 Q Are you aware whether the HSP drugs and
11 usual and customary transactions would factor into
12 the named plaintiffs' reconciliation payments or
13 not?
14 A Can you state the question, please?
15 Q Are you aware whether HSP drug
16 transactions, had they again adjudicated at U&C
17 price, would factor into the named plaintiffs'
18 reconciliation payments?
19 A So again, at this stage of my estimation,
20 I haven't thought that hard about the generic
21 reconciliation rate, because we're talking about a
22 very small number of claims relative to the total
23 that are being -- that are actually eligible for
24 this overcharge calculation to begin with. And I
25 need to kind of think through how one would

**Page 236**

1 actually operationalize that if required at all.
2 Q So at this time, you don't have a model
3 that would be able to do that. Is that fair?
4 A I don't have a method for doing that. It
5 doesn't mean that I can't come up with a method,
6 but I'd have to think through whether I have
7 enough data to do so and I have the right type of
8 data to do so, what types of assumptions I would
9 have to make, et cetera.
10 Q Now, I'd like to ask some more general
11 questions about your damages model for the 14
12 states. Did you exclude any transactions from
13 your damages calculation other than the exclusions
14 we've already discussed, including figure 2 and
15 the exclusion based on HSP enrollment fees?
16 A Can you be more specific?
17 Q Well, maybe -- let me direct your
18 attention to attachment D, footnote 6.
19 A Okay. Attachment D, footnote 6.
20 Q And footnote 6 indicates that your
21 exclusion for the HSP offset reduced the 59-plus
22 million claims down to 43,213,540 claims, right?
23 A Yeah, I'm with you.
24 Q After making exclusions down to this
25 43-plus million number, did you do any other

**Page 237**

1 exclusions to further limit this 43,213,540
2 number?
3 A No.
4 Q You did not exclude transactions based on
5 the fact that the associated health plan may have
6 known that the HSP price was not being reported as
7 U&C price?
8     MS. FEGAN: Objection. Lack of
9 foundation.
10     You can answer.
11     THE WITNESS: Thank you. No, not at this
12 time. My understanding is that may occur in the
13 future or could potentially occur.
14 BY MR. RENDELL:
15 Q Did you exclude any transactions based on
16 the fact that the associated health plan as an
17 arbitration agreement in its PBM-to-TPP contract?
18 A No.
19 Q Did you exclude any transactions based on
20 the fact that the associated health plan has a
21 generic effective rate guarantee in its PBM-to-TPP
22 agreement?
23 A No, not at this time. As we've
24 discussed, those types of exclusions and
25 additional offsets would require some thinking.

 1   Q   In calculating damages -- excuse me.
 2   Strike that.
 3       In calculating offsets on a
 4   transaction-by-transaction basis, you kept the
 5   patient's portion of the payment fixed, right?
 6   A   Yes.
 7   Q   Are you aware that some patients may have
 8   plans that require variable cost sharing; in other
 9   words, a coinsurance, not a fixed copay?
10   A   Yes.
11   Q   Are you aware that your decision to treat
12   the patient share of the transaction as fixed
13   increases your calculated overcharge for every
14   transaction where the patient has a variable
15   coinsurance rather than a fixed copay?
16   A   Does it?
17   Q   Well, we can walk through an example, if
18   you'd like.  I'm afraid it's going to be too
19   difficult to calculate, but would you agree that
20   if the original price for a drug is $75 and the
21   patient has a 10 percent coinsurance, the
22   patient's original coinsurance will be $7.50?
23   A   Sure.
24   Q   And if you change that total price from
25   $75 to 11.99, the 10 percent coinsurance falls

Page 238

 1   from $7.50 to $1.19, right?
 2   A   I mean, I'm not doing the math in my
 3   head, but I agree that it would fall in some
 4   amount.
 5   Q   It would fall; is that right?
 6   A   That's what you just represented,
 7   correct.
 8   Q   And have you considered whether that
 9   reduction in the patient's share of the
10   transaction would increase or decrease your
11   calculated overcharge amount?
12   A   Not at this time.
13   Q   I'd like to show you another transaction
14   example.  This will be marked Exhibit 9.
15       (Conti Deposition Exhibit Number 9 was
16   marked for identification.)
17   BY MR. RENDELL:
18   Q   Do you see this transaction bears the
19   Bates number DCVS-00333786270?
20   A   Yes, I see that.
21   Q   And do you see the U&C price originally
22   reported on this transaction was $60.59?
23   A   I'm sorry, where do I see that?
24   Q   The field charged U&C price amount.
25   A   Yes.

Page 239

 1   Q   The patient's share here was $10, right?
 2   A   Yes.
 3   Q   And the PBM's share was $35.78, right?
 4   A   Yes, I see that.
 5   Q   So the total payment for this transaction
 6   was $10 plus 35.78, or $45.78 --
 7   A   Okay.
 8   Q   -- Is that fair to say?
 9   A   Yes.  And are you representing that this
10   is a claim that was included in my calculation?
11   Q   Yes.  I'll represent that.
12   A   Okay.  In my overcharge calculation,
13   correct?
14   Q   In your overcharge calculation, yes.
15   A   Okay.
16   Q   And to be clear, the overcharge
17   calculation at the end, that doesn't include your
18   HSP offset.
19   A   Okay.  That's helpful.
20   Q   It's just your transaction-by-transaction
21   overcharge calculation.
22       Okay.  So here you see that the $45.78
23   amount, which, by the way, is in the sell price
24   amount column so, fortunately, we don't have to do
25   the math.  It's SELL_PRC_AMT.

Page 240

 1   A   I'm sorry what is that amount referring
 2   to?
 3   Q   You see that the $45.78 is the sum of $10
 4   plus the $35.78 PBM payment.
 5   A   Yes.
 6   Q   Okay.  And looking at this, you can see
 7   that $45.78 is less than the reported U&C price
 8   amount for this particular transaction, right?
 9   A   I'm sorry, where do I see the reported
10   U&C amount?
11   Q   The CHRGD_UC_PRC_AMT.
12   A   I'm not following you.  So the -- you're
13   saying -- you're representing that this is the
14   actual U&C price?
15   Q   This is the U&C price as it was
16   reported --
17   A   I'm with you.
18   Q   -- at the time.
19       In conducting your damages analysis, did
20   you actually look at the U&C price field?
21   A   I looked at it, but it did not factor
22   into my calculation.
23   Q   Right.  Understood.  Okay.
24       So looking at this now, you can see that
25   the total payment originally for this transaction

Page 241

61 (Pages 238 - 241)

**Page 306**

1 claims at this stage of your analysis as you
2 excluded [sic], right?
3      MS. FEGAN: I think you used "excluded"
4 twice.
5      THE WITNESS: Yeah, I think -- I don't
6 think that's right.
7 BY MR. RENDELL:
8    Q   You excluded over three times as many
9 claims at this stage of your analysis as you
10 included at this stage of your analysis, right?
11   A   Right.
12   Q   Are you aware how many health plans may
13 have only had claims among the 262 million-plus
14 claims that you excluded?
15   A   I can't do the calculation at the plan
16 level because I don't have the data to do it at
17 this point in time. But again, these PBMs are
18 transacting a billion dollars -- a billion claims
19 in a given day overall, nationwide. And so -- and
20 these are very commonly used drugs.
21       So again, my assessment is -- is that
22 most TPPs that would meet the definition of class
23 would likely have at least one.
24   Q   Can you assign a statistical number or a
25 percentage likelihood to your likelihood estimate?

**Page 307**

1    A   I could. I have not done that
2 calculation at this time.
3    Q   Okay. And you say that these are very
4 common drugs, but looking at your TPP class claims
5 exclusion, isn't it a fair inference that they are
6 more commonly charged at or under the HSP price
7 than they are over the HSP price?
8    A   I don't think you can make that
9 assessment at this stage.
10   Q   Why not?
11   A   Because again, these are claims that I am
12 including that meet multiple criteria, not just
13 one.
14   Q   Well, of the 322-plus million class
15 claims that you looked at, more of them were
16 previously adjudicated at a price that was at or
17 below the HSP price than were adjudicated over the
18 HSP price, right?
19   A   You mean over the HCP [sic] price --
20   Q   More --
21   A   More of them were adjudicated over.
22   Q   More of them were adjudicated at or under
23 the HSP price than were adjudicated over the HSP
24 price.
25   A   Okay.

**Page 308**

1    Q   In other words, of these transactions --
2    A   Uh-huh.
3    Q   -- you excluded more than you included.
4    A   That's right.
5    Q   And you did that at the stage of your
6 analysis where you were considering whether the
7 original price had been equal to or less than the
8 HSP price, right?
9    A   Uh-huh.
10       MR. RENDELL: Nothing further at this
11 time.
12       THE WITNESS: Thank you.
13       MS. FEGAN: Thank you.
14       THE VIDEOGRAPHER: We are off the record
15 at 6:18 p.m., and this conclude today's testimony
16 given by Rena Conti. The total number of media
17 units used was six and will be retained by
18 Veritext Legal Solutions.
19       (Whereupon, at 6:18 p.m., the deposition
20 of RENA CONTI was concluded.)

**Page 309**

1      CERTIFICATE OF NOTARY PUBLIC
2      I, Denise M. Brunet, the officer before
3 whom the foregoing deposition was taken, do hereby
4 certify that the witness whose testimony appears
5 in the foregoing deposition was sworn by me; that
6 the testimony of said witness was taken by me
7 stenographically and thereafter reduced to print
8 by means of computer-assisted transcription by me
9 to the best of my ability; that I am neither
10 counsel for, related to, nor employed by any of
11 the parties to this litigation and have no
12 interest, financial or otherwise, in the outcome
13 of this matter.

15      *Denise M. Brunet*
16      Denise M. Brunet
17      Notary Public in and for
18      The District of Columbia

20 My commission expires:
21 December 14, 2022