# EXHIBIT 5

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| Christopher Corcoran, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>CVS Pharmacy, Inc.<br><br>Defendant. | Case No. 15-cv-03504-YGR<br><br>CLASS ACTION<br><br>DECLARATION OF AMBER D. COMPTON<br><br>**UNREDACTED VERSION OF DOCUMENT -<br>TO BE FILED UNDER SEAL<br>(L.R. 79-5(d)(1)(D))** |

I, Amber D. Compton, pursuant to 28 U.S.C. § 1746, hereby affirm that I am over 18 years of age and competent to make the following Declaration.

Professional Experience

1. I am currently the Vice President, Retail Strategy & Contracting for Express Scripts, Inc. ("Express Scripts"), one of the largest pharmacy benefit management ("PBM") companies in the United States. I manage, directly or indirectly, a team of approximately 30 individuals.

2. I have over fifteen (15) years of experience in the PBM industry, working at Express Scripts.

3. My current responsibilities as the Vice President of Retail Strategy & Contracting include, among other things, managing relationships and negotiating provider agreements with pharmacies, ensuring network integrity, and overseeing Express Scripts' retail network.

4. I have held the position of Vice President of Retail Strategy & Contracting since 2010. Before that, I held the following positions at Express Scripts: Senior Manager (2001-2005); Director (2005-2006); Sr. Director (2006-2010).

5. In my various roles, I have been responsible for, among other things, managing Express Scripts' relationships with the retail pharmacies participating in its pharmacy network(s), including CVS Pharmacy, Inc. ("CVS"). The management of Express Scripts' relationships with retail pharmacies includes: assembling our pharmacy networks, negotiating our

contracts with the pharmacies, enrolling pharmacies in the networks, and ensuring the pharmacies are compliant with our contracts and provider manuals.

6. Through this work and my general experience in the PBM industry, I am familiar with the concept of "usual and customary" pricing.

### Generic Drug Programs

7. In approximately 2006, Walmart announced that it would begin selling certain generic medications for $4 to its customers. The announcement received significant attention in the healthcare industry generally and the PBM industry specifically.

8. After Walmart announced its $4 list, many companies that dispense prescription drugs, such as pharmacies and grocery stores, responded with a generic drug offering in one form or another of their own.

9. Generic drug membership programs were not an uncommon model. For example, the primary national retail pharmacy chains with which Express Scripts contracts, such as CVS, Walgreens and Rite Aid, all adopted a generic drug membership program at some point after the Walmart announcement. It is my understanding that a primary characteristic of a membership program is that it requires a customer to choose to enroll, i.e., to take some form of action not required of a regular customer, in order to join and receive the program's benefits.

10. In general, the membership program price is not offered to all pharmacy customers. Rather, as noted above, only individuals that enroll in a given pharmacy's program are charged the program prices. Prices offered under legitimate membership programs (*i.e.* prices not offered to all of a given pharmacy's customers) are generally not included in the pharmacy's usual and customary price under the Express Scripts, Inc. Pharmacy Provider Agreement. By contrast, Walmart made its $4 price available to all Walmart customers and, accordingly, reported those prices as its usual and customary price on pharmacy claims submitted to Express Scripts.

11. In my experience, there was general awareness in the marketplace that pharmacies with a membership program were not reporting the membership program prices as usual and customary prices.

12. During my tenure as Vice President, Retail Network Strategy and Contracting, our department was aware of CVS having a membership program. My understanding is CVS continued operating the program after I assumed my current position within Express Scripts.

13. As I understand it, in order to purchase prescriptions under its membership program, CVS required customers to enroll (i.e., not every CVS customer was part of the program; only

CONFIDENTIAL

CVSSM-0001347

people filling out an enrollment form participated) and to pay a membership fee to obtain the program's defined benefit.

### Express Scripts' Contract with CVS

14. Express Scripts contracts with the retail pharmacies that participate in its networks.

15. From 2008 through the present, the master contract governing the overall relationship between Express Scripts and CVS is the "Express Scripts, Inc. Pharmacy Provider Agreement," signed by Susan Lang, Senior Vice President of Pharmacy and Retail Relations at Express Scripts, on January 25, 2008 (the "Contract").

16. One defined term in the Contract is "Usual and Customary Retail Price" ("U&C"). The Contract defines U&C as "the usual and customary retail price of a Covered Medication in a cash transaction at the Pharmacy dispensing the Covered Medication (in the quantity dispensed) on the date that it is dispensed, including any discounts or special promotions offered on such date." Contract at ¶ 1.17.

17. I was aware that CVS was not submitting to Express Scripts the membership program prices as CVS's U&C price on prescription drug claims. Express Scripts did not object to CVS's approach because Express Scripts understood that the membership program price did not meet the definition of the U&C, as set forth in the Contract. Specifically, CVS did not make their membership prices available to all cash paying customers. Rather, as described above, it was a legitimate membership program that required enrollment and payment of a fee.

18. Express Scripts was aware of the pharmacy membership programs in the industry at the time, is aware that several still exist today, and believes these programs are outside the parties' contractual relationship. Specifically, bona fide membership programs were not "cash transaction[s]" for purposes of the U&C definition in the Contract, nor did Express Scripts interpret the terms "discounts" and "special promotions" in the Contract as encompassing the membership price.

DATED: 11/21/2016

Amber D. Compton
Vice President, Retail Strategy and Contracting
Express Scripts, Inc.

CONFIDENTIAL

CVSSM-0001348