# EXHIBIT 7

Page 1

1          UNITED STATES DISTRICT COURT

2         NORTHERN DISTRICT OF CALIFORNIA

3              OAKLAND DIVISION

4

CHRISTOPHER CORCORAN, et al.

5          Plaintiff,

6

     vs.                          No. 15-CV-03504-YGR

7

CVS PHARMACY, INC.,

8

          Defendant.

9    _____

10                              **UNREDACTED VERSION
                                 OF DOCUMENT -**

11                              **TO BE FILED UNDER SEAL
                                 (L.R. 79-5(d)(1)(D))**

12

13

14      VIDEOTAPED DEPOSITION OF WILLIAM JOHN BARRE

15

16            Thursday, November 17, 2016

17                 12:59 P.M.

18

19            12670 High Bluff Drive

20            San Diego, California

21

22

23   Reported by:

24   Harry Alan Palter

25   CSR No. 7708, Certified LiveNote Reporter

CONFIDENTIAL

CVSSM-0001339

```
                                             Page 2
 1  APPEARANCES:
 2
 3  For Plaintiffs:
 4      STEIN MITCHELL CIPOLLONE BEATO & MISSNER
        BY:  ROBERT B. GILMORE
 5      Attorney at Law
        1100 Connecticut Avenue, NW, Suite 1100
 6      Washington, DC 20036
        202.601.1589   Fax 202.352.1877
 7      E-mail: rgilmore@steinmitchell.com
 8
    For CVS:
 9
        WILLIAMS & CONNOLLY LLP
10      BY:  COLLEEN MCNAMARA
             GRANT GEYERMAN (TELEPHONICALLY)
11      Attorneys at Law
        725 Twelfth Strreet, NW
12      Washington, D.C. 20005
        202.434.5186   Fax 202.434.5029
13      E-mail: cmcnamara@wc.com
               ggeyerman@wc.com
14
15  For the Deponent:
16      THE PHOENIX LAW GROUP
        BY:  CANDIDA RUESGA
17      Attorney at Law
        8765 East Bell Road, Suite 110
18      Scottsdale, Arizona 85260
        480.444.3500
19      E-mail: cruesga@phoenixlawgroup.com
20
    Videographer:
21
        Ryan LaFond
22
23
24
25
```

```
                                             Page 3
 1                   INDEX
 2                                         PAGE
 3  APPEARANCES                               2
 4  PROCEEDINGS                               5
 5
 6            INDEX TO EXAMINATION
 7
 8         WITNESS:  WILLIAM JOHN BARRE
 9
10  EXAMINATION OF:
11  Bill Barre
12    BY MS. McNAMARA                     6, 88
13    BY MR. GILMORE                         50
14
15  WITNESS DECLARATION                      90
16  DEPOSITION ERRATA SHEET                  91
17  REPORTER'S CERTIFICATE                   92
18
19  INDEX OF VIDEO MEDIA
20  Media No. 1                              6
21
22           •_____•
23
24
25
```

```
                                             Page 4
 1              INDEX TO EXHIBITS
 2              WILLIAM JOHN BARRE
 3          Corcoran vs. CVS Pharmacy, Inc.
 4           Thursday, November 17, 2016
 5          Harry Alan Palter, CSR No. 7708
 6
 7  MARKED          DESCRIPTION            PAGE
 8  Defense Exhibit 299   CVS Pharmacy, Inc.'s     7
                          Amended Notice of
 9                        Videotaped Deposition
                          of Bill Barre
10
11  Defense Exhibit 300   MedImpact MedCare       20
                          Pharmacy Network
12                        Agreement, CVSC-0333819
                          through CVSC-0333863
13
    Defense Exhibit 301   Salesforce document,    35
14                        MEDIMPACT000001 through
                          MEDIMPACT000003
15
16  Plaintiff Exhibit 606  TP Contracts Indexing  64
                           Form, CVSC-0006048
17                         through CVSC-0006081
18
19           •_____•
20
21
22
23
24
25
```

```
                                             Page 5
 1            San Diego, California
 2     Thursday, November 17, 2016; 12:59 P.M.
 3
 4
 5         THE VIDEOGRAPHER:  All right.  Good
 6  afternoon.  We are on the record.
 7         This is the videotaped deposition of Bill
 8  Barre in the matter of Christopher Corcoran, et al.,
 9  vs. CVS Pharmacy, Inc.  This deposition is taking
10  place at 12670 High Bluff Drive, San Diego,
11  California  92130.  Today's date is November 17th,
12  2016.  Time on the record is 12:59.
13         My name is Ryan LaFond.  I'm the
14  videographer with U.S. Legal Support.  Our certified
15  court reporter is Harry Palter.  Video and audio
16  recording will take place, unless all counsel have
17  agreed to go off the record.
18         Would all present please identify
19  themselves, beginning with the witness.
20         THE WITNESS:  Bill Barre.
21         MS. RUESGA:  Candida Ruesga, Phoenix Law
22  Group, on behalf of MedImpact.
23         MS. McNAMARA:  Colleen McNamara and Grant
24  Geyerman, on the phone, from Williams & Connolly on
25  behalf of CVS pharmacy.
```

Page 22

1      A      It would be the agreement we would have
2   signed per that date.  Previously, we may have had
3   other national agreements of some type.  But to this
4   date, that would be, yes.
5      Q      And I'd like you to turn to page 20 of
6   the agreement.  And that is the Bates label ending
7   in -838.
8      A      Hmm-hmm.
9      Q      And about two-thirds of the way down the
10  page is a definition of, "Usual and customary or
11  U&C."  Do you see that?
12     A      Yes, I do.
13     Q      And it says, "Usual and customary or U&C,
14  means the lowest price member pharmacy would charge
15  to a cash-paying customer at that location for an
16  identical prescription on that day.  This price must
17  include any applicable discounts, promotions, or
18  other offers to attract customers."
19            Did I read that correctly?
20     A      Yes.
21     Q      And this would be the definition of "U&C"
22  that you and CVS agreed to as of the date of this
23  contract; correct?
24     A      Yes.
25     Q      Are you familiar with the term "cash

Page 23

1   discount card"?
2      A      Yes.
3      Q      What is a "cash discount card"?
4      A      A "cash discount card" is a card that a
5   consumer brings to a pharmacy and typically receives
6   a discount to that card compared to the pharmacy's
7   usual and customary price.
8      Q      And when you say, "discount compared to
9   the pharmacy's usual and customary price," what do
10  you mean?
11     A      We would negotiate a formula for pricing
12  drugs for cash discount business with a pharmacy or
13  a chain of pharmacies.  And the claims would price
14  at those contracted, calculated rates or the
15  pharmacy's usual and customary, whichever is a lower
16  price.
17     Q      And at the time you executed this
18  agreement with CVS, did you understand the
19  definition of "usual and customary" to require CVS
20  to submit cash discount card prices as usual and
21  customary?
22            MR. GILMORE:  Objection.  Form.
23  Foundation.
24            THE WITNESS:  No.  We would not have
25  considered that to be their usual and customary

Page 24

1   price.  It would have been the price of that
2   particular card program separate.
3   BY MS. McNAMARA:
4      Q      And why not?  Why wouldn't cash discount
5   cards be included in this definition?
6      A      Our view of usual and customary is as
7   it's defined in this agreement here (Indicating);
8   someone that has walked off the street, has not
9   shown any other type of processing or adjudication
10  associated with that card.
11            Passively, what would they be charged for
12  that drug without presenting any type of a -- other
13  form of either payment or form of a cash discount
14  card that would provide some type of a different
15  adjudication process.
16            So from a passive basis, you or myself or
17  anybody walking off the street -- what would that
18  price of that product be at that store at that given
19  point in time?
20     Q      Got it.
21            And did your understanding of whether
22  cash discount cards would be included in this U&C
23  definition ever change?
24     A      No.
25     Q      Do you recall that back in 2006, Walmart

Page 25

1   started to offer a list of generic drugs for $4?
2      A      Yes.
3      Q      And what do you remember about that
4   offering?
5      A      Well, that Walmart -- it was
6   approximately 400 drugs, almost all generic.  I
7   don't think there was any brand associated with
8   that.  It was a 30-day supply.  And they were
9   putting that list together and offering that as
10  their usual and customary price -- a $4 price tag --
11  for those particular drugs.
12     Q      And do you recall that they were offering
13  that price to anybody who walked in off the street
14  and purchased the drug?
15     A      We viewed that as Walmart's usual and
16  customary price.  Again, it was a passive
17  experience.  A person would not have to show any
18  type of ID card, or discount card or insurance card
19  or anything else to obtain that price.
20     Q      And do you recall in the 2007-2008
21  timeframe other pharmacies coming out with
22  membership programs offering special pricing on
23  generics?
24     A      Yes.
25     Q      And tell me what you remember about those

U.S. LEGAL SUPPORT
(877) 479-2484

CONFIDENTIAL

CVSSM-0001341

Page 26

1   programs.
2        A     What I recall is that several pharmacy
3   chains offered a membership program to which -- may
4   or may not have had a fee applied to -- and it was a
5   card specific to that pharmacy.
6             So, in other words, if you had a CVS
7   program, it wouldn't work at Walgreens, by way of
8   example -- and because a person had actively joined
9   that program, they were eligible to either get
10  either 30-day programs or some 90-day programs and
11  others -- prescriptions for those day supplies at a
12  discounted price.
13       Q     And did you view those programs as
14  different from the Walmart $4 offering?
15       A     Yes.
16       Q     And why was that?
17       A     Again, it's this passive vs. active
18  scenario.
19            In a passive model, the Walgreens usual
20  and customary was obtained by a consumer without
21  taking any action on their part.
22            In the example of a club program -- or
23  however you want to refer to these programs -- a
24  person had actively joined.  They either registered
25  or gave their name and information, but they were

Page 27

1   connected to a specific type of program that an
2   individual not enrolled in that program would not be
3   eligible to receive that pricing model.
4        Q     And you mentioned you recalled some
5   programs having a fee and others not having a fee.
6             Was the fee a determining factor for you
7   or was it the active-passive distinction that you've
8   been articulating?
9        A     It was the active --
10            MR. GILMORE:  Objection.  Form,
11  foundation.
12            THE WITNESS:  Excuse me.
13            It was the -- it was the active vs.
14  passive.
15            In passive, again meaning Walmart, a
16  person took no action and received that opportunity.
17            As far as a CVS or Walgreens or any other
18  type of program of these "club programs" as we
19  generically referred to them as, the individual had
20  made a decision to actively become part of such
21  program.  So we viewed that as different.
22  BY MS. McNAMARA:
23       Q     And did you view those -- well, and tell
24  me how you viewed membership programs with respect
25  to the pharmacy's usual and customary price.

Page 28

1        A     The --
2             MR. GILMORE:  Objection.  Form.
3   Foundation.
4             THE WITNESS:  The membership program was
5   a program that a consumer actively enrolled in, as
6   if they were joining -- and that was different than
7   a usual and customary, which we viewed as what would
8   be that -- what would be that price point if a
9   consumer was not taking any action, simply coming to
10  the pharmacy and presenting their prescription
11  without any other insurance card or discount program
12  or anything of that nature; what would that price
13  calculate -- what would they choose to charge for
14  that price?
15  BY MS. McNAMARA:
16       Q     And do you recall CVS having a membership
17  program?
18       A     Yes.
19       Q     And what do you recall about that
20  program?
21       A     I remember the program came out -- I
22  believe the program was really specifically for
23  90 days' medications at the time.  I believe they
24  had some type of charge associated with the program,
25  if I remember correctly.  And the program began

Page 29

1   somewhere in the 2007 or '8 range.  I can't exactly
2   remember when, but it sounds about right timewise.
3        Q     And CVS's program was also an
4   enrollment-based program, to your recollection?
5             MR. GILMORE:  Objection.  Form.
6   Foundation.
7             THE WITNESS:  Yes.  We saw it as an
8   enrollment program.
9   BY MS. McNAMARA:
10       Q     And how did you learn about CVS's
11  program?
12       A     Don't remember exactly the specific
13  event, but it was generally known in the industry
14  that CVS was offering such programs.  So whether --
15  some type of chain drugstore publication or whether
16  some type of industry information piece -- I'm sure
17  that's how we found out about it.
18       Q     And do you recall when you learned about
19  it?
20       A     Somewhere right around the beginning that
21  it started.  So in the 2007-'8 range, but not
22  specifically.
23       Q     And do you recall discussing membership
24  programs with other MedImpact employees in your
25  group?

CONFIDENTIAL                                                    CVSSM-0001342

Page 90

1    DECLARATION UNDER PENALTY OF PERJURY

2

3          I, William John Barre, do hereby certify under

4    penalty of perjury that I have read the foregoing

5    transcript of my deposition taken on November 17, 2016;

6    that I have made such corrections as appear noted on the

7    Deposition Errata Sheet, attached hereto, signed by me;

8    that my testimony as contained herein, as corrected, is

9    true and correct.

10

11          Dated this _____ day of _____, 20___, at

12   _____, California.

13

14

15          _____

16                William John Barre

17

18

19

20

21

22

23

24

25

Page 92

1    STATE OF CALIFORNIA      )

2                            )

3    COUNTY OF SAN DIEGO      )

4

5

6          I, Harry A. Palter, a Certified Shorthand

7    Reporter of the State of California, do hereby certify:

8          That prior to being examined, the witness in

9    the foregoing proceedings was by me duly sworn to

10   testify to the truth, the whole truth, and nothing but

11   the truth;

12          That said proceedings were taken before me at

13   the time and place therein set forth and were taken down

14   by me in shorthand and thereafter transcribed into

15   typewriting under my direction and supervision;

16          I further certify that I am neither counsel

17   for, nor related to, any party to said proceedings, nor

18   in any way interested in the outcome thereof.

19          In witness whereof, I have hereunto

20   subscribed my name.

21   Dated: November 18, 2016

22

23

24

     HARRY ALAN PALTER

25   CSR No. 7708

Page 91

1    DEPOSITION ERRATA SHEET

2    Page No._____ Line No. _____

3    Change:_____

4    Reason for change: _____

5    Page No._____ Line No. _____

6    Change:_____

7    Reason for change: _____

8    Page No._____ Line No. _____

9    Change:_____

10   Reason for change: _____

11   Page No._____ Line No. _____

12   Change:_____

13   Reason for change: _____

14   Page No._____ Line No. _____

15   Change:_____

16   Reason for change: _____

17   Page No._____ Line No. _____

18   Change:_____

19   Reason for change: _____

20   Page No._____ Line No. _____

21   Change:_____

22   Reason for change: _____

23

24   _____  _____

25      William John Barre              Dated

U.S. LEGAL SUPPORT
(877) 479-2484

CONFIDENTIAL

CVSSM-0001344