# EXHIBIT 9

```
 1   A.               UNITED STATES DISTRICT COURT

 2                  NORTHERN DISTRICT OF CALIFORNIA

 3   BEFORE THE HONORABLE YVONNE GONZALEZ ROGERS, JUDGE

 4   CHRISTOPHER CORCORAN, ET AL.,)        NO. C 15-3504 YGR
                                  )
 5              PLAINTIFFS,       )
     VS.                          )
 6   CVS PHARMACY, INC.,          )
                                  )
 7              DEFENDANTS.       )
     _____)         PAGES 1 - 53
 8
                                        OAKLAND, CALIFORNIA
 9                                      TUESDAY, MARCH 7, 2017
```

## TRANSCRIPT OF PROCEEDINGS

**APPEARANCES:**

```
FOR
PLAINTIFFS:              PRITZKER LEVINE LLP
                        180 GRAND AVENUE, SUITE 1390
                        OAKLAND, CALIFORNIA 94612
                   BY:  JONATHAN K. LEVINE, ESQUIRE
                        ELIZABETH C. PRITZKER, ATTORNEY AT LAW
AND
                        STEIN MITCHELL CIPOLLONE BEATO & MISSNER
                        LLP
                        1100 CONNECTICUT AVE. NW, SUITE 1100
                        WASHINGTON, DC 20036
                   BY:  ROBERT B. GILMORE, ESQUIRE

FURTHER APPEARANCES ON NEXT PAGE.


REPORTED BY:            KATHERINE WYATT, CSR NO. 9866

    PROCEEDINGS REPORTED BY ELECTRONIC/MECHANICAL STENOGRAPHY;
TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION.
```

```
 1  ‖        A P P E A R A N C E S  (CONT'D.)

 2  ‖ ALSO FOR INDIRECT PURCHASER PLAINTIFFS:

 3  ‖ HAUSFELD
    ‖ 600 MONTGOMERY STREET
 4  ‖ SUITE 3200
    ‖ SAN FRANCISCO, CALIFORNIA 94111
 5  ‖ BY:  BONNY E. SWEENEY, ATTORNEY AT LAW

 6  ‖ FOR DEFENDANTS:

 7  ‖ WILLIAMS & CONNOLLY LLP

 8  ‖ 725 TWELFTH STREET, N.W.

 9  ‖ WASHINGTON, DC 20005

10  ‖ BY:  GRANT A. GEYERMAN, ESQUIRE

11  ‖      F. LANE HEARD III, ESQUIRE

12  ‖      ENU MAINIGI, ATTORNEY AT LAW

13  ‖ AND

14  ‖ SWANSON & MCNAMARA

15  ‖ 300 MONTGOMERY STREET

16  ‖ SUITE 1100

17  ‖ SAN FRANCISCO, CALIFORNIA 94104

18  ‖ BY:  EDWARD W. SWANSON, ESQUIRE

19  ‖

20  ‖

21  ‖

22  ‖

23  ‖

24  ‖

25  ‖
```

```
 1   MARCH 7, 2017                          2:00 O'CLOCK P.M.

 2

 3                    P R O C E E D I N G S

 4        THE CLERK:  OKAY.  WE'LL DO THE CORCORAN VERSUS CVS

 5   NEXT.

 6        OKAY.  I'LL CALL THE CASE.  YOU CAN COME TO THE PODIUM,

 7   COUNSEL.

 8        CALLING CIVIL ACTION 15-3504, CORCORAN VERSUS CVS HEALTH

 9   CORPORATION.

10        COUNSEL, PLEASE COME FORWARD, AND STATE YOUR APPEARANCES.

11        MS. SWEENEY:  GOOD AFTERNOON, YOUR HONOR.  BONNY

12   SWEENEY FROM HAUSFELD FOR THE PLAINTIFFS.

13        MR. GILMORE:  GOOD AFTERNOON, YOUR HONOR.  ROBERT

14   GILMORE WITH STEIN MITCHELL FOR THE PLAINTIFFS.

15        MR. LEVINE:  GOOD AFTERNOON, YOUR HONOR.  JONATHAN

16   LEVINE, PRITZKER LEVINE, FOR THE PLAINTIFFS.

17        THE COURT:  GOOD AFTERNOON.

18        MR. GEYERMAN:  GOOD AFTERNOON, YOUR HONOR.  GRANT

19   GEYERMAN FROM WILLIAMS & CONNOLLY FOR THE DEFENDANT.

20        MR. HEARD:  LANE HEARD FROM WILLIAMS & CONNOLLY FOR

21   CVS.

22        THE COURT:  MR. HEARD, I DON'T HAVE YOUR NAME.  HOW DO

23   I SPELL YOUR LAST NAME?

24        MR. HEARD:  HEARD, H-E-A-R-D.

25        THE COURT:  OKAY.
```

```
 1              MS. MAINIGI:  ENU MAINIGI FROM WILLIAMS & CONNOLLY FOR

 2    THE DEFENDANTS.

 3              MR. SWANSON:  GOOD AFTERNOON, YOUR HONOR.  ED SWANSON

 4    OF SWANSON & MCNAMARA ON BEHALF OF THE DEFENDANTS.

 5              THE COURT:  ALL RIGHT.  GOOD AFTERNOON.

 6              MR. NEHRU:  GOOD AFTERNOON.  VIVAAN NEHRU FOR THE

 7    DEFENDANT.

 8              THE COURT:  WHICH OF THE FIRMS?

 9              THE CLERK:  DO YOU HAVE A CARD?

10              THE COURT:  WHICH OF THE FIRMS?

11              MR. NEHRU:  WILLIAMS & CONNOLLY.

12              THE COURT:  AND HOW DO I SPELL YOUR LAST NAME?

13              MR. NEHRU:  N-E-H-R-U.

14              THE COURT:  OKAY.  GOOD AFTERNOON.

15         ALL RIGHT.  WHO IS ARGUING?

16              MS. SWEENEY:  YOUR HONOR, BONNY SWEENEY FROM HAUSFELD.

17    MR. GILMORE AND I HAVE SPLIT UP THE ARGUMENT FOR PLAINTIFFS'

18    COUNSEL.  MR. GILMORE IS ADDRESSING MOST OF THE CLASS

19    CERTIFICATION ISSUES.  I WILL BE ADDRESSING ADEQUACY, ANY

20    QUESTIONS PERTAINING TO ERISA THAT YOUR HONOR MIGHT HAVE AND

21    MANAGEABILITY.

22         MR. GILMORE WILL ALSO ADDRESS ANY QUESTIONS YOUR HONOR HAS

23    ABOUT THE MOTIONS PERTAINING TO THE EXPERTS.

24              THE COURT:  ALL RIGHT.  LET'S START WITH YOU, MR.

25    GILMORE, THEN.
```

```
 1        MR. HEARD?

 2             MR. HEARD:  YES.

 3             THE COURT:  ALL RIGHT.

 4        OKAY.  LET'S START FROM THE BEGINNING.  WITH RESPECT TO THE

 5   ARGUMENTS ABOUT AVIS AND CORCORAN AND THEIR STANDING, I AM

 6   CONFUSED, MR. HEARD.  IT SEEMS TO ME THAT IF SOMEONE HAS EVEN ONE

 7   RELEVANT TRANSACTION THAT IS SUFFICIENT EVEN IF SOME OTHER

 8   TRANSACTIONS DO NOT QUALIFY.

 9        AM I WRONG WITH THAT BASIC PROPOSITION?

10             MR. HEARD:  WE DON'T DISAGREE WITH THE PROPOSITION.  WE

11   DISAGREE WITH --

12             THE COURT:  SO THE DISAGREEMENT COMES IN WHETHER OR NOT

13   I'M GOING TO ALLOW THIS ADDITIONAL EVIDENCE THAT'S TEED UP IN THE

14   MOTION TO STRIKE.

15             MR. HEARD:  THAT'S CORRECT.

16             THE COURT:  ALL RIGHT.  SO WE'RE GOING TO MOVE ON FROM

17   THERE.  WE'LL GET TO THAT ISSUE LATER.

18        AND THEN, WITH RESPECT TO THE OVERCHARGE, ON THAT ISSUE,

19   AGAIN, IT'S NOT CLEAR TO ME THAT THIS IS AN ISSUE OF STANDING.

20        IT SEEMS TO ME I NEED TO DECIDE IF THIS CASE GOES

21   ANYWHERE.  AND, FRANKLY, I HAVE TO TELL YOU RIGHT NOW,

22   MR. GILMORE, I HAVE MY SIGNIFICANT CONCERNS.  BUT WE'LL GET TO

23   THOSE.  WHETHER SOMEONE IS TYPICAL IF ALL THEY ARE DOING IS THEY

24   HAVE PURCHASED PRESCRIPTIONS IN THE 30-DAY OR 60-DAY VERSUS THE

25   90-DAY.
```

```
 1          SO FOR ME IT'S NOT SO MUCH AN ISSUE OF STANDING AS IT IS

 2   TYPICALITY.  HOW IS IT AN ISSUE OF STANDING?

 3          MR. HEARD:  WELL, I HAD NOT THOUGHT OF IT IN THOSE

 4   TERMS, YOUR HONOR.  WE THOUGHT IT WAS AN ISSUE OF STANDING

 5   BECAUSE OUR PERSPECTIVE WAS THAT THIS ATTEMPT TO DEFINE INTO THE

 6   CLASS PERSONS WHO SUPPOSEDLY PAID MORE THAN A PRORATED PRICE --

 7          THE COURT:  RIGHT.

 8          MR. HEARD:  -- IS TO BASE THE DEFINITION ON A FICTION

 9   THAT THERE WAS, IN FACT, PRORATED CHARGED PRICES PAID BY HSP

10   MEMBERS.  SO OUR THINKING WAS THIS IS A CASE WHERE THE RIGOROUS

11   ANALYSIS UNDER RULE 23 PENETRATES TO LOOK AT THE FACTS TO SEE IF

12   THERE IS ANY FACTUAL BASIS TO SAY THAT THERE WAS A PRORATED PRICE

13   PAID BY HSP MEMBERS.

14          AND WE BELIEVE THE STATE OF THE RECORD NOW, AFTER THE REPLY

15   BRIEFS, IS THAT THERE'S NO EVIDENTIARY BASIS FOR SAYING THAT HSP

16   MEMBERS EVER PAID THE PRORATED PRICE.  NOBODY WAS PAYING $3.33

17   FOR A 30-DAY PRESCRIPTION OR THE EQUIVALENT FOR A 60-DAY

18   PRESCRIPTION.

19          I SEE THAT YOUR HONOR -- IT'S RIGHT THAT THOSE PLAINTIFFS IN

20   A WAY ARE NOT TYPICAL BECAUSE THEY REALLY DON'T EXIST.  THAT'S

21   NOT THE FUNDAMENTAL CHARGE HERE.  THE CHARGE IS THAT THERE WAS

22   SOMETHING UNFAIR BECAUSE PEOPLE PAID MORE THAN THE HSP PRICE,

23   AND, IN FACT, MOST OF THE PLAINTIFFS PAID LESS.

24          THE COURT:  RESPONSE.

25          MR. GILMORE:  YOUR HONOR, THERE'S ABUNDANT EVIDENCE
```

```
 1    THAT CVS, IN FACT, DID CHARGE PATIENTS FOR QUANTITIES SMALLER

 2    THAN THE STANDARD 90-DAY HSP QUANTITY PRICES THAT ARE LESS THAN

 3    THE STANDARD 90-DAY HSP PRICE.

 4        THERE ARE OVER TWO-AND-A-HALF MILLION SUCH PURCHASES IN

 5    CVS'S TRANSACTION DATA.  AND SO THE NOTION THAT THERE ISN'T ANY

 6    EVIDENCE --

 7            THE COURT:  DO YOU HAVE A PERSPECTIVE ON THE STANDING

 8    VERSUS TYPICALITY DISTINCTION I'M TRYING TO MAKE?

 9            MR. GILMORE:  I DO, YOUR HONOR.  I MEAN, CVS BRIEFED IT

10    AS STANDING.  THERE ARE -- WE THINK THAT THE PLAINTIFFS, WHO

11    HAVE -- THERE ARE ONLY FOUR PLAINTIFFS, I BELIEVE, WHO ONLY HAVE

12    PRORATED QUALIFYING TRANSACTIONS.  AND -- BUT THERE IS A

13    SIGNIFICANT PORTION OF THE CLASS AS A WHOLE.  SO THEIR CLAIMS

14    CERTAINLY ARE TYPICAL FOR THE CLASS THAT WE SEEK TO CERTIFY AS A

15    WHOLE.

16        AND AS I SAID, GETTING BACK TO THE EVIDENCE, THE RIGOROUS

17    ANALYSIS SHOWS THAT, IN FACT, CVS DID CHARGE LESS THAN THE FULL

18    PRICE FOR LESS THAN THE FULL QUANTITIES, IN NUMEROUS, MILLIONS OF

19    TRANSACTIONS.  WHAT CVS DID AS A WORKAROUND SYSTEM, BECAUSE LOTS

20    OF PEOPLE DIDN'T WANT TO PAY THE FULL PRICE, IS THAT CVS WOULD

21    RING UP THAT TRANSACTION AS --

22            THE COURT:  YOU'RE GETTING OFF TOPIC.

23            MR. GILMORE:  -- A NON-HSP TRANSACTION.

24            THE COURT:  YOU'RE GETTING OFF TOPIC.

25        I WANT TO MOVE TO ASCERTAINABILITY.
```

```
 1        ANYTHING ELSE TO BE SAID BRISENO?  I MEAN, I KNOW THAT I'VE

 2   ASKED FOR SUPPLEMENTAL BRIEFING, BUT NOW'S YOUR OPPORTUNITY.  I

 3   SEE IT NOW AS, YOU KNOW, WITHIN THE NORMAL RULE 23 ANALYSIS.  AT

 4   LEAST THAT'S HOW I VIEWED IT.  THAT'S HOW I THINK THE NINTH

 5   CIRCUIT IS ASKING US TO LOOK AT IT.

 6        ANYTHING ELSE TO BE SAID?  IF NOT WE'LL MOVE TO PREDOMINANCE

 7   AND COMMONALITY.

 8        MR. GILMORE:  YOUR HONOR, I THINK OUR PAPERS STATE OUR

 9   POSITION.  WE FEEL THAT USING CVS'S OWN DATA WE CAN, IN FACT,

10   HAVE -- ASCERTAIN WHO THE CLASS MEMBERS ARE.

11        MR. HEARD:  NOTHING FURTHER, YOUR HONOR.

12        THE COURT:  ALL RIGHT.  SO THIS IS WHERE THE RUBBER

13   MEETS THE ROAD, AS THEY SAY.  THIS WHOLE CASE IS PREMISED ON

14   MISREPRESENTATIONS.  BUT THE EVIDENCE, AS NOW BEING SUBMITTED TO

15   THE COURT, SUGGESTS OR SHOWS PRETTY CLEARLY THAT ALL OF THE

16   REPRESENTATIONS WERE MADE TO THE PBM'S OR THE TPP'S, AND THE

17   PLAINTIFFS HAVE TO DEAL WITH THAT FACT.

18        MOREOVER, THE PROBLEM I SEE IS THAT THESE ARE, WHAT, 50ISH,

19   IN THAT GROUP, OF PBM'S AND 1200 CONTRACTS, ALL OF WHICH WERE

20   SEPARATELY NEGOTIATED BY SOPHISTICATED PARTIES?

21        AND SOMEHOW YOU HAVE COMMON EVIDENCE TO SUGGEST THAT THERE

22   HAVE BEEN AFFIRMATIVE MISREPRESENTATIONS?

23        YOU KNOW, I WENT BACK AND I LOOKED AT MY ORDER WHEN I

24   ALLOWED THIS CASE TO PROCEED.  AND IT CERTAINLY WASN'T MY

25   UNDERSTANDING OF WHAT YOU THOUGHT YOU HAD.  SO HERE WE ARE.
```

1     I JUST, AS I LOOKED AT THE EVIDENCE WITH RESPECT TO THE

2   AFFIRMATIVE REPRESENTATIONS, WHICH IS ONE OF YOUR THEORIES,

3   OMISSIONS, WHICH IS YOUR SECOND THEORY, AND THEN, PERHAPS,

4   INDIRECT MISREPRESENTATIONS, I DON'T SEE HOW YOU GET OVER THIS

5   HURDLE THAT ALL OF THIS WAS NEGOTIATED KNOWINGLY AND

6   INTELLIGENTLY BY SOPHISTICATED PARTIES IN TERMS OF WHAT YOU'RE

7   CLAIMING YOUR PROBLEM IS.

8     THAT'S THE CRUX.  GO AHEAD.

9     **MR. GILMORE:**  YOUR HONOR, WE THINK THAT THE PBM

10   TESTIMONY, AS ELICITED IN CROSS-EXAMINATION IN THEIR DEPOSITIONS,

11   ACTUALLY SUPPORTS OUR CASE FOR THESE REASONS.  FIRST OF ALL,

12   CVS'S WHOLE ARGUMENT THAT THERE ARE THESE SECRET, UNDOCUMENTED

13   UNDERSTANDINGS.  THERE'S NOT ANY PAPER.  THERE'S NO WRITTEN

14   UNDERSTANDING THAT MEMORIALIZE WHAT THESE AFTER-THE-FACT

15   LITIGATION DECLARATIONS REFLECT.

16     AND WHEN WE LOOK AT THE CONTRACTS, INTEGRATED, NEGOTIATED

17   CONTRACTS BETWEEN THE PBM'S AND CVS, THEIR LANGUAGE, SPECIFICALLY

18   THE DEFINITIONS OF "USUAL AND CUSTOMARY PRICE," ON THEIR FACE

19   WOULD REQUIRE PRICES SUCH AS THE HSP PRICE TO BE SUBMITTED AS

20   USUAL AND CUSTOMARY PRICES.

21     **THE COURT:**  LET ME ASK YOU SOMETHING.  DON'T THOSE 1200

22   CONTRACTS DEFINE "USUAL AND CUSTOMARY"?  I THINK I HAVE EXAMPLES

23   OF VARIOUS DEFINITIONS.

24     **MR. GILMORE:**  YOUR HONOR --

25     **THE COURT:**  "YES" OR "NO"?

```
 1        MR. GILMORE:  THEY DO.  AND THOSE DEFINITIONS ARE ALL

 2   MATERIALLY THE SAME.  THERE'S ONE DISTINCTION WHICH WE ACCOUNTED

 3   FOR IN OUR REVISED CLASS DEFINITION, BUT THEY ARE ALL MATERIALLY

 4   THE SAME.  AND WE KNOW THIS FOR A NUMBER OF REASONS.

 5        FIRST OF ALL, CVS IN ITS OPPOSITION AT PAGE TEN SAID THAT

 6   ALL OF THE DEFINITIONS OF U & C SHARE A COMMON ELEMENT, WHICH IS

 7   THAT IT'S THE PRICE THAT CASH CUSTOMERS PAY.

 8        AND WE SHOW THROUGH THE TRANSACTION DATA, WE SHOW THROUGH

 9   CVS'S INTERNAL DOCUMENTS THAT, A:  THIS IS DESCRIBED AS A CASH

10   PROGRAM OR AS A CASH OFFERING; THAT IT WAS -- THE HSP PRICES ARE

11   THE SINGLE MOST COMMON PRICES PAID BY CASH CUSTOMERS, SO -- AND

12   WHEN WE LOOK AT THE ARGUMENTS AND ANALYSIS FROM THE GARBE CASE,

13   FOR INSTANCE, THIS PROGRAM FITS THE DEFINITION IN THESE

14   CONTRACTS.

15        SO CVS HAS BROUGHT WITNESSES TO COME IN AND SAY:

16             "WELL, THERE'S NO PAPER, BUT WE HAD THIS UNDERSTANDING

17        THAT THESE DIDN'T NEED TO BE SUBMITTED AS USUAL AND

18        CUSTOMARY PRICES, DESPITE WHAT THE PLAIN LANGUAGE OF THE

19        CONTRACTS REFLECTS."

20        AND -- BUT WHEN WE ASKED THESE WITNESSES IN THEIR

21   DEPOSITIONS, IT'S CLEAR THAT EVEN THEIR TESTIMONY THAT THEY ARE

22   GIVING NOW IS NOT INFORMED.  IN FACT, IT'S BASED ON

23   MISREPRESENTATIONS.  IT'S BASED ON UNTRUTHS.

24        THEIR POSITIONS THAT THEY STATE IN THEIR DECLARATIONS, THAT

25   THE HSP PROGRAM PRICES DIDN'T NEED TO BE SUBMITTED AS USUAL AND
```

1    CUSTOMARY PRICES WERE BASED ON THEIR BELIEF THAT THIS WAS

2    LEGITIMATE.

3        WE USE THE WORDS OF THE ONE DECLARANTS, AMBER COMPTON, "A

4    BONA FIDE PROGRAM."  WE ASKED WHAT THAT MEANT.  THAT MEANT THAT

5    THE ONLY WAY YOU COULD GET THESE PRICES WAS IF YOU WERE IN THE

6    PROGRAM.

7            **THE COURT:**  LET ME TAKE AN EXAMPLE.  LET'S SAY YOU TOOK

8    JUST ONE OF THOSE CONTRACTS.  YOU'RE A CONSUMER.  YOU THINK

9    YOU'VE BEEN WRONGED, AND YOU HAVE THE EXACT SAME ISSUE YOU HAVE

10   HERE TODAY THAT YOU WANT ME TO CERTIFY A CLASS.  THERE ARE 11

11   DIFFERENT STATES.  IF THAT PERSON BROUGHT A LAWSUIT THE JUDGE

12   WOULD HAVE TO HAVE THE CONTRACT BETWEEN THE PBM AND CVS AND WOULD

13   HAVE TO UNDERSTAND WHAT THOSE PARTIES BELIEVED WHEN THEY

14   NEGOTIATED THAT CONTRACT IN ORDER TO MAKE ANY SENSE OF THE CLAIM

15   OF WHETHER OR NOT THERE WAS SOME FRAUD INVOLVED IN IT.

16       SO HOW CAN YOU AVOID -- NOW WHAT YOU'VE DONE IS YOU'VE

17   MULTIPLIED THAT 1200 TIMES.  HOW CAN I AVOID THAT CRITICAL LINK?

18           **MR. GILMORE:**  THE CONTRACTS AS RELEVANT HERE ARE

19   MATERIALLY THE SAME.  THEY ALL INVOLVE WHAT'S CALLED THE LOWER OF

20   U & C PRICING, WHICH IS A MECHANISM THAT THE CONTRACTS SHOW THAT

21   THE WITNESSES TESTIFIED, BOTH CVS AND DECLARANTS.  SAID WORKS THE

22   SAME.  IN FACT, CVS'S BUSINESS TREATS ALL OF THEIR CONTRACTS THE

23   SAME.

24       THE PRICE THAT CVS WILL BE PAID IN AN INSURANCE TRANSACTION

25   IS THE LOWER OF SOME CALCULATED NUMBER UNDER THE CONTRACT OR WHAT

1   CVS HAS REPORTED AS ITS USUAL AND CUSTOMARY PRICE.

2        THAT'S LOWER U & C PRICING.  AND THAT IS THE STANDARD

3   PRICING ALL OF THE WITNESSES HAVE SAID THIS IS COMMONPLACE.  IT

4   IS ESSENTIALLY UNIFORM THROUGHOUT CVS'S BUSINESS.

5             **THE COURT:**  ALL RIGHT.  RESPONSE.

6             **MR. HEARD:**  YOUR HONOR, EXACTLY CORRECT.  ONE CANNOT

7   AVOID IN THIS CASE ASKING EACH PBM AS TO EACH CONTRACT WHAT THAT

8   CONTRACT REQUIRED.  SO ON THE QUESTION OF PREDOMINANCE, YOUR

9   HONOR IS GOING TO BE ASKING:

10            "WHAT'S THE TRIAL EVIDENCE GOING TO BE?  AND IS THAT

11       TRIAL EVIDENCE INDIVIDUAL TO A PLAINTIFF OR IS IT COMMON?"

12       AND THERE IS NO COMMON ANSWER BECAUSE EACH PLAINTIFF HAS ITS

13   OWN HEALTH PLAN.  THAT HEALTH PLAN IS CONTRACTED WITH A

14   PARTICULAR PBM.  AND SO FOR EACH PLAINTIFF ONE HAS TO ASK WHAT

15   THAT PBM THAT WAS ADMINISTERING THAT PLAINTIFF'S CONTRACT

16   UNDERSTOOD TO BE THE REQUIREMENT.

17       AND THE EVIDENCE IN THE RECORD SHOWS THAT WE'VE GOT TO GO

18   PBM BY PBM, PLAINTIFF BY PLAINTIFF TO UNDERSTAND WHAT THEIR

19   UNDERSTANDING OF THE REQUIREMENT WAS.  AND THE EVIDENCE IN THE

20   RECORD, OF COURSE, SHOWS NOW FROM THE FIVE LARGEST PBM'S THAT

21   THEY BELIEVE THERE WAS NO REQUIREMENT ON THE PART OF CVS TO

22   REPORT MEMBER PRICES AS U & C PRICES.

23       BUT ONE CAN ONLY KNOW THAT BY GOING PBM BY PBM FOR EACH

24   PLAINTIFF AND CLASS MEMBER.  THAT'S WHY INDIVIDUAL PROOF IS GOING

25   TO PREDOMINATE.  OF COURSE, IF THERE'S NO REQUIREMENT TO REPORT

1   MEMBER PRICE, THERE'S NO MISREPRESENTATION.  THE CASE DIES RIGHT

2   THERE.

3       BUT IT'S INDIVIDUALIZED INQUIRY, CONTRACT BY CONTRACT, PBM

4   BY PBM.

5           **MR. GILMORE:**  YOUR HONOR, MAY I RESPOND BRIEFLY TO

6   THAT?

7           **THE COURT:**  YOU MAY, AND THEN I WOULD LIKE TO HEAR ANY

8   ARGUMENTS YOU MIGHT HAVE ON <u>GARBE</u>, MR. HEARD.

9       GO AHEAD.

10          **MR. GILMORE:**  SURE.  THERE IS UNIFORM ANSWERS, COMMON

11  ANSWERS TO COMMON QUESTIONS JUST ON THE RECORD OF THIS CASE.

12  WHEN WE DEPOSED THE PBM WITNESSES THAT CVS HAS BROUGHT IN, CVS

13  ITSELF HAS POINTED OUT THAT THESE PBM'S REPRESENT 75 PERCENT OF

14  THE CLASS.

15      WE ASKED THEM:

16          "DID YOU GET CVS'S ACTUAL CASH TRANSACTION DATA?"

17      NO, THEY DIDN'T.

18          "DID YOU KNOW THAT CVS ALLOWED PEOPLE WHO WEREN'T IN

19  THE PROGRAM TO PAY THESE SAME PRICES?

20          "NO, WE DIDN'T KNOW THAT.

21          "AND IF YOU DID KNOW THAT WOULD YOU HAVE EXPECTED CVS

22      TO SUBMIT THESE HSP PRICES AS THE USUAL AND CUSTOMARY

23      PRICES?"

24      AND THEY SAID:

25          "YES, IF IT WAS NOT CONFINED TO THE CLASS MEMBERS THEN

```
 1            THESE NEEDED TO BE SUBMITTED AS USUAL AND CUSTOMARY PRICES."

 2            THE COURT:  SO WHAT'S YOUR RESPONSE?

 3            MR. GILMORE:  THAT'S THE COMMON ANSWER.  SORRY.

 4            THE COURT:  WHAT'S YOUR RESPONSE TO THAT?

 5            MR. HEARD:  IT'S AN INDICATION, AGAIN, OF JUST HOW

 6   INDIVIDUALIZED THE EVIDENCE IS BECAUSE THIS GOES TO:  WHAT DID

 7   THE PBM'S KNOW?  AND THE EVIDENCE IS DISTINCT.

 8            THE COURT:  IF THEY ARE ALL SAYING THAT YOU HAVE TO

 9   DISCLOSE IT, WHICH IS WHAT HE JUST REPRESENTED TO ME, AND THESE

10   ARE THE FIVE MAJOR PEOPLE.

11            MR. HEARD:  YES.

12            THE COURT:  AT CLASS CERTIFICATION WE DON'T TRY THE

13   ENTIRE CASE.

14            MR. HEARD:  NO.

15            THE COURT:  SO WHY ISN'T THAT SUFFICIENT?

16       WELL, FIRST OF ALL, TELL ME IF HE'S MISREPRESENTING THE

17   RECORD.  AND SECOND, THEN ANSWER MY QUESTION.

18            MR. HEARD:  YES.  THE RECORD IS THAT, OF COURSE, THE U

19   & C PRICE HAD TO BE PRESENTED TO THE PBM.  WHERE THERE'S A

20   DIFFERENCE AND WHY YOU HAVE TO GO PBM BY PBM IS WHAT DID THEY

21   EXPECT CVS TO REPORT?

22       THE EVIDENCE FROM THE FIVE LARGEST IS THEY DID NOT EXPECT

23   THEM TO REPORT THE MEMBER PRICE.  AND THEY DID SO BECAUSE OF

24   DIFFERENT CRITERIA.

25       FOR EXAMPLE, EXPRESS SCRIPTS SAID THE MOST IMPORTANT
```

1    CHARACTERISTIC ABOUT A MEMBER PROGRAM WAS WHETHER THE INDIVIDUAL

2    CUSTOMER HAD TO AFFIRMATIVELY ENROLL IN THE PROGRAM.

3        MEDCO, ON THE OTHER HAND, SAID THE KEY CHARACTERISTIC OF A

4    MEMBER PROGRAM WAS THE PRICE.  THEY ARE APPLYING DIFFERENT

5    CRITERIA.  DIFFERENT ELEMENTS OF THE MEMBERSHIP PROGRAM ARE

6    IMPORTANT TO THEM, AND ONE CAN ONLY KNOW THAT IF ONE GOES

7    INDIVIDUALLY AND PRESENTS INDIVIDUAL EVIDENCE FOR EACH PBM.

8            **THE COURT:**  DO YOU WANT TO --

9          **MR. GILMORE:**  YOUR HONOR, MAY I RESPOND TO THAT?

10          **MR. HEARD:**  YOUR HONOR?

11          **THE COURT:**  GARBE, DO YOU HAVE ANYTHING TO SAY ABOUT

12   GARBE?

13          **MR. HEARD:**  I DO.  I THINK IT'S DISTINGUISHABLE FOR A

14   COUPLE OF REASONS, YOUR HONOR, THE PRINCIPAL ONE BEING THAT GARBE

15   IS QUITE UNUSUAL IN ITS PROCEDURAL POSTURE AND IN THE EVIDENTIARY

16   RECORD IT DISTINGUISHES FROM THIS CASE.

17       THE DISTRICT COURT THERE WAS QUITE CLEAR THAT IT WAS RULING

18   ON AN INDUSTRY UNDERSTANDING OF UNIFORM -- USUAL AND CUSTOMARY

19   PRICE SEPARATE AND APART FROM WHAT ANY CONTRACT PROVIDED.

20       AND THE KEY LANGUAGE THERE IS IT SAYS "USUAL AND CUSTOMARY."

21   AND THIS IS AT PAGE 1015 OF THE OPINION.

22          "'USUAL AND CUSTOMARY'" IS DEFINED BY THE RELEVANT

23          CONTRACT OF THE PBM HANDLING THE CLAIMS PROCESSING FOR THESE

24          PROGRAMS."

25       AND WHERE THE PLAINTIFF IN THAT CASE SAID THE NCPDP

1    DEFINITION CONTROLLED, THE COURT SAID:

2            "WE DISAGREE."

3        THE COURT SAID:

4            "IT WOULD BE NONSENSICAL TO FIND THAT THESE CONTRACTUAL

5        DEFINITIONS WOULD NOT CONTROL THE SPECIFIC CONTRACT."

6        SO THAT ITS ULTIMATE HOLDING AT PAGE 1016 WAS:

7            "ULTIMATELY, THE COURT HOLDS THAT THE NCPDP DEFINITION

8        OF 'CASH PRICE TO THE GENERAL PUBLIC' CONTROLS UNLESS,

9        UNLESS FURTHER DEFINED BY RELEVANT CONTRACT."

10       AND IN THAT CASE THE COURT DID NOT HAVE CONTRACTS BEFORE IT.

11   AS YOUR HONOR SAYS, THERE'S MORE THAN A THOUSAND CONTRACTS THAT

12   THE PLAINTIFFS HAVE PUT BEFORE YOU.  AND THE COURT HAD NO

13   EVIDENCE BEFORE IT, AS YOUR HONOR HAS EVIDENCE, THAT THE PBM'S

14   CONSTRUED THESE CONTRACTS IN A WAY CONTRARY TO THE PLAINTIFFS'

15   ALLEGATION.

16           **THE COURT:**  ALL RIGHT.  MR. GILMORE.

17           **MR. GILMORE:**  WITH RESPECT TO GARBE, WHAT COUNSEL

18   DESCRIBES GARBE IS INCORRECT.  THE PLAINTIFFS' EXPERT, SUSAN

19   HAYES, DID AN EXHAUSTIVE ANALYSIS OF THE CONTRACTS AND WENT

20   THROUGH.  AND THE PLAINTIFFS SUBMITTED TO THE COURT:

21           "HERE'S A THOUSAND CONTRACTS."

22       AND I SUSPECT THAT THE CONTRACTS THAT KMART HAD ARE PROBABLY

23   VERY SIMILAR TO THE ONES THAT CVS HAS AND --

24           **THE COURT:**  WE DON'T HAVE ANY SIMILAR ANALYSIS BY YOUR

25   EXPERTS, THOUGH.

1          **MR. GILMORE:**  WELL, WE HAVE --

2          **THE COURT:**  AM I CORRECT?

3          **MR. GILMORE:**  NO, I DON'T THINK THAT IS CORRECT.   DR.

4     NAVARRO HAS LOOKED AT DEFINITIONS IN CVS CONTRACTS.

5          **THE COURT:**  HOW MANY?

6          **MR. GILMORE:**  I'M NOT SURE.  I MEAN, IT'S --

7          **THE COURT:**  MORE THAN TEN?

8          **MR. GILMORE:**  I THINK THAT HE SAID IT WAS IN THE TEENS.

9     I DON'T REMEMBER THE EXACT NUMBER.  BUT WE HAVE CVS'S CONTRACT

10    CHART.  CVS SUBMITTED A CONTRACT CHART TO US.

11         AND WHEN YOU LOOK THROUGH THEIR DEFINITIONS, BOTH IN THAT

12    CHART AS WELL AS IN THE BRIEF, WE SEE THAT THERE'S FUNDAMENTAL

13    SIMILARLY.

14         LET ME GO BACK TO THE POINT ABOUT THE PBM TESTIMONY, YOUR

15    HONOR, BECAUSE IN EXHIBIT 62 TO OUR REPLY BRIEF, WE EXCERPT THE

16    PBM'S DEPOSITION TESTIMONY.  AND I'LL READ AN EXAMPLE.

17         **THE COURT:**  WE DON'T HAVE ALL DAY, BUT GO AHEAD.

18         **MR. GILMORE:**  I'LL MAKE THIS QUICK.  THIS IS FROM BILL

19    BARRY.  I HAVE ONE COPY, BUT I CAN HAND IT TO THE COURT.  IT'S

20    EXHIBIT 62 IN OUR REPLY BRIEF.

21         **THE COURT:**  NO, I'M JUST ABOUT TO REMIND YOU WHEN

22    LAWYERS READ THEY BECOME MOTORIZED.

23         **MR. GILMORE:**  I WILL TRY AND RESPECT THE COURT REPORTER

24    AND YOUR HONOR AND TRY AND READ SLOWLY.

25         WE ASKED HIM -- I ASKED HIM.  I TOOK HIS DEPOSITION.  AND I

1   ASKED MR. BARRY:

2         "IF THE HEALTH SAVINGS PASS PRICES WERE THE MOST COMMON

3       PRICES THAT CVS CHARGED CASH-PAYING CUSTOMERS WHO WERE NOT

4       ENROLLED IN THE HSP PROGRAM, WOULD MEDIMPACT HAVE WANTED

5       THOSE PRICES TO BE REPORTED AS USUAL AND CUSTOMARY PRICES?

6         "ANSWER:  IF BY NATURE CVS WAS PROVIDING THAT PRICE

7       POINT TO A CONSUMER, NO ACTION REQUIRED OR REQUESTED BY THE

8       CONSUMER, AND THEY SIMPLY WENT OUT AND PROVIDED THEIR PRICE

9       POINT.  LET'S JUST SAY, FOR EXAMPLE, THAT WAS $10.  WE WOULD

10      EXPECT THAT $10 TO BE CVS'S USUAL AND CUSTOMARY PRICE."

11      THE OTHER WITNESSES GAVE SIMILAR ANSWERS.  AND OUR DATA, AND

12  DR. HAYES' -- PROFESSOR HAYES' ANALYSIS SHOWS THAT TIME AND

13  AGAIN, CVS CHARGED NON-HSP MEMBERS THESE HSP PRICES.

14      SO IT WAS NOT AN EXCLUSIVE CLUB.  SO WE BELIEVE THAT

15  CERTAINLY THIS TESTIMONY WHICH WE THINK IS UNIFORM, WE PUT IN

16  FRONT OF THE COURT FROM THE WITNESSES THAT CVS PICKED AND

17  SUBMITTED DECLARATIONS FROM, DOES GIVE COMMON ANSWERS TO COMMON

18  QUESTIONS.

19          **THE COURT:**  LET'S MOVE TO RELIANCE, WHICH HAS SIMILAR

20  ISSUES.

21      FIRST OF ALL, WITH RESPECT TO WHETHER OR NOT THERE'S ANY

22  EVIDENCE TO SHOW -- WELL, ANY EVIDENCE WHERE YOU CAN PROVE THE

23  RELIANCE COMPONENT WITH RESPECT TO THE PBM'S YOU DIDN'T REALLY

24  TAKE THAT HEAD-ON IN YOUR OPPOSITION.  SO DO YOU WANT TO DO SO

25  NOW?  OR DO YOU WANT TO STAND ON YOUR OWN BRIEFS?

```
 1          MR. GILMORE:  IN OUR REPLY BRIEF -- WELL, I THINK THE

 2   TESTIMONY -- I THINK WE ACTUALLY DID ADDRESS THIS IN OUR REPLY

 3   BRIEF, YOUR HONOR.  THAT THE PBM DEPOSITION TESTIMONY REVEALED

 4   THAT THEY WEREN'T GIVEN THE TRUTH.  THEY WEREN'T GIVEN WHAT CVS'S

 5   ACTUAL CASH DATA WAS.  AND THEY WEREN'T TOLD THAT CVS WAS

 6   CHARGING THE HSP PRICES TO NON-HSP MEMBERS.

 7          AND SO THEY HAD RELIED ON THE REPRESENTATION, CVS'S

 8   DESCRIPTION OF THIS PROGRAM AS AN EXCLUSIVE PROGRAM.  THAT'S

 9   ACTUALLY MEMORIALIZED IN THE DECLARATIONS THAT THEY SUBMITTED.

10          SO WE THINK THAT THAT CERTAINLY WITH RESPECT TO THE PBM'S

11   THAT CVS HAS BROUGHT IN, THAT THERE IS RELIANCE IN THAT RESPECT,

12   AND IT'S COMMON.  IT'S COMMON EVIDENCE THAT SHOWS THAT.

13          THE COURT:  RESPONSE.

14          MR. HEARD:  I THINK THAT'S MISTAKEN IN TWO REGARDS,

15   YOUR HONOR.  FIRST OF ALL, ON THE FUNDAMENTAL LEVEL IT'S

16   INDIVIDUALIZED EVIDENCE NECESSARILY, AS RELIANCE EVIDENCE ALMOST

17   ALWAYS IS, BECAUSE TAKE AN INDIVIDUAL PLAINTIFF, TAKE PLAINTIFF

18   ODORISIO, FOR EXAMPLE.

19          IN HIS CASE, THE QUESTION IS:  WHAT DID HIS PBM RELY?

20   THAT'S EVIDENCE PECULIAR TO HIS CASE AND NOT IN THE CASE OF A

21   PLAINTIFF WHOSE HEALTH PLAN WAS ADMINISTERED BY A DIFFERENT PBM.

22          DID THE PBM RELY?  NOT IF THEY UNDERSTOOD THAT CVS WAS

23          NOT REQUIRED TO SUBMIT THE MEMBER PRICE AS THE U & C PRICE.

24          BUT THERE'S A SECOND LEVEL OF RELIANCE, YOUR HONOR, THAT IS

25   INDIVIDUAL TO THE INDIVIDUAL PLAINTIFFS' CASE.
```

1        **THE COURT:**  WELL, WE'RE NOT THERE YET.  I WANTED TO

2   MAKE SURE THAT WE'VE ADDRESSED -- DO YOU HAVE ANYTHING ELSE TO

3   SAY ON THE RELIANCE BY THE PBM'S.

4        **MR. GILMORE:**  NO, YOUR HONOR.

5        **MR. HEARD:**  IF I MAY, YOUR HONOR, I UNDERSTOOD MR.

6   GILMORE TO ARGUE -- AND IT'S AN ALLEGATION NOT IN THE COMPLAINT

7   BUT IT'S CERTAINLY AN ARGUMENT THEY ARE NOW MAKING, WHICH THE

8   WHOLE MEMBERSHIP PROGRAM IS A SHAM.  WE DIDN'T REALLY CHARGE A

9   MEMBERSHIP PRICE.  WE DIDN'T REALLY ENROLL PEOPLE IN THE PROGRAM.

10  AND THAT HAD PBM'S KNOWN THAT THEY WOULD HAVE TAKEN A DIFFERENT

11  VIEW.

12       BUT THAT INTRODUCES THE WHOLE CONCEPT OF:  DID THOSE PBM'S

13  REASONABLY RELY?  THE EVIDENCE IN THE RECORD IS THAT THEY KNEW

14  ABOUT THIS PROGRAM.  THEY KNEW ABOUT SIMILAR PROGRAMS BY WALGREEN

15  AND RITE AID AND HEB AND KROGER AND KMART AND WALMART.  AND MEDCO

16  EVEN TESTIFIED THAT THEY HAD A SECRET SHOPPER PROGRAM.  THEY WENT

17  OUT FOR THEMSELVES TO SEE WHETHER THE PROGRAM WAS A SHAM OR NOT.

18       SO WE WOULD HAVE TO GO PBM BY PBM TO SEE WHETHER THEY

19  REASONABLY RELIED.  IF THEY DIDN'T KNOW THAT THE PROGRAM WAS

20  LEGITIMATE, WHY DIDN'T THEY KNOW?  BECAUSE LIKE MEDCO THEY COULD

21  HAVE GONE OUT AND FOUND OUT ON THEIR OWN.

22       AND, AGAIN, THAT WILL BE EVIDENCE PECULIAR TO A PARTICULAR

23  PBM FOR THAT PBM'S MEMBERS.  ITS CUSTOMERS, ITS PLAINTIFFS.

24       **THE COURT:**  WITH RESPECT TO THE RELIANCE BY THE

25  INDIVIDUAL PLAINTIFFS THEMSELVES, AND THEIR CONTINUED USE OF OR

```
 1    PATRONAGE OF CVS, CAN'T THAT KIND OF EVIDENCE BE DEALT WITH IN

 2    TERMS OF EITHER A CLASS DEFINITION OR ADMINISTRATION, ANYTHING

 3    LIKE THAT?

 4            MR. HEARD:  I DON'T BELIEVE SO, YOUR HONOR, BECAUSE

 5    THERE ARE THREE ASPECTS TO THIS, PROBABLY AT LEAST TWO OR THREE

 6    ASPECTS.  ON THE FIRST LEVEL, THE CONTINUED PATRONAGE ITSELF

 7    SHOWS, OR A JURY COULD FIND, THAT IT'S EVIDENCE THAT THEY DIDN'T

 8    RELY.

 9         BUT PLAINTIFFS HAVE NOW COME BACK AND ARGUED THAT IT WAS

10    SOMEHOW INDISPENSABLE THAT THEY FILLED THEIR PRESCRIPTIONS AT

11    CVS.  AND THAT INTRODUCES A WHOLE OTHER LEVEL OF INDIVIDUALIZED

12    EVIDENCE BECAUSE THEN WE'RE INTO QUESTIONS FOR EACH.  THEY ARE

13    INDIVIDUAL TO EACH PLAINTIFF:  DID THEY, IN FACT, PATRONIZE

14    MULTIPLE PHARMACIES DURING THE CLASS PERIOD SHOWING THAT OTHER

15    PHARMACIES WERE AVAILABLE?

16         WHEN THEY SWITCHED PHARMACIES, AS MANY OF THEM DID, AS A

17    MAJORITY OF THEM DID DURING THE CLASS PERIOD, WHY DID THEY SWITCH

18    AND HOW DIFFICULT WAS IT FOR THEM TO SWITCH?

19         IF THEY DIDN'T SWITCH BUT THEY ARE SIMPLY SAYING:

20            "WE HAD NO CHOICE BUT TO SHOP AT CVS," WERE THERE OTHER

21    PHARMACIES AVAILABLE?  THAT'S INDIVIDUALIZED IN THEIR

22    NEIGHBORHOOD AND THEIR CIRCUMSTANCES.

23         ALL OF THAT IS INDIVIDUALIZED EVIDENCE THAT I DON'T THINK

24    CAN BE DEFINED OUT OF THE CLASS BUT REQUIRES INQUIRY CLASS MEMBER

25    BY CLASS MEMBER AS TO WHY THEY DID WHAT THEY DID.
```

1          **THE COURT:**  MR. GILMORE, RESPONSE.

2          **MR. GILMORE:**  YES, YOUR HONOR.  WITH RESPECT TO THE

3     ADMINISTRATION OR CLASS DEFINITION, WE THINK IF THE COURT THINKS

4     THAT THIS IS A CONCERN THAT MAY IMPACT THE CLASS, THEN THE

5     RESOLUTION AT MOST WOULD BE TO CUT OFF THE CLASS DEFINITION UPON

6     THE FILING OF THE SUIT.

7          BUT OUR ARGUMENT IS THIS:  THESE ARE NOT DISCRETIONARY

8     PURCHASES, SO WE'RE NOT TALKING ABOUT --

9          **THE COURT:**  WELL, THEY ARE NOT DISCRETIONARY PURCHASES,

10    BUT THEY CERTAINLY ARE -- THERE'S PLENTY OF PHARMACIES AROUND AND

11    THEY ARE RIGHT ACROSS THE STREET FROM EACH OTHER.  SO WHETHER OR

12    NOT YOU GO TO CVS OR RITE AID OR SOME OTHER -- WALGREENS, THAT'S

13    NOT MANDATORY IN ANY WAY EVEN IF YOUR PRESCRIPTIONS -- YOUR NEED

14    FOR THOSE PRESCRIPTIONS ARE.

15         **MR. GILMORE:**  IT'S NOT.  THERE IS, THOUGH, AN IMPORTANT

16    OBJECTIVE IN THE HEALTHCARE INDUSTRY THAT CVS HAS ESPOUSED.  IT'S

17    ADMITTED THAT CONTINUITY OF CARE IS AN IMPORTANT HEALTHCARE

18    OBJECTIVE.

19         **THE COURT:**  THAT MAY BE, BUT CAN YOU REALLY SAY THAT

20    ALL CLASS MEMBERS ACROSS 11 STATES SOMEHOW -- ESPECIALLY,

21    BECAUSE I SUSPECT MANY CLASS MEMBERS ARE ELDERLY -- HAVE SOME

22    NOTION THAT, YOU KNOW, CENTRALIZED -- AT THIS POINT IN TIME,

23    CENTRALIZED PHARMACEUTICAL PRACTICES IS SOMETHING THAT THEY ALL

24    AGREE ON?

25         **MR. GILMORE:**  WITH RESPECT TO THE CLASS, THE CLAIMS

1    THAT WE'VE ASSERTED AND WE POINT TO THE AUTHORITIES, INCLUDING

2    YOUR HONOR'S DECISION IN THE BIAS CASE AND THE U.S. FOOD CASE

3    THAT BIAS CITED SHOWS THAT THERE'S A PRESUMPTION OF RELIANCE FOR

4    THE CLASS WHEN YOU HAVE FINANCIAL MISREPRESENTATIONS, UNIFORM

5    MISREPRESENTATIONS AT THE POINT --

6            THE COURT:  BY THE WAY, BIAS, YOU HAVE NO IDEA ABOUT

7    THAT CASE, DO YOU?  HAVE YOU TALKED TO THE LAWYERS IN THAT CASE?

8    THERE WERE THREE BANK CASES, WELLS FARGO, CHASE AND CITIBANK.

9    TWO OF THEM WERE ULTIMATELY RESOLVED FOR THE DEFENDANT'S FAVOR.

10   ONLY BIAS HAS MOVED FORWARD FOR THE PLAINTIFFS.

11        DO YOU UNDERSTAND THOSE CASES?  BECAUSE I SPENT YEARS WITH

12   THEM.

13           MR. GILMORE:  I'M QUITE SURE YOU KNOW THEM BETTER THAN

14   I DO, YOUR HONOR.  I'M ONLY GOING BY YOUR REPORTED OPINIONS.

15           THE COURT:  MY ONLY SUGGESTION IS THAT YOU SHOULD

16   ALWAYS BE CAREFUL.  EVERYONE IN THE COURTROOM SHOULD BE CAREFUL

17   CITING CASES BACK TO JUDGES THAT THEY WROTE, BECAUSE YOU DON'T

18   QUITE UNDERSTAND THE CONTEXT OF THOSE CASES.

19        BUT GO AHEAD.

20           MR. GILMORE:  WELL, WITH THAT WARNING, I'LL TRY AND

21   PROCEED AND APOLOGIZE IF I MISSTATE THE CASE.  WE RECOGNIZE THAT

22   WE SAW AT LEAST TWO CASES OF YOURS THAT DEALT WITH SOME OF THE

23   SAME KINDS OF ISSUES HERE, THE STICK CASE AND THE BIAS CASE.

24        AND WE ARGUED, AND I THINK SHOWED WHY, THE BIAS CASE IS THE

25   ONE THAT IS MORE APT IN TERMS OF THE COMMON ELEMENTS THAT THE

1    VARIATIONS IN THE CONTRACTS WEREN'T SOMETHING THAT PREVENTED

2    CLASS CERTIFICATION IN THAT CASE.

3         **THE COURT:**  THERE'S NOT THE SAME COROLLARY.  MOVE ON.

4         **MR. GILMORE:**  OKAY.  BUT WITH RESPECT TO THE POINT OF

5    UNIFORM FINANCIAL MISREPRESENTATIONS, WHICH IS A POINT THAT A

6    NUMBER OF CASES -- AND WE CITED THOSE IN OUR BRIEF -- SAY THAT

7    THERE'S A PRESUMPTION OF RELIANCE WHEN WE'RE TALKING ABOUT PRICE.

8    AND THAT'S WHAT THIS CASE IS ABOUT:  MISREPRESENTATIONS ON PRICE

9    AT THE POINT OF SALE.

10        AND THAT IS --

11        **THE COURT:**  BUT IT'S NOT.  THAT IS THE

12   MISREPRESENTATION IS NOT AT THE POINT OF SALE.  THE ONLY ALLEGED

13   MISREPRESENTATION THAT HOLDS YOUR THEORY TOGETHER IS A

14   REPRESENTATION TO THE PBM'S AND THE TPP'S.

15        IN TERMS OF A PRESUMPTION OF RELIANCE, WHAT STATES OF THE 11

16   FOLLOW THAT PRESUMPTION?

17        **MR. GILMORE:**  YOUR HONOR, WELL, FIRST OF ALL THERE ARE

18   A NUMBER OF STATES THAT DON'T HAVE RELIANCE AS UDAAP --

19        **THE COURT:**  DO YOU HAVE THE LIST, YES OR NO?

20        **MR. GILMORE:**  I DO.  GIVE ME ONE MINUTE.

21        **THE COURT:**  WHILE HE'S LOOKING, WHAT ABOUT THIS

22   DISTINCTION BETWEEN DISCRETIONARY AND NECESSARY PURCHASES, MR.

23   HEARD?

24        **MR. HEARD:**  YOUR HONOR'S ANSWER WAS THE ANSWER WE GAVE

25   IN OUR BRIEF, WHICH IS THE QUESTION ISN'T WHETHER THE DRUG

1    PRESCRIPTION IS INDISPENSABLE.  THE QUESTION IS WHETHER THEY HAVE

2    AN ALTERNATIVE SOURCE.  AND THE PLAINTIFFS' OWN EVIDENCE IS THAT

3    THEY REGULARLY SWITCH BETWEEN PHARMACIES PRECISELY BECAUSE THERE

4    WERE PHARMACIES ESSENTIALLY ACROSS THE STREET.  AND EVEN WHERE

5    THEY DIDN'T SWITCH, THEY TESTIFIED THAT THERE WERE PHARMACIES

6    NEARBY.  BUT THAT QUESTION IS AN INDIVIDUAL QUESTION

7    PLAINTIFF-BY-PLAINTIFF, JUST AS THE QUESTION OF CONTINUITY OF

8    CARE IS PECULIAR TO EACH INDIVIDUAL AND WHETHER THAT WAS A

9    CONCERN IN THEIR CASE.

10             **THE COURT:**  ALL RIGHT.  DO YOU HAVE THE ANSWER?

11             **MR. GILMORE:**  YES, YOUR HONOR.  FOR EXAMPLE, WITH

12    RESPECT TO UDAAP, THE STATUTORY CLAIMS, ONLY ARIZONA, CALIFORNIA,

13    PENNSYLVANIA AND TEXAS REQUIRE RELIANCE.  THE OTHER STATES DO NOT

14    REQUIRE RELIANCE AS PART OF THEIR UDAAP CLAIMS.

15             YOUR HONOR, WITH RESPECT TO WHAT THE EVIDENCE SHOWS, CVS HAS

16    NOT POINTED TO EVIDENCE THAT PLAINTIFFS HAD REASONABLY ECONOMIC

17    ALTERNATIVES TO BUY THESE SAME DRUGS FOR LESS THAN WHAT THEY WERE

18    BUYING THEM FROM CVS.  THEY ARE MEDICALLY NECESSARY DRUGS.  SO

19    THE QUESTION ISN'T YOU DON'T NEED TO BUY THEM.  THE QUESTION IS:

20    COULD YOU GO SOMEWHERE ELSE AND GET THEM FOR LESS THAN WHAT

21    YOU'RE PAYING CVS FOR IT?

22             AND THAT'S NOT EVIDENCE THAT CVS HAS PUT IN THE RECORD, BUT

23    WE DON'T THINK THAT THERE IS EVIDENCE OF THAT.  AND WITH RESPECT

24    TO -- YOUR HONOR, I THINK THAT THE TESTIMONY ABOUT WHETHER THERE

25    ARE OTHER PHARMACIES, I MEAN THAT IS TRUE, BUT INCONSEQUENTIAL,

1   BECAUSE IT'S NOT -- OF COURSE THERE ARE OTHER PHARMACIES OUT

2   THERE, BUT THEY NEED TO GET THESE DRUGS.  AND THEY DIDN'T HAVE A

3   CHOICE.

4          THE COURT:  I DON'T UNDERSTAND THAT STATEMENT.  CVS HAS

5   PENICILLIN AND WALGREENS DOESN'T?

6          MR. GILMORE:  DOES WALGREENS OFFER IT? IS THERE A

7   WALGREENS NEARBY SUCH THAT IT'S ECONOMICAL TO GO THERE AND BUY

8   THE PRESCRIPTION FOR THE SAME OR LESS THAN WHAT YOU'RE PAYING

9   CVS?

10     THAT'S -- PLAINTIFFS -- WHAT CVS HAS TRIED TO DO IS SAID

11  THAT PLAINTIFFS HAD OTHER OPTIONS, BUT THEY ACTUALLY HAVEN'T PUT

12  THAT EVIDENCE IN THAT YOU HAD OTHER OPTIONS TO BUY THESE SAME

13  DRUGS SOMEWHERE LESS.  THEY DIDN'T GO OUT AND GET MARKETING

14  SURVEYS, FOR INSTANCE.

15         MR. HEARD:   IT'S IN THE PLAINTIFFS' DEPOSITION

16  TESTIMONY, AND I'M PREPARED TO HAND UP THE EXCERPTS FROM THAT

17  TESTIMONY THAT SHOWS THAT.

18         MR. GILMORE:  ON THE PRICES?

19         THE COURT:  YOU DIDN'T TALK TO HIM DIRECTLY, DID YOU?

20         MR. GILMORE:  YOUR HONOR, ON THE PRICES, I DON'T THINK

21  THAT THERE ARE -- I DON'T THINK THAT THERE'S DEPOSITION TESTIMONY

22  THAT SAYS THAT FOR THE PRESCRIPTIONS THAT THE PLAINTIFFS WERE

23  PURCHASING HERE THAT THEY WERE ABLE TO OBTAIN THOSE PURCHASES FOR

24  LESS FROM OTHER PHARMACIES.

25         THE COURT:  ALL RIGHT.  LET'S MOVE ON TO INJURIES,

```
1    THIRD ISSUE UNDER PREDOMINANCE.

2        SO WE HAVE TWO PARTICULAR PLAINTIFFS THAT YOU'RE CONCERNED

3    ABOUT ON THE DEFENSE SIDE, MR. HEARD.

4            MR. HEARD:  WELL, THOSE TWO ARE ILLUSTRATIVE.  THE

5    LARGER PROBLEM, YOUR HONOR, IS THAT TO DETERMINE WHETHER A CLASS

6    MEMBER HAS INJURY ONE HAS TO LOOK BACK TO THEIR PARTICULAR HEALTH

7    INSURANCE POLICY, THEIR PLAN.

8        THAT'S WHAT CONTRACTUALLY SAYS THAT THEY ARE GOING TO MAKE A

9    $5 COPAYMENT OR A $20 COPAYMENT OR TIERED COPAYMENT.

10           THE COURT:  WITH RESPECT TO KRONE -- AND THAT'S

11   K-R-O-N-E -- WHAT'S YOUR RESPONSE ON THE COLLATERAL SOURCE

12   ARGUMENT RAISED BY THE PLAINTIFFS IN THEIR REPLY?

13           MR. HEARD:  I WOULD SAY THREE RESPONSES, YOUR HONOR.

14   FIRST, THE COLLATERAL SOURCE RULE MIGHT APPLY.  WHAT WE WERE

15   TALKING ABOUT WAS INSURANCE THAT WAS INSURING AGAINST THE RISK OF

16   BEING OVERCHARGED.  THAT'S NOT THE KIND OF INSURANCE THAT IS

17   INVOLVED HERE, AND I DON'T THINK LOGICALLY THE COLLATERAL SOURCE

18   RULE APPLIES.

19       SECONDLY, AS A MATTER OF COMMON SENSE WHEN THE QUESTION IN

20   THIS CASE IS WHETHER THE CUSTOMER PAID MORE THAN HE SHOULD HAVE,

21   ACCORDING TO THE TERMS OF HIS INSURANCE POLICY, ONE HARDLY IGNORE

22   WHAT THE INSURANCE POLICY PROVIDES AND PAID.

23       THIRD, THE LEGAL PRINCIPLE IS THAT THE COLLATERAL SOURCE

24   RULE DOESN'T APPLY UNLESS THE PAYMENT IS FROM A WHOLLY

25   INDEPENDENT THIRD PARTY.  AND THE TPP'S, THE THIRD-PARTY PAYERS,
```

```
 1   ARE NOT WHOLLY INDEPENDENT --

 2           THE COURT:  RESPONSE, MR. GILMORE, TO THOSE THREE

 3   POINTS?

 4           MR. GILMORE:  YOUR HONOR, THE COLLATERAL SOURCE RULE IN

 5   GENERAL IN CALIFORNIA AND OTHER JURISDICTIONS SAYS IF A

 6   THIRD-PARTY REIMBURSES A PLAINTIFF FOR SOME OF THE LOSS THAT

 7   DOESN'T EXONERATE THE DEFENDANT FOR THE LIABILITY.

 8       TO BE CLEAR, AS I UNDERSTAND WHAT CVS IS TRYING TO ARGUE,

 9   CVS IS SAYING POSSIBLY IF WE HADN'T OVERCHARGED PEOPLE, THEN THEY

10   MAY HAVE BEEN -- THEY MAY HAVE PAID THE SAME AMOUNT

11   OUT-OF-POCKET.

12       AND THAT IS A CONJECTURAL ARGUMENT.  AND THE CASE LAW IS

13   CLEAR YOU CAN'T OPPOSE CLASS CERTIFICATION WITH A CONJECTURAL

14   ARGUMENT.

15       MORE IMPORTANTLY, CVS IS CONFUSING WHAT IS RELEVANT ABOUT

16   THE INSURANCE HERE.  YOU DON'T NEED TO LOOK AT THE SPECIFIC PLAN

17   DESIGN THAT A PLAINTIFF HAS. WHAT YOU NEED TO LOOK AT IS THE

18   REQUIREMENT FOR LOWER AND USUAL AND CUSTOMARY PRICING.

19       AND INSURER CALCULATES WHAT THE DEFAULT COPAYMENT IS.  AND

20   HOWEVER IT DOES THAT IT THEN COMPARES THAT NUMBER TO WHAT IT GOT

21   AS THE USUAL AND CUSTOMARY PRICES REPORTED FROM THE PHARMACY.

22   AND IF THE USUAL AND CUSTOMARY PHARMACY PRICE IS LOWER, THAT'S

23   THE NUMBER THAT THE INSURER, THE PBM, TELLS THE PHARMACY TO

24   COLLECT.

25       SO THE VARIATIONS IN PLAN DESIGN DON'T MATTER.  YOU GET TO A
```

```
 1   COMPARISON THAT IS UNIFORM ACROSS THE CLASS.

 2           THE COURT:  HOW ARE YOU GOING TO -- LET'S SAY KRONE,

 3   HOW DO YOU CALCULATE THE DAMAGES FOR KRONE WITHOUT LOOKING AT HER

 4   INSURANCE?

 5           MR. GILMORE:  WHAT CVS -- AS I UNDERSTAND IT, CVS IS

 6   ARGUING THAT --

 7           THE COURT:  I'M ASKING YOU, MR. GILMORE, AS THE

 8   PLAINTIFFS' ATTORNEY HOW DO YOU CALCULATE THE DAMAGES FOR

 9   PLAINTIFF KRONE WITHOUT LOOKING AT HER POLICY?

10           MR. GILMORE:  WE CALCULATE THE DAMAGES AS FOLLOWS:  WE

11   HAVE CVS'S TRANSACTION DATA.  WE KNOW AT THE TIME FOR HER

12   PURCHASES FROM CVS -- BY THE WAY, SHE'S A FORMER PLAINTIFF.

13   SHE'S BEEN DISMISSED FOR REASONS NOT RELEVANT TO THIS ISSUE.  BUT

14   IT'S ILLUSTRATIVE.

15       WE LOOK AT CVS'S TRANSACTION DATA.  THE INFORMATION IS ALL

16   IN THE TRANSACTION DATA.  WE KNOW THAT THE NUMBER THAT THE -- HER

17   INSURER OR PBM REPORTED TO CVS.  WE COMPARE THAT TO WHAT

18   PROFESSOR HAYES RECALCULATED AS WHAT CVS'S TRUE, USUAL AND

19   CUSTOMARY PRICE OUGHT TO HAVE BEEN.

20       AND IF THE TRUE, USUAL AND CUSTOMARY PRICE IS LESS THAN WHAT

21   SHE PAID AS A COPAYMENT, THEN THE DELTA IS THE DAMAGES.

22       YOU DON'T NEED TO LOOK AT THE VARIATIONS, TO THE EXTENT

23   THERE ARE ANY VARIATIONS, IN HER OWN PLAN DESIGN BECAUSE THAT

24   LOWER U & C PRICING IS UNIFORM.

25           THE COURT:  IF I HAVE AN INSURANCE PLAN THAT TELLS ME I
```

1   HAVE TO PAY $10 PER PRESCRIPTION, AND I WANT TO BUY OR I NEED TO

2   BUY AMOXICILLIN FOR MY KID, AND IT WAS REPORTED AS THE -- THE

3   BOTTLE WAS REPORTED AS BEING $30.  UNDER MY PLAN I PAY TEN.  IF

4   THE USUAL AND CUSTOMARY PRICE WAS $20, UNDER MY PLAN I PAID TEN.

5   I DON'T GET TO PAY ZERO, WHICH IS THE DELTA, THE $10 DELTA

6   BETWEEN THE TWO PRICES.

7        SO HOW DO YOU DECIDE WHAT MY DAMAGES ARE IF THE TWO NUMBERS

8   ARE STILL HIGHER THAN THE MINIMUM AMOUNT I HAVE TO PAY UNDER MY

9   PLAN?

10            **MR. GILMORE:**  IN THAT CASE THERE ARE NO DAMAGES.

11  HERE'S WHERE THERE WOULD BE DAMAGES.  SAY THE PHARMACIES -- SAY

12  YOUR COPAYMENT IS $10, BUT IT'S SUBJECT TO THIS LOWER U & C

13  PRICING.  AND IF YOU HAVE EVER GONE TO THE PHARMACY AND NORMALLY

14  YOU PAY YOUR FLAT RATE, BUT SOMEDAY FOR THE SAME PRESCRIPTION

15  INSTEAD OF PAYING THE NORMAL RATE YOU'RE ACCUSTOMED TO, IT'S SOME

16  DIFFERENT, SMALLER NUMBER.  THAT IS VERY LIKELY A SITUATION WHERE

17  THE PHARMACY SUBMITTED ITS USUAL AND CUSTOMARY PRICE.  THAT

18  NUMBER, THE U & C, IS LOWER THAN YOUR DEFAULT COPAY, AND SO YOUR

19  INSURER TOLD THE PHARMACY:

20            "CHARGE JUDGE GONZALEZ ROGERS THIS SMALLER AMOUNT."

21       WHAT WE'RE SEEING IN OUR CASE IS THAT CVS SHOULD HAVE BEEN

22  SUBMITTING LOWER USUAL AND CUSTOMARY PRICES INSTEAD OF THE

23  INFLATED ONE. SO WE --

24            **THE COURT:**  SO BACK TO MY ORIGINAL QUESTION --

25            **MR. GILMORE:**  SURE.

1          **THE COURT:**  -- WHICH IS:  HOW DO YOU MAKE THAT

2     CALCULATION WITHOUT AN ANALYSIS OF THE PLAN?

3          **MR. GILMORE:**  BECAUSE WE KNOW --

4          **THE COURT:**  YOU HAVE TO KNOW WHAT THE BASE NUMBER IS.

5          **MR. GILMORE:**  WE KNOW WHAT THE BASE NUMBER IS.  WE KNOW

6     THE NUMBER THAT THE INSURER TOLD THE PHARMACY TO COLLECT.  AND WE

7     LOOK AT THAT AND WE COMPARE IT TO THE RECALCULATED U & C'S THAT

8     PROFESSOR HAYES DEVELOPED BASED ON THE CVS HSP PRICES.  AND IF

9     THAT RECALCULATED U & C IS LOWER THAN WHAT THE PERSON ACTUALLY

10    PAID AT THE STORE, THAT DIFFERENCE ARE THE DAMAGES.  IT'S THE

11    SAME CALCULATION CLASS-WIDE, AND IT'S UNIFORM.

12         **THE COURT:**  YOU'RE DOING THIS DRUG BY DRUG?

13         **MR. GILMORE:**  IT'S NOT DRUG BY DRUG, BECAUSE ALL OF THE

14    DRUGS IN THE CLASS WERE PRICED WITH THE SAME PRICES THAT WERE --

15    THAT WERE BEING OFFERED THROUGH THE HSP PRICES.

16         **THE COURT:**  HOW MANY CLASSES OF DRUGS ARE THERE?

17         **MR. GILMORE:**  I DON'T THINK THERE ARE REALLY ANY

18    CLASSES.  ALL OF THE DRUGS THAT ARE IN THE CASE ARE DRUGS THAT

19    WAS OFFERED THROUGH THE HSP PROGRAM.

20         **THE COURT:**  YOU USED THE WORD "CLASS," SO I USED YOUR

21    WORD.  IF IT'S NOT A CLASS, THEN WHAT IS IT?

22         **MR. GILMORE:**  IT'S THE -- WELL, I'M SORRY.  I'M

23    MISUNDERSTOOD YOU'RE QUESTION.

24         **THE COURT:**  SO LET'S GO BACK THEN.

25         **MR. GILMORE:**  THE CLASS IS THE DRUGS THAT CVS OFFERED

1   THROUGH THE HSP PROGRAM.

2        **THE COURT:**  HOW MANY ARE THERE?

3        **MR. GILMORE:**  IT'S APPROXIMATELY 400.  WE KNOW THE

4   EXACT NUMBER.  AND, IN FACT, WE HAVE A COMPLETE SET FOR THE 11

5   STATES AT ISSUE OF ALL THE TRANSACTIONS OF ANY KIND THAT INVOLVED

6   THOSE DRUGS THAT ARE OFFERED THROUGH THE HSP PROGRAM.

7        **THE COURT:**  BACK TO MY ORIGINAL QUESTION:  ARE YOU

8   DOING YOUR ANALYSIS DRUG BY DRUG, I.E. THE 400 SPECIFIC DRUGS AT

9   ISSUE?

10        **MR. GILMORE:**  BY AND LARGE, NO, FOR THE OVERWHELMING

11   NUMBER OF DRUGS.  FOR THE OVERWHELMING NUMBER OF DRUGS THEY WERE

12   ALL BEING OFFERED FOR THE SAME PRICE THROUGH THE HSP PROGRAM.

13   AND SO THE CALCULATION TAKES THAT SAME PRICE POINT AND SIMPLY

14   RECALCULATES THE HSP -- I'M SORRY -- RECALCULATES THE USUAL AND

15   CUSTOMARY PRICE USING THAT UNIFORM PROGRAM PRICE POINT.  AND THEN

16   IT COMPARES IT TO --

17        **THE COURT:**  WAIT ONE MOMENT.

18        **MR. GILMORE:**  -- AND IF THERE'S A DIFFERENCE --

19        **THE COURT:**  USUALLY YOU STOP WHEN I START TALKING.

20      AT WHAT POINT IN TIME?  WHEN HAVE YOU TAKEN THE SNAPSHOT TO

21   DO THE COMPARATIVE ANALYSIS?

22        **MR. GILMORE:**  WELL, WE DO IT FOR EACH TRANSACTION IN

23   THE DATA.  CVS HAD PRICING AT ONE PRICE POINT IN THE HSP PROGRAM

24   FROM 2008 UP TO 2010, AND THEN BEGINNING IN 2011 IT WENT UP TO A

25   DIFFERENT PRICE POINT.  SO WE HAVE THOSE TWO SORT OF SETS OF

1  PRICES UNDER THE PROGRAM.

2       THAT'S WHAT PROFESSOR HAYES IS USING.

3       MY APOLOGIES, YOUR HONOR.  I DIDN'T REALIZE THAT YOU WERE

4  TALKING.  I DIDN'T MEAN TO INTERRUPT.

5            **THE COURT:**  NO, I INTERRUPTED YOU.

6            **MR. GILMORE:**  YOU'RE ALLOWED TO DO THAT.

7            **THE COURT:**  ANY RESPONSE?

8            **MR. HEARD:**  YOUR HONOR, ONLY IF YOU GO BACK TO THE

9  INDIVIDUAL PLAINTIFFS' INSURANCE POLICY WILL YOU KNOW, FOR

10  EXAMPLE, THAT THEY HAD A $5 COPAY.  AND IF THEY HAD A $5 COPAY

11  THEY NEVER PAID MORE THAN THE HSP MEMBER PRICE.  AND SUCH

12  PLAINTIFFS WOULD HAVE NO LOSS, NO INJURY.  THAT'S WHY --

13            **THE COURT:**  YOU CAN TELL THAT RIGHT NOW BECAUSE YOU --

14  I MEAN, THESE ARE JUST NUMBERS, RIGHT?  AND IF THE DATA SET IS

15  BIG ENOUGH AND THE ALGORITHM IS SOPHISTICATED ENOUGH, CAN'T THAT

16  BE CALCULATED?

17            **MR. HEARD:**  YOU CAN CALCULATE THE DELTA, I SUPPOSE,

18  BETWEEN THE U & C PRICE AND WHAT THEY PAID.  WHAT YOU CAN'T TELL

19  IS WHAT THEY WERE -- WHAT THEIR INSURANCE POLICY GUARANTEED THEM

20  AS A PRICE.  WHAT DID THEY CONTRACT TO GET?  AND SOME WILL HAVE

21  CONTRACTED TO PAY COPAYMENT THAT MEANT THEY COULD NEVER POSSIBLY

22  HAVE LOST MONEY AS A RESULT OF THE --

23            **THE COURT:**  ISN'T THAT JUST 1200 NUMBERS?  THAT IS, YOU

24  HAVE 1200 CONTRACTS THAT SAY IF -- LET'S SAY 500 OF THEM SAY

25  500 -- I MEAN, $5 FOR PRESCRIPTION, WELL, ISN'T THAT EASY ENOUGH

```
 1   TO TAKE OUT THOSE, ANYBODY WHO HAS THOSE $5 CONTRACTS?

 2          MR. HEARD:  NO, YOUR HONOR.  IT'S REALLY MORE THAN 1200

 3   CONTRACTS.  THAT'S THE NUMBER OF CVS PBM CONTRACTS ACCORDING TO

 4   THE PLAINTIFFS.  WHEN WE TALK ABOUT THE NUMBER OF DIFFERENT

 5   HEALTH INSURANCE POLICIES THAT THE 38 MILLION MEMBERS OF THE

 6   CLASS HAD WE'RE TALKING ABOUT MANY MULTIPLES OF 1,000 CONTRACTS.

 7   AND IT'S THOSE PLANS THAT TELL US WHAT THEY HAD CONTRACTED TO PAY

 8   FOR THEIR DRUGS.

 9          THE COURT:  BUT DON'T THE 38 MILLION FUNNEL INTO THE

10   1200?

11          MR. HEARD:  THEY FUNNEL INTO 50 PBM'S WHO ADMINISTER

12   THEIR TRANSACTIONS, SOME NUMBER OF ADDITIONAL CONTRACTS, BUT THAT

13   DOESN'T -- THAT TELLS US WHAT THE DIFFERENCE WAS BETWEEN WHAT

14   THEY PAID AND USUAL AND CUSTOMARY PRICE.  IT DOESN'T TELL US WHAT

15   THEIR HEALTH INSURANCE POLICY GUARANTEED THEM.

16      HOW WOULD YOU KNOW THAT THEY HAD A $5 COPAYMENT UNLESS YOU

17   WENT BACK TO THEIR POLICY TO KNOW THAT?

18          THE COURT:  RIGHT.  WE NEED TO KEEP MOVING.  SO MOVING

19   ON TO TYPICALITY.

20          MR. GILMORE:  MAY I VERY QUICKLY JUST DRAW THE COURT'S

21   ATTENTION TO ONE EXHIBIT THAT BEARS ON THIS POINT?  IT'S ECF

22   17034.  IT'S EXHIBIT 26 IN OUR MOTION.

23      CVS IS TRYING TO SAY THAT IT'S IMPOSSIBLE TO CALCULATE THE

24   DAMAGES IF YOU PLUG IN THE HSP PRICES AS USUAL AND CUSTOMARY

25   PRICES.  BUT AT THE TIME CVS DID EXACTLY THAT.  CVS WAS
```

1  CONCERNED --

2          **THE COURT:**  ALL RIGHT.

3      YOU MADE YOUR POINT.  I'LL GO LOOK AT THE EXHIBIT.

4          **MR. GILMORE:**  I HAVE A COPY HERE, IF YOU LIKE, YOUR

5  HONOR.

6          **THE COURT:**  I HAVE IT.

7      AM I RIGHT THAT IF I STRIKE DR. HAYES' DECLARATION YOU HAVE

8  NO EVIDENCE INDICATING THAT CAINE WOULD BE TYPICAL OF THE CLASS?

9          **MR. GILMORE:**  WELL, SHE TESTIFIED IN HER DEPOSITION,

10  YOUR HONOR, AND OUR INTERROGATORY RESPONSES IDENTIFY WHAT WE

11  BELIEVE IS THE KIND OF TRANSACTION THAT FITS THE CLASS

12  DEFINITION.

13          **THE COURT:**  ALL RIGHT.  NEXT, THE PRORATION ISSUE.

14  HERE IT LOOKS LIKE BROWN,  HAGERT, ODORISIO AND WULFF WERE THE

15  ONES WHO DID NOT MAKE THE 90-DAY SUPPLIES?  THEY WERE THE ONES

16  WHO ONLY DID 30 OR 6O, SO THEY WOULD NOT BE TYPICAL IF I DID NOT

17  FIND FOR YOU ON THAT ISSUE?

18          **MR. GILMORE:**  THAT WOULD BE CORRECT, YOUR HONOR.

19          **THE COURT:**  ALL RIGHT.  WITH RESPECT TO THE ARGUMENT

20  ABOUT VOLUNTARY PAYMENT, AGAIN, COULDN'T THAT ISSUE BE RESOLVED

21  SIMPLY IN HOW EITHER A CLASS IS DEFINED OR IN HOW A CLASS IS

22  ADMINISTERED?

23          **MR. HEARD:**  THE REASON I THINK NOT, YOUR HONOR, AND

24  HAVING GIVEN THIS SOME REFLECTION SINCE YOU ASKED THAT, THE

25  RELIANCE ARGUMENT AND VOLUNTARY PAYMENT IS SOMEWAY JUST THE FLIP

1   SIDE OF THAT COIN, IS A STATE OF MIND QUESTION.  DOES THE

2   PLAINTIFFS' SUBSEQUENT CONDUCT REFLECT THAT THEY WOULD HAVE

3   ENGAGED IN THIS TRANSACTION?

4       **THE COURT:**  BUT IF THE CLASS PERIOD ENDED WHEN THE --

5   THAT'S WHY I ASKED ABOUT DEFINITION.  IF THE CLASS PERIOD ENDED

6   WHEN THE SUIT WAS FILED JULY 30, 2015, WOULDN'T THAT ADDRESS THE

7   ISSUE?

8       **MR. HEARD:**  OKAY.  WELL, WE'RE USING THE VOLUNTARY

9   PAYMENT DOCTRINE IN THE FOLLOWING WAY.  CLEARLY, THE PLAINTIFFS

10   ENGAGED IN A SERIES OF TRANSACTIONS, CONTINUED PATRONAGE, AFTER

11   THEY FILED THE LAWSUIT.  THAT CONDUCT REFLECTS THAT THE PRICE

12   WASN'T TERRIBLY IMPORTANT TO THEM AND REFLECTS BACK ON WHAT THEIR

13   STATE OF MIND WAS.

14       **THE COURT:**  WELL, IT COULD ALSO REFLECT THAT THEY

15   DIDN'T KNOW.

16       **MR. HEARD:**  IT COULD, BUT THAT'S AN INDIVIDUAL ISSUE.

17       **THE COURT:**  ALL RIGHT.

18       **MR. HEARD:**  IT'S AN INDIVIDUAL ISSUE, YOUR HONOR.  THE

19   PLAINTIFFS STOPPED THEIR PATRONAGE.  THERE'S A COINCIDENCE HERE

20   WHICH AGAIN SHOWS THE INDIVIDUALITY OF THE EVIDENCE.  THE

21   PLAINTIFFS ONLY STOPPED THEIR CONTINUED PATRONAGE WHEN YOUR HONOR

22   RULES ON THE MOTION TO DISMISS AND SAYS MATERIALITY MAY BE

23   AFFECTED BY THEIR --

24       **THE COURT:**  WITH RESPECT TO THE TEXAS REPRESENTATIVES,

25   HOW ARE YOU DEALING WITH THE DIFFERENCE BETWEEN THEIR DEPOSITION

```
 1   TESTIMONY AND THE REVISIONS TO THE COMPLAINT AFTER I MADE MY

 2   RULING?

 3            MR. GILMORE:  YOUR HONOR, WHEN THE TEXAS PLAINTIFFS

 4   JOINED THE LAWSUIT IN MARCH OF 2016, CVS HAD STOPPED THE HSP

 5   PROGRAM A MONTH EARLIER, SO THERE WASN'T AVAILABLE THROUGH CVS

 6   THESE HSP-ELIGIBLE DRUGS BEING OFFERED AT THE HSP PRICES.  SO THE

 7   FACT THAT THEY MADE OTHER PURCHASES AT CVS ISN'T THE RELEVANT

 8   ISSUE.

 9       THE RELEVANT ISSUE IS:  ARE THERE OTHERWISE QUALIFYING

10   TRANSACTIONS THAT OCCURRED AFTER A PERSON JOINED THE SUIT?   WE

11   DON'T THINK THAT THEY -- WE KNOW THEY DON'T HAVE QUALIFYING

12   TRANSACTIONS FROM THE POINT IN TIME WHICH THEY JOINED THE SUIT.

13       THEIR TRANSACTIONS THAT QUALIFY FOR THE CLASS WERE YEARS

14   FORWARD.

15            THE COURT:  ACTUALLY, I DON'T WANT TO HEAR MUCH ON

16   ERISA OR ADEQUACY, BUT I'LL GIVE YOU A MINUTE EACH IF YOU WANT TO

17   SUPPLEMENT ANYTHING FROM YOUR BRIEF.

18            MR. GILMORE:  WE STAND ON OUR PAPERS ON THOSE TWO

19   POINTS, YOUR HONOR.

20            THE COURT:  MR. HEARD?

21            MR. HEARD:  YOUR HONOR, AS TO ERISA, THE ONE THING I

22   WOULD ADD IS THAT THE PLAINTIFFS IN THEIR REPLY RELIED ON THE

23   DISTRICT COUNSEL CASE.  WE THINK THE MORE APT AUTHORITY IS THE

24   NINTH CIRCUIT DECISION IN THE OREGON TEAMSTER EMPLOYERS TRUST,

25   DECIDED FIVE MONTHS LATER, 800 F.3D 1151.
```

```
 1        ON THE QUESTION OF ADEQUACY, WE CERTAINLY APPRECIATE THAT

 2    IT'S A HARD STANDARD TO MEET OFTENTIMES, BUT THE PLAINTIFF SHOULD

 3    AT LEAST KNOW THE BASICS ABOUT THEIR CLAIM.  WE'VE STATED IN THE

 4    PAPERS AND PROVIDED EXHIBIT FIVE TO SHOW HOW STRIKINGLY

 5    UNFAMILIAR THEY WERE WITH EVEN THE TERMINOLOGY, MUCH LESS WHAT IT

 6    MEANT.

 7        BUT BEYOND THAT, YOUR HONOR, I THINK WHAT IS STRIKING -- AND

 8    I WOULD DRAW YOUR ATTENTION TO THIS -- IS BEYOND THEIR

 9    UNFAMILIARITY WITH THE HEALTH SAVINGS CLASS PROGRAM, OR EVEN THE

10    TERM "USUAL AND CUSTOMARY PRICING" --

11        THE COURT:  YOU KNOW WHAT?  SOMEONE ONCE ARGUED THAT I

12    SHOULD DISMISS A JUROR IN A CRIMINAL CASE BECAUSE THE JUROR

13    DIDN'T UNDERSTAND THE WORD "ABIDE."  I DO NOT HOLD IT AGAINST

14    PEOPLE WHO ARE NOT AS SMART AS YOU THAT THEY DON'T UNDERSTAND

15    WHAT A "USUAL AND CUSTOMARY PRICE" IS, OR THAT THEY DON'T

16    UNDERSTAND THE ACRONYM "HSP" OR THAT THEY DON'T UNDERSTAND THE

17    SOPHISTICATIONS OF SOME PROGRAM.

18        MR. HEARD:  NOR DO WE EXPECT YOU TO, YOUR HONOR.

19        THE COURT:  I JUST DON'T.

20        MR. HEARD:  THAT'S REALLY NOT OUR ARGUMENT.  I THINK

21    THEIR KNOWLEDGE IS MORE FUNDAMENTALLY --

22        THE COURT:  ALL RIGHT.  ENOUGH ON THAT ONE.  LET'S MOVE

23    ON.

24        SUPERIORITY.  SUPERIORITY.

25        MR. GILMORE:  YOUR HONOR, MY COLLEAGUE, BONNY SWEENEY,
```

```
 1    WILL BE PREPARED TO ADDRESS THAT IF YOUR HONOR'S QUESTIONS ARE

 2    ABOUT THE ELEMENTS OF THE CLAIMS AND THE APPROACH TO TRYING THIS

 3    CASE AS A CLASS ACTION.

 4        IF YOUR HONOR HAS QUESTIONS ON THOSE AREAS, MS. SWEENEY WILL

 5    BE PREPARED TO ADDRESS THEM.  IF THERE ARE OTHER ELEMENTS OR

 6    OTHER ASPECTS I MAY BE THE ONE TO ANSWER THOSE QUESTIONS.

 7             THE COURT:  THAT'S FINE.  I ACTUALLY DON'T -- I MEAN,

 8    FRANKLY, I DON'T HAVE TOO MANY QUESTIONS ON THIS.  WE'LL GET TO

 9    THIS IF WE CAN.  LET'S DEAL WITH THE OTHER ELEMENTS FIRST.

10        BUT I WOULD LIKE FOR SOMEONE TO EXPLAIN TO ME BETTER HOW THE

11    CONDOR SYSTEM WORKS GIVEN THE PLAINTIFFS' RELIANCE ON THAT FOR

12    PURPOSES OF THEIR PROOF.  SO CAN SOMEONE EXPLAIN TO ME HOW IT

13    WORKS?

14             MR. GILMORE:  YOUR HONOR, I THINK THE CONDOR CODE, IT'S

15    JUST A NUMBER THAT GETS ASSIGNED TO PLANS.  IT'S ALSO CALLED A

16    "PLAN I.D." I THINK WITHIN CVS'S DOCUMENTS.  SO I THINK THIS

17    ISSUE GETS TO POTENTIALLY ASCERTAINABILITY.  PROFESSOR HAYES, AS

18    WE EXPLAIN IN OUR BRIEFS AND IN HIS DECLARATIONS, WENT THROUGH

19    AND USING AN APPROACH THAT, FRANKLY, CVS'S 30 (B) (6) DEPONENT

20    WITNESS SAID WAS THE APPROPRIATE ONE, AND IS REALLY CONSISTENT

21    EVEN WITH THE DECLARANT'S DECLARATION.

22             THE COURT:  WOULD YOU EXPLAIN IT?

23             MR. GILMORE:  SURE.  IT'S A PLAN I.D. NUMBER.  SO YOU

24    ASSOCIATE THE NUMBER WITH THE CONTRACTS THAT CVS HAS.

25             THE COURT:  LET ME ASK IT DIFFERENTLY.
```

```
 1              MR. GILMORE:  RIGHT.

 2              THE COURT:  CAN YOU EXPLAIN HOW YOUR EXPERT IS GOING TO

 3    USE IT IN HIS CALCULATIONS?

 4              MR. GILMORE:  OF COURSE.  HE LINKS TRANSACTIONS THAT

 5    HAVE CONDOR CODES AND DESCRIPTIONS OF THE PLAN.  MAYBE IF I JUST

 6    CALL IT "PLAN I.D. NUMBER."

 7         CVS'S TRANSACTION DATA HAS THE PLAN I.D. NUMBER AND A PLAN

 8    NAME FOR EACH TRANSACTION.  AND IT'S FIELDS IN CVS TRANSACTION

 9    DATA.  HE USES THAT INFORMATION ALONG WITH THE INFORMATION CVS

10    HAS PRODUCED IN DISCOVERY OF WHAT THOSE PLAN NUMBERS CORRESPOND

11    TO IN TERMS OF THE CONTRACTS.  AND THEN, IF THE TRANSACTION,

12    ACCORDING TO THE PLAN I.D. NUMBER, MATCHES UP WITH A CONTRACT

13    THAT IS PART OF OUR CLASS DEFINITION, THEN IT'S A QUALIFYING

14    TRANSACTION, ASSUMING IT HAS THE OTHER ELEMENTS THAT THERE'S

15    DAMAGES.

16         SO IT'S SIMPLY A NUMBER THAT IS USED TO LINK A TRANSACTION

17    TO CONTRACTS.

18              THE COURT:  HOW MANY TRANSACTIONS ARE WE DEALING WITH?

19              MR. GILMORE:  THERE ARE 30 -- THERE ARE APPROXIMATELY

20    40 MILLION CLASS MEMBERS.  I THINK IT'S IN OUR PAPERS.  THE

21    SPECIFIC TRANSACTION NUMBERS ARE HIGHER THAN THAT.

22              THE COURT:  HOW MANY TRANSACTIONS DO YOU ESTIMATE EACH

23    MEMBER OF THE CLASS HAS?

24              MR. GILMORE:  I DON'T KNOW THE ANSWER.  I MEAN, MOST OF

25    OUR PLAINTIFFS HAVE MULTIPLE QUALIFYING TRANSACTIONS.  I THINK
```

```
 1    MAYBE ALL OF THEM DO.

 2            THE COURT:  DOES ANYBODY KNOW WHAT THE DATASET IS THAT

 3    WE'RE DEALING WITH?  ANYBODY?  AN ASSOCIATE?

 4            MR. HEARD:  IT'S OVER 200 MILLION TRANSACTIONS.

 5            THE COURT:  SO THESE 200 MILLION TRANSACTIONS HAVE, I

 6    TAKE IT, CRITICAL FIELDS.  AND IT IS THE FIELDS THAT ARE -- THAT

 7    POPULATE THIS CONDOR PROGRAM?

 8            MR. GILMORE:  THE FIELDS HAVE A CONDOR CODE IS ONE OF

 9    THE FIELDS.  AND THERE'S ALSO A PLAN DESCRIPTION.  AND THOSE,

10    THAT INFORMATION, IS USED TO LINK UP WITH CONTRACTS THAT HAVE

11    THAT BLANK I.D. NUMBER AND THAT CONDOR CODE NUMBER.  AND SO YOU

12    CAN LINK THE TRANSACTIONS TO THE CONTRACTS.

13            THE COURT:  MR. GEYERMAN.

14         I CAN'T HEAR YOU.

15            MR. GEYERMAN:  MR. GEYERMAN, YOUR HONOR.

16         CONDOR CODE IS SET UP AT THE TIME THAT A PLAN IS SET UP IN

17    CVS'S SYSTEM.  THAT NUMBER MAY OR MAY NOT BE ASSOCIATED WITH A

18    CONTRACT BETWEEN CVS AND A PBM.  AND IT IS THE CONTRACT BETWEEN

19    CVS AND THE PBM THAT CONTAINS THE RELEVANT DEFINITION OF "USUAL

20    AND CUSTOMARY PRICE" FOR PURPOSES OF IDENTIFYING WHETHER IT'S IN

21    OR OUTSIDE OF THE CLASS --

22            THE COURT:  WHAT DOES THE CONDOR CODE NUMBER REPRESENT?

23            MR. GEYERMAN:  IT REPRESENTS A PLAN THAT IN REAL TIME

24    IS WHO CVS WILL BE ASSOCIATING THE CLAIM WITH.  BUT THE CONDOR

25    PLAN I.D. -- THE CONDOR CODE, SAME THING, SAME -- CONDOR NUMBER,
```

1   CONDOR CODE, MAY OR MAY NOT IDENTIFY THE RELEVANT CONTRACT WITH

2   WHOM CVS IS CONTRACTING FOR THE CLAIM.

3       FOR EXAMPLE, FOR A PERIOD OF TIME CVS AND AETNA, ONE OF THE

4   LARGEST HEALTH INSURERS IN THE COUNTRY, HAD A DIRECT CONTRACT

5   BETWEEN THEMSELVES.  THE CONDOR I.D. WAS ASSOCIATED WITH AETNA.

6   FOR THE PERIOD OF TIME WHEN CVS CONTRACTED DIRECTLY WITH AETNA

7   THAT'S THE CONTRACT YOU WOULD LOOK AT TO SEE WHAT THE RELEVANT

8   DEFINITION OF "USUAL AND CUSTOMARY PRICE" IS.

9       AT SOME POINT DURING THE PUTATIVE CLASS PERIOD CVS AND

10  AETNA, THE CONTRACT ENDED AND AETNA STARTED USING CAREMARK, A

11  PBM.  THE CONDOR CODE REMAINS THE SAME BECAUSE IT WAS STILL

12  ASSOCIATED WITH AETNA PLANS AND HEALTH MEMBERS.

13      BUT ONCE CAREMARK BECAME THE INTERMEDIARY THE CONTRACT THAT

14  CONTROLLED THE RELEVANT DEFINITION OF "USUAL AND CUSTOMARY PRICE"

15  EXISTED BETWEEN CVS AND CAREMARK.  AND SO, THEREFORE, THE

16  RELEVANT CONTRACT CHANGES FOR A GIVEN CONDOR CODE OR CAN CHANGE

17  FOR A GIVEN CONDOR CODE BASED UPON THE PARTICULAR BUSINESS

18  RELATIONSHIP THAT CVS HAS WITH THE INSURER OR THE HEALTH PLAN.

19      AND THAT WAS THE BASIS OF OUR ARGUMENT ON THE CONDOR CLAIMS,

20  THE MANAGEABILITY AND ASCERTAINABILITY.

21          **THE COURT:**  ALL RIGHT.

22          **MR. GILMORE:**  AND IF I MAY RESPOND.

23          **THE COURT:**  NO.  I'M JUST TRYING TO UNDERSTAND THE

24  BASICS.

25          **MR. GILMORE:**  SURE.

1    **THE COURT:** OKAY. INJUNCTIVE RELIEF. I DON'T SEE HOW

2    I CAN GRANT INJUNCTIVE RELIEF WHEN THERE'S NO CONDUCT TO ENJOIN

3    AT THIS POINT.

4    **MR. GILMORE:** YOUR HONOR, WE KNOW THAT CVS TRANSITIONED

5    EN MASSE ITS HSP MEMBERS TO A NEW PROGRAM THAT IS BEING

6    ADMINISTERED BY A THIRD PARTY. IT DOESN'T EVEN REQUIRE A FEE.

7    AND WE ALSO KNOW THAT CVS IS NOT REPORTING THOSE PRICES AS ITS

8    USUAL AND CUSTOMARY PRICES, EITHER.

9    **THE COURT:** IS THAT PART OF THIS LAWSUIT AND ARE THOSE

10   PEOPLE OR COMPANIES PART OF THIS LAWSUIT?

11   **MR. GILMORE:** THE THIRD PARTY THAT IS ADMINISTERING IS

12   NOT JOINED.

13   **THE COURT:** HOW CAN I ENJOIN CONDUCT THAT IS NOT IN

14   FRONT OF ME?

15   **MR. GILMORE:** HE WOULD SAY, YOUR HONOR, THAT THERE'S A

16   PROSPECT THAT CVS WILL CONTINUE EITHER REINSTITUTING AN HSP

17   PROGRAM OR --

18   **THE COURT:** STANDARD IS VERY, VERY HIGH. I MEAN, BASED

19   UPON WHAT I HAVE, I DON'T THINK THERE'S ENOUGH THERE. WE'RE

20   GOING TO KEEP MOVING. I HAVE PEOPLE WAITING IN THE GALLEY HERE.

21   ON THIS DISCOVERY MOTION, WELL, I LOOK AT IT AS A DISCOVERY

22   MOTION. IT'S A MOTION TO STRIKE.

23   **MR. GILMORE:** TO STRIKE PROFESSOR HAYES' OPINIONS WITH

24   RESPECT TO CERTAIN PLAINTIFFS?

25   **THE COURT:** YES.

1      **MR. GILMORE:**  YES.

2      **MR. GEYERMAN:**  UM-HUM.

3      **THE COURT:**  THIS ALL MAY BE MOOT IF I DON'T GRANT THE

4      MOTION TO CERTIFY.  AND IF I DON'T GRANT THE MOTION TO CERTIFY,

5      THEN YOU NOW HAVE THE INFORMATION.  THEY CAN USE ALL OF THAT YOU

6      ARE ON NOTICE.  SO IF THEY FILE ANOTHER MOTION YOU HAVE ALL THAT.

7      RIGHT?

8      **MR. GEYERMAN:**  WE DO HAVE THE INFORMATION NOW, YOUR

9      HONOR.  I FEEL THE PREJUDICE THAT WE SUFFERED, WE BELIEVE, IS

10     THAT WE DEPOSED EACH OF THE NAMED PLAINTIFFS BEFORE WE GOT THE

11     LARGER POOL OF --

12     **THE COURT:**  I TALKED TO JUDGE CORLEY ABOUT ALL OF YOU.

13     AND SHE SAID THAT THE CONDUCT ON BOTH SIDES OF THE AISLE HAS BEEN

14     LESS THAN IDEAL.  SO SHE SAYS THAT, YOU KNOW, BOTH SIDES HAVE

15     ACTED IN WAYS THAT ARE NOT -- THAT DO NOT COMPORT CERTAINLY WITH

16     THE NORTHERN DISTRICT STANDARDS, IN TERMS OF THE KINDS OF MOTION

17     PRACTICE SHE'S SEEN.

18     SO I CERTAINLY AM NOT GOING TO DO ANYTHING TO UNDERMINE HER

19     MANAGEMENT OF THIS LAWSUIT.  BUT I HAVE TO SAY THAT I AM

20     DISAPPOINTED IN ALL OF YOU, AND I TAKE HER AT HER WORD THAT YOU

21     HAVE BEEN DIFFICULT, TO SAY THE LEAST.  SO YOU NOW KNOW.

22     WHAT'S THE REAL PREJUDICE AT THIS POINT?  FOR PURPOSES OF

23     THIS MOTION ALONE.

24     **MR. GEYERMAN:**  YOUR HONOR, IF THE ENHANCED POOL OF

25     TRANSACTIONS ARE CONSIDERED, THEN THERE'S STILL SOME PLAINTIFFS

```
 1  WHO WE WOULD SAY DO NOT CONTAIN STANDING.

 2         THE COURT:  RIGHT.  BUT IF THEY ARE GIVEN LEAVE TO

 3  AMEND, THEN THEY WOULD, RIGHT?  BECAUSE YOU HAVE THE INFORMATION

 4  NOW.

 5         MR. GEYERMAN:  SETTING ASIDE BROWN, HAGERT, ODORISIO

 6  AND WULFF WHO SUFFER FROM THE PRORATION ISSUE.

 7         THE COURT:  AND TO ARGUE THAT THEY HAVE THE 50 MILLION

 8  TRANSACTIONS, OR WHATEVER, AND SO THEREFORE THEY SHOULD READ YOUR

 9  MIND AND KNOW WHAT YOUR RELYING ON IS ABSURD.

10         MR. GILMORE:  YOUR HONOR.

11         THE COURT:  I DON'T WANT TO HEAR IT FROM EITHER SIDE.

12         MR. GILMORE:  YOUR HONOR, I WILL OFFER MY APOLOGY

13  FOR --

14         THE COURT:  DON'T OFFER IT TO ME.  OFFER IT TO JUDGE

15  CORLEY WHEN YOU SEE HER TOMORROW.

16         MR. GILMORE:  I WILL DO SO.

17         THE COURT:  ALL RIGHT.  MOVING TO NAVARRO.

18     WITH RESPECT TO DR. NAVARRO'S QUALIFICATIONS, HE SEEMS TO ME

19  TO HAVE RELEVANT EXPERIENCE.  IT MAY BE SOMEWHAT OUTDATED.

20  SOUNDS LIKE THAT GOES TO WEIGHT MORE THAN TO ADMISSIBILITY.

21     THE REAL QUESTION I HAVE IS WHETHER HE'S DONE ENOUGH TO

22  SUPPORT HIS OPINIONS.  WHERE IS HIS REAL METHODOLOGY?  IS HE

23  SUPPOSED TO JUST GET ON THE STAND AND PONTIFICATE?

24     TWO MINUTES A SIDE, AND THEN I'M GOING TO GO TO MY NEXT

25  CASES.
```

```
 1          GO AHEAD.

 2              MR. GILMORE:  SHOULD I GO FIRST, YOUR HONOR?

 3              THE COURT:  IT'S YOUR EXPERT.

 4              MR. GILMORE:  YOUR HONOR, DR. NAVARRO HAS EXTENSIVE,

 5   RELEVANT EXPERIENCE HERE.  AND HIS METHODOLOGIES, HE'S ONE

 6   LOOKING AT THE CONTRACTS AND DRAWING ON HIS UNDERSTANDING OF HOW

 7   THIS BUSINESS WORKS TO SAY THESE ARE USUAL AND CUSTOMARY PRICES

 8   AND THAT THEY -- THE LOWER U & C PRICING IS COMMON CLASS-WIDE AND

 9   THE HARM FROM CVS'S CONDUCT WOULD APPLY CLASS-WIDE.

10          HIS APPROACH IS VERY SIMILAR TO THE ONE THAT THE GARBE COURT

11   WITH THE EXPERT FOR PLAINTIFFS IN THAT CASE UNDERTOOK.

12              THE COURT:  IT LOOKS LIKE THAT EXPERT DID SIGNIFICANTLY

13   MORE ANALYSIS THAN NAVARRO HAS.

14              MR. GILMORE:  SHE MAY HAVE LOOKED AT A LARGER NUMBER OF

15   CONTRACTS, BUT DR. NAVARRO LOOKED AT THE COMBINATION OF A SET OF

16   CONTRACTS.  I THINK I SAID EARLIER THAT IT WAS IN THE TEENS.

17   THAT WAS ORIGINALLY, I THINK, SUBSEQUENT TO HIS ORIGINAL REPORT.

18   HE LOOKED AT MORE BASED ON CONTRACTS THAT CVS CITED IN ITS

19   OPPOSITION.

20          HE LOOKED AT THE CONTEMPORANEOUS RECORDS.  HE LOOKED AT

21   CVS'S DOCUMENTS, AND HE LOOKED AT WHAT THE CVS WITNESSES WERE

22   SAYING.  AND DRAWING ON HIS OWN EXPERIENCE HE APPLIED THAT

23   EXPERIENCE TO THE RECORD AND SAID THAT THERE IS COMMON CONDUCT

24   HERE.

25          THAT THE HSP PRICES FIT THESE DEFINITIONS OF USUAL AND
```

1    CUSTOMARY PRICE AND SHOULD BE REPORTED AS SUCH.

2         HE ALSO LOOKED AT THE RELEVANT FACTORS WITH RESPECT TO THE

3    PROGRAMS THEMSELVES, THE PROGRAM ITSELF, AND THE POROUS NATURE,

4    THE FACT THIS THESE PRICES WERE BEING CHARGED OUTSIDE THE

5    PROGRAM, THE FACT THAT THE FEE WAS NOMINAL AND WASN'T EVEN

6    UNIFORMLY COLLECTED.

7         AND HE SAID EVEN IF YOU CREDIT WHAT THE PBM'S SAID, GIVEN

8    THESE CONDITIONS OF A MEMBERSHIP PROGRAM, ONE WOULDN'T,

9    CONSISTENT WITH INDUSTRY STANDARDS, EVER BE ABLE TO EXCLUDE THESE

10   PRICES AS USUAL AND CUSTOMARY PRICES.

11             **THE COURT:**  RESPONSE --

12         **MR. GEYERMAN:**  YOUR HONOR --

13             **THE COURT:**  -- AND/OR ARGUMENT.

14         **MR. GEYERMAN:**   -- WE AGREE WITH YOU THAT DR. NAVARRO

15   HAS NOT DONE ENOUGH.  WE AGREE.  WE DON'T BELIEVE HE'S EMPLOYED

16   REALLY ANY METHODOLOGY AT ALL.  IN THE OPPOSITION BRIEF THE

17   PLAINTIFFS STATE AT PAGE 12 THAT DR. NAVARRO PERFORMED THE SAME

18   INDUSTRY SURVEY THAT WAS PROVIDED TO THE COURT IN GARBE.

19        FIRST OF ALL, DR. NAVARRO HIMSELF DOESN'T EVEN DESCRIBE WHAT

20   HE DID AS PURPORTING TO PERFORM A SURVEY.  IN SUPPORT OF THAT

21   ASSERTION, THE PLAINTIFFS CITE TO ROBERT NAVARRO'S DECLARATION,

22   PARAGRAPHS 35 TO 39.

23        IN THOSE FIVE PARAGRAPHS, TWO PARAGRAPHS RELATE TO

24   COMMERCIAL CONTRACTS.  NOT A SINGLE CVS TO PBM CONTRACT IS CITED

25   IN THOSE TWO PARAGRAPHS ABOUT COMMERCIAL CONTRACTS.

 1    WHAT IS CITED IS ONE PROVIDER MANUAL FROM MEDIMPACT, A PBM

 2    WHO CVS HAS DEPOSED IN THIS CASE AND WHO IS VICE PRESIDENT OF THE

 3    NETWORK SAID THAT THE HSP PROGRAM FELL OUTSIDE THE DEFINITION OF

 4    THE CVS MEDIMPACT CONTRACTUAL DEFINITION OF "USUAL AND CUSTOMARY

 5    PRICE."

 6    IN THE OTHER THREE OF THE FIVE PARAGRAPHS THAT THE

 7    PLAINTIFFS CITE TO AS DEMONSTRATING HIS METHODOLOGY -- THIS IS

 8    PARAGRAPHS 37 TO 39 -- THOSE RELATE TO MEDICARE PART D AND

 9    MEDICAID.

10    DR. NAVARRO DOESN'T EVEN ADDRESS THE WRITTEN STATEMENT BY

11    THE CENTER FOR MEDICARE AND MEDICAID SERVICES, WHICH IS REPORTED

12    IN A DOCUMENT THAT WE ATTACHED TO OUR REPLY BRIEF AT EXHIBIT A.

13    FOOTNOTE 26 OF THAT REPORT SAYS THAT CMS DOESN'T HAVE A STATED

14    POLICY ONE WAY OR THE OTHER WHETHER OR NOT IF YOU HAVE A

15    MEMBERSHIP PROGRAM THAT'S CHARGING A FEE, WHETHER THAT IS

16    CONSIDERED YOUR USUAL AND CUSTOMARY PRICE.

17    SO WE THINK IT WOULD BE ODD, TO SAY THE LEAST, FOR SOMEONE

18    TO BE RENDERING AN OPINION ABOUT WHAT WOULD BE REQUIRED BY

19    MEDICARE WITHOUT EVEN ACKNOWLEDGING WHAT THE STATED POSITION IS

20    OF CMS.

21    AS FOR MEDICAID, DR. NAVARRO CITES TO FOUR STATE MEDICAID

22    DEFINITIONS OF USUAL AND CUSTOMARY PRICE.  HE SAYS NOTHING ABOUT

23    THE OTHER 46 STATES' DEFINITION OF USUAL AND CUSTOMARY PRICE.

24    AND HE SAYS NOTHING ABOUT THE STATE OF TEXAS WHO, AS REFLECTED IN

25    EXHIBIT B TO OUR REPLY BRIEF, TEXAS MEDICAID OFFICIALS TOLD CVS

```
 1   CONTEMPORANEOUS WITH THE LAUNCE OF HEALTH SAVINGS PASS PROGRAM IN

 2   THE FALL OF 2008 THAT THEY AGREED THAT EVEN UNDER TEXAS'S

 3   DEFINITION OF "USUAL AND CUSTOMARY PRICE" FOR MEDICAID PURPOSES

 4   IT WAS NOT.

 5        SO THIS IS ALL TO SAY I THINK THAT THERE'S NOTHING THERE IN

 6   TERMS OF THE METHODOLOGY.  WE DON'T DISPUTE THAT DR. NAVARRO HAS

 7   EXPERIENCE WITH THE PBM INDUSTRY, GENERALLY.  BUT WE'RE NOT

 8   CHALLENGING HIM FOR THAT BASIS.  THIS IS A VERY NARROW ATTACK

 9   UNDER DAUBERT WHICH IS ANY OPINIONS ABOUT GENERIC DRUG MEMBERSHIP

10   PROGRAMS.  AND HE HAS ABSOLUTELY ZERO EXPERIENCE WHICH GENERIC

11   DRUG MEMBERSHIP PROGRAMS.  AND, THEREFORE, HE SHOULD NOT BE

12   ALLOWED TO OPINE ON THAT ISSUE.

13             THE COURT:  ALL RIGHT.

14          MR. GILMORE:  YOUR HONOR, MAY I RESPOND VERY BRIEFLY?

15             THE COURT:  THIRTY SECONDS.

16          MR. GILMORE:  WITH RESPECT TO TEXAS, TEXAS FILED A

17   SUIT.  THE TEXAS ATTORNEY GENERAL FILED A SUIT AGAINST CVS.

18             THE COURT:  TEXAS ATTORNEY GENERAL FILED A SUIT AND HAS

19   ITS OWN CONTRACT THAT THEY CAN LOOK AT OR THAT A JUDGE CAN LOOK

20   AT WITH RESPECT TO REPRESENTATIONS MADE THERE.

21        WE'RE MOVING ON.

22        OKAY.  WITH RESPECT TO DOCKET 225, THE MOTION WITH RESPECT

23   TO YOUR SCHEDULE.

24          MR. GILMORE:  MS. SWEENEY IS GOING TO ADDRESS THE

25   SCHEDULE CONSIDERATIONS, YOUR HONOR.
```

1          **THE COURT:**  ASSUMING FOR PURPOSES OF ARGUMENT THIS

2   MOTION IS DENIED, MS. SWEENEY, HOW MUCH TIME DO YOU WANT TO

3   FIGURE OUT WHAT YOUR NEXT STEPS ARE?

4          **MS. SWEENEY:**  I GUESS IT WOULD DEPEND IN PART UPON

5   WHETHER THE MOTION WAS DENIED IN PART OR IN TOTAL, BUT PROBABLY

6   45 DAYS, YOUR HONOR.  S.

7          **THE COURT:**  OKAY.

8     I'LL PUT YOU ON MY CALENDAR FOR MONDAY, MAY 1ST.  THIS IS

9   THE CMC CALENDAR AT 2:00 P.M., FOR A SCHEDULE.

10    ARE YOU GOING TO ARGUE THE CALENDAR ISSUES?

11         **MR. GEYERMAN:**  YES.

12         **THE COURT:**  WHEN ARE YOU GOING TO BE PREPARED TO FILE A

13  MOTION FOR SUMMARY JUDGMENT?  THAT IS, WHETHER OR NOT THIS MOTION

14  IS GRANTED.

15         **MR. GEYERMAN:**  OUR PREFERENCE IS TO SEE THE OUTCOME OF

16  THE CLASS CERTIFICATION MOTION.  BUT IN FAILING THAT, WHEN THE

17  PARTIES WERE DISCUSSING A JOINT PROPOSAL, THE PLAINTIFFS AT A

18  MINIMUM WERE SAYING THAT MAY 9TH, I BELIEVE, MAY 8TH OR IN 9TH

19  WAS WHAT THEY WERE AT.  BUT, AGAIN, WE BELIEVE --

20         **THE COURT:**  MAY 8TH OR 9TH FOR WHAT?

21         **MR. GEYERMAN:**  WELL, BEFORE AN ORDER --

22         **THE COURT:**  I AM ASKING YOU WHEN YOU -- WELL, LET ME

23  ASK YOU THIS QUESTION: ARE YOU GOING TO FILE A MOTION FOR SUMMARY

24  JUDGMENT IF THE CLASS IS NOT CERTIFIED?

25         **MR. GEYERMAN:**  WE WOULD, YOUR HONOR.

```
 1              THE COURT:   WHAT IF THEY ARE GIVEN ANOTHER OPPORTUNITY

 2    TO FILE?

 3              MR. GEYERMAN:   IF THEY ARE GIVEN AN OPPORTUNITY TO FILE

 4    AN AMENDED COMPLAINT FOR A DIFFERENT CLASS?

 5              THE COURT:   OR A REVISED MOTION FOR CLASS

 6    CERTIFICATION.

 7              MR. GEYERMAN:   I THINK WE WOULD LIKELY THEN AWAIT THAT

 8    MOTION BEFORE MOVING FOR SUMMARY JUDGMENT.

 9              THE COURT:   ARE YOU WORKING ON YOUR SUMMARY JUDGMENT

10    MOTION NOW?

11              MR. GEYERMAN:   WELL, WE HAD STARTED IT WHEN WE RECEIVED

12    YOUR HONOR'S ORDER THAT SAID WE WOULD TALK ABOUT THIS AND YOU

13    INTENDED TO GRANT RELIEF.   WE PUT PENCILS DOWN A LITTLE BIT WITH

14    RESPECT TO THAT.   BUT WE DON'T WANT TO DELAY THE CASE, BUT WE DO

15    THINK IT MAKES SENSE TO SEE WHAT IS HAPPENING WITH CLASS

16    CERTIFICATION.

17              MS. SWEENEY:   YOUR HONOR, JUST TO CLARIFY, PLAINTIFFS

18    PUT TOGETHER A PROPOSED SCHEDULE WHICH WE COULD SHOW TO YOUR

19    HONOR THAT WAS BASED ON THE UNDERSTANDING THAT THE COURT GRANTED

20    THE MOTION FOR CERTIFICATION.   AND SO WHAT I UNDERSTOOD YOUR

21    QUESTION TO ASK WAS IF THE COURT DENIES IN PART THE MOTION FOR

22    CLASS CERTIFICATION, HOW MUCH TIME DO PLAINTIFFS NEED TO PUT

23    TOGETHER A REVISED MOTION IF THEY DECIDE TO DO THAT.   SO IF I

24    MISUNDERSTOOD THAT, YOUR HONOR, I WOULD LIKE TO HAND UP THE

25    PROPOSAL THAT WE HAD PREPARED.
```

```
 1              THE COURT:  WELL, LET ME SEE IT.  AND THEY HAVE SEEN

 2   IT?

 3              MR. GEYERMAN:  NO, WE HAVEN'T, YOUR HONOR.

 4              MS. SWEENEY:  I HAVE ANOTHER, YOUR HONOR.

 5              THE COURT:  WELL, THAT'S DIFFERENT.  LET ME ASK YOU

 6   THIS, JUST TO MAKE SURE WE'RE ON THE SAME PAGE, MS. SWEENEY.

 7              MS. SWEENEY:  YES.

 8              THE COURT:  IF THE MOTION IS DENIED, I UNDERSTOOD YOUR

 9   RESPONSE TO BE THAT YOU WOULD NEED 45 DAYS TO DECIDE WHAT YOU ARE

10   GOING TO DO.

11              MS. SWEENEY:  WE WOULD NEED 45 DAYS TO SUBMIT A REVISED

12   MOTION FOR CLASS CERTIFICATION.

13        AND TO CLARIFY, YOUR HONOR, THAT WOULD BE AT LEAST 45 DAYS

14   FROM THE DATE OF THE ORDER.

15              THE COURT:  I UNDERSTAND.

16        WELL, LET ME DO THIS BECAUSE I HAVE PEOPLE WAITING.

17        GO AHEAD.  WHAT DO YOU HAVE TO SAY?

18              MR. GEYERMAN:  YOUR HONOR, WE CAN BE PREPARED TO FILE

19   OUR MOTION FOR SUMMARY JUDGMENT BY THE END OF APRIL.

20              THE COURT:  ALL RIGHT.  I'VE TAKEN THESE DOWN.  THE

21   REQUEST, JUST SO I CAN CLEAR MY DOCKET, THE MOTION, THE

22   ADMINISTRATIVE MOTION IS DENIED.  BUT TRIAL DATE IS VACATED.  THE

23   SUMMARY JUDGMENT, OBVIOUSLY THAT DATE IS VACATED.  I'LL SUBMIT A

24   NEW SCHEDULE AFTER I THINK ABOUT WHAT YOU'VE SAID TODAY.

25        OKAY?  ALL RIGHT.  THANK YOU.
```

1             **MR. HEARD:**  THANK YOU, YOUR HONOR.

2             **MS. SWEENEY:**   THANK YOU, YOUR HONOR.

3             **MR. GILMORE:**  THANK YOU, YOUR HONOR.

4             (THEREUPON, THIS HEARING WAS CONCLUDED.)

5  STENOGRAPHY CERTIFICATION

6             "I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT
   FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER."

7             MARCH 8, 2017
              KATHERINE WYATT

8  _____

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25