# Exhibit 10

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| Christopher Corcoran, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>CVS Pharmacy, Inc.<br><br>Defendant. | Case No. 15-cv-03504-YGR<br><br>CLASS ACTION<br><br>DECLARATION OF JOHN M. LAVIN<br><br>**UNDREDACTED VERSION OF DOCUMENT -<br>TO BE FILED UNDER SEAL (L.R. 79-5(d)(1)(D))** |

I, John M. Lavin, pursuant to 28 U.S.C. § 1746, hereby affirm that I am over 18 years of age and competent to make the following Declaration.

**Background**

1. I am currently the Senior Vice President, Network Administration for Caremark, L.L.C. I have held this position since 2011. Caremark, L.L.C. is an indirect subsidiary of CVS Health Corporation (f/k/a CVS Caremark Corporation); Caremark, L.L.C. is a separate and distinct company from CVS Pharmacy, Inc.

2. Prior to becoming the Senior Vice President, Network Administration for Caremark, L.L.C., I held the following positions, starting in the year listed, within the company and its predecessors (hereinafter collectively referenced as "Caremark"): Manager of Network Management (1992); Director of Network Management (1995); Vice President of Network Administration (2000). I have been with Caremark's Network Administration Department since its inception.

3. Collectively, I have over 25 years of experience working in the pharmacy benefit management ("PBM") industry. This experience includes but is not limited to: designing and implementing prescription drug benefit design options that Caremark's clients select; assembling networks of pharmacies to serve the members covered by Caremark's clients; and understanding and managing the process for "adjudicating" prescription drug claims.

4. In my capacity as Senior Vice President, Network Administration, I currently am responsible for, among other things, managing Caremark's relationship with all of its

CONFIDENTIAL                                                                                                                                        CVSSM-0007731

network pharmacies. This includes: pharmacy contracting, pharmacy enrollment, network operations, provider-pharmacy audit, pharmacy communications, network development, and other operations responsibilities.

5. Caremark is one of the two largest PBMs in the United States today. (Express Scripts, Inc. is the other largest PBM). Caremark has been one of the three largest PBMs for at least the last decade.

6. In Network Administration, I manage a team of approximately 230 Caremark employees.

**Definition of "Usual and Customary"**

7. The relationship between Caremark and CVS Pharmacy, Inc. ("CVS") retail pharmacies is governed by contract. From November 2008 through the present, the controlling base agreement between Caremark and CVS is the PCS Health Systems, Inc. Provider Agreement between PCS Health Systems, Inc.[1] and CVS Pharmacy, Inc., accepted by PCS on March 31, 1997 (the "Agreement"). In 1997, I worked at PCS Health Systems, Inc., and I negotiated the Agreement on behalf of PCS Health Systems, Inc.

8. The Agreement defines "Usual and Customary Price" ("U&C") as "the lowest price the Provider would charge to a particular retail customer if such customer were paying cash for an identical prescription on that particular day. This price must include any applicable discounts offered to attract customers." Agreement at 20.[2]

9. The Agreement's definition of "Usual and Customary Price" does not require CVS to determine and submit to Caremark the "most frequently charged" price for a particular prescription. The absence in the definition of a reference to "most frequently charged" is not unusual: during my many years of negotiating scores of contracts with pharmacy companies, I cannot recall any Caremark contract defining usual and customary by referring to the most frequent price point charged over some prior period of time. As the definition in Paragraph 8 reflects, the concept of usual and customary is about the retail price charged today ("on that particular day"), not the retail price charged on an earlier day or over a period of time. The definition is, among other things, patient-specific and day-specific, and a "most frequently charge" would be inconsistent with those concepts.

**Cash Discount Cards**

10. During the nineteen years since the Agreement was executed, numerous third-party alternatives to prescription drug insurance have entered the marketplace. For example, in the mid-2000s, PBMs, including Caremark, began to market "cash discount cards" to institutional and commercial clients, as well as to individual consumers.

11. Cash discount cards, which I have also heard referred to as "cash cards," may provide customers with lower-than-retail pricing on a wide variety of medications. The pricing is

---

[1] PCS Health Systems, Inc. is a predecessor of Caremark.
[2] Caremark's Provider Manual also contains a definition of U&C. The Provider Manual's definition and the Agreement's definition are consistent.

established by contract (or separate fee schedule) between the PBM and the pharmacy. A purchase using a cash discount card is adjudicated by a PBM.

12. Cash discount cards have been widely used for over a decade. Caremark does not consider the prices offered through cash discount cards to be CVS's (or any pharmacy's) usual and customary price.

### Set-Price Generic Programs vs. Club Programs

13. In 2006, Walmart announced a set list of generic medications for which it would sell a 30-day supply for $4 to any customer. After that, many other companies (e.g., big-box retailers, grocery stores, and pharmacy chains) entered the marketplace with their own products. These products varied in terms of their medication lists, benefit design, and approach in reporting or not-reporting the new price as the pharmacy's usual and customary price.

14. Caremark's Networking Group classifies, and for many years has classified, these new generic programs as falling into one of two categories. Only the prices charged in the first of these two categories are the pharmacy's "usual and customary" prices under Caremark's negotiated definitions of the phrase.

15. The first category is "Set Price Generic Programs," meaning a set price is charged to all customers for a list of generic medications. Set Price Generic Programs do not require customers to enroll into a plan or program, or pay a fee to join. Simply put, the set price is the price any customer of that store will pay for the medication. Typical price points include $4.00 for a 30-day supply or $10.00 for a 90-day supply. Pharmacies are contractually required to submit Set Price Generic Program prices as their usual and customary price on claims transmitted to Caremark. Examples of Set Price Generic Programs are those offered by Walmart, Kroger (now discontinued), and Safeway.

16. The second category are "Club Plans," meaning a program that requires members to join or register for the program in order to obtain the special pricing. A prescription purchased through a Club Plan often is an adjudicated transaction using a processor or PBM. Unlike with Set Price Generic Programs, pharmacies offering Club Plans are not contractually required to submit to Caremark the Club Plan price as their usual and customary prices. Examples of Club Plans include the Walgreens Prescriptions Savings Club and CVS's Health Savings Pass (now discontinued).

17. Conceptually, a critical distinction exists between (1) a Set Price Generic Program and (2) a Club Plan. In a Set Price Generic Program, the preferential price is charged to every customer without limitation, whereas the price in a Club Plan is reserved for those customers who have taken steps to enroll in a program in order to obtain the program's benefits.

### CVS's Health Savings Pass

18. I am aware that, until February 1, 2016, CVS retail pharmacies offered a Club Plan, the Health Savings Pass ("HSP"). HSP provided enrollees in the program a typical 90-day supply of approximately 400 generic drugs for a predetermined price point as well as discounts on Minute Clinic services.

3

CONFIDENTIAL
CVSSM-0007733

19. I understand that CVS required customers to opt into the program, fill out an enrollment form, agree to the program's terms and conditions, and pay an annual membership fee of $10–$15 in order to access the HSP program benefits. I further understand that HSP claims were adjudicated by a PBM (Caremark from 2008–July 2013, and ScriptSave from July 2013–January 2016).

20. Caremark considers, and has always considered, HSP a "Club Plan." Accordingly, CVS, like all other pharmacy companies with whom Caremark contracts and who operate Club Plans, was not required nor expected to submit its HSP program price as its usual and customary price on Caremark claims.

21. In the Agreement, the term "applicable discounts" did not include the Health Savings Pass price. There can be several types of discounts that Caremark would not consider "applicable discounts" for purposes of the Agreement. For example, if the pharmacy provided its employees a discount off its retail prices, that would not be an "applicable discount."

22. At or within several months of the HSP program's launch, I discussed HSP with Elizabeth Wingate, CVS's then-Vice President, Managed Care. I understood Ms. Wingate to be responsible for CVS's HSP program at the time. I recall Ms. Wingate telling me, in substance, that CVS would not be submitting the HSP program price as its usual and customary price. I recall agreeing with Ms. Wingate, seeing no compliance issue under the Agreement with CVS's approach, and communicating as much to her.

Date: 11/18/2016

John M. Lavin
Caremark, SVP, Network Administration

4

CONFIDENTIAL   CVSSM-0007734