# EXHIBIT 10



# PLANET DEPOS
## We make it >> happen.

# Transcript of Amber D. Compton

**Date:** December 16, 2016

**Case:** Corcoran, et al. -v- CVS Pharmacy, Inc.

Planet Depos
Phone: 888-433-3767
Fax: 888-503-3767
Email: transcripts@planetdepos.com
Internet: www.planetdepos.com

Worldwide Court Reporting | Interpretation | Trial Services

CONFIDENTIAL

CVSSM-0008392

---

**Page 1**

```
 1              UNITED STATES DISTRICT COURT
 2              NORTHERN DISTRICT OF CALIFORNIA
 3
 4   CHRISTOPHER CORCORAN, et al.,  )
                                    )
 5        Plaintiffs,               )
                                    ) Case No.:
 6   vs.                            )
                                    ) 3:15-cv-03504-YGR
 7   CVS PHARMACY, INC.,            )
                                    )
 8        Defendant.                )
 9
10
11
12
13
14       VIDEO-RECORDED DEPOSITION OF AMBER D. COMPTON
15            TAKEN ON BEHALF OF THE PLAINTIFFS
16                    DECEMBER 16, 2016
17
18
19
20     (Starting time of the deposition:  9:32 a.m.)
21
22
23
24
25
```

---

**Page 2**

```
 1                    I N D E X
 2   QUESTIONS BY:                         PAGE
 3   MR. GILMORE                            7
 4   MS. MAINIGI                            90
 5   MR. SITARCHUK                          92
 6   MR. GILMORE                            93
 7
 8
 9               E X H I B I T S
10   EXHIBIT                               PAGE
11   Exhibit 613   Subpoena                  8
12   Exhibit 618   Declaration of Amber D.  13
13                 Compton
14   Exhibit 532   CVS/Express Scripts provider  65
15                 contract
16   Exhibit 617   2008 Express Scripts Network  69
17                 Provider Manual
18   Exhibit 615   2010 Express Scripts Network  71
19                 Provider Manual
20   Exhibit 616   2016 Express Scripts Network  76
21                 Provider Manual
22   Exhibit 619   August 10, 2016 complaint   81
23
24   (The exhibits were retained by the court reporter to
     be attached to the original and copies of the
25   transcript.)
```

---

**Page 3**

```
 1              UNITED STATES DISTRICT COURT
 2              NORTHERN DISTRICT OF CALIFORNIA
 3
 4   CHRISTOPHER CORCORAN, et al.,  )
                                    )
 5        Plaintiffs,               )
                                    ) Case No.:
 6   vs.                            )
                                    ) 3:15-cv-03504-YGR
 7   CVS PHARMACY, INC.,            )
                                    )
 8        Defendant.                )
 9
10       VIDEO-RECORDED DEPOSITION OF AMBER D. COMPTON,
11   produced, sworn and examined on December 16, 2016,
12   between the hours of nine o'clock in the forenoon
13   and noon of that day, at the offices of Bryan Cave
14   LLP, One Metropolitan Square, 211 North Broadway,
15   Suite 3600, St. Louis, Missouri 63102-2750, before
16   William L. DeVries, a Certified Court Reporter (MO),
17   Certified Shorthand Reporter (IL), Registered
18   Diplomate Reporter, and Certified Realtime Reporter,
19   in a certain cause now pending in the United States
20   District Court, Northern District of California,
21   between CHRISTOPHER CORCORAN, et al., Plaintiffs,
22   vs. CVS PHARMACY, INC., Defendant; on behalf of the
23   Plaintiffs.
24
25
```

---

**Page 4**

```
 1                  A P P E A R A N C E S
 2   For the Plaintiffs:
 3   Mr. Robert B. Gilmore
 4   Stein Mitchell Cipollone Beato & Missner LLP
 5   1100 Connecticut Avenue, NW, Suite 1100
 6   Washington, D.C. 20036
 7   (202) 601-1589
 8   rgilmore@steinmitchell.com
 9
10   For the Defendant:
11   Mr. Enu Mainigi
12   Williams & Connolly LLP
13   725 Twelfth Street, N.W.
14   Washington, D.C. 20005
15   (202) 434-5000
16   emainigi@wc.com
17
18   For the Witness:
19   Mr. Eric W. Sitarchuk
20   Morgan, Lewis & Bockius LLP
21   1701 Market Street
22   Philadelphia, Pennsylvania 19103-2921
23   (215) 963-5000
24   eric.sitarchuk@morganlewis.com
25
```

CONFIDENTIAL

CVSSM-0008393

Page 5

```
Also present:
    Mr. John Niehaus, Videographer
    Ms. Allison Stoll, Express Scripts




Court Reporter:
    William L. DeVries, RDR/CRR
    Missouri CCR #566
    Illinois CSR #084-003893
```

Page 6

1     IT IS HEREBY STIPULATED AND AGREED by
2 and between counsel for the Plaintiffs and counsel
3 for the Defendant that this deposition may be taken
4 in shorthand by William L. DeVries, RDR/CRR, a
5 Certified Court Reporter and Certified Shorthand
6 Reporter, and afterwards transcribed into
7 typewriting; and the signature of the witness is
8 expressly waived.
9             * * * * *
10           AMBER D. COMPTON,
11 of lawful age, produced, sworn and examined on
12 behalf of the Plaintiffs, deposes and says:
13    (Starting time of the deposition: 9:32 a.m.)
14          VIDEOGRAPHER: We're on the record.
15 This is the deposition of Amber D. Compton in the
16 matter of Christopher Corcoran, et al., versus
17 CVS Pharmacy, Inc., in the U.S. District Court for
18 the Northern District of California, Case Number
19 15-cv-3504-YGR.
20           Today's date is December 16th, 2016.
21 The time on the video monitor is 9:32 a.m. The
22 videographer today is John Niehaus representing
23 Planet Depos. This video deposition is taking place
24 at Bryan Cave in St. Louis, Missouri.
25           Will counsel please identify themselves

Page 7

1 and whom they represent?
2           MR. GILMORE: Robert Gilmore with Stein
3 Mitchell on behalf of plaintiffs and the class.
4           MS. MAINIGI: Enu Mainigi from Williams
5 & Connolly for the defendants.
6           MS. STOLL: Allison Stoll for the
7 witness.
8           MR. SITARCHUK: Eric Sitarchuk for the
9 witness.
10          VIDEOGRAPHER: The court reporter today
11 is Bill DeVries representing Planet Depos. Would
12 the reporter please swear in the witness?
13          COURT REPORTER: Do you swear or affirm
14 that the testimony you are about to give in this
15 proceeding will be the truth, the whole truth, and
16 nothing but the truth?
17    A.    THE WITNESS: Yes, I do.
18              EXAMINATION
19 QUESTIONS BY MR. GILMORE:
20    Q.    Good morning, Ms. Compton.
21    A.    **Good morning.**
22    Q.    Could you please state your full name
23 for the record?
24    A.    **Sure. Amber Dawn Compton.**
25    Q.    What is your current home address?

Page 8

1     A.    **630 Willow Lake Court, Weldon Spring,**
2 **Missouri 63304.**
3     Q.    I'm going to hand you what we marked as
4 Plaintiffs' Exhibit 613.
5           (WHEREIN, Exhibit 613, Subpoena, was
6 marked for identification.)
7     Q.    (By Mr. Gilmore) Plaintiffs'
8 Exhibit 613 is a subpoena for you to testify at this
9 deposition that was served and accepted by your
10 attorneys. You understand that you are testifying
11 today pursuant to this deposition subpoena?
12    A.    **Yes.**
13    Q.    Have you been deposed before?
14    A.    **No, I have not.**
15    Q.    Let me go over some ground rules for
16 what depositions involve. My job is to ask you
17 questions that you understand. Is that fair?
18    A.    **Yes.**
19    Q.    And your job is to answer my questions
20 to the best of your ability, okay?
21    A.    **Yes.**
22    Q.    It's important since this is being
23 transcribed that you give verbal answers rather than
24 head shakes or uh-huhs. Fair?
25    A.    **Yes.**

CONFIDENTIAL

CVSSM-0008394

**Page 17**

1  contract to prepare this declaration?
2     A. I did not -- I didn't review it. I
3  worked with Allison to --
4       MR. SITARCHUK: I'd instruct you not to
5  answer beyond that.
6     A. THE WITNESS: Okay.
7       MR. SITARCHUK: Worked with Allison is
8  good enough.
9     Q. (By Mr. Gilmore) So you yourself
10 haven't checked to confirm that the cited language
11 in the CVS/Express Scripts provider agreement is
12 accurate?
13    A. I'm familiar with the language that's
14 in there, yes, in their contract.
15    Q. You didn't compare the cited language
16 here with the contract itself in preparing this
17 declaration; is that right?
18    A. When I was reviewing the document for
19 the draft for the final declaration I was in
20 agreement with the language that was included.
21    Q. My question was a little different.
22 I'm just asking you, you didn't take a copy of the
23 contracts and compare the language with what's in
24 the declaration? You're relying on someone else; is
25 that right?

**Page 18**

1     A. Yes, I was relying on Allison.
2     Q. Sitting here today, are you aware of
3  anything that you would correct or say differently
4  in this declaration?
5     A. No.
6     Q. You say you have no knowledge of anyone
7  else's thoughts on this, meaning the views that you
8  express in this declaration. Why don't you have any
9  knowledge of other people at Express Scripts
10 thoughts on what you say in this declaration?
11      MS. MAINIGI: Objection to form.
12      MR. SITARCHUK: Objection to form.
13    Q. (By Mr. Gilmore) You can answer.
14    A. So I can answer. Okay. I'm sorry.
15    Q. If -- if your attorney instructs you on
16 privilege grounds not to answer, then that would be
17 the only ground that you can't --
18    A. Okay.
19    Q. -- answer unless you don't understand
20 my question in --
21    A. Okay.
22    Q. -- which case I'll try and rephrase it.
23 Let me know.
24    A. Okay.
25    Q. But otherwise, they'll make objections.

**Page 19**

1  But you'll still answer the question to the best of
2  your ability.
3     A. I don't -- I don't have -- I have not
4  had any conversations with anyone at Express Scripts
5  regarding these club or member programs. It's been
6  our position that they were outside of the contract
7  that we would have held with CVS or that we do
8  currently hold with CVS, and I wouldn't have engaged
9  with others regarding the programs.
10    Q. If you haven't had conversations with
11 anyone else at Express Scripts regarding these club
12 member programs, how do you know it's our position,
13 as you said, Express Scripts' position versus just
14 your own?
15      MS. MAINIGI: Objection to form.
16    A. When the programs were introduced to
17 the market they were a program that was created that
18 was unique for a specific patient. Patient had to
19 choose to participate in the program, and therefore
20 we felt that our position that we took was this was
21 outside of the usual and customary retail pricing.
22    Q. (By Mr. Gilmore) My question was a
23 little different.
24    A. Okay.
25    Q. And I'll ask you questions about

**Page 20**

1  your -- your positions as you express them in the
2  declaration, but you've said a couple times that
3  these are our positions or we viewed this. And I'm
4  just trying to understand what's your basis for
5  saying that? How did you learn that Express Scripts
6  as a company holds these positions that you're
7  saying it holds?
8       MS. MAINIGI: Objection to form.
9     A. It would be the area responsible --
10 responsible for this contracting exercise with CVS
11 and how we interpret the language would be my team.
12 So I collectively I guess used we as my -- my
13 organization, my responsibility.
14    Q. (By Mr. Gilmore) Do you know if your
15 supervisors throughout the -- I guess going back to
16 say --
17    A. Uh-huh.
18    Q. -- 2008 to the present, have they
19 expressed views to you that match up with what
20 you've set forth in this declaration about CVS's
21 membership program, Health Savings Pass program?
22    A. If we would have had those
23 conversations if those discussions would have
24 occurred, this is our -- this would have been the
25 position that those predecessors along with myself

**Page 21**

1  would have had the same view.
2      Q.  Did those conversations occur to your
3  recollection?
4      A.  We had awareness that these programs
5  were in the marketplace. We did. There were --
6  there were ways through NACDS. There were ways
7  through Drug Store News when a program was -- like
8  this type of program was launched, whether it was
9  CVS or whether it was anyone else.
10         So we had knowledge that the programs
11 existed. We looked at the way the programs were
12 structured. To the extent that we felt they were
13 outside of the usual and customary pricing, our
14 position, my position was they were outside of the
15 contract that I held with the said retailer.
16     Q.  Again, my question is a little
17 different, and I'll try and make myself clear.
18     A.  Okay.
19     Q.  I'm really asking do you recall
20 conversations, meetings, memos, something where you
21 communicated to someone else or someone else
22 communicated to you within Express Scripts the views
23 that you express in your declaration?
24     A.  I mean, we -- I would have made a
25 business decision that these club or membership

**Page 22**

1  programs were outside of our contract. So yes,
2  there would have been some discussion around the
3  program. The consensus was I felt these programs
4  were exempt from our contract.
5      Q.  Did your supervisors need to approve
6  that decision, do you remember?
7      A.  We would have, yes --
8      Q.  Do --
9      A.  -- from a business perspective.
10     Q.  Do you recall a specific meeting or --
11     A.  I do not recall.
12     Q.  Okay. Or any specific action that your
13 supervisors and you took where they said, yes,
14 Amber, you're right, I agree with your position?
15     A.  I don't recall.
16         MR. SITARCHUK:  And Amber, make sure to
17 wait for Rob to finish his question before you
18 answer.
19     A.  THE WITNESS:  Okay.
20         MR. GILMORE:  That was a little bit of
21 a long question.
22         MR. SITARCHUK:  And he paused a little
23 bit, so ...
24     Q.  (By Mr. Gilmore)  In your declaration
25 in paragraph one you say (quote as read):

**Page 23**

1      I am currently the vice president,
2      retail strategy and contracting for
3      Express Scripts, Inc., Express Scripts,
4      one of the largest pharmacy benefit
5      management, PBM, companies in the
6      United States.
7      Did I read that all correctly?
8      A.  Yes.
9      Q.  Can you tell us what a PBM is?
10     A.  Sure. It's an organization that's
11 designed to work with a variety of plan sponsors to
12 manage their pharmacy benefit.
13     Q.  As a PBM Express Scripts clients are
14 what you call plan sponsors?
15     A.  Plan sponsors or clients.
16     Q.  And these plan sponsors are insurance
17 companies, employee benefit plans, those kinds of
18 organizations?
19     A.  Correct.
20     Q.  Are Express Scripts clients also the
21 individuals insured under those plans?
22     A.  I'm sorry. Say it again.
23     Q.  Do Express Scripts clients, do they
24 include individuals who are insured under the plans
25 that the plan sponsors --

**Page 24**

1      A.  Yes.
2      Q.  -- have?  Express Scripts contracts
3  with pharmacies like CVS, right?
4      A.  Correct.
5      Q.  And those contracts allow Express
6  Scripts clients to use their member's insurance at
7  CVS stores, fair?
8      A.  Correct.
9      Q.  How is Express Scripts paid generally
10 speaking for performing its PBM business with
11 respect to transactions at a pharmacy like CVS?
12     A.  We -- from the pharmacy perspective?
13     Q.  Yes.
14     A.  We have a variety of networks that CVS,
15 for example, would contract with and participate in,
16 and the reimbursement is negotiated between the two
17 parties.
18     Q.  And then, generally speaking, how is
19 Express Scripts paid by its clients?
20     A.  I've -- I've not spent time on the
21 client side, so I don't have -- wouldn't be able to
22 answer that.
23     Q.  I think I heard you say that there are
24 two parts in terms of how CVS pays Express Scripts.
25 By joining an Express Scripts network and then

CONFIDENTIAL

CVSSM-0008398

---

Page 49

1  way the programs were presented and how they were
2  constructed.
3     Q.  (By Mr. Gilmore)  The third sentence of
4  paragraph ten of your declaration reads (quote as
5  read):
6         The prices offered under legitimate
7         membership programs, i.e. prices not
8         offered to all of a given pharmacy's
9         customers, are generally not included
10        in the pharmacy's usual and customary
11        price under the Express Scripts, Inc.
12        pharmacy provider agreement.
13        Did I read all that correctly?
14     A.  Yes, you did.
15     Q.  You used the phrase legitimate
16  membership programs, right?
17     A.  Uh-huh.
18        MR. SITARCHUK:  You got to say yes or
19  no.
20     A.  Yes.
21     Q.  (By Mr. Gilmore)  What makes a
22  membership program legitimate versus not legitimate?
23     A.  The -- the term I -- I feel I used that
24  term for as these programs were being introduced to
25  the -- to the public, being put on a press release,

Page 50

1  offered at the point of sale at the counter for the
2  customers, that these were valid and true membership
3  programs.
4     Q.  In other words, a membership program
5  wouldn't be legitimate or valid and true if those
6  prices are offered to people not in the program?
7        MS. MAINIGI:  Objection to form.
8     A.  I don't know all of the details of the
9  programs, so again, if the customer chose to
10  participate in the program, it's up to them to
11  understand what -- what the program consists of and
12  what benefits they'll get from that program.
13     Q.  (By Mr. Gilmore)  Is what makes the
14  program, these membership programs you're talking
15  about a legitimate program that the only way you get
16  these prices is if you have enrolled in the program
17  and paid the fee?
18        MR. SITARCHUK:  Objection to form.
19        MS. MAINIGI:  Join.
20     A.  Generally if you've enrolled in the
21  program, yes, you've made a decision to enroll in
22  the program.
23     Q.  (By Mr. Gilmore)  And so if as a
24  customer you could get these prices from CVS even if
25  you hadn't enrolled in the program and paid the fee,

Page 51

1  that would make the program not a legitimate
2  membership program?
3        MR. SITARCHUK:  Objection to form.
4        MS. MAINIGI:  Objection to form.
5     Q.  (By Mr. Gilmore)  Fair?
6        MR. SITARCHUK:  Objection to form.
7        MS. MAINIGI:  Join.
8     A.  I don't think it would be a program.
9        MR. SITARCHUK:  We've been going for an
10  hour.  Let's take a break.
11        MR. GILMORE:  Sure.
12        VIDEOGRAPHER:  We're going off the
13  record at approximately 10:30 a.m.
14        (WHEREIN, a recess was taken.)
15        VIDEOGRAPHER:  We're back on the record
16  at approximately 10:42 a.m.
17     Q.  (By Mr. Gilmore)  Ms. Compton, we're
18  still looking at paragraph ten in your declaration,
19  Plaintiffs' Exhibit 618.  The third sentence which
20  we read before says (quote as read):
21        Prices offered under legitimate
22        membership programs, i.e. prices not
23        offered to all of a given pharmacy's
24        customers, are generally not included
25        in the pharmacy's usual and customary

Page 52

1        price under the Express Scripts, Inc.
2        pharmacy provider agreement.
3        I want to ask you about that word
4  generally.  Does that indicate that sometimes
5  membership program prices are included in the
6  pharmacy's usual and customary price under the
7  Express -- Express Scripts agreement?
8     A.  No, U&C is a defined term.  So it's
9  pursuant to -- the U&C definition will be pursuant
10  to the contract negotiation.
11     Q.  Could you delete generally and replace
12  it with never or -- I'm sorry.
13        Could you delete generally not and
14  replace it with never?
15        MR. SITARCHUK:  Never not.
16        MS. MAINIGI:  Objection.
17        MR. SITARCHUK:  Sure that works?  I'll
18  object to form.
19     Q.  (By Mr. Gilmore)  Let me ask it a
20  different way.  What I'm trying to get at is I see
21  the qualifier generally.  When I see that, to me
22  that means that most of the time membership program
23  prices are not included in the pharmacy's usual and
24  customary price under Express Scripts agreements,
25  but sometimes they may be.  Is that true, what I

CONFIDENTIAL

CVSSM-0008405

**53**

1  just said?
2       MS. MAINIGI: Objection.
3    A. No. I don't have any membership -- any
4  contractual agreement where a membership program
5  would be included in the definition of usual and
6  customary.
7    Q. (By Mr. Gilmore) Let's turn to
8  paragraph eleven in your declaration. You say
9  (quote as read):
10      In my experience, there was general
11      awareness in the marketplace that
12      pharmacies with a membership program
13      were not reporting the membership
14      program prices as usual and customary
15      prices.
16      What's your basis to say there was
17 general awareness?
18    A. The -- the programs were public
19 programs. They were available knowledge wise
20 through the press releases that we've discussed, and
21 my understanding, my position is that like Express
22 Scripts they were generally excluded from usual and
23 customary prices. General understanding. Again, I
24 don't have detailed knowledge. It's just a general
25 statement.

**54**

1    Q. Did you talk with employees at other
2  PBMs in which those employees at other companies
3  said they also were -- knew that pharmacies were not
4  submitting these membership program prices as usual
5  and customary prices?
6    A. No, I would --
7       MS. MAINIGI: Objection.
8    A. I would have not spoken with other PBMs
9  regarding this or any contract term.
10   Q. (By Mr. Gilmore) Do you recall any
11 communication to you from someone at CVS saying
12 something to the effect of, Amber, CVS is not going
13 to submit its Health Savings Pass prices at its
14 usual and customary prices?
15   A. No, I do not recall that conversation
16 or a conversation.
17   Q. Are you aware of anyone at CVS having
18 that kind of conversation with anyone else besides
19 you at Express Scripts?
20   A. I'm not, no.
21   Q. And you can't point us to a letter or
22 e-mail or any other written communication between
23 anyone at Express Scripts and anyone at CVS
24 reflecting that CVS is not going to submit its
25 Health Savings Pass price as its usual and customary

**55**

1  price, fair?
2       MS. MAINIGI: Objection.
3    A. That is fair. I can't point to
4  anything.
5    Q. (By Mr. Gilmore) Nor can you point us
6  to any written communication occurring at the time
7  that says, from Express Scripts to CVS, Express
8  Scripts knows you're not submitting this as the
9  usual and customary price and Express Scripts agrees
10 with that? You can't point us to any document that
11 says that, right?
12      MS. MAINIGI: Objection.
13   A. That's correct.
14   Q. (By Mr. Gilmore) Turn to paragraph 17
15 of your declaration. You say (quote as read):
16      I was aware that CVS was not submitting
17      to Express Scripts the membership
18      program prices as CVS's U&C price on
19      prescription drug claims.
20      Did I read that correctly?
21   A. You did, yes.
22   Q. How did you become aware of that?
23   A. Again, we -- I viewed the membership
24 program as being outside of the Express Scripts CVS
25 contract. Wouldn't have expected them to be part of

**56**

1  the contract or claims adjudication to Express
2  Scripts.
3    Q. Putting aside that you didn't expect
4  CVS to submit these prices, what did you do or learn
5  to in fact know that CVS was not submitting to
6  Express Scripts the membership prices as CVS's usual
7  and customary prices?
8       MR. SITARCHUK: Objection to form.
9       MS. MAINIGI: Join.
10   A. I'm not sure I understand what you're
11 asking.
12   Q. (By Mr. Gilmore) So I heard you say
13 that you didn't expect CVS to submit the HSP prices
14 at CVS's usual and customary prices. In paragraph
15 17 you say you were aware that CVS was not doing
16 that. I'm just trying to understand what you did to
17 get that knowledge? Did you look at data? Did you
18 look at some kind of communication, some -- any
19 information or something that would in fact confirm
20 for you at the time CVS is not submitting these
21 prices as its usual and customary prices?
22   A. Well, pursuant to the contract U -- U&C
23 is a defined term within our contract. I had taken
24 a position that these programs were outside of their
25 usual and customary pricing and wouldn't be subject

CONFIDENTIAL                                                                CVSSM-0008406

93

1  A. No.
2  Q. So do you have any knowledge of what
3  was said to Medicare or TRICARE -- Medicare part D
4  or TRICARE either way?
5  A. No.
6    MR. SITARCHUK: That's all I have.
7  Thank you.
8    FURTHER EXAMINATION
9  QUESTIONS BY MR. GILMORE:
10  Q. Are you aware of the existence of any
11  investigations of Express Scripts by Medicare part D
12  or TRICARE or any other government agency relating
13  to usual and customary pricing?
14    MR. SITARCHUK: And I'd object and
15  instruct you not to answer to the extent if any that
16  would call for communications with counsel, but if
17  you have any awareness other than that, please
18  answer the question.
19  **A. No, I don't have any awareness.**
20  Q. (By Mr. Gilmore) Are you aware of any
21  litigation that Express Scripts has been involved in
22  regarding the usual and customary pricing that
23  pharmacies submit?
24    MR. SITARCHUK: Same instruction.
25  **A. No, not aware.**

94

1  Q. (By Mr. Gilmore) Are you aware of any
2  litigation that Express Scripts has been involved in
3  regarding pharmacies' discount membership programs?
4    MR. SITARCHUK: Same instruction.
5  **A. No, not aware.**
6    MR. GILMORE: No further questions.
7    MS. MAINIGI: Nothing for me. Thank
8  you.
9    MR. SITARCHUK: We're done.
10    VIDEOGRAPHER: We're going off the
11  record at approximately 11:41 a.m.
12    (WHEREIN, the deposition was concluded
13  at 11:41 a.m.)
14
15
16
17
18
19
20
21
22
23
24
25

95

1  CERTIFICATE OF REPORTER
2
3    I, William L. DeVries, a Certified
4  Court Reporter (MO), Certified Shorthand Reporter
5  (IL), Registered Diplomate Reporter, and a Certified
6  Realtime Reporter, do hereby certify that the
7  witness whose testimony appears in the foregoing
8  deposition was duly sworn by me pursuant to Section
9  492.010 RSMo; that the testimony of said witness was
10  taken by me to the best of my ability and thereafter
11  reduced to typewriting under my direction; that review
12  was not requested; that I am neither counsel for, related
13  to, nor employed by any of the parties to the action
14  in which this deposition was taken, and further that I
15  am not a relative or employee of any attorney or counsel
16  employed by the parties thereto, nor financially or
17  otherwise interested in the outcome of the action.
18
19
20  *William L. DeVries*
21    Certified Court Reporter
22    within and for the State of Missouri
23
24
25

CONFIDENTIAL

CVSSM-0008416