# EXHIBIT 11



# PLANET DEPOS
## We make it » happen.™

# Transcript of John Martin Lavin

**Date:** January 5, 2017

**Case:** Corcoran, et al. -v- CVS Pharmacy, Inc.

Planet Depos
Phone: 888-433-3767
Fax: 888-503-3767
Email: transcripts@planetdepos.com
Internet: www.planetdepos.com

Worldwide Court Reporting | Interpretation | Trial Services

CONFIDENTIAL

Transcript of John Martin Lavin  1 (1 to 4)
Conducted on January 5, 2017

## Page 1

```
            UNITED STATES DISTRICT COURT
          NORTHERN DISTRICT OF CALIFORNIA

Christopher Corcoran, et  )
al.,                      )
      Plaintiffs,         )
                          )
v.                        ) Case No. 3:15-cv-03504-YGR
                          )
CVS Pharmacy, Inc.,       )
      Defendant.          )
_____)


        VIDEOTAPED DEPOSITION OF JOHN MARTIN LAVIN

                   Phoenix, Arizona
                   January 5, 2017








                Prepared by:
                Meri Coash, RMR, CRR
                Certified Reporter
                Certification No. 50327
```

## Page 2

```
                I N D E X
WITNESS                                    PAGE
JOHN MARTIN LAVIN
      Examination By Mr. Levine              6
      Examination By Ms. Mainigi           158
      Further Examination By Mr. Levine    165




              EXHIBITS MARKED
EXHIBITS        DESCRIPTION                 PAGE
Plaintiffs'     Declaration of John M. Lavin  15
Exhibit 701
Plaintiffs'     2009 Caremark provider manual 57
Exhibit 702
Plaintiffs'     Network Performance October 1, 100
Exhibit 703     2008, Troubleshooting Set Price
                Generic Programs,
                Caremark-0002102 - 2104
Plaintiffs'     Narrative Onset Price Program 116
Exhibit 704
Plaintiffs'     Cash Offering Project Assumptions, 120
Exhibit 705     Confidential 09/15/08,
                Caremark-0002105 - 2108,
                Confidential
Plaintiffs'     Email from Domenico Gugliuzza to 154
Exhibit 706     John Lavin, Thomas Gibbons, John
                Kirby, Jeffrey Knudson, John
                Murphy, Dan Rocha, Paul Ferschke,
                Gregory Sciarra, and Daniel
                Schmid, dated April 9, 2013, with
                attachment, CVSC-0317696 - 697
```

## Page 3

```
Defendant's    Email string ending with email  158
Exhibit 707    from Paul Hoolihan to Aaron
               Roesing and Holly Sambora, dated
               January 12, 2010,
               Corcoran - CONFIDENTIAL,
               Caremark-0000829 - 837




               PREVIOUSLY MARKED EXHIBITS
Exhibit 672    Agreement PCS Health Systems    Page 41
               and CVS Pharmacy dated
               March 31, 1997
Exhibit 679    2016 Caremark provider manual   Page 58



               INSTRUCTIONS NOT TO ANSWER
                   Page 14      Line 3
                   Page 14      Line 8
```

## Page 4

```
    VIDEOTAPED DEPOSITION OF JOHN MARTIN LAVIN
was taken on January 5, 2017, commencing at 8:31 a.m. at
the law offices of Galbut & Galbut, PC, Camelback
Esplanade, 2425 East Camelback Road, Suite 1020, Phoenix,
Arizona, before Meri Coash, a Certified Reporter in the
State of Arizona.



                        * * *

APPEARANCES:
    For the Plaintiffs:
       PRITZKER LEVINE, LLP
       By:  Jonathan K. Levine, Esq.
            180 Grand Avenue
            Suite 1390
            Oakland, California  94612
            415-692-0772
            jkl@pritzkerlevine.com

    For the Defendants and Deponent:
       WILLIAMS & CONNOLLY, LLP
       By:  Enu Mainigi, Esq.
            Colleen McNamara, Esq.
            725 Twelfth Street, NW
            Washington, DC  20005
            202-434-5000
            emainigi@wc.com
            cmcnamara@wc.com

    Also present:  Florence Crisp, Esq.; Thao Pham,
    Esq.; and Philip Walberer, videographer
```

CONFIDENTIAL                                    CVSSM-0007644

**105**

1  And then there were some other, you know, attributes
2  that — you know, that we've listed down below. Most of
3  them had a situation where once the member enrolled, there
4  was enrollment, eligibility file, and then the — you
5  know, the pharmacy would send the claim in to that
6  program. And those programs, you know, included — You
7  know, the first one that I was aware of, I believe, was
8  Walgreens, and then there were others like CV-— you
9  know, Rite Aid and CVS. And then in comparison was what
10 is stated the standard — standard set price generic
11 program, and those were programs where the member didn't
12 have to enroll. You went into — and the — By far the
13 first and the biggest was Wal-Mart's, and when you walked
14 into a Walmart, everybody you got in there got, that was
15 their everyday low price, and that's what they gave
16 everybody who came to — and cash customer that came into
17 the program. We considered the standard set program —
18 that pricing — the standard set price programs, like the
19 Walmart program, we considered that their usual and
20 customary. For the club programs, we did not consider
21 that part of their usual and customary.
22    Q.  So this classification that you're referring to
23 in paragraph 14 of your declaration, which has these two
24 types of programs, who at Caremark was involved with
25 making the classification?

**106**

1    A.  That was my team, including Brian, myself, Todd
2  Guinn, our supporting legal staff, and then we had input
3  from other — from our client-facing management teams.
4     Q.  And when -- when did this class -- when -- when
5  was this classification? When did it occur?
6     A.  We developed this after — really it was after
7  the Walgreens — the Walgreens program came out, because
8  as we had discussions with Walgreens, we had to evaluate
9  it because that was really the first club pro- — plan,
10 using our terminology, that came out. So at that point,
11 we had to evaluate that and make a determination on how we
12 were going to move forward.
13    Q.  Do you have a more temporal specificity? 2007?
14 2008?
15    A.  I don't have a specific date, but it was — be —
16 you know, it was in — it was after the Walgreens program
17 came out.
18    Q.  Did the classification that you settled on
19 require the approval of anyone other than you?
20    A.  The — You know, as I stated, we looked at —
21 you know, I talked — I worked with our legal team to
22 evaluate that based on our contract, and then secondly, I
23 worked — we — you know, worked with our general
24 management as we do with all types of decisions, worked
25 with our — you know, with our management team.

**107**

1     Q.  When you say "general management," who are you
2  referring to?
3     A.  Our management of Caremark.
4     Q.  The people above you?
5     A.  People who -- people above me and also people in
6  other -- in other parts of the organization.
7     Q.  Who else did you talk to at -- above you with
8  respect to this issue of the classification of the generic
9  programs?
10    A.  I don't remember any specifically back in '07 and
11 '08. I don't remember all my specific discussions at that
12 year.
13    Q.  Well, generally, do you recall any of those
14 discussions with anyone?
15    A.  Not specifically, no.
16    Q.  Was the process -- Well, let me ask you this.
17 Is the document that is Exhibit 703 -- is this the final
18 outcome of this process that you've described?
19         MS. MAINIGI: Objection.
20    A.  THE WITNESS: At the time, this was our --
21 this is -- this is our position, which has been
22 consistent. Across time, across pharmacies, this is our
23 position.
24 BY MR. LEVINE:
25    Q.  Are there -- And was the process itself

**108**

1  documented anywhere? I know this is the end result, but
2  is the process memorialized anywhere?
3     A.  Not that I'm — like, did we set up a — I'm
4  sorry. What did — what do you mean by that did we set up
5  a memorial or something —
6     Q.  Yeah. Is there -- was there a group -- was there
7  a group tasked with doing this that had minutes -- that
8  prepared minutes, agendas, presentations, or -- or is
9  there a file someplace that contained --
10    A.  I'm not aware that it was that formal of a
11 process.
12    Q.  Has Caremark ever conveyed this classification
13 that you referred to to CVS in writing?
14    A.  I don't remember that specifically. There
15 were — We had questions from CVS, and pretty much all
16 the chains that created some program, they would call us
17 and ask about our — our — you know, how we evaluate the
18 program. And so there may be, but I'm not — I don't —
19 off of the top of my head, I don't specifically know.
20    Q.  So sitting here today, you're not aware of any?
21    A.  That's correct.
22    Q.  Okay. And sitting here today, are you aware of
23 any writing that conveys this classification to any of
24 Caremark's clients?
25    A.  The — there was a lot of questions from a lot of

CONFIDENTIAL                                                                                CVSSM-0007670

**165**

1  Q. And would you include that amendment for all the
2  times in your declaration you say "set price generic
3  program"?
4  A. Yes.
5      MS. MAINIGI: I have no further questions.
6
7          FURTHER EXAMINATION
8  BY MR. LEVINE:
9  Q. The -- Let's go back to Exhibit 707, please.
10 You do not appear to be an author or recipient of any of
11 the emails. Is that correct?
12 A. That is correct.
13 Q. Have you seen this email before sitting here
14 today?
15 A. I have seen this email before.
16 Q. When did you see it last?
17 A. I saw it in my preparation --
18 Q. Prior to --
19 A. -- for my --
20 Q. Sorry.
21 A. -- for my 30(b) whatever it is. You guys figure
22 that out.
23 Q. Okay. Had you seen it in 2010?
24 A. I am not -- I -- I don't remember seeing this in
25 2010.

**166**

1  Q. Okay. So would you agree with me that all of the
2  individuals for whom this was from, to, or cc'd are
3  Caremark employees?
4  A. Yes.
5  Q. All right. So this document never left Caremark?
6  A. This email was an internal email.
7      MR. LEVINE: All right. All right. So
8  we're going to switch hats and --
9      THE VIDEOGRAPHER: Do you want me to end
10 this one?
11     MR. LEVINE: Well, I don't know. Do we need
12 a separate tape?
13     MS. MAINIGI: I would do a separate tape.
14     MR. LEVINE: Okay.
15     THE VIDEOGRAPHER: This marks the end of the
16 deposition of John Lavin. We are going off the record at
17 2:07 p.m.
18     (The deposition was concluded at 2:07 p.m.)
19
20          _____
             JOHN MARTIN LAVIN
21
22
23
24
25

**167**

1  STATE OF ARIZONA   )
2  COUNTY OF MARICOPA )
3      BE IT KNOWN the foregoing deposition was
4  taken by me pursuant to stipulation of counsel; that I was
5  then and there a Certified Reporter of the State of
6  Arizona, and by virtue thereof authorized to administer an
7  oath; that the witness before testifying was duly sworn by
8  me to testify to the whole truth; notice was provided that
9  the transcript was available for signature by the
10 deponent; that the questions propounded by counsel and the
11 answers of the witness thereto were taken down by me in
12 shorthand and thereafter transcribed into typewriting
13 under my direction; that the foregoing pages are a full,
14 true, and accurate transcript of all proceedings and
15 testimony had and adduced upon the taking of said
16 deposition, all to the best of my skill and ability.
17     I FURTHER CERTIFY that I am in no way related to
18 nor employed by any parties hereto nor am I in any way
19 interested in the outcome hereof.
20     DATED at Phoenix, Arizona, this 6th day of
21 January, 2017.
22
23          *Meri Coash*
            Meri Coash, RMR, CRR
24          Certified Reporter #50327
25

CONFIDENTIAL

CVSSM-0007685