# Exhibit 19



# Transcript of Thomas J. Gibbons, Individually and as Corporate Designee

**Date:** December 13, 2016

**Case:** Corcoran, et al. -v- CVS Pharmacy, Inc.

Planet Depos
Phone: 888-433-3767
Fax: 888-503-3767
Email: transcripts@planetdepos.com
Internet: www.planetdepos.com

Worldwide Court Reporting | Interpretation | Trial Services

109

1 step that makes a price no longer be a usual
2 and customary price?
3   A   You're asking -- if I may, you're
4 asking me to answer on behalf of my PBM
5 background?
6   Q   I'm asking just in your view,
7 because as I understand, you've been
8 designated as an expert by CVS on that, so
9 what is your --
10       In your opinion, first, why
11 does it matter? What is significant about
12 enrollment that makes a price obtained after
13 enrolling in a program not a usual and
14 customary price?
15   A   So I'll answer on behalf of our
16 program.
17       You know, our program is
18 something we offered out to the community
19 that was a decision point, that a -- a
20 consumer needed to determine whether the cost
21 of enrollment and the product mix that was
22 available on the products, as well as signing
23 up and going through the enrollment and HIPAA
24 waiver, was a program they wished to
25 participate in.

110

1       And if it was, it was
2 something we put them into through Health
3 Savings Pass. It was entirely different than
4 we would set up as a usual and customary
5 pricing that we used across the rest of our
6 public business.
7       Our customer needed to make an
8 active decision to participate in that
9 program.
10   Q   What if every single person who is
11 a cash-paying customer paid the Health
12 Savings Pass prices and no one paid the
13 official U&C price that CVS asserted it had?
14       Would those HSP prices still
15 not be considered usual and customary prices
16 in your view?
17   A   They would not.
18       Again, as we process all of
19 our prescriptions, we need to determine what
20 the price would be if there was no form of
21 insurance or discount submitted by our
22 customer, and we need to submit that out to
23 the entire population, not just the two or
24 three percent that might be paying cash.
25       Health Savings Pass created a

111

1 different price point for a subset of drugs
2 for a specific quantity of drugs. If
3 everyone enrolled in that, then that's the
4 price they would get, but it was entirely
5 differently from our usual and customary
6 price.
7   Q   And did -- you mentioned discounts.
8       There are some definitions
9 in -- of usual and customary prices in
10 contracts. I believe the Caremark provider
11 contract with CVS expressly includes
12 discounts.
13       You're familiar with those
14 kinds of definitions of usual and customary
15 prices, right?
16       MR. GEYERMAN: Objection to
17 form.
18   A   I don't have them all memorized,
19 but I'm certainly familiar with them.
20   Q   Okay.
21       And there's no question that
22 the Health Savings Pass Program offers
23 discount prices?
24       MR. GEYERMAN: Objection to
25 form.

112

1   Q   Right?
2   A   I would say the Health Savings Pass
3 Program creates a price point for a 90-day
4 supply of specific medications.
5   Q   It's a discount program, right?
6       MR. GEYERMAN: Objection to
7 form.
8   A   That price is less than other
9 prices. If you want to call that discount, I
10 would agree with that.
11       But fundamentally, I think the
12 program itself creates a price list that
13 creates a price point for select generic
14 drugs.
15   Q   Now, you -- in paragraph 8 of your
16 declaration, if we can turn to that,
17 Plaintiffs' Exhibit 607, you say, "To my
18 knowledge, no PBM or commercial payer has
19 objected to CVS's position."
20       Can I ask you, first of all,
21 have you personally communicated to
22 commercial payers CVS's position that it's
23 contractual definitions of usual and
24 customary do not require CVS to submit the
25 HSP price as its U&C price for

**Page 113**

1  program-eligible medications?
2     A  I believe the majority of those
3  conversations were had with payers before I
4  left the PBM side and came to work on the
5  retail side.
6     Q  So since you took over in 2011, can
7  you think of any communication you've had --
8  you personally have had where you conveyed to
9  a payer or a PBM CVS's position that you
10 state here in paragraph 8?
11    A  No.
12    Q  Now, there are -- there have been
13 government payers that have objected to CVS's
14 position that its contractual definitions of
15 usual and customary do not require CVS to
16 submit the HSP price as its U&C price for
17 program-eligible medications, fair?
18       MR. GEYERMAN:  Objection to
19 form.
20    A  Oh, I think there's some states
21 that have redefined their programs in such
22 ways to include programs such as Health
23 Savings Pass as part of the -- as pricing
24 they're entitled to.
25    Q  Let's return to that a little bit

**Page 114**

1  later today.
2        Now, CVS categorizes its HSP
3  program as part of its retail cash business
4  internally, right?
5        MR. GEYERMAN:  Objection to
6  form.
7     A  I really don't understand that
8  question.
9     Q  Internally --
10       MR. GILMORE:  Let's go off the
11 record.
12       THE VIDEOGRAPHER:  We are off
13 the records at 12:36 p.m.
14       (Discussion off the record.)
15 the.
16       (Recess.)
17       THE VIDEOGRAPHER:  We are on
18 the record at 12:46 p.m.
19 BY MR. GILMORE:
20    Q  The question before we took a
21 break, Mr. Gibbons, was internally, CVS
22 categorizes the HSP program as part of its
23 retail cash business, right?
24       MR. GEYERMAN:  Objection to
25 form.

**Page 115**

1     A  It probably depends on what area of
2  the classification is.  Typically, we would
3  look at three major aspects of pharmacy
4  volume.
5          One would be a funded benefit.
6  Some would be various cash card programs, and
7  some would be usual and customary pricing.
8          Most of the reports I would
9  see, if HSP wasn't a standalone program, it
10 would be part of the cash discount programs.
11       (Exhibit 478 marked for
12 identification.)
13 BY MR. GILMORE:
14    Q  Let me hand you what we marked as
15 Plaintiffs' Exhibit 478.
16    A  That's correct.
17       MR. GEYERMAN:  Thank you.
18    Q  Plaintiffs' Exhibit 478 is an email
19 with attached slide deck.  The beginning
20 Bates number is CVSC-315353, and the cover
21 email is a March 10, 2015 email from Sam
22 Christophersen to you, Mr. Zevzavadjian,
23 Ms. Greenbaum, Mr. Shenck, Ms. Greenlef
24 and -- I don't know if Shavdia Dewang is a
25 man or a woman.  Shavdia Dewang.

**Page 116**

1        Have you seen this document
2  before?
3     A  I believe I have.
4     Q  Let's turn to the slide deck
5  itself.  And the first page of the slide
6  deck, which is on Bates number 315354, says,
7  "Solving for four customers segments."
8        Do you see that?
9     A  I do.
10    Q  Now, there's kind of a grid here,
11 right, on this slide?
12       MR. GEYERMAN:  If you want to
13 look at the document before he asks you, go
14 ahead.
15    Q  Sure.
16       (Deponent read the document.)
17    A  Okay.
18    Q  So this slide deck here on the
19 first page, it has a grid with categories for
20 cash and non-cash customers, right?
21    A  It does.
22    Q  And the row for cash has two
23 groups, cash patients who pay the discount
24 price and cash patients who pay the U&C
25 price, right?

**Page 261**

1  actually -- I think I'm done.
2          MR. GEYERMAN: Are you --
3          MR. GILMORE: Yes. So --
4          MR. GEYERMAN: Do you want
5  three minutes to check your notes or do you
6  know you're done?
7          (Pause.)
8          MR. GILMORE: I have no
9  further questions.
10         MR. GEYERMAN: All right.
11         THE VIDEOGRAPHER: We are off
12 the record at 5:35 p.m.
13         (Whereupon, the proceedings
14 adjourned.)

**Page 262**

1          ACKNOWLEDGMENT OF DEPONENT
2     I, THOMAS J. GIBBONS, do hereby
3  acknowledge that I have read and examined the
4  foregoing testimony, and the same is a true, correct
5  and complete transcription of the testimony given by
6  me and any corrections appear on the attached Errata
7  sheet signed by me.
8
9  _____  _____
10    (DATE)              (SIGNATURE)

**Page 263**

1          C E R T I F I C A T E
2     I, Jill K. Ruggieri, Registered Merit
3  Reporter and Certified Realtime Reporter, do certify
4  that the deposition of THOMAS J. GIBBONS, in
5  the above-captioned matter, on December 13, 2016,
6  was stenographically recorded by me, before being
7  sworn by me, a Notary Public in and for the State of
8  Rhode Island; that the transcript produced by me is
9  a true record and accurate record of the proceedings
10 to the best of my ability; that I am neither counsel
11 for, related to, nor employed by any of the parties
12 to the above action; and further that I am not a
13 relative or employee of any attorney or counsel
14 employed by the parties thereto, nor financially or
15 otherwise interested in the outcome of the action.
16
17 _____
18    Jill K. Ruggieri, RPR, RMR, FCRR, CRR
19
20 Transcript review was requested of the reporter.