# EXHIBIT 31

# CHANGE to WIN

Testimony of

Jasmin Weaver
Healthcare Initiatives Legislative Director
Change to Win

Before the

UNITED STATES HOUSE OF REPRESENTATIVES

COMMITTEE ON OVERSIGHT AND GOVERNMENT REFORM

SUBCOMMITTEE ON THE FEDERAL WORKFORCE, POSTAL SERVICE,
AND THE DISTRICT OF COLUMBIA

Hearing on

H.R. 4489, "The FEHBP Prescription Drug Integrity, Transparency, and Cost Savings Act"

February 23, 2010

Chairman Lynch, Ranking Member Chaffetz, and Members of the Subcommittee:

My name is Jasmin Weaver and I am the Healthcare Initiatives Legislative Director at Change to Win, a six million member partnership of five unions: the Service Employees International Union, United Food and Commercial Workers International Union, International Brotherhood of Teamsters, Laborers' International Union of North America, and United Farm Workers of America.  Four of our five affiliate unions represent federal workers, several hundred thousand in total, so you can understand why we have a strong interest in improving the Federal Employee Health Benefits Program's (FEHBP) contracting practices to ensure that federal employees get the best possible drug coverage at the best price.  We also have a strong interest in reforming the pharmacy benefit management industry generally, because our members pay more and more for prescription drugs every year, and we think that reforming the FEHBP can make it a model for how to provide quality, affordable drug coverage.

Given these goals, we are thrilled to be here today to testify in support of H.R. 4489.  We believe this bill will save federal employees and the federal government hundreds of millions of dollars, reduce conflicts of interest in FEHBP drug contracting, increase privacy protections for federal employees, and strengthen OPM's oversight of the FEHBP.  The bill has our unqualified support, and we thank Chairman Lynch and the members of the subcommittee for your work on this issue.

**Background on Pharmacy Benefit Managers (PBMs)**

To make clear why this bill is necessary, let me provide a little background on how pharmacy benefit managers, or PBMs, operate. Health plans hire PBMs to manage their prescription drug benefits, and PBMs establish a network of pharmacies for distributing drugs, negotiate with pharmacies and drug manufacturers to establish drug prices, help determine which drugs will be covered by a health plan and which will not, and provide disease management and clinical programs. While PBMs can provide a useful service, they also are in a position of trust that can easily be abused.

One of the basic problems with PBMs is a severe lack of transparency, as many PBMs refuse to tell their customers how much they pay for the drugs they help provide. The OPM Inspector General has said that "the single most important issue which OPM must resolve is the fact that . . . the cost structures of the PBMs are utterly nontransparent."[1]

This lack of transparency causes many problems. For example, PBMs often charge the health plans they serve more for drugs than they pay the pharmacies that distribute those drugs to patients (this is above and beyond a per drug dispensing fee that the PBM pays the pharmacy).[2] This is known as "spread pricing." Nothing in current FEHBP rules prohibits spread pricing, and in 2005 Caremark, which manages 80% of pharmacy benefits for health plans within the FEHBP, paid $137 million—including $54.6 million to the FEHBP[3]—to settle a false claims suit brought by the government alleging, among other things, that Caremark's predecessor, Advance PCS, "devised elaborate schemes which paid pharmacies at a much lower rate than it in turn billed its customers, including government programs."[4]

PBMs also may switch patients to a drug other than the one their doctor prescribed, sometimes a drug more expensive for the health plan and patient, to take advantage of rebates the PBM receives from drug manufacturers, which can be hidden from the PBM's customers.[5] In a 2008 case brought by 28 states and the District of Columbia, Caremark paid $38.5 million to settle claims alleging a broad range of deceptive business practices, including drug switching and drug promotions to maximize payments from drug manufacturers.[6]

**How Transparency Could Benefit the FEHBP**

Greater transparency in the FEHBP's PBM contracts could save the government money. Although the FEHBP is the largest employer-sponsored health plan in the country,[7] and thus should receive the best prices, it spends 15-45% more than other federal programs for prescription drugs.[8] Many other large government plans have achieved savings through transparency requirements, including TRICARE and Medicaid,[9] and many states and large private employers have also saved millions by switching to more transparent pricing.[10] PBMs often cite Medicare Part D as a model drug benefits program, and argue that the FEHBP should not be changed because it operates in a similar way to Medicare Part D,[11] but a 2008 study by the House Oversight and Government Reform Committee found that if Medicare Part D paid the same drug prices as Medicaid, taxpayers would save over $156 billion in the next ten years.[12]

Change to Win recently released a report (attached) that further highlights the need for greater transparency in FEHBP PBM contracts. Our report, titled **CVS CAREMARK'S GENERIC RIP OFF**, demonstrates that CVS Caremark has failed to offer its lowest price on hundreds of generic drugs to the federal government and federal employees, even though the federal government is CVS Caremark's largest customer.

Specifically, we found that CVS Caremark offers lower prices on hundreds of generic drugs to people who simply sign up for its retail generic discount program than it does to the federal government and federal employees under the Blue Cross Blue Shield Federal Employee Program (FEP)—in fact, the total price for drugs to plan participants and the government (and thus taxpayers) was higher for 85% of the drugs on CVS Caremark's generic discount list. This is so hard to believe that it bears repeating in a different way: **for the vast majority of the drugs on CVS's generic discount list, a person with no insurance who joins its discount program pays *less* than a federal employee and the government together pay under the FEP; thus, when purchasing hundreds of generic drugs, FEP members and the government would actually be better off if they did not use their insurance and instead simply used the CVS generic discount program.**

The price differences involved here are often substantial. For example, CVS offers a 90-day supply of the antacid Ranitidine for **$9.99** through its discount generics program, but CVS Caremark charges FEP plan participants and the federal government up to **$217.74** for a 90-day supply of the same drug under the FEP plan. That is, the FEP price is more than twenty times the CVS generic discount price. Ironically, this same drug was at the center of improper drug switching allegations against CVS that led to a $37 million settlement in March 2008 with Attorneys General in 23 states, the District of Columbia, and the federal government.[13]

Our report suggests that if CVS Caremark charged the FEP and plan participants the same price it offers to members of its discount program for just **three** commonly prescribed drugs, federal employees and the government could save tens of millions of dollars every year. And if CVS Caremark offered its lowest price for generic drugs to the government for all the drugs that are part of its discount program, federal employees and the government could save hundreds of millions of dollars.

The price differentials revealed by our research point to a broader lack of transparency and accountability and underline the need for PBM reform in the FEHBP. It is hard to imagine that OPM and federal employees would agree to the situation I have described above if they knew what they were really being charged. Why is the government paying CVS Caremark to reduce its drug costs when CVS Caremark is failing to provide its lowest prices on generics at the retail pharmacies it owns?

**The Benefits of H.R. 4489**

This bill addresses all of the problems I have discussed: it prohibits spread pricing, it requires greater transparency, it bans drug switching that is designed solely to enhance profits for a PBM, and it should significantly reduce drug costs for federal employees and the government.

Moreover, the bill gives OPM greater power to audit and oversee FEHBP PBM contracts, which will make it easier for OPM to root out waste, fraud, and abuse in FEHBP contracts.

The bill also takes another key step: while OPM already prevents some conflicts of interest by refusing to hire PBMs that are owned by drug manufacturers, this bill would extend that ban to also cover PBMs that are owned by retail drugstores (and vice versa). PBM-drugstore combinations, such as CVS-Caremark, bring together two businesses that have inherent conflicts of interest. PBMs are supposed to save health plans money by negotiating lower drug prices with manufacturers and pharmacies, while drugstores are incentivized to drive plan participants into their stores to fill the maximum number of prescriptions and have little incentive to help save health plans money. By extending the existing ban on PBM-manufacturers to also cover PBM-drugstores, this bill will prevent these conflicts of interest.

I am sure you will hear opposition to this bill from some PBMs. Some may say that this bill will reduce their profits, reduce choice for consumers, or push up prescription drug costs. I can't deny that this bill will likely reduce PBM profits, but that is an inevitable result of getting a better deal for the federal government and federal employees. And the notion that this bill might reduce choice or increase prices by causing some PBMs to abandon the FEHBP is absurd. Many PBMs already operate under conditions similar to those imposed by this bill.

Argus Health Systems, which you will also hear from today, agrees to fully transparent pricing. Many other PBMs, including many that currently contract with the FEHBP, have agreed to some contracts that require transparency, pass through of rebates, and other rules similar to those contained in this bill. Even PBMs that are opposing the transparency provisions in this bill have demonstrated that they can do just fine when subject to rules like those in this bill. In fact, as a result of multi-million dollar settlements with the Departments of Justice and Health and Human Services for allegations that included misconduct in contracts with the FEHBP, both CVS Caremark and Medco, two of the largest PBMs operating in the FEHBP, are governed by consent decrees that address issues like spread pricing, drug manufacturer rebates, drug switching, and plan audit rights. If PBMs can comply with these consent decrees, they can also operate under the rules imposed by this bill. These consent orders will expire soon, enhancing the need for this legislation to permanently regulate these activities.

Some may argue that the reforms implemented by this bill go too far, and will cause too many disruptions in the FEHBP. But as I have just explained, many PBMs already operate under conditions similar to those imposed by this bill. More importantly, the government spends over $10 billion annually on prescription drugs via the FEHBP, so the notion that the potential savings achieved by this bill would not be worth the trouble it may cause doesn't hold water.

In conclusion, this bill would be a huge step in the right direction for the FEHBP. It could save federal employees and the federal government hundreds of millions of dollars, it will reduce conflicts of interest and opportunities for fraud, it will prohibit inappropriate drug switching, and it will give OPM greater power to audit and oversee FEHBP PBM contracts. These would be major achievements, and that is why we wholeheartedly support this bill.

Thank you for your time. I would be happy to respond to your questions.

---

[1] Testimony by Patrick E. McFarland, Inspector General, U.S. Office of Personnel Management before the Subcommittee on the Federal Workforce, Postal Service, and District of Columbia on "FEHBP's Pharmacy Benefits: Deal or No Deal?" 24 June 2009.

[2] Garis, Robert I. and Bartholomew E. Clark. *The Spread*. Prime Therapeutics. "Prime Therapeutics Supports CMS Proposal to Limit Spread Pricing in Medicare Part D Administration"; Sipkoff, Martin. "PBMs Raise the Curtain." See also, Sipkoff, Martin. "PBMs Raise the Curtain"; *United States ex rel. Brown v. CaremarkPCS, Inc.*, No. 02-9236, E.D. Pa., 31 Mar. 2005 (Second Amended Complaint ("SAC")): at pp. 18-19; *SEPTA v. CaremarkPCS Health L.P.,* Amended Complaint: at p. 4.

[3] U.S. Office of Personnel Management, Office of Inspector General, Semi-annual Report to Congress, April 1, 2005 – September 30, 2005, pp. 13-14, available at <www.opm.gov/About_opm/reports/InspectorGeneral/pdf/OPMSAR33.pdf>.

[4] *United States ex rel. Brown v. CaremarkPCS, Inc.*, No. 02-9236, E.D. Pa., 31 Mar. 2005, SAC: at ¶51.

[5] U.S. Government Accountability Office. *Federal Employee Health Benefits: Effects of Using Pharmacy Benefit Managers on Health Plans, Enrollees, and Pharmacies.* Report to the Honorable Byron L. Dorgan, U.S. Senate. GAO-03-196. Jan. 2003: at pp. 25-28, available at <http://www.gao.gov/new.items/d03l96.pdl>; Martin, Steven S. "PBM Industry Today: Who's Managing Drug Costs?"; see also: *State of Ohio v. Caremark Rx, L.L.C.,* Complaint: at p. 5; *United States ex rel. Brown,* SAC: at p. 11; Drury, Susan. "Drug Pushing."

[6] Miller, James P. "CVS Caremark settles deceptive-practices complaint for $38.5 million: Deceptive practices alleged by 28 states." *Chicago Tribune*. 15 Feb. 2008.

[7] U.S. Office of Personnel Management Website at <http://www.opm.gov/insure/health/reference/handbook/fehb01.asp>.

[8] Welcome Packet for the U.S. House of Representatives Subcommittee on the Federal Workforce, Postal Services and District of Columbia Forum. "Prescribing the Right Solution: A Discussion on Improving FEHBP's Drug Benefit." September 2009: at p. 3.

[9] A 2007 U.S. House of Representatives Report found that drug manufacturer rebates negotiated by the government reduce Medicaid drug spending by 26%, and that the Department of Veterans Affairs (VA) negotiates average manufacturer drug discounts of 50%. In addition, a 2008 GAO report on TRICARE's prescription drug benefit program found that the program not only benefits from Federal Supply Schedule pricing to get the best price for drugs, but has also achieved significant savings since 2005 by leveraging its uniform formulary, avoiding about $450 million in drug costs in 2006 and $916 million in 2007. See: U.S. House of Representatives, *Private Medicare Drug Plans: High Expenses and Low Rebates Increase the Costs of Medicare Drug Coverage.* Majority Staff, Committee on Oversight and Government Reform, Oct. 2007: at pp. 9-11, available at <http://oversight.house.gov/documents/20071015093754.pdl>; U.S. Government Accountability Office, *DOD Pharmacy Benefits Program.* Report to Congressional Committees. GAO-08-327. Apr. 2008: at p. 4, available at <http://www.gao.gov/products/GAO-08-327>.

[10] For example, in August 2009 the State of New Jersey announced that it would enter into a new contract with Medco Health Solutions to provide pharmacy benefits for approximately 670,000 state employees, dependents, and retirees. CVS Caremark previously managed the $1 billion annual contract with Horizon Blue Cross Blue Shield. The new contract is projected to save the state $559 million over five years through a transparent, pass-through pricing model. The state decided on the pass-through option because it "satisfies dual goals of attaining the greatest cost savings while achieving transparency in a time when that keyword is paramount to business operations in the public sector." See State of New Jersey, Department of Treasury, Purchasing Bureau. "Award Recommendation, Employee Benefits: Pharmacy Benefit Management, Reference Number: 10-X-20899, T2679." 4 Aug. 2009. For savings from transparent contract, see pp. 3-4, and p. 46. In addition, in June 2009 New York's Metropolitan Transportation Authority voted to end its relationship with CVS Caremark and expects to save $50 million under a new PBM contract with Innoviant. In its Request for Proposals, the MTA placed a priority on transparent pass-through pricing and financial guarantees. MTA Staff Summary Report on Contract Number 0819983 with Innoviant, Inc., at p. 2. See also Wessel, David, Bernard Wysocki Jr., and Barbara Martinez. "As Health Middlemen Thrive, Employers Try to Tame Them." *The Wall Street Journal*. 29 Dec. 2006: at p. A1.

[11] Testimony by Mark Merritt, President & Chief Executive Officer, Pharmaceutical Care Management Association before the Subcommittee on the Federal Workforce, Postal Service, and District of Columbia on "FEHBP's Pharmacy Benefits: Deal or No Deal?" 24 Jun. 2009.

[12] U.S. House of Representatives, *Medicare Part D: Drug Pricing and Manufacturer Windfalls*. Majority Staff, Committee on Oversight and Government Reform. Jul. 2008: at p. 10.

[13] Won Tesoriero, Heather, and David Armstrong. "CVS Caremark Reaches Settlement"; *United States ex rel. Lisitza*, Settlement Agreement: at p. 5.