**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| SHEET METAL WORKERS LOCAL NO. 20 WELFARE AND BENEFIT FUND, and INDIANA CARPENTERS WELFARE FUND, on behalf of themselves and all others similarly situated, | |
| Plaintiffs, | |
| v. | Case No. 1:16-cv-00046-S |
| CVS PHARMACY, INC. and CAREMARK, L.L.C., | |
| Defendants. | |
| PLUMBERS WELFARE FUND, LOCAL 130, U.A., on behalf of itself and all others similarly situated, | |
| Plaintiffs, | |
| v. | Case No. 1:16-cv-00447-S |
| CVS PHARMACY, INC. and CAREMARK, L.L.C., | |
| Defendants. | |

**MEMORANDUM IN SUPPORT OF DEFENDANTS' OBJECTION**
**TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

**[Redacted]**

# TABLE OF CONTENTS

**INTRODUCTION** ................................................................................................. 1

**FACTUAL BACKGROUND** ............................................................................... 7

    **A.**    **Prescription-Drug Transactions at Retail Pharmacies.** ................. 7

    **B.**    **CVS's Health Savings Pass, or "HSP," Membership Program.** ............................ 11

    **C.**    **The Pharmaceutical Industry Did Not Treat Membership Program Prices as U&C Prices.** ................................................. 13

    **D.**    **Plaintiffs' Lawsuit and Motion for Class Certification.** ................. 18

**ARGUMENT** .................................................................................................... 20

  **I.**    **THE CLASSES ARE NOT REASONABLY ASCERTAINABLE.** ........................ 20

    **A.**    **Identifying Class Members Would Require Thousands of Individualized Contract Inquiries.** ................................................. 21

    **B.**    **The Class Definitions Are Too Vague To Apply on a Classwide Basis.** ............... 23

    **C.**    **Plaintiffs Offer No Method for Identifying Class Members.** ................................ 26

  **II.**   **COMMON ISSUES DO NOT PREDOMINATE OVER INDIVIDUAL ISSUES.** 27

    **A.**    **Plaintiffs' Theory of Liability Depends on Individual Contract Terms.** ............. 29

    **B.**    **Many Class Members Knew HSP Prices Were Not U&C Prices.** ......................... 38

    **C.**    **Whether Defendants' Actions Injured Plaintiffs Does Not Have a Common Answer.** ................................................. 44

    **D.**    **Plaintiffs Do Not Demonstrate that Damages Are Both Capable of Measurement on a Classwide Basis and Tied to Their Theory of Liability.** ........................... 49

    **E.**    **Whether Defendants Are Liable to the Class Depends on Defenses Unique to Certain Class Members.** ................................................. 52

  **III.**   **PLAINTIFFS ARE NOT TYPICAL OR ADEQUATE.** ........................................ 58

    **A.**    **Sheet Metal Workers and Indiana Carpenters Had Actual Knowledge that HSP Prices Were Not Submitted as U&C Prices.** ................................... 59

    **B.**    **Plaintiffs Cannot Represent Health Plans that Contracted with OptumRx or MedImpact as Their PBMs.** ................................. 60

    **C.**    **Named Plaintiffs Are Subject to Additional Unique Defenses.** ......................... 62

    **D.**    **Named Plaintiffs Lack Familiarity with the Basic Elements of Their Claims.** .... 64

  **IV.**   **A CLASS ACTION IS NOT SUPERIOR TO OTHER METHODS.** ....................... 66

    **A.**    **Variations in State Law Preclude Certification.** ................................................. 67

    **B.**    **Class Members Are Sophisticated Parties Capable of Bringing Their Own Claims.** ................................................. 73

**CONCLUSION** ................................................................................................ 76

## <u>TABLE OF AUTHORITIES</u>

Page(s):

### FEDERAL CASES

*Abraham v. WPX Energy Prod., LLC,*
  20 F. Supp. 3d 1244 (D.N.M. 2014) ...................................................................................69

*Amchem Prods., Inc. v. Windsor,*
  521 U.S. 591 (1997)..........................................................................................................58

*Americold Realty Tr. v. ConAgra Foods, Inc.,*
  136 S.Ct. 1012 (2016)........................................................................................................62

*Anza v. Ideal Steel Supply Corp.,*
  547 U.S. 451 (2006)...........................................................................................................39

*Arthur Andersen LLP v. Carlisle,*
  556 U.S. 624 (2009)...........................................................................................................54

*Bank v. Elec. Payment Servs., Inc.,* No. CIV. A. 95-614-SLR,
  1997 WL 811552 (D. Del. Dec. 30, 1997)........................................................................62

*Block v. First Blood Assocs.,*
  125 F.R.D. 39 (S.D.N.Y. 1989) ........................................................................................74

*Blough v. Shea Homes, Inc.,* No. 2:12-cv-01493 RSM,
  2014 WL 3694231 (W.D. Wash. July 23, 2014) ..............................................................41

*Bridge v. Phx. Bond & Indem. Co.,*
  553 U.S. 639 (2008)...........................................................................................................39

*Broussard v. Meineke Disc. Muffler Shops, Inc.,*
  155 F.3d 331 (4th Cir. 1998) ............................................................................................60

*Carrera v. Bayer Corp.,*
  727 F.3d 300 (3d Cir. 2013)..............................................................................................20

*Carrier v. American Bankers Life Assurance Co. of Florida,* No. 05-CV-430,
  2008 WL 312657 (D.N.H. Feb. 1, 2008) ..........................................................................64

*Castano v. Am. Tobacco Co.,*
  84 F.3d 734 (5th Cir. 1996) ..............................................................................................66

*Charles Brooks Co. v. Georgia-Pac. Corp.,* No. 06-CV-1061,
  2007 WL 1175051 (W.D. Ark. Apr. 19, 2007)..................................................................68

*Comcast Corp. v. Behrend,*
  569 U.S. 27 (2013)..............................................................................................49, 51, 52

*Cooper v. S. Co.*,
    390 F.3d 695 (11th Cir. 2004) .................................................................................61

*Corcoran v. CVS Health Corp.*, No. 17-16996,
    2019 WL 2454529 (9th Cir. June 12, 2019) (unpublished mem.)..........................38

*Coverdell v. Mid-S. Farm Equip. Ass'n*,
    335 F.2d 9 (6th Cir. 1964) .....................................................................................62

*Crawford Prof'l Drugs, Inc. v. CVS Caremark Corp.*,
    748 F.3d 249 (5th Cir. 2014) .................................................................................55

*Crosby v. Soc. Sec. Admin. of U.S.*,
    796 F.2d 576 (1st Cir. 1986)...............................................................20, 21, 23, 26

*Doermer v. Oxford Fin. Grp., Ltd.*,
    884 F.3d 643 (7th Cir. 2018) .................................................................................62

*Donachy v. Intrawest U.S. Holdings, Inc.*, No. 10-4038,
    2012 WL 869007 (D.N.J. Mar. 14, 2012)...............................................................69

*Dushkin v. Desai*,
    18 F. Supp. 2d 117 (D. Mass. 1998) ......................................................................36

*Emp'r Teamsters-Local Nos. 175/505 Health & Welfare Tr. Fund v. Bristol Myers*
    *Squibb Co.*, 969 F. Supp. 2d 463 (S.D.W. Va. 2013) ......................................40, 44

*Estate of Migliaccio v. Midland Nat'l Life Ins.*,
    436 F. Supp. 2d 1095 (C.D. Cal. 2006) .................................................................63

*Feist v. Consol. Freightways Corp.*,
    100 F. Supp. 2d 273 (E.D. Pa. 1999), aff'd, 216 F.3d 1075 (3d Cir. 2000) ..........63

*George Lussier Enterprises., Inc. v. Subaru of New England, Inc.*,
    393 F.3d 36 (1st Cir. 2004)....................................................................................39

*Gonzalez v. Proctor & Gamble Co.*,
    247 F.R.D. 616 (S.D. Cal. 2007) .....................................................................40, 71

*Grand Wireless, Inc. v. Verizon Wireless, Inc.*,
    748 F.3d 1 (1st Cir. 2014).......................................................................................55

*Gries v. Standard Ready Mix Concrete, L.L.C.*,
    252 F.R.D. 479 (N.D. Iowa 2008) .........................................................................73

*Hammer v. Vital Pharm., Inc.*, No. 11-4124,
    2015 WL 12844442 (D.N.J. Mar. 31, 2015)..........................................................41

*Hemi Grp., LLC v. City of New York*,
    559 U.S. 1 (2010)..........................................................................................39

*Hogan v. SPAR Grp., Inc.*,
    914 F.3d 34 (1st Cir. 2019)............................................................................54

*Holmes v. Sec. Inv'r Prot. Corp.*,
    503 U.S. 258 (1992)........................................................................................52

*In re Actiq Sales & Mktg. Practices Litig.*,
    307 F.R.D. 150 (E.D. Pa. 2015).....................................................................74

*In re Asacol Antitrust Litig.*,
    907 F.3d 42 (1st Cir. 2018)..................................................................... passim

*In re Celexa & Lexapro Mktg. & Sales Practices Litig.*,
    291 F.R.D. 13 (D. Mass. 2013).......................................................................73

*In re Celexa & Lexapro Mktg. & Sales Practices Litig.*,
    325 F.R.D. 529 (D. Mass. 2017).....................................................................56

*In re Ford Motor Co. Ignition Switch Products Liability Litigation*,
    194 F.R.D. 484 (D.N.J. 2000).........................................................................72

*In re Ford Motor Co. E-350 Van Prods. Liab. Litig.* (No. II), No. 03-4558, 2012 WL
    379944 (D.N.J. Feb. 6, 2012) .........................................................................41

*In re Lidoderm Antitrust Litig.*,
    103 F. Supp. 3d 1155 (N.D. Cal. 2015) ..........................................................71

*In re Light Cigarettes Mktg. Sales Practices Litig.*,
    271 F.R.D. 402 (D. Me. 2010).................................................................40, 57

*In re Neurontin Marketing & Sales Practices Litigation*,
    712 F.3d 21 (1st Cir. 2013)............................................................................44

*In re Nexium Antitrust Litig.*,
    777 F.3d 9 (1st Cir. 2015)...............................................................20, 49, 52

*In re Pharm. Indus. Average Wholesale Price Litig.*,
    230 F.R.D. 61 (D. Mass. 2005).......................................................................74

*In re Rail Freight Fuel Surcharge Antitrust Litig.–MDL No. 1869, BNSF Ry. Co.*,
    725 F.3d 244 (D.C. Cir. 2013)........................................................................52

*In re Schering Plough Corp. ERISA Litig.*,
    589 F.3d 585 (3d Cir. 2009)...........................................................................61

*In re Sears, Roebuck & Co. Tools Mktg. & Sales Practices Litig.*, No. 05C4742 et al.,
   2006 WL 3754823, at *3 (N.D. Ill. Dec. 18, 2006) ...............................................................38

*In re Sepracor Inc. Sec. Litig.*,
   233 F.R.D. 52 (D. Mass. 2005) ......................................................................................64, 65

*In re Skelaxin (Metaxalone) Antitrust Litig.*,
   299 F.R.D. 555 (E.D. Tenn. 2014) ........................................................................................21

*In re Testosterone Replacement Therapy Prods. Liab. Litig. Coordinated Pretrial*
   *Proceedings*, 159 F. Supp. 3d 898 (N.D. Ill. 2016) ..............................................................44

*In re Titanium Dioxide Antitrust Litig.*,
   962 F. Supp. 2d 840 (D. Md. 2013) ................................................................................53, 54

*In re TJX Cos. Retail Sec. Breach Litig.*,
   246 F.R.D. 389 (D. Mass. 2007) ..........................................................................................58

*In re Warfarin Sodium Antitrust Litig.*,
   212 F.R.D. 231 (D. Del. 2002) .............................................................................................70

*In re WellPoint, Inc. Out-of-Network "UCR" Rates Litig.*, No. MDL 09-2074,
   2014 WL 6888549 (C.D. Cal. Sept. 3, 2014) .......................................................................37

*Innovative Network Sols., Inc. v. Onestar Commc'ns, LLC*,
   283 F. Supp. 2d 295 (D. Me. 2003) ......................................................................................36

*InterGen N.V. v. Grina*,
   344 F.3d 134 (1st Cir. 2003) ................................................................................................54

*Kennedy v. Axa Equitable Life Ins.*, No. 06-6082,
   2007 WL 2688881 (D.N.J. Sept. 11, 2007) ..........................................................................57

*Kent v. SunAmerica Life Ins.*,
   190 F.R.D. 271 (D. Mass. 2000) ..........................................................................................23

*Kerns v. Stover*, No. 11-6099-CV-SJ-HFS,
   2013 WL 12290249 (W.D. Mo. Jan. 7, 2013) .......................................................................74

*Lares Grp., II v. Tobin*,
   221 F.3d 41 (1st Cir. 2000) ..................................................................................................56

*Lozano v. AT & T Wireless Servs., Inc.*,
   504 F.3d 718 (9th Cir. 2007) ....................................................................................53, 54, 55

*Lyon v. Caterpillar, Inc.*,
   194 F.R.D. 206 (E.D. Pa. 2000) ......................................................................................72, 73

*Mad Rhino, Inc. v. Best Buy Co.*, No. CV 03-5604 GPS AJWX, 2008 WL 8760854, at *3
(C.D. Cal. Jan. 14, 2008) .......................................................................................................24

*Manson v. GMAC Mortg., LLC*,
283 F.R.D. 30 (D. Mass. 2012) .............................................................................................21

*Markarian v. Conn. Mut. Life Ins.*,
202 F.R.D. 60 (D. Mass. 2001) .......................................................................................40, 44

*MAZ Partners LP v. Shear*, No. 11-11049-PBS,
2016 WL 183519 (D. Mass. Jan. 14, 2016) ..........................................................................61

*Mazza v. Am. Honda Motor Co.*,
666 F.3d 581 (9th Cir. 2012) ..........................................................................................70, 72

*McAdams v. Mass. Mut. Life Ins. Co.*,
391 F.3d 287 (1st Cir. 2004)..................................................................................................37

*Me. Cmty. Health Options v. United States*, No. 18-1023,
2019 WL 465375 (U.S. June 24, 2019) .................................................................................25

*Moore v. PaineWebber, Inc.*,
306 F.3d 1247 (2d Cir. 2002)................................................................................................44

*Ouadani v. TF Final Mile LLC*,
876 F.3d 31 (1st Cir. 2017)...................................................................................................54

*Pablo v. ServiceMaster Glob. Holdings Inc.*, No. C 08-03894 SI,
2011 WL 3476473 (N.D. Cal. Aug. 9, 2011) ........................................................................55

*Perisic v. Ashley Furniture Indus., Inc.*, No. 8:16-cv-3255-T-17,
2018 WL 3391359 (M.D. Fla. June 27, 2018).......................................................................41

*Poulos v. Caesars World, Inc.*,
379 F.3d 654 (9th Cir. 2004) ................................................................................................41

*Primavera Familienstiftung v. Askin*,
178 F.R.D. 405 (S.D.N.Y. 1998) ..........................................................................................73

*Ret. Bd. of the Policemen's Annuity & Ben. Fund of Chi. v. Bank of N.Y. Mellon*,
775 F.3d 154 (2d Cir. 2014)............................................................................................38, 60

*Ross v. Lockheed Martin Corp.*,
267 F. Supp. 3d 174 (D.D.C. 2017) ......................................................................................26

*Rotella v. Wood*,
528 U.S. 549 (2000)...............................................................................................................56

*Schonton v. MPA Granada Highlands LLC*, No. 16-cv-12151,
  2019 WL 1455197 (D. Mass. Apr. 2, 2019) ....................................................20, 23

*Se. Fin. Credit Union v. Coll. Network, Inc.*, No. 115-cv-01507-LJM-TAB,
  2016 WL 1187731 (S.D. Ind. Mar. 28, 2016) ...........................................................68

*Shanley v. Cadle*,
  277 F.R.D. 63 (D. Mass. 2011) ...................................................................................21

*Sidney Hillman Health Ctr. of Rochester v. Abbott Labs. & Abbvie Inc.*,
  192 F. Supp. 3d 963 (N.D. Ill. 2016), aff'd, 873 F.3d 574 (7th Cir. 2017) ...........................44

*Southern States Police Benevolent Association, Inc. v. First Choice Armor & Equipment,
  Inc.*,
  241 F.R.D. 85 (D. Mass. 2007) ...........................................................................70, 72

*Spotswood v. Hertz Corp.*, No. RDB-16-1200,
  2019 WL 498822 (D. Md. Feb. 7, 2019) .............................................................53, 55

*Steginsky v. Xcelera, Inc.*, No. 3:12-cv-188 (SRU),
  2015 WL 1036985 (D. Conn. Mar. 10, 2015) .............................................................59

*Suchanek v. Sturm Foods*,
  2018 U.S. Dist. LEXIS 213658 (S.D. Ill. July 3, 2018) ...............................................70

*Thomas D. Philipsborn Irrevocable Ins. Tr. v. Avon Capital, LLC*, No. 11 C 3274,
  2013 WL 6068797 (N.D. Ill. Nov. 18, 2013) .............................................................63

*Thorn v. Jefferson-Pilot Life Ins.*,
  445 F.3d 311 (4th Cir. 2006) ......................................................................................56

*United States ex rel. Winkelman v. CVS Caremark Corp.*,
  827 F.3d 201 (1st Cir. 2016) ................................................................................56, 57

*United States v. Cheal*,
  389 F.3d 35 (1st Cir. 2004) .........................................................................................29

*Van West v. Midland Nat'l Life Ins.*,
  199 F.R.D. 448 (D.R.I. 2001) ............................................................................. passim

*Vasic v. PatentHealth, L.L.C.*,
  171 F. Supp. 3d 1034 (S.D. Cal. 2016) ......................................................................71

*Vega v. T-Mobile USA, Inc.*,
  564 F.3d 1256 (11th Cir. 2009) ..................................................................................70

*Vista Healthplan, Inc. v. Cephalon, Inc.*, No. 2:06-cv-1833,
  2015 WL 3623005 (E.D. Pa. June 10, 2015) ..............................................................70

*Wal-Mart Stores, Inc. v. Dukes,*
    564 U.S. 338 (2011)..........................................................................................20, 28

*Wash. Physicians Serv. Ass'n v. Gregoire,*
    147 F.3d 1039 (9th Cir. 1998) .......................................................................24

*Waste Mgmt. Holdings, Inc. v. Mowbray,*
    208 F.3d 288 (1st Cir. 2000)...........................................................................70

*Westways World Travel, Inc. v. AMR Corp.*, No. EDCV 99-386,
    2005 WL 6523266 (C.D. Cal. Feb. 24, 2005)................................................37

*Williams v. Balcor Pension Inv'rs,*
    150 F.R.D. 109 (N.D. Ill. 1993).....................................................................62

## STATE CASES

*Apollo Real Estate Inv. Fund, IV, L.P. v. Gelber,*
    935 N.E. 2d 949 (Ill. App. Ct. 2009) .............................................................67

*Cohen v. DIRECTV, Inc.*,
    101 Cal. Rptr. 3d 37 (2009) ............................................................................71

*Congregation Yetev Lev D'Satmar, Inc. v. 26 Adar N.B. Corp.*,
    192 A.D.2d 501 (N.Y. App. Div. 1993) ...................................................58, 69

*Cypher v. Bill Swad Leasing Co.*,
    521 N.E.2d 1142 (Ohio Ct. App. 1987).........................................................57

*Danica Plumbing & Heating LLC v. Amoco Constr. Corp.*, No. 8994/07,
    2008 WL 498630 (N.Y. Sup. Ct. Feb. 6, 2008).............................................68

*DCB Constr. Co. v. Cent. City Dev. Co.*,
    965 P.2d 115 (Colo. 1998) (en banc).............................................................29

*Hydro Conduit Corp. v. Kemble,*
    793 P.2d 855 (N.M. 1990) ..............................................................................69

*Inca Materials, Inc. v. Indigo Constr. Servs., Inc.*, No. 1-14-1345,
    2015 WL 6955213 (Ill. App. Ct. Nov. 10, 2015)......................................68, 69

*News World Commc'ns, Inc. v. Thompsen,*
    878 A.2d 1218 (D.C. 2005) .......................................................................57, 69

*Pflanz v. Foster,*
    888 N.E.2d 756 (Ind. 2008) ......................................................................58, 69

*Prignano v. Prignano,*
    934 N.E.2d 89 (Ill. App. Ct. 2010) ................................................................68

*Starko, Inc. v. Presbyterian Health Plan, Inc.*,
    276 P.3d 252 (N.M. Ct. App. 2011)....................................................................68

*Zine v. Chrysler Corp.*,
    600 N.W.2d 384 (Mich. Ct. App. 1999) ..........................................................72

## FEDERAL STATUTES, REGULATIONS, AND RULES

18 U.S.C. § 1964...................................................................................................39

29 U.S.C. § 1144...................................................................................................24

42 U.S.C. 300gg-91(c)(1) ...................................................................................24

42 U.S.C. § 18021(b)(1) ......................................................................................24

45 C.F.R. § 160.103..............................................................................................24

Fed. R. Civ. P. 17......................................................................................58, 62, 63

Fed. R. Civ. P. 23 ........................................................................................ passim

## STATE STATUTES

Ca. Bus. & Prof. Code § 17204 ...........................................................................40

D.C. Code Ann. § 12-301(8)..........................................................................57, 69

Ind. Code Ann. § 34-11-2-7 (West 2019) .....................................................57, 69

Iowa Code § 714H.5.............................................................................................40

Mass. Gen. Laws Chapter 260, § 5A ...................................................................71

Mich. Comp. Laws Ann. § 445.911(7) (West 2019) ...........................................57

N.J. Stat. Ann. § 2A:14-1, § 56:8-2 ...............................................................71, 72

Nev. Rev. Stat. Ann. § 11.190 2 (d) (West 2017)................................................57

Ohio Rev. Code Ann. § 1345.10(C) (West 2019).................................................57

## OTHER AUTHORITIES

Wright & Miller, 6A Federal Practice & Procedure § 1548 ................................63

90A C.J.S. *Trusts* § 579 ......................................................................................62

Federal Arbitration Act ........................................................................................53

## <u>INTRODUCTION</u>

Plaintiffs' Motion satisfies none of the core requirements for class certification under Rule 23.  It asks the Court to lump together disparate claims based on thousands of separate contractual requirements and many varying states' laws.  It disregards fundamental differences among the proposed class members, including many who knew about the allegedly fraudulent conduct and many who have agreed to arbitrate their claims.  It defines the classes in a manner calculated to frustrate any effort to determine who is in the classes, who if anyone suffered an injury, and the amounts of any such injuries.  All of this effort to shoehorn unlike claims into "classes" serves no purpose, as the proposed class members are sophisticated and well-heeled entities who could pursue their own claims if they really were defrauded as Plaintiffs contend. The Court should not endorse Plaintiffs' misuse of the class action device.

*       *       *       *       *

Plaintiffs seek to certify four separate classes of "health plans" to pursue RICO and state-law claims on the theory that CVS Pharmacy, Inc. ("CVS") and five pharmacy benefit managers ("PBMs"), including Caremark, L.L.C. ("Caremark"), engaged in a "scheme" and "conspiracy" to overcharge health plans around the country.  According to Plaintiffs, CVS should have treated its Health Savings Pass ("HSP") membership prices as its "Usual and Customary" ("U&C") prices when reporting U&C prices to Caremark and other PBMs – even though HSP pricing was available only to members who chose to enroll in the program and pay an annual fee.  And, according to Plaintiffs, the PBMs conspired with CVS to conceal from the "health plans" that CVS was not treating its HSP prices as U&C prices.

Plaintiffs' theory will fail on the merits, because (among other reasons) there was nothing secret or deceptive about CVS's HSP program or its pricing.  Far from a "conspiracy," each

1

PBM independently concluded that HSP membership prices were not CVS's "Usual and Customary" prices.  And far from a "fraud" on Plaintiffs and other "health plans," the evidence will show that the HSP program was public knowledge, and many health plans – including two of the three named Plaintiffs – had actual knowledge that CVS was not reporting HSP prices as U&C prices.

Merits aside, for purposes of this Motion for Class Certification, a class action is not an appropriate mechanism to litigate Plaintiffs' claims on a global basis.  Most fundamentally, Plaintiffs ignore that prescription drug pricing is highly complex and defined by multiple layers of individually negotiated contracts.

- CVS has contracts with each PBM, which are the source of CVS's obligation, if any, to report U&C prices to the PBM.  Those contracts also define what prices are "Usual and Customary" and determine when, if ever, PBMs will pay CVS's U&C prices.  But no matter what those contracts require as between CVS and the PBMs, they do not create liability to Plaintiffs and other potential class members, who are not parties to those contracts.

- Plaintiffs and other third-party payors ("TPPs") have separate contractual relationships with their respective PBMs, which govern what the TPPs will pay for prescription drugs dispensed to their insureds or beneficiaries.  CVS is not a party to those contracts.  If Plaintiffs and the proposed class members were entitled to the benefit of HSP pricing, or were entitled to know that CVS was not treating HSP prices as U&C prices, those rights would come from the various PBM-TPP contracts.

2

At both levels, the contracts' pricing terms are a product of individual negotiation, and they vary widely.  This market structure makes class treatment inappropriate for a variety of reasons under settled Rule 23 jurisprudence.

I.       *Ascertainability*.  A class should not be certified unless its membership is ascertainable without individualized inquiries.  Plaintiffs' proposed classes fail that test.  They include only entities that contracted for "Usual and Customary" pricing terms, but many PBM-TPP contracts do not include U&C as a payment metric; so ascertaining which entities are class members would require a member-by-member review of thousands of contracts.

Plaintiffs' class definitions also use the term "health plan" to describe the entities that are class members, but they do not say what that term means, and it has no accepted definition.  Similarly, Plaintiffs do not define their vague exclusions for "governmental payors" and "affiliates" of a PBM, each of which invites confusion and abuse.

II.      *Predominance.*  To show that issues common to the class members predominate over individual issues, Plaintiffs must show that there are *common answers* to the key questions in this case.  Based on Plaintiffs' theory of liability, the key questions are: (i) whether CVS was required to treat its HSP prices as its U&C prices, and (ii) whether CVS and the PBMs were required to inform proposed class members that CVS was not treating HSP as U&C.  There are no common answers to these questions – at least not answers that would allow Plaintiffs to recover – for multiple reasons:

A.       Under Plaintiffs' theory, whether CVS and the PBMs were required to treat HSP prices as U&C, or to inform health plans about such pricing decisions, depends on individualized contract terms.

3

- Plaintiffs' putative class is limited to "health plans" that contracted with PBMs Caremark, Express Scripts, OptumRx, Medco, and MedImpact (collectively the "Class PBMs"), but CVS's contract with each of these Class PBMs contains a differently worded definition of "Usual & Customary" price.

- Answering the question whether each of the Class PBMs had a duty to inform the putative class members that CVS was not reporting its HSP prices as U&C prices would require analyzing the *thousands* of contracts between each PBM and each proposed class member.

B.       Individual fact questions also predominate because many putative class members *knew* that they were not receiving CVS's HSP prices.  The HSP program was widely publicized, and neither CVS nor the PBMs took steps to keep it secret from third-party payors like Plaintiffs and the proposed class members.  In fact, the evidence conclusively shows that *two of the three named Plaintiffs* were informed that CVS was not treating HSP prices as U&C prices.  Those class members who had such knowledge will be subject to strong defenses to the elements of causation, reliance, and deception, which will depend on individualized review of their communications and other member-specific evidence.

C.       Plaintiffs do not offer a mechanism for distinguishing injured from uninjured "health plans," despite the First Circuit's strong emphasis on this requirement for class certification.  *See In re Asacol Antitrust Litig.*, 907 F.3d 42, 61 (1st Cir. 2018).  Any given putative class member may not have suffered injury from CVS's allegedly inaccurate U&C prices, depending on the terms of the member's contract with its PBM.  In particular, many contracts between PBMs and TPPs contain *aggregate discount guarantees* that fully extinguished any impact from transactions that allegedly included inaccurate U&C prices.

4

D.      Plaintiffs also do not offer a mechanism for measuring damages on a classwide basis.  Their expert's proposed class-wide damages model relies on data produced by CVS and purports to measure overpayments *made by the Class PBMs to CVS*.  But the PBMs are not class members, and their payments are not at issue.  Plaintiffs and their expert offer no class-wide model to measure any alleged overpayments *made by class members – i.e., TPPs – to the PBMs*, which are the payments that make up the alleged damages in this case.  Far less do they offer a way to allocate any alleged overpayments to individual class members, who are not identified in CVS's data.

E.      Putative class members are subject to individualized defenses concerning arbitration and statutes of limitations.  *First*, many putative class members have agreed to contractual arbitration clauses that cover the claims in this case.  Both CVS and Caremark will enforce their arbitration rights, which will require member-by-member contract analysis under varying states' laws and will require many class members to proceed separately in arbitration, outside any class action proceeding.  *Second*, proposed class members are subject to varying statute of limitations defenses.  Members had different knowledge about HSP pricing at different times, which will defeat or limit many potential class members' claims – all depending on what the individual class member learned, or should have learned, and when.  These defenses also will vary depending on the state law that applies to each claim, as laws differ concerning the length of limitations period and whether the limitations period begins upon discovery.

III.     ***Typicality and Adequacy.***  The three named Plaintiffs are not typical of the members of each class as a whole, nor adequate to represent each class.  *First*, two of the named Plaintiffs, Sheet Metal Workers Local No. 20 Welfare and Benefit Fund ("Sheet Metal") and Indiana Carpenters Welfare Fund ("Indiana Carpenters"), had actual knowledge that pharmacies

were not submitting membership program prices as U&C prices.  That knowledge is a case-dispositive defense that will overwhelm these Plaintiffs' incentive and ability to represent class members who can claim they were actually deceived by the alleged fraudulent scheme.  *Second*, none of the named Plaintiffs contracted with PBMs Optum or MedImpact.  Because each PBM contract is different, named Plaintiffs are unsuitable to represent class members whose claims turn on PBM contracts completely unrelated to Plaintiffs' PBMs' contracts.  *Third*, Plaintiffs are subject to additional unique defenses because they have sued in the name of trusts and refused to substitute the trustees who are the real parties in interest.  *Fourth*, the named Plaintiffs are inadequate class representatives because they are unfamiliar with even the most basic elements of their claims, including whether and how the defendants supposedly overcharged them.

IV.     ***Superiority.***  Finally, Plaintiffs cannot satisfy their burden to show that class adjudication would be superior to other mechanisms of adjudication.  The putative class members are sophisticated entities with sufficient incentives and wherewithal to bring their own claims if they believe themselves defrauded by a supposed racketeering scheme.

In contrast to that workable alternative, Plaintiffs' complicated proposal for four separate classes with overlapping state-law membership is unmanageable in the extreme.  Plaintiffs' classes include materially different unjust enrichment claims and consumer protection statutes.  Their proposed verdict forms gloss over significant distinctions in establishing claims in each state.  And given that different states are covered by different classes, individual health plans may need to pursue individual litigation to obtain full recovery ***even if Plaintiffs prevail*** on the class claims.  Plaintiffs' proposed class action does not serve the interests of the proposed class members, much less the interest of justice.  Class certification should be denied.

## **FACTUAL BACKGROUND**

### A.   **Prescription-Drug Transactions at Retail Pharmacies.**

Plaintiffs allege that Defendants participated in a scheme to deceive and overcharge the members of the proposed class by failing to treat CVS's Health Savings Pass membership prices as its "Usual and Customary" prices.  To understand this claim, one must understand how prescription drugs are priced.  This, in turn, requires an understanding of multiple participants in the market, who may serve as buyers, sellers, or intermediaries, depending on the type of transaction.

**"Cash" Transactions.**  To begin with the simplest scenario, when a pharmacist fills a prescription for a customer who has no insurance or other benefit, the pharmacy will charge the customer its retail price for the prescribed drug and quantity at that time.  Such customers are called "cash customers," whether they actually pay with cash, credit card, or check, and the retail price they pay is called the "cash price."[1]  *See* DX 2, Expert Report of Catherine Graeff ("Graeff Rep.") 10–11; DX 31, OptumRx 30(b)(6) Deposition ("Optum Dep.") 40:9–21, 70:18–71:12; DX 18, Deposition of Brian Correia ("Correia Dep.") 112:24–113:20; DX 28, Express Scripts 30(b)(6) Deposition ("Express Scripts Dep.") 30:18–23, 51:16–53:23; DX 29, Medco 30(b)(6) Deposition ("Medco Dep.") 26:17–22, 100:14–17.  The cash price is set by the pharmacy, constrained only by marketplace economics.  *See* Graeff Rep. 11.

**"Adjudicated" Transactions.**  Most customers are not cash customers and do not pay the cash price.  Most have insurance that determines the amount they will pay for prescription drugs.  A smaller number of customers have an alternative form of prescription benefit, like a discount card or a membership program.  For all customers with a prescription benefit, whether

---

[1] Attached to this Memorandum as Appendix A is an Index of all the exhibits cited by the Defendants herein.

insurance or otherwise, the prescription price is determined through a process called "adjudication," which involves not just the customer and the retail pharmacy, but one or more separate entities who pay or act as an intermediary.  These intermediaries can pay for some or all of the prescription cost.  *See generally* Graeff Rep. 10 & nn.17–20.

   ***Third Party Payors, or "TPPs":*** Various types of entities provide health insurance to individuals.  These include insurance companies (e.g., Blue Cross), governmental entities and programs (e.g., Medicare or Medicaid), or insurance plans sponsored by employers, pension plans, or union-affiliated trust funds.  These entities commonly are referred to as third party payors ("TPPs") because they pay healthcare costs for consumers who are their insureds, beneficiaries, employees, or members.  *See* Expert Report of Rena Conti, Ph.D. (Dkt. No. 121.4) ("Conti Rep.") ¶¶ 24–25.

   ***Pharmacy Benefit Managers, or "PBMs":*** Most TPPs do not pay pharmacies directly for prescription drugs, nor do the TPPs contract with pharmacies.  Rather, the TPP typically contracts with an intermediary called a Pharmacy Benefit Manager, or "PBM," to administer the prescription drug benefits that the TPP provides to individuals.  *See id.* at ¶¶ 26–28.  The contract between the TPP and the PBM sets the drug prices that the TPP will pay to the PBM.  *Id.*  The PBM, in turn, enters into contracts with the retail pharmacies, which set the prices the PBM will pay to each pharmacy for prescriptions the pharmacy fills for the TPPs' insureds, beneficiaries, employees, or members.

   When filling a prescription for a consumer with a prescription benefit, the pharmacist electronically submits information about the prescription and the consumer's prescription benefit to the PBM, whose computer systems "adjudicate" the prescription in "real time," within a matter of seconds.  *Id.* at ¶¶ 56–59; *see also* Graeff Rep. 4, 10.  Through the "adjudication," the

PBM determines whether the prescription is covered by the consumer's prescription benefit, how much the consumer must pay the pharmacy (for example, as a deductible, copay, or coinsurance), and how much the PBM will pay the pharmacy.  Conti Rep. ¶¶ 56–59.  The PBM also adjudicates how much the TPP must reimburse the PBM for the prescription, but the PBM does not report that information to the pharmacy.  *See* DX 6, Declaration of Susan Colbert ("Colbert Decl.") ¶ 6.  Typically, the PBM and the consumer will each pay part of the prescription price to the pharmacy, and then the PBM will be reimbursed a certain amount by the TPP pursuant to the TPP's contract with the PBM.  Conti Rep. ¶¶ 24–25.

      *Pricing in Pharmacy-PBM Contracts:* The price the PBM pays to the pharmacy for the prescription is governed by the contract between the PBM and the pharmacy.  The TPP is not a party to this contract.  Conti Rep. ¶ 35.  While pricing terms vary, many contracts between PBMs and pharmacies contain "lower of" pricing logic that requires the PBM to pay the lowest of several price metrics for individual prescriptions.  *Id.*  In many, but not all, PBM-pharmacy contracts, one of those pricing metrics is the pharmacy's **"Usual and Customary"** or **"U&C"** price for the prescription.  *See* Graeff Rep. 8, 10.  U&C is a defined term in many contracts, and the wording of those definitions varies from contract to contract.  *See id.* at 10 (trading partner agreements and payer sheets set the "precise definition" of U&C between pharmacy and PBM).  As discussed in detail below, CVS and the PBMs understand the U&C price to be the pharmacy's retail price: the price the pharmacy would charge to a "cash customer" for the same prescription on the same day at the same retail store.  *See id.* at 10–11 (explaining "cash customer" would pay the "retail price" for a prescription).

      *Pricing in PBM-TPP Contracts:* The amount the TPP will reimburse to the PBM for the same prescription depends on the terms of the contract between those parties, which is

separate from the contract between the PBM and the pharmacy.  The pharmacy is not a party to the contract between the PBM and TPP.  There are two common pricing alternatives in contracts between PBMs and TPPs: **"spread"** (or "traditional") pricing, or **"pass-through"** (or "transparent") pricing.  *See* Optum Dep. 158:2–161:24; DX 30, MedImpact 30(b)(6) Deposition ("MedImpact Dep.") 90:25–95:8; Express Scripts Dep. 43:5–45:21.  A TPP that contracts for spread pricing agrees to pay the PBM a price for a certain drug transaction that may differ from the price paid by the PBM to the pharmacy, thus creating a price differential or "spread."  Under a spread-pricing model, the PBM aims to charge the TPP more in the aggregate than the PBM pays to pharmacies and retain this positive spread as compensation for providing PBM services to the TPP, but on individual transactions there may be no spread – or even a negative spread.  *See* DX 5, Deposition of Rena Conti, Ph.D. ("Conti Dep.") at 128:13–19, 130:5–10; DX 1, Expert Report of Brett E. Barlag ("Barlag Rep.") ¶ 118.  A TPP that contracts for pass-through pricing agrees to pay the PBM no more than the PBM pays the pharmacy.  *See* Conti Dep. 127:13–128:12; Barlag Rep. ¶ 118.  Under a pass-through pricing model, the PBM receives compensation for its services through fixed fees, which it may charge on each transaction.  *See* Conti Dep. 127:13–128:6; Barlag Rep. ¶ 118.

Like the PBM-pharmacy contracts discussed above, TPP-PBM contracts commonly contain "lower of" pricing logic that entitles the TPP to pay the lowest of multiple pricing metrics, one of which may be the pharmacy's U&C price for the prescription.

Many TPP-PBM contracts also contain an **aggregate pricing guarantee** for generic drugs, often called a "generic effective rate" guarantee or "GER."  Conti Dep. 131:19–133:21; DX 4, Expert Report of Alan Sekula, Pharm.D. ("Sekula Rep.") ¶ 10.  A GER provides that the TPP will receive an average percentage discount off of a benchmark price for a certain "basket"

of prescriptions (e.g., 65% off the average wholesale price for all generic drugs dispensed at retail pharmacies) purchased during a certain time period.  Sekula Rep. ¶ 10.  At the end of the relevant time period, the PBM must make a reconciliation payment to compensate the TPP if the TPP has paid more than the guarantee.  *Id.* ¶ 15.  There is wide variance in how the guarantees function.  *Id.* ¶¶ 14, 17.  Because these variations depend on the terms of a TPP's contract with its PBM, one must review the contract to determine how the GER affects the amount that the TPP pays for its generic drug purchases.  *Id.* ¶¶ 14, 19–20.  The GERs and reconciliation payments can negate or reduce any potential U&C overcharge on an individual transaction involving an HSP drug.  *Id.* ¶¶ 18–19.  For many putative class members, therefore, GERs may eliminate or reduce alleged damages arising from overcharges on individual transactions.  *See* Barlag Rep. ¶ 134.

### B.  CVS's Health Savings Pass, or "HSP," Membership Program.

Plaintiffs claim that the U&C prices CVS submitted to PBMs were fraudulently inflated because CVS did not report as its U&C prices the prices it charged to customers enrolled in a program called the "Health Savings Pass," or "HSP."  HSP offered customers without insurance an opportunity to purchase certain specified generic medicines at a set price, which was lower than CVS's retail price, if the customer enrolled in the HSP program and paid an annual fee.

CVS launched HSP on November 9, 2008.  By that time, a number of other pharmacies already offered low-priced programs for generic drugs.  The trend began in 2006, when Walmart began offering 30-day supplies of certain generic drugs for $4 to all Walmart customers.  Other big-box retailers, grocers, and pharmacies followed suit.  Walgreens and Rite Aid responded to Walmart's initiative by introducing fee-based membership programs.  DX 22, Deposition of Thomas E. Morrison ("Morrison Dep.") 66:1–67:1, 72:16–73:3.  Unlike Walmart, which offered its $4 price to everyone, Walgreens and Rite Aid offered lower prices only to program members.

11

*See* Express Scripts Dep. 33:24–36:19; Medco Dep. 12:3–13:13; DX 14, Declaration of G. William Strein ("Strein Decl.") ¶¶ 6–9; DX 10, Declaration of John Lavin ("Lavin Decl.") ¶¶ 13–17.  These fee-based membership programs required customers to enroll, agree to certain terms and conditions (e.g., waiver of rights under the Health Insurance Protection and Portability Act ("HIPPA")), and pay a membership fee.  *See* Lavin Decl. ¶¶ 16–17.  In return, members received lower prices on a limited set of medications.  *Id.*

     CVS created HSP in response to the membership programs its direct competitors, Walgreens and Rite Aid, were offering.  Similar to those programs, CVS offered HSP prices only to program members who affirmatively chose to enroll in the program, agreed to its terms and conditions, and paid a membership fee – $10 through December 31, 2010; $15 thereafter.  *See id.* ¶ 19.  HSP offered members a set price – $9.99 through December 31, 2011; $11.99 thereafter – for a 90-day supply of hundreds of generic drugs.

     HSP received substantial publicity.  Information about HSP was available on the Internet, in newspapers, and on television, including shows like NBC's *Today*.  *See, e.g.*, DX 71, Archived CVS.com page describing HSP (Nov. 2008) (CVSC-0404811); DX 74, Thomas M. Ryan, Editorial, *Patient-Centered Healthcare*, Bos. Globe, June 26, 2009, at A15 (CVSSM-0002033); DX 70, CVS press release announcing HSP (Oct. 30, 2008) (CVSC-0197684); DX 53, Email from Bari Harlam to Sue Colbert (Nov. 4, 2008) ("Harlam Email") (CVSC-0001686).  Publications across the country reported on HSP.  *See, e.g.*, DX 72, Laura Klepacki, *Discount Generics Programs Flood Retail*, Drug Store News, Nov. 17, 2008, at 50 (CVSSM-0002016); DX 73, *Ryan: Discount Generics a Response to Economy, Not Competition*, Drug Store News, Nov. 17, 2008, at 4 (CVSSM-0002020).  CVS also announced HSP during its 2008 Third

Quarter earnings call, which was attended by investors and a number of PBMs and TPPs.  DX 69, Event Report for 2008 3Q CVS Caremark Earnings Call (CVSC-0384895).

CVS discontinued HSP on February 1, 2016, after years of declining enrollment.  *See* First Amended Complaint (Dkt. No. 81) ¶ 83.

### C.   The Pharmaceutical Industry Did Not Treat Membership Program Prices as U&C Prices.

After Walmart introduced its $4 list and other pharmacies responded with their own Walmart-style pricing or, alternatively, membership programs, the pharmaceutical industry considered how these new prices interacted with insurance benefits.  A wide variety of industry participants – including TPPs, consultants to TPPs, PBMs, pharmacies, and Medicaid agencies – concluded that: (1) when a pharmacy offered discount prices to *all customers*, like Walmart did, the prices were U&C prices; and (2) by contrast, when a pharmacy offered special prices *only to members* who had enrolled in a membership program and paid a membership fee, like CVS did, the membership program price was not the pharmacy's U&C price.

Plaintiffs characterize this industry consensus as a "conspiracy" between CVS and PBMs to avoid giving TPPs the benefit of HSP pricing.  On the contrary, the evidence uniformly shows that PBMs and many other industry participants independently concluded that membership program prices were not U&C prices.  It also shows that the industry – including many putative class members – understood that CVS was not treating its HSP prices as U&C prices.

### 1.   Class PBMs knew membership program prices were not U&C.

Although the contracts between CVS and the "Class PBMs" – the four PBMs with whom the proposed class members contracted – do not have a common definition of U&C price, each of the Class PBMs independently determined that a membership program price reserved to customers who enroll and pay a fee is not the U&C price.  *See* Lavin Decl. ¶¶ 16, 17, 20; Correia

13

Dep. 23:20–26:25, 113:11–24; Express Scripts Dep. 34:3–17, 35:13–38:10, 39:1–40:12; Medco Dep. 12:25–13:13; Optum Dep. 40:22–41:12, 43:6–44:3, 45:10–46:2; 69:24–72:5; MedImpact Dep. 41:7–17, 44:9–45:24, 63:18–66:10.  Each of the Class PBMs came to this conclusion independently, without coordinating with each other, and most of them reached this conclusion after considering other pharmacies' membership programs *before* CVS launched HSP.  *See* Correia Dep. 62:23–63:1, 77:1–5; Express Scripts Dep. 40:13–42:4; 42:5–43:4; Medco Dep. 16:7–17:20; Optum Dep. 46:9–47:8, 50:23–53:23, 61:8–24; MedImpact Dep. 51:23–54:20.

### 2. Other PBMs knew membership program prices were not U&C.

Other PBMs, whom Plaintiffs do not accuse of any wrongdoing, reached the same conclusion as the four Class PBMs.

- **Prime Therapeutics**: Bretta Grinsteinner, Assistant Vice President for the PBM Prime Therapeutics ("Prime"), testified ███████████████████████ ███████████████████████████████████████ DX 8, Declaration of Bretta Grinsteinner ("Grinsteinner Decl.") ¶ 12 (CVSSM-0025938).

- **Argus**: Justin Kaiser, Vice President Pharmacy Networks and Analytics for the PBM Argus, testified that ██████████████████████████ ██████████████████████████████ DX 9, Declaration of Justin Kaiser ("Kaiser Decl.") ¶ 16 (CVSSM-0025927).

Plaintiffs have not identified *even one* PBM that reached a different conclusion.

### 3. State Medicaid agencies knew membership program prices were not U&C prices.

Like the putative classes of private "health plans," Medicaid agencies are payors financially incented to pay as little as possible for prescription drug benefits.  Many state Medicaid officials understood that membership program prices were not U&C prices.  As one official said, ██████████████████████████████████

14

██████████████████████████████████████████████ DX 66, Email from Lisa

Arndt (June 28, 2012) (CVSSM-0025687); *see also* DX 12, Email from Charles Sandler (Nov.

30, 2009) (CVSSM-0025668 ) ████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

██████████████████████████ (emphasis added)); DX 33, Deposition of Barbara Mart

("Mart Dep.") 69:5–10 ("Because of the requirement [of an] enrollment fee . . . we [Nebraska

Medicaid] did not believe that this met the definition of usual and customary . . . .").

### 4.    TPPs and consultants knew membership program prices were not U&C prices.

Numerous TPPs (including putative class members) and the consultants whom they hired

for advice regarding prescription drug benefits knew that membership program prices were not

U&C prices.  For example:

- Darren Gettings, Vice President of Anthem (the second largest health insurer in the United States), testified that ██████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████ DX 7, Declaration of Darren Gettings ("Gettings Decl.") ¶ 12 (CVSSM-0025934). ██████████████████████ ██████████████████████████████████████████ *Id.* ¶ 14.

- Joseph Zavalishin, former Vice President of Aetna (the third largest health insurer in the United States), has testified that Aetna believed "CVS did not need to submit the HSP program price as its U&C price" and that the HSP price "was not an 'applicable customer discount,' as [Aetna] understood that phrase [in its U&C definition]."  DX 17, Declaration of Joseph Zavalishin ("Zavalishin Decl.") ¶¶ 12–13.  Aetna took the same position regarding other membership programs: "By the time CVS had launched HSP, other pharmacies' membership programs, such as the Walgreens program, were available in the marketplace . . . . Aetna did not require those other pharmacies to submit their program prices as U&C on Aetna claims either."  *Id.* ¶ 11.

- Edward Stacey, a Vice President at Cigna (the fourth largest health insurer in the United States), testified that ████████████████████████████████████ ██████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████

 DX 27, Cigna 30(b)(6) Deposition ("Cigna Dep.") 30:8–14.

- Jason Gray of Mercer, a leading pharmaceutical benefits consultant, sent an email in 2008 to his client, DX 55, Email from Bruce MacRae to (Nov. 6, 2008) (CAREMARKSM_0033360).

- Caremark told DX 12, Declaration of Steve Schaper ("Schaper Decl.") ¶ 10; DX 59, Email from Bill Yates to (Sept. 25, 2009) ("Yates Email") (CAREMARKSM_0070701).

- Caremark told Schaper Decl. ¶ 11; DX 60, Email from Don Creveling to (Oct. 13, 2009) (CAREMARKSM_0070692).

- Caremark told Schaper Decl. ¶ 12; DX 63, Email from Jessica Read (Dec. 21, 2009) ("Read Email") (CAREMARKSM_0087005).

- Caremark told Schaper Decl. ¶ 15; DX 54, Email from Jeff Kalmanowicz (Nov. 6, 2008) ("Kalmanowicz Email") (CAREMARKSM_0043681).

- MedImpact told MedImpact Dep. 122:17–124:11; DX 52, Email from Jeanine Robertson (Nov. 3, 2008) (MI-SM_00003186A) (emphasis added).

16

- MedImpact prepared a white paper for client ███████████████ ███████████████████████████████████████████████████ ███████████████████ MedImpact Dep. 141:4–142:14; DX 57, Email from Michael Lyon to ████████████████████ (Feb. 11, 2009) (emphasis added) ("Lyon Email") (MI-SM_00006577).

- MedImpact explained to client ███████████████████████ ██████████████████████████████████████████████████████ █████████████ MedImpact Dep. 147:4–151:11; DX 56, Email from Michael Mark ███████████████ (Dec. 23, 2008) (MI-SM_00003197) (emphasis added).[2]

### 5. Two named Plaintiffs knew membership program prices were not U&C prices.

**Sheet Metal Workers Local No. 20 ("Sheet Metal")**: In a June 2009 email, Dan Tibus

of Caremark provided information about HSP to Sheet Metal representatives.  DX 15,

Declaration of Daniel Tibus ("Tibus Decl.") ¶¶ 10–12; DX 58, Email from Daniel Tibus to Rick

Gerasta (June 23, 2009) ("Tibus Email") (CAREMARKSM_0006154).  Mr. Tibus informed

Sheet Metal ████████████████████████████████████████████████

---

[2] Government-funded TPPs also knew that HSP prices were not reported as U&C prices. *See, e.g.*, DX 13, Declaration of Tracy Stephenson ("Stephenson Decl.") ███████████ ██████████████████████████████████████████████████████████ ████████████████████████ DX 61, Email from Mike Ayotte (Nov. 29, 2009) (CVSC-0002107); Schaper Decl. ████ DX  51, Email from Kirby Bessant to ████████████ (Oct. 15, 2008 CAREMARKSM_0015182) (Caremark notifies ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ██████████████████ Schaper Decl. ████ DX 65, Letter from Jack Gierat to ███████████ (Feb. 8, 2010) (CAREMARKSM_0060702 ) (Caremark notifies ██████████████████████████████████████████████████████████ █████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

Tibus Email at 6154 (emphasis added).  Sheet Metal trustee Michael Jones personally signed up

for HSP because he knew he could not obtain HSP prices through his Sheet Metal benefits –

something he obviously would have obtained had HSP pricing been submitted as U&C pricing to

Sheet Metal.  DX 21, Deposition of Michael Jones ("Jones Dep.") 82:14–24, 86:10–25; 109:1–

25; 110:1–23; *see also* DX 67, CVSC-0222123, and DX 68, CVSC-0229731 (extracts from HSP

Enrollment Records ████████████████████).

**Indiana Carpenters Welfare Fund ("Indiana Carpenters")**: In April 2010, Bart

Gerber of Medco notified Indiana Carpenters that membership program prices were not U&C:

> Medco has found that the low cost generic programs vary from retailer to retailer; some
> programs are offered free of charge to patients whereby the low cost generic price can be
> submitted via the U&C field through Medco's Te1ePAID system (for example, the $4
> Wal*Mart generic program), ***other programs include membership fees to gain access to
> a member-only price that differs from the pharmacy's U&C price*** (for example the
> program offered by Walgreens).

DX 64, Email from Irene Newman to David Tharp (Apr. 23, 2010) (IKORCC0006409)

(emphasis added) ("Newman Email"); *see also* Medco Dep. 39:11–44:11.

### D.    Plaintiffs' Lawsuit and Motion for Class Certification.

Plaintiffs filed this case in February 2016, alleging that CVS committed fraud against a

proposed class of "health plans" ***and*** the Class PBMs by failing to submit HSP prices as its U&C

prices.  Discovery soon debunked this claim, as it showed that PBMs uniformly knew and agreed

that HSP prices were not U&C prices.  Plaintiffs then amended their complaint to allege that the

Class PBMs were part of a ***conspiracy*** with CVS to defraud health plans by interpreting their

respective contracts not to require reporting HSP pricing as U&C pricing and by concealing

these interpretations from the health plans.  The Amended Complaint, filed in May 2018, alleges

18

claims for RICO, fraud, negligent misrepresentation, unjust enrichment, and under the consumer protection laws of thirty-two states.

Discovery has revealed no evidence of any conspiracy.  The record shows that Caremark and other PBMs notified many putative class members that membership program prices were not U&C prices, that many putative class members and their consultants (like others in the industry, including state health officials, pharmacies, and PBMs) knew and agreed that pharmacies did not need to report membership program prices as U&C prices, and that Plaintiffs failed to identify a single pharmacy or PBM that came to a different conclusion.  Defendants will thus prevail on the merits.  More to the point for class certification purposes, though, discovery has shown that the evidence regarding Plaintiffs' allegations varies – in individualized, decisive, and often complex ways – from one potential class member to another depending on multiple layers of contracts and the class members' specific communications.

Plaintiffs nonetheless seek to certify four classes, each composed of "health plans" that, at any time between November 2008 and February 1, 2016, (1) had one of the Class PBMs as their pharmacy benefit managers, (2) paid for generic prescription drugs purchased from CVS that were included in the HSP program, and (3) "paid for those drugs based on a formula containing [U&C] price."  Plaintiffs' Mem. in Support of Class Certification (Dkt. No. 120.1), at 2–3  ("Pls.' Mem.").  The four classes are:

- A "Nationwide Class" for Plaintiffs' RICO claim;

- An "Unfair and Deceptive Conduct Consumer Protection Class" for drugs purchased in California, Florida, Illinois, Iowa, Massachusetts, New Jersey, New York, Ohio, and Washington;

- An "Omissions Consumer Protection Class" for drugs purchased in Illinois, Michigan, Nevada, and New Jersey; and

- An "Unjust Enrichment Class" for drugs purchased in Arkansas, Colorado, Connecticut, District of Columbia, Hawaii, Illinois, Indiana, Iowa, Missouri, New Mexico, New York, Oklahoma, and West Virginia.

*Id.*  Plaintiffs exclude from all four classes: "(1) any governmental payors, including Medicare and Medicaid; (2) any health plans that served on Caremark's Client Advisory Committee since January 1, 2008; and (3) any health plans that have had parent, subsidiary, or affiliate relationships with any pharmacy benefit manager at any time since January 1, 2008."  *Id.* at 2 n.1.

## ARGUMENT

Plaintiffs have "the burden of establishing that the requirements of Rule 23(a) have been satisfied and that the proposed action falls within one of the three categories enumerated in Rule 23(b)."  *Van West v. Midland Nat'l Life Ins.*, 199 F.R.D. 448, 451 (D.R.I. 2001).  "A party seeking class certification must affirmatively demonstrate his compliance with the Rule – that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc."  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). Plaintiffs have not met their burden.

## I.  THE CLASSES ARE NOT REASONABLY ASCERTAINABLE.

A class may not be certified unless its membership is ascertainable.  *See, e.g.*, *In re Nexium Antitrust Litig.*, 777 F.3d 9, 19 (1st Cir. 2015).  Ascertainability is an "'essential prerequisite of a class action,'" requiring plaintiffs to prove "'that the class is currently and readily ascertainable based on objective criteria.'"  *Id.* (quoting *Carrera v. Bayer Corp.*, 727 F.3d 300, 306 (3d Cir. 2013)).  It must be "administratively feasible to determine whether a particular individual is a member" of the class.  *Crosby v. Soc. Sec. Admin. of U.S.*, 796 F.2d 576, 580 (1st Cir. 1986); *Schonton v. MPA Granada Highlands LLC*, No. 16-cv-12151, 2019 WL 1455197, at *3 (D. Mass. Apr. 2, 2019).  "[W]hen 'class members [are] impossible to identify prior to

individualized fact-finding and litigation,'" a class should not be certified.  *Shanley v. Cadle*, 277 F.R.D. 63, 68 (D. Mass. 2011) (second alteration in original) (quoting *Crosby*, 796 F.2d at 580).

For at least three reasons, the members of all four of Plaintiffs' proposed classes are not ascertainable "prior to individualized fact-finding and litigation."  *First*, determining whether potential class members paid for HSP "drugs based on a formula containing Usual and Customary price," Pls.' Mem. at 2–3 – an essential element of all four of Plaintiffs' class definitions – would require thousands of individualized contract inquiries.  *Second*, the other elements of Plaintiffs' class definitions and class exclusions are so vague that they can be applied, if at all, "only on a case-by-case basis."  *Crosby*, 796 F.2d at 580.  *Third*, Plaintiffs fail to show that "electronic records of each Class member and its payments," Pls.' Mem. at 27, can identify class members without individualized fact-finding and litigation.

## A.  Identifying Class Members Would Require Thousands of Individualized Contract Inquiries.

The proposed classes are limited to those health plans that paid for HSP drugs based on a formula that included U&C price as a component.  That limitation is essential to Plaintiffs' theory of the case: A payor without a contractual entitlement to U&C pricing suffered no injury if HSP prices were not reported as U&C prices.  The problem for Plaintiffs is that this limitation makes it impossible to identify class members without examining and interpreting their individual contracts.  Such a contract-by-contract inquiry defeats ascertainability.  *See, e.g.*, *In re Skelaxin (Metaxalone) Antitrust Litig.*, 299 F.R.D. 555, 570 (E.D. Tenn. 2014) (class not ascertainable where identifying class members required "individual inquiry into contracts covering millions of [prescription] purchases"); *Manson v. GMAC Mortg., LLC*, 283 F.R.D. 30, 38 & n.26 (D. Mass. 2012) (class not ascertainable where class members were identifiable "only by an inquiry into the securitization documents . . . that underlie most of the mortgages.").

21

This problem is pervasive, as U&C pricing terms are absent from many contracts between PBMs and their TPP-clients, who would otherwise qualify as potential class members. For example, ███████████████████████████████████████████████



Plaintiff Sheet Metal epitomizes the individualized nature of this inquiry.  Determining whether Sheet Metal paid for HSP drugs "based on a formula containing Usual and Customary price" requires analyzing at least four different contracts from different times in the class period.[5]

───────────────────

3 ████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

[5] *See* DX 38, Pricing Implementation Doc. (Jan. 1, 2008) (CAREMARKSM_0054058); DX 48, Template Amended and Restated Prescription Benefit Services Agreement (CAREMARKSM_0088613); DX 40, Pricing Implementation Doc. (Jan. 1, 2011) (CAREMARKSM_0054105); DX 49, Template Agreement (CAREMARKSM_0088642); DX

This analysis reveals that, for part of the class period, Sheet Metal's ███████████████ ███████████████ *See* Pls.' Mem. at 22 ████████████████ ███████████████████████████████████████ In July 2013, Sheet Metal adopted █ ██████████████████████████████████████████████████████ ████████████████. *See* Maintenance Choice Agreement, at 54153. Then, effective January 2015, Sheet Metal contracted for ████████████████████████████ ████████████████. *See* 2015 Sheet Metal PBSA, at 54181.

Identifying class members would require a similarly individualized analysis of contracts for thousands of potential class members. *See* Barlag Rep. ¶¶ 118–122. This individualized contract analysis inevitably would lead to individualized litigation about whether various potential class members' contracts entitled them to U&C pricing.[6] By defining the proposed classes to require individualized inquiries – which will vary from class member to class member, contract to contract, and year to year – Plaintiffs have rendered them unascertainable. *See, e.g.*, *Crosby*, 796 F.2d at 580; *Schonton*, 2019 WL 1455197, at *3.

### B. The Class Definitions Are Too Vague To Apply on a Classwide Basis.

Rather than specifying "objective" criteria for class membership, Plaintiffs' proposed class definitions and exclusions rely on vague terms that can be applied (if at all) only on a "case-by-case basis." *Crosby*, 796 F.2d at 580 (internal quotation marks omitted). Such vagueness defeats ascertainability. *See, e.g.*, *Kent v. SunAmerica Life Ins.*, 190 F.R.D. 271, 278

---

45, Maintenance Choice Program Letter Agreement (Apr. 18, 2013) ("Maintenance Choice Agreement") (CAREMARKSM_0054152); DX 46, Prescription Benefit Services Agreement (Jan. 1, 2015) ("2015 Sheet Metal PBSA") (CAREMARKSM_0054155).

[6] Indeed, Plaintiffs previously argued that Sheet Metal's 2015 contract ████████████ ████████████████ contrary to Defendants' interpretation. *See* DX 75, Sheet Metal's Revised Resps. to CVS's 2d Set of Interrogs. at 3–4 (identifying the 2015 Sheet Metal PBSA as ███████████████████████████

(D. Mass. 2000) ("[A] class must be unambiguously defined in order for a court to decide . . . who will be bound by the judgment."); *Mad Rhino, Inc. v. Best Buy Co.*, No. CV 03-5604 GPS AJWX, 2008 WL 8760854, at *3 (C.D. Cal. Jan. 14, 2008) ("Because at least two parts of this definition are impermissibly vague, neither class is ascertainable.").

**What is a "health plan"?**  The starting point for membership in all three proposed classes is the term "health plan."  Pls.' Mem. at 2–3.  Plaintiffs do not define "health plan," and the term does not have any well-established, objective meaning.  For example, the term might – or might not – be limited to insurers, or include self-insured payors, ERISA plans, or state-regulated multiple-employer welfare arrangements.[7]  Plaintiffs say that "health plans[ are] operated by an entity known as a third-party payor []."  Pls.' Mem. at 4.  But many entities that provide prescription benefits are stand-alone entities (e.g., self-insured plans) not "operated by a third-party payor."[8]  Adding to the confusion, Plaintiffs often use the terms "payor," "third party

---

[7] Neither the Oxford English Dictionary nor Merriam-Webster defines "health plan." The Cambridge Business English Dictionary defines "health plan" as "a type of *insurance that you buy* in order to pay for the cost of medical treatment if you are ill or injured."  *Health Plan, Cambridge Dictionary*, https://dictionary.cambridge.org/us/dictionary/english/health-plan (last visited July 16, 2019) (emphasis added).  The U.S. Code contains at least two different definitions of "health plan" with different inclusions and exclusions.  *Compare, e.g.*, 42 U.S.C. § 18021(b)(1) (does "not include a group health plan or multiple employer welfare arrangement to the extent the plan or arrangement is not subject to State insurance regulation under [29 U.S.C. § 1144]"), *with, e.g.*, 45 C.F.R. § 160.103 (does not include "[a]ny policy, plan, or program to the extent that it provides, or pays for the cost of, excepted benefits that are listed in . . .  42 U.S.C. 300gg-91(c)(1)").  Under at least one state's law, the term "health plan[]" does not include ERISA plans.  *See, e.g.*, *Wash. Physicians Serv. Ass'n v. Gregoire*, 147 F.3d 1039, 1043–44 (9th Cir. 1998) (internal quotation marks omitted), *as amended on denial of reh'g and reh'g en banc* (Aug. 24, 1998).

[8] For a detailed discussion of the difference between "health insurers," "stop-loss insurers," and "plan sponsor[s such as] an employer, a union, or another type of employee organization that makes health benefits available to its employees or members and their families," see, for example, Order Denying Motion for Class Certification, *In re Thalomid & Revlimid Antitrust Litig.*, No. 14-6997, Dkt. No. 250, at  (D.N.J. Oct. 30, 2018) [Dkt. No. 250], at 8–10 ("Plan sponsors with fully insured contract[s] are excluded from the putative Classes because the plan sponsor does not directly bear any of the costs of drug prices.").

payor," and "health plan" interchangeably – including in their proposed class definitions and exclusions.[9]

In the absence of a definition, deciding which of these entities is a "health plan" would require a case-by-case inquiry.  That would result in individualized litigation and would create opportunities for potential class members to evade a defense judgment by arguing that they are not "health plans."  Plaintiffs' proposed classes therefore are too vague to be ascertainable.

**What is a "governmental payor"?**  Plaintiffs' proposed exclusions from the classes are equally vague.  They propose to exclude "governmental payors, including Medicare and Medicaid," but this term, too, is undefined and confusing.  For example:

- Would a public school qualify as a "governmental payor"?[10]

- Are public hospitals "governmental payor[s]"?

- Do the classes include or exclude "health plans" that are partially or wholly government-funded but not operated by a governmental entity?

- Do the classes include or exclude government-subsidized prescription coverage sold through state or federal marketplaces established under the Affordable Care Act?[11]  *See, e.g.*, The Marketplace in Your State, HealthCare.gov, https://www.healthcare.gov/marketplace-in-your-state/.

---

[9] *Compare, e.g.*, Pls.' Mem. at 2 n.1 (conflating "payor" and "health plan"), *with id.* at 4 n.6 (referring to excluded governmental payors as creating a class of "only private, non-governmental TPPs"); *compare id.* at 4 (stating a "health plan" is "operated by an entity known as a [TPP]"), *with id.* at 1 ("health plans (like Plaintiffs)"), *and* 22–24 (describing Plaintiffs as "TPP[s]").

[10] Even the expert on whom Plaintiffs wish to rely to identify class members did not know the answer to this question.  *See* Conti Dep. 184:14–17; Pls' Mem. at 27 & n.150 (citing Conti Rep. ¶ 77).

[11] In addition to federal tax subsidies for purchases of medical and prescription coverage through the marketplaces, the Affordable Care Act promised certain risk-sharing payments directly to insurers – payments at issue in cases that are set to be decided by the Supreme Court.  *See, e.g.*, *Me. Cmty. Health Options v. United States*, No. 18-1023, 2019 WL 465375, at *1 (U.S. June 24, 2019) (granting certiorari and consolidating with similar cases).  If the Supreme Court requires the federal government to make the promised payments, will the recipient insurers be excluded from the proposed classes?

- Do the classes include or exclude student health insurance plans offered by state universities?

- Do the classes include or exclude state-subsidized high-risk insurance pools, which existed in many states for part of the class period?[12]

Plaintiffs' proposed class definitions offer no objective criteria to answer these questions, which is fatal to ascertainability in a healthcare industry characterized by complex contractual relationships and overlapping ownership structures.

**What is an "affiliate relationship"?**  Plaintiffs also would exclude from the classes "any health plans that that have had . . . affiliate relationships with any [PBM] at any time since January 1, 2008."  Pls.' Mem. at 2 n.1 (emphases added).  What does it mean to have an "affiliate relationship" with a PBM?  Would a joint venture or minority ownership share suffice?  Not only was Plaintiffs' expert uncertain, but she testified that "to operationalize the term 'affiliate'" she would need "to look at evidence" and "also likely rely on counsel."  Conti Dep. 189:13–16; *see id.* at 188:12–189:16.  A class definition that requires reviewing evidence and ad hoc opinions of counsel is far from "'precise, objective, and presently ascertainable,'" *Ross v. Lockheed Martin Corp.*, 267 F. Supp. 3d 174, 191 (D.D.C. 2017) (quoting Manual for Complex Litigation § 21.222 (4th ed. 2004)).

### C.     Plaintiffs Offer No Method for Identifying Class Members.

Plaintiffs' Motion also should be denied because it offers no workable method to identify members of the classes – even if one knew what entities to look for.  Such a workable methodology is a prerequisite for certification.  *See, e.g.*, *Crosby*, 796 F.2d at 580.  Plaintiffs' expert proposes to identify the relevant "health plans" through "CVS claims data."  *See* Conti

---

[12] For background on high-risk pools existing before certain provisions of the Affordable Care Act took effect, see K. Pollitz, The Henry J. Kaiser Family Foundation, *Issue Brief: High-Risk Pools for Unsurable Individuals* (Feb. 2017), http://files.kff.org/attachment/Issue-Brief-High-Risk-Pools-For-Uninsurable-Individuals.

Rep. ¶ 71.  But CVS's claims data – the **pharmacy** claims data – is not a reliable source for identifying TPPs or "health plans."  *See* Colbert Decl. ¶¶ 5, 8.  Rather, CVS's data identifies the entities with whom CVS contracts, typically the PBMs.  *See id.*

As discussed above, CVS submits individual claims for adjudication electronically to the PBM, which transmits back to CVS how much the PBM and the customer will pay to CVS for the drug.  *See id.* ¶ 5.  The PBM does not transmit to CVS information on the separate adjudication between the PBM and the third-party-payor or "health plan" that pays the PBM for the drug purchase.  *See id.*  Thus, CVS's data identifies **the PBM** that paid CVS for the drug purchase, but rarely indicates the identity of the **TPP** that paid the PBM.  *See id.*; Conti Dep. 147:3–8.  ████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████  Nor does CVS's data identify which TPPs are putative members of the classes ("health plans" with U&C pricing formulas in their contracts) or are excluded from the classes (governmental payors, affiliates of PBMs, and members of Caremark's "Client Advisory Committee").  *See* Conti Dep. 147:16–22, 176:11–21, 184:18–23, 186:12–187:6.  Plaintiffs' expert thus fails to explain how she could use CVS's data to identify a specific class member.  The only way to do so would be on an individualized basis.  *See, e.g.*, Barlag Rep. ¶¶ 130–156; *cf., e.g.*, Conti Dep. 181:13–182:3 (acknowledging that (1) to determine whether U&C pricing applied to Plaintiffs' transactions, Plaintiffs' expert "looked at their contracts [and] . . . other documents" and (2) claims data alone does not "state whether a transaction is adjudicated according to 'lower of' U&C logic").

## II.   COMMON ISSUES DO NOT PREDOMINATE OVER INDIVIDUAL ISSUES.

Motions for class certification based on allegations of fraud and deception often founder on the "predominance" component of Rule 23(b), which requires a proponent to establish that

common questions of law and fact predominate over questions affecting only individual class members. This case shows why, as "dissimilarity among the claims of class members," concerning their contracts, knowledge, and payment structures, make the proposed class action "inefficient" and "unfair." *See In re Asacol Antitrust Litig.*, 907 F.3d 42, 51–52 (1st Cir. 2018) (internal quotation marks omitted).

"What matters to class certification . . . is not the raising of common ***questions*** – even in droves – but, rather the capacity of a classwide proceeding to generate ***common answers*** apt to drive the resolution of the litigation." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (alteration in original) (emphasis added) (citation omitted). In determining whether common issues "predominate," "the threshold question is whether those issues overshadow the issues that must be resolved separately for different members of the class." *Van West*, 199 F.R.D. at 453 (internal quotation marks omitted). Plaintiffs must show that trying their claims will resolve, "in one stroke," the issues that are central to all the class members' claims. *Dukes*, 564 U.S. at 350.

Plaintiffs have not shown, and cannot show, that any of the major questions driving this suit is susceptible to a common answer. Each claim will depend on individualized proof. *First*, any answer to the critical question whether CVS engaged in fraudulent or deceptive conduct will depend on contracts that are specific to each PBM and each proposed class member. The different contracts between CVS and the Class PBMs determine whether CVS had a contractual obligation to report HSP prices to PBMs as U&C prices. And the thousands of different contracts between the PBMs and the proposed class members determine whether the PBMs, in turn, were required to (a) charge the proposed class members based on a lower-of U&C pricing formula in which HSP prices were U&C prices or (b) inform the proposed class members that CVS did not report HSP prices as U&C prices. *Second,* because many class members (including

28

two named Plaintiffs) had actual knowledge that CVS was not reporting its HSP prices as U&C prices, there will be individual answers regarding whether class members' injuries were caused by any alleged deceptive conduct by CVS.  *Third*, whether class members were injured by non-reporting of HSP prices as U&C prices depends on the drug-pricing formula in each class member's PBM contract, many of which contained aggregate guarantees that made them indifferent to HSP prices.  *Fourth*, Plaintiffs offer no mechanism to prove damages on a classwide basis.  *Fifth*, class members are subject to unique and dispositive defenses based on arbitration agreements and statutes of limitations.

### A.    Plaintiffs' Theory of Liability Depends on Individual Contract Terms.

All of Plaintiffs' claims depend on a finding that Defendants acted in a deceptive, fraudulent, unfair, or unjust manner.[13]  Plaintiffs' theory is that CVS failed to report HSP prices as U&C prices and that the Class PBMs, conspiring with CVS, failed to disclose this non-reporting to class members.  To establish liability under this theory, Plaintiffs must prove that (a) CVS was required to submit HSP prices as U&C prices, (b) PBMs were required to treat HSP prices as U&C prices in their charges to class members, and (c) PBMs were required to disclose

---

[13] Plaintiffs allege mail and wire fraud as the predicate acts for their RICO claims.  One element of mail and wire fraud is "a scheme to defraud based on false pretenses, [representations, or promises]."  *United States v. Cheal*, 389 F.3d 35, 41 (1st Cir. 2004).  Regarding the consumer protection class, Plaintiffs' Appendix A makes clear that the relevant statutes require an act that is unfair, unlawful, fraudulent, unconscionable or deceptive.  And regarding unjust enrichment, Plaintiffs' Appendix E concedes they must prove Defendants' retention of the benefit was "unjust."  *See also DCB Constr. Co. v. Cent. City Dev. Co.*, 965 P.2d 115, 122 (Colo. 1998) (en banc) ("[W]e hold that injustice in [the context of an unjust enrichment claim] requires some type of improper, deceitful, or misleading conduct by the landlord.  This is in harmony with [another decision] . . . the Restatement of Restitution, and the weight of authority in other jurisdictions (citation omitted).")

to class members that CVS and the PBMs were not treating HSP prices as U&C prices.  Unless

these alleged duties existed, the challenged conduct was not fraudulent, deceptive, or unfair.[14]

As Plaintiffs recognize, any such legal duties are a matter of "[c]ontracts between TPPs

and PBMs – and between PBMs and pharmacies."  Pls.' Mem. 4.  To determine whether such

duties exist, therefore, the Court and the finder of fact will have to parse two separate contractual

relationships *for each class member*: (1) the contracts between CVS and the Class PBMs, which

define "Usual & Customary" prices, and (2) the contracts between the Class PBMs and "health

plans," which define the putative class members' pricing formulas and the Class PBMs' duties.

This inquiry is highly individualized because every contract is subject to negotiation between the

parties, and the relevant contractual provisions vary.

**The CVS-PBM Contracts and Their Different U&C Definitions.**  CVS is obligated to

report its U&C price under its contracts with each of the Class PBMs, but the definitions of U&C

in each contract vary, as explained above in Section I.A.  Applying these different definitions,

there can be no common answer to the question whether CVS was required to treat its HSP price

as its U&C price – at least not an answer in Plaintiffs' favor.

As described above, Defendants' position on the merits is that all of the U&C definitions

should be interpreted, in light of the uniform industry understanding, to mean that membership

program prices like HSP are *not* U&C prices.  Plaintiffs disagree, but not because they point to a

contrary industry-wide understanding.  Rather, Plaintiffs claim that *the contracts' plain*

*language* required reporting HSP prices as U&C prices.  For Plaintiffs to prevail on this theory,

---

[14] To be clear, Defendants dispute that such contractual duties can support Plaintiffs' claims, which are not for breach of contract.  Defendants will reserve these merits-based arguments for the appropriate time.

they must parse the contractual language.  Such parsing defeats class certification, because each contract is different.

For example:

- The CVS-Caremark contract defines U&C as: ███████████████████ ██████████████████████████████████ ████████████████████████████ ████████████████████ DX 36, PCS Health Systems, Inc. Provider Agreement (Mar. 31, 1997) (CVSC-0324091).

- The CVS-Express Scripts contract defines U&C as: ██████████████ ██████████████████████████ ████████████████████████████ ██████████████████████████ ████ DX 39, Pharmacy Provider Agreement (Jan. 18, 2008) (CVSC-0325309).

- The CVS-Optum contract defines U&C as: ████████████████ ██████████████████████████ ████████████████████████████████ ████████████ DX 47, Pharmacy Network Agreement (Jan. 29, 2015) (CVSC-0327930) (emphasis added).

Applying these different definitions, Plaintiffs cannot show based on common evidence that CVS was required to treat its HSP price as its U&C price.  Even if one interprets the CVS-

---

[15] Optum testified ████████████████████████████ ████████████████████████████████████ ████████████████████ Optum Dep. 78:20–79:6-23.

Express Scripts contract to include HSP because the U&C definition ███████████ ███████████████████████████████ – an interpretation that Defendants dispute[16] – the CVS-Optum contract would require the opposite result because it ███████████████ ████████████████████ And the CVS-Caremark contract might well require a different result because, the evidence will show, HSP was not ███████████████████ it was designed to dissuade existing customers from switching to other pharmacies that offered similar programs. Morrison Dep. 88:9–90:4.  In short, for Plaintiffs to prevail on the merits, the variations among these U&C definitions will require contract-by-contract analysis.

**The PBM-TPP Contracts and Their Different U&C Definitions.**  Even setting aside the U&C definitions in the CVS-Class PBM contracts, common issues do not predominate because of the separate and distinct definitions of "usual and customary" in the PBM-TPP contracts.  To prove their claims, Plaintiffs must show not only that CVS violated a contractual requirement to report HSP prices as U&C prices to the Class PBMs under the CVS-PBM contracts, but also that class members were contractually entitled to HSP prices under their (the TPPs') contracts with PBMs.  There can be no common answer to the latter question because the putative class members' contracts define "usual and customary" in very different ways.  These U&C definitions in the PBM-TPP contracts vary widely across PBMs, individual PBMs' portfolios of clients, and the relevant time period.  *See, e.g.,* ███████████████████ ███████

---

[16] In the prescription context, the term "discounts" is a term of art generally referring to a reduction off the pharmacy's retail price (e.g., a percentage reduction, a $1.00 coupon).  A transaction like HSP, governed by a separate and distinct price schedule, is not a reduction off the pharmacy's retail price, although it is lower in comparison to the retail price.  DX 19, Deposition of Thomas Gibbons ("Gibbons Dep.") at 112: 1-14; DX 20, Testimony of Thomas Gibbons, Temp. Inj. Hr'g Tr. vol. 3, at 45:19–46:1, *State ex rel. Winkelman v. CVS Health Corp.*, No. D-1-GV-14-388 (D. Ct. Travis Cty., Tex. Jan. 31, 2018).

For example:

- In 2006, ██████████████████████████████████████

  ████████████████████████████████████ DX 37, Trust

  Participation Agreement ¶ 2.1 (Feb. 1, 2006) (P_000001) (emphasis added).

- In 2011, ████████████████████████████████████████

  ████████████████████████████████████████████████

  ████████████████████████████████████████████████

  ██████████████████████ DX 42, Pharmacy Benefit Management Agreement

  ¶ Article 1 (July 6, 2011) (P_000647) (emphasis added).

- In 2015, ████████████████████████████████████

  ████████████████████████████████████ 2015 Sheet

  Metal PBSA ¶ 1.26 (emphasis added).

- In 2011, ███████████████████████████████████████

  ██████████████████████████████████████████

  ██████████████████████████████████████████

  ██████████████████████████████████████████

  ████████████████████████ DX 41, Service Agreement ██

  (April 1, 2011) (MI-SM_00005277, at 5328) (emphasis added).

- In 2013, ███████████████████████████████████

  ██████████████████████████████████████████████

  ██████████████████████████████████████

  ██████████████████████████████████████████

███████████████████████████ DX __, Service Agreement ¶ 1.13 (Jan. 1, 2013) (MI-SM_00006146, at 6151) (emphasis added). [17]

As with the CVS-PBM contracts, there is no common answer to whether CVS's HSP price was the U&C price under each of the Plaintiffs' and putative class members' own definitions of U&C in their contracts – at least not an answer in Plaintiffs' favor.  Under the first example above, the TPP has no claim because ████████████████████████ ████████████████████████████████████████████████ ███████████████████████.  In the last example above, the TPP ████████████████ ██████████████████ such that this particular TPP could not argue the HSP price was the U&C price simply because it was lower than the pharmacy's retail price.  The second, third, and fourth examples ████████████████████████████████████████████ ████████████████████████████████████████████████ requires an individual inquiry.

**The PBM-TPP Contracts and the Alleged Duty to Disclose.**  Because CVS's contractual obligation to report U&C prices runs only to PBMs, not to "health plans," Plaintiffs must show more than a breach of that reporting obligation.  Plaintiffs must also prove that the Defendants had a duty to disclose *to the proposed class members* that CVS was not reporting HSP prices as U&C prices.

When asked in discovery to identify the source of this alleged duty, Plaintiffs pointed to individual provisions in their own contracts with only three of the five Class PBMs.  For example, Indiana Carpenters stated:

---

[17] ████████████████████████████████████████████████

34

- "Caremark agreed ███████████████████████████████████████ ███████████████████████████████████████ ████████████████ while knowing that claims submitted for generic drugs covered under CVS's HSP program were artificially inflated by virtue of CVS's fraud." DX 76, Indiana Carpenters' Resp. to CVS Pharmacy, Inc.'s Fifth Set of Interrogs. to Pls.

- "Medco Health Solutions, Inc. agreed that Indiana Carpenters would ███████████ ████████████████████████████████████████████ *Id.*

- "Express Scripts, Inc. agreed that Plumbers would ███████████████████████ ████████████████████████████████████ ██████████████████████████████████████████████ ███████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ███████████████████████████████████████ ████████████████████████████████████████████ Express Scripts did not disclose that it was financially benefitting by allowing pharmacies, including CVS, not to report membership prices as U&C prices." DX 77, Plumbers' Resp. to CVS Pharmacy, Inc.'s Fifth Set of Interrogs.to Pls.

These contractual provisions cannot create any duty *from* at least two of the five Class PBMs, who are not parties to these contracts, or any duty *to* putative class members, who are not parties either. In any event, Defendants dispute that any of these contractual provisions creates a duty to disclose that CVS was not reporting HSP prices as U&C. Certainly, none of the provisions actually states that PBMs *had* a duty to disclose, and the PBMs testified that these contract

provisions *did not create* such a duty.  *See* Express Scripts Dep. 92:11–98:19; Optum Dep. 156:20–157:7.

For purposes of class certification, however, there can be no dispute that answering the question whether there was a duty to disclose requires examining the terms of each contract between the Class PBMs and the putative class members.  The above-quoted interrogatory responses show that the contracts vary widely, and the particular contract provisions on which Plaintiffs rely for the alleged duty to disclose are disparate and contract-specific.  These contracts number in the thousands.  Express Scripts Dep. 90:7–25; Schaper Decl. ¶ 5.  Further complicating the matter, PBMs sometimes had more than one contract with a putative class member, and some class members had more than one PBM in the relevant period.  Plaintiffs' interrogatory responses themselves show that the contracts differ in significant ways even between the same PBM and the same health plan.  *See supra* p. 35 (*"at least two of Plumbers' contracts with Express Scripts* ███████████████████████████████████

████████████████████████████████████████

██████████████████████████

To the extent Plaintiffs may argue that the Class PBMs' contractual relationships with putative class members made the PBMs "fiduciaries" with a corresponding duty to disclose, that is incorrect, and it is not a common issue for class certification purposes.  The existence of a fiduciary relationship is a question of state law, which will require the Court to analyze fiduciary duty jurisprudence in each of the proposed class jurisdictions.  *See, e.g.*, *Dushkin v. Desai*, 18 F. Supp. 2d 117, 121–22 (D. Mass. 1998) (noting some jurisdictions recognized a "spiritual counseling" fiduciary duty, but Massachusetts did not); *Innovative Network Sols., Inc. v. Onestar Commc'ns, LLC*, 283 F. Supp. 2d 295, 302–03 (D. Me. 2003) (noting contractual relationship

alone did not give rise to a fiduciary relationship under Maine or Indiana law). Contracts between the Class PBMs and at least some putative class members expressly provide that the PBM is *not* a fiduciary. *See, e.g.*, DX 45, Prescription Benefit Management Services Agreement (Jan. 1, 2013) (CAREMARKSM_0068676, at 68690) ████████████████████

████████████████████████████████████████████████████████

████████ Determining which class members agreed that their PBM was *not* a fiduciary would require a contract-by-contract analysis. Even if some of the class members' contracts are silent, the Court would be required to analyze the relationship between each class member and its PBM to determine whether there is the sort of relationship of confidence and trust that warrants implying a fiduciary relationship—and the answer may vary according to which State's law applies. *See McAdams v. Mass. Mut. Life Ins. Co.*, 391 F.3d 287, 303 (1st Cir. 2004) ("Under Massachusetts law, the question of whether one party owes fiduciary duties to another is a question of fact[,]" and involves "a fact-specific inquiry.").

\*     \*     \*     \*     \*

The case law confirms that a class should not be certified when liability to the class members depends on distinct terms in contracts. For example, in *Westways World Travel, Inc. v. AMR Corp.*, No. EDCV 99-386, 2005 WL 6523266, at *6 (C.D. Cal. Feb. 24, 2005), *aff'd*, 265 F. App'x 472 (9th Cir. 2008), the court decertified a class action in a RICO and unjust enrichment case because "an individualized inquiry would be necessary to determine whether each travel agency relied on Defendants' alleged misrepresentations or its own particular legal and contractual relationship with American." *Id.*; *see also In re WellPoint, Inc. Out-of-Network "UCR" Rates Litig.*, No. MDL 09-2074PSG (FFMX), 2014 WL 6888549, at *4 (C.D. Cal. Sept. 3, 2014) (no class certification where "[usual, customary, and reasonable] obligations are

governed by its contracts, and the relevant terms of those contracts vary across the proposed

classes" even where a standard, industry definition existed); *Ret. Bd. of the Policemen's Annuity*

*& Ben. Fund of Chi. v. Bank of N.Y. Mellon*, 775 F.3d 154, 162 (2d Cir. 2014) (Plaintiffs lacked

standing to assert claims related to certificates issued by trusts in which no Plaintiff ever invested

because "whether Countrywide breached its obligations under the governing agreements (thus

triggering BNYM's duty to act) requires examining its conduct with respect to each trust. . . .

And whether a loan's documentation was deficient requires looking at individual loans and

documents.  We see no way in which answering these questions for the trusts in which Plaintiffs

invested will answer the same questions for the numerous trusts in which they did not invest.").[18]

The individual issues in this case are far more prevalent, as Plaintiffs cannot establish any duty,

much less a violation by Defendants, without scrutinizing two separate sets of contracts, which

differ for every class member.

### B.      Many Class Members Knew HSP Prices Were Not U&C Prices.

Individual issues overwhelm any common issues because many proposed class members

– including two of the named plaintiffs – actually ***knew*** that CVS and the PBMs were not

treating HSP prices as U&C prices.  Class members who had such knowledge cannot satisfy the

causation and reliance elements of their claims or prove that any enrichment was "unjust."

Accordingly, each proposed class member's claim will depend on individualized proof

concerning its particular knowledge (or lack thereof) concerning CVS's HSP reporting.

---

[18] *Corcoran v. CVS Health Corp.*, No. 17-16996, 2019 WL 2454529, at *1 (9th Cir. June 12, 2019) (unpublished mem.), addressed only differences in contracts between PBMs and CVS, not contracts between PBMs and TPPs.  That case therefore did not address whether a class should be certified when, as here, the class claims would require reviewing thousands of individual PBM/TPP contracts.  Regardless, Defendants respectfully disagree with the *Corcoran* opinion.

1.    **The plaintiff's knowledge is a defense to each of the claims in the Complaint.**

Civil RICO claims are subject to a stringent causation standard.  A civil plaintiff has standing to sue under RICO only if he has been "injured in his business or property ***by reason of*** a violation of section 1962 [the substantive RICO provision]."[19]  18 U.S.C. § 1964(c) (emphasis added).  The phrase "by reason of" is the source of RICO's causation standard.  *See Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 9 (2010).  The "central question" is "whether the alleged violation led ***directly*** to the plaintiff's injuries."  *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006) (emphasis added).[20]  As the Supreme Court has noted, "the complete absence of reliance may prevent the plaintiff from establishing proximate cause."  *Bridge v. Phx. Bond & Indem. Co.*, 553 U.S. 639, 658 (2008).  That follows from RICO's strict causation standard, as an alleged RICO violation does not lead "directly" to Plaintiffs' alleged overpayment if the Plaintiffs made payments with eyes wide open.  *Anza*, 547 U.S. at 461.  In other words, if a health plan knew it was not receiving HSP prices as U&C prices, but paid the allegedly inflated price anyway, the direct cause of the health plan's alleged overpayment was not CVS's "fraudulent" price reporting – but rather the health plan's acquiescence in the supposed overcharge.

---

[19] Plaintiffs claim that defendants violated RICO Section 1962(c), which requires them to prove: (1) an "enterprise" (2) that defendants "conduct[ed] or participate[d][in]" (3) through a "pattern" (4) of "racketeering activity."  18 U.S.C. § 1962(c).  Plaintiffs allege acts of mail and wire fraud as the predicate "racketeering activity."

[20] RICO's causation element is notoriously difficult to satisfy.  For example, the First Circuit in *George Lussier Enterprises., Inc. v. Subaru of New England, Inc.*, 393 F.3d 36 (1st Cir. 2004), held that even if alleged mail and wire fraud "may have contributed to [car] dealers' specific injuries" by furthering a scheme that coerced dealers into buying car accessories, without evidence "such as a dealer signing a dealer contract or making substantial investment in a dealership as a result of the fraud," the dealers could not establish the requisite direct connection between the RICO violation and its injuries.  *Id.* at 51.

The state consumer protection statutes covered by Plaintiffs' classes similarly require proof of causation, reliance, or both.[21]  So, too, do several of Plaintiffs' state-law unjust enrichment claims.[22]  For all unjust enrichment claims, Plaintiffs must show that Defendants received a benefit from putative class members under circumstances that would make it "unjust" for Defendants to retain the benefit (Appendix E).  Plaintiffs "do not explain why it is unjust for the Defendants to retain the money from someone who did not believe their misrepresentations when purchasing, did not purchase because of their misrepresentations, or received the benefit promised."  *In re Light Cigarettes Mktg. Sales Practices Litig.*, 271 F.R.D. 402, 418 (D. Me. 2010).

---

[21] *See, e.g.*, *Markarian v. Conn. Mut. Life Ins.*, 202 F.R.D. 60, 68 (D. Mass. 2001) ("[P]roof of actual reliance on a misrepresentation is not required so long as the evidence warrants a finding of a causal relationship between the misrepresentation and the injury to the plaintiff." (internal quotation marks omitted)); *see also Gonzalez v. Proctor & Gamble Co.*, 247 F.R.D. 616, 624 (S.D. Cal. 2007) ("Plaintiff, relying on *Vasquez*, argues that CLRA claims are subject to class wide proof of liability and reliance without a need for individualized proof.  As previously discussed, however, *Vasquez* and its progeny only permit an inference of common reliance when the allegations demonstrate that a single, material misrepresentation was directly made to each class member.")  Plaintiffs' Appendix B highlights that causation is required to establish the consumer protection claims.  *See, e.g.*, Ca. Bus. & Prof. Code § 17204 (Actions shall be prosecuted "by a person who has suffered injury… *as a result* of the unfair competition." (emphasis added)); Iowa Code § 714H.5 (A consumer "who suffers an ascertainable loss of money or property *as the result* of a prohibited practice or act in violation of this chapter may bring an action at law to recover actual damages." (emphasis added)).

[22] *See, e.g.*, *In re Light Cigarettes Mktg. Sales Practices Litig.*, 271 F.R.D. 402, 408 (D. Me. 2010) ("The Plaintiffs recognize that causes of action under California CLRA, Illinois ICFA, and Illinois unjust enrichment require damage and reliance."); *see also Emp'r Teamsters-Local Nos. 175/505 Health & Welfare Tr. Fund v. Bristol Myers Squibb Co.*, 969 F. Supp. 2d 463, 475 (S.D.W. Va. 2013) ("Without any specific allegations as to who received these misrepresentations, how the misrepresentations influenced doctors, and why certain patients received Plavix instead of alternative medications, this Court is left without sufficient allegations from which to properly infer that proximate causation is satisfied.  Therefore, both of Plaintiffs' claims [including for unjust enrichment] should be dismissed for lack of causation.")

2.    **Individualized issues of knowledge defeat class certification.**

In fraud and related cases, courts commonly find that individual issues predominate when the class claims turn on individual issues of knowledge.  *See Hammer v. Vital Pharm., Inc.*, No. 11-4124 (MAS)(DEA), 2015 WL 12844442, at *5 (D.N.J. Mar. 31, 2015) ("[I]f a class member knew of the alleged 'misrepresentation,' . . . then that knowledge could break the proximate cause link between the alleged misrepresentation and any damages suffered.  Determining whether a class member had such knowledge requires an individualized inquiry creating a predominance problem." (citation omitted)).[23]  The same result is appropriate here, because ascertaining each putative class member's knowledge regarding the relationship between membership program prices and U&C prices would require an individualized inquiry.  In *Weiner v. Snapple Beverage Corp.*, the court found class certification inappropriate where "[i]ndividualized inquiries would be required to determine, for instance, whether class members were fully informed about the inclusion of HFCS in Snapple beverages, whether they believed HFCS to be natural, and whether they continued to purchase Snapple despite their beliefs

---

[23] *See also Poulos v. Caesars World, Inc.*, 379 F.3d 654, 664–66 (9th Cir. 2004) (affirming denial of class certification under Rule 23(b)(3) of a civil RICO action, where the district court determined that individualized reliance issues related to proof of causation regarding predicate acts of mail fraud would predominate over common questions); *Blough v. Shea Homes, Inc.*, No. 2:12-cv-01493 RSM, 2014 WL 3694231, at *14 (W.D. Wash. July 23, 2014) ("[W]here discovery has revealed substantial variations in homeowners' knowledge of defects prior to purchase, a presumption of reliance does not alter the predominance of individualized inquiries into causation over common questions."); *In re Ford Motor Co. E-350 Van Prods. Liab. Litig.* (No. II), No. 03-4558, 2012 WL 379944, at *15 (D.N.J. Feb. 6, 2012) ("[I]t would take individualized causation inquiries to determine which putative class members saw such news reports prior to their purchase of an E–350 and understood the van to have handling problems."); *Perisic v. Ashley Furniture Indus., Inc.*, No. 8:16-cv-3255-T-17MAP, 2018 WL 3391359, at *6 (M.D. Fla. June 27, 2018) ("[I]t seems that individualized inquiries will be needed in light of the varying representations or varying knowledge of the proposed class members.").

concerning HFCS."  No. 07 CIV. 8742 (DLC), 2010 WL 3119452, at *11 (S.D.N.Y. Aug. 5, 2010).

Here, as in *Weiner*, "[s]uch individual issues would also dwarf any issues of law or fact common to the class," *id.*, because the record shows that a large number of class members, ***including two of three named Plaintiffs***, were fully aware that the HSP price was not considered CVS's U&C price.  These class members learned the relevant facts through a wide range of different individualized communications – and some knew from their own experience that membership program prices were not HSP prices.  Some examples include:

- **Named Plaintiff Sheet Metal Workers.**  Daniel Tibus, an Account Executive at Caremark, Sheet Metal's PBM, emailed Sheet Metal trustees and officials with details about the HSP program.  Tibus Decl.  ¶¶ 10–12; Tibus Email.  Tibus ███████████████████████████████████████████████████████████ ████████████████████████  Sheet Metal trustee Michael Jones testified that he personally was aware that Sheet Metal was not getting HSP prices: He signed up for HSP individually because he could not access the prices through his Sheet Metal benefits.  Jones Dep. 82:14–24, 86:10–25; 109:1–25; 110:1–23. ██████████████████

- **Named Plaintiff Indiana Carpenters.**  Bart Gerber of Medco, the PBM for Indiana Carpenters, sent an email to Irene Newman, the fund administrator for Indiana Carpenters, explaining that, "***programs include membership fees to gain access to a member-only price that differs from the pharmacy's U&C price***."  DX 23, Irene Newman ("Newman Dep.") 41:16–25, 42:1–25, 43:1–10; Newman Email (emphasis added).  Newman forwarded the email to several Indiana Carpenters trustees.  Newman Dep. 56:25, 57:1–25, 58:1–25, 59:1–25, 60:1–9; Newman Email.





Class members who received communications like these unequivocally knew that membership program prices are not U&C prices and have no meritorious claims.  But even if Plaintiffs' dispute this interpretation, it remains that the knowledge of these class members must be tested individually, by reference to their unique communications and experience in the industry.  These examples demonstrate that determining whether each absent class member had knowledge defeating their claims requires reviewing **_thousands_** of internal and external communications.  At Caremark, for example, clients may communicate with their assigned account team in person, via email or letter, or by phone.  *See, e.g.*, Schaper Decl. ¶ 7.  The same is true of account teams at the other Class PBMs.  *See, e.g.*, Medco Dep. 83:4–9.

Class certification therefore should be denied because Plaintiffs cannot prove the elements of their claims by common evidence, without recourse to individualized document review and mini-trials.[24]  Individualized issues would predominate.[25]

### C.   Whether Defendants' Actions Injured Plaintiffs Does Not Have a Common Answer.

As a prerequisite to class certification, the plaintiff must provide a mechanism for determining on a class-wide basis whether any given class member suffered an injury.  The First Circuit in *Asacol* emphasized this requirement: "[W]here injury-in-fact is a required element of a

---

[24] *See Markarian v. Conn. Mut. Life Ins. Co.*, 202 F.R.D. 60, 69 (D. Mass. 2001) (In action under Massachusetts consumer protection statute, individual issues predominate where "statements in the Illustrations provided to members of the putative class were not uniform, oral representations were often involved, and some prospective purchasers, like Markarian, had independent sources of advice.  Thus, the total mix of information made available to each purchaser was distinctive, if not unique, and the question of causation must be decided with regard to each purchaser in the context of the particular information that he or she received."); *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1253–56 (2d Cir. 2002) (explaining in RICO and common law fraud action that the Third, Fourth, Fifth, Sixth and Seventh Circuits "have held that oral misrepresentations are presumptively individualized" and noting that "[o]nly if class members received materially uniform misrepresentations can generalized proof be used to establish any element of the fraud").

[25] In addition, to establish RICO causation, each class member will have to establish that CVS's alleged misrepresentations were sufficiently "direct."  *See, e.g., Sidney Hillman Health Ctr. of Rochester v. Abbott Labs. & Abbvie Inc.*, 192 F. Supp. 3d 963, 970 (N.D. Ill. 2016), *aff'd*, 873 F.3d 574 (7th Cir. 2017).  Whenever a drug was purchased, however, CVS transmitted its U&C prices not to a health plan but rather to a PBM.  And before the PBM transmitted the U&C price to the appropriate health plan, if ever, the PBM had to adjudicate the transaction and determine that the U&C price governed the reimbursement.  Because the adjudication process did not involve CVS's directly transmitting its U&C prices to health plans, these indirect representations fail under the RICO causation standard.  Though Plaintiffs allege that "the First Circuit has expressly rejected this type of 'break in causation'" logic in *In re Neurontin Marketing & Sales Practices Litigation*, 712 F.3d 21 (1st Cir. 2013), Pls.' Mem. at 32, other courts disagree with this gloss.  For instance, *Employer Teamsters-Local Nos. 175/505 Health & Welfare Trust Fund v. Bristol Myers Squibb Co.*, 969 F. Supp. 2d 463 (S.D. W. Va. 2013), read the First Circuit as relying on the fact that defendants "had made misrepresentations about Neurontin directly to and concealed information directly from [Plaintiff]" in order to "help[] establish the causation necessary for Plaintiffs to succeed on their claim."  *Id.* at 474; *see also In re Testosterone Replacement Therapy Prods. Liab. Litig. Coordinated Pretrial Proceedings*, 159 F. Supp. 3d 898, 913–14 (N.D. Ill. 2016) (collecting cases).

claim . . . a class cannot be certified based on an expectation that the defendant will have no opportunity to press at trial genuine challenges to allegations of injury-in-fact." *In re Asacol Antitrust Litig.*, 907 F.3d at 58.  Rather, "the district court must at the time of certification offer a reasonable and workable plan for how that opportunity will be provided in a manner that is protective of the defendant's constitutional rights and does not cause individual inquiries to overwhelm common issues." *Id.*  In other words, before a class can be certified, Plaintiffs must offer a workable method to distinguish injured from uninjured class members.

Plaintiffs have provided no workable method to do this for any of their classes. Determining whether each class member suffered an injury under Plaintiffs' theory of liability would require examining specific terms in each contract between the individual health plan and its PBM.  Specifically, the Court would need to consider (1) whether each health plan includes U&C pricing as part of its reimbursement formula for individual transactions, and (2) if so, whether that health plan's reimbursements to a PBM were subject to aggregate guaranteed pricing that made individual transaction prices immaterial.

**Whether U&C prices affect reimbursement.**  As explained above, not all PBM-TPP contracts include U&C pricing.  *Supra* I.A; *see* App. B: MedImpact U&C and GER Variations; App. D: Caremark U&C and GER Variations.  Any health plan whose PBM contract did not entitle the plan to reimbursement based on U&C pricing obviously suffered no injury if U&C prices were inflated.  Determining which health plans excluded U&C prices from their reimbursement formulas, however, requires reviewing every contract between each health plan and each PBM across the entire Class Period.  Not only did some of the contracts not include U&C prices, but the contracts also changed over time, meaning that a health plan may have added or removed U&C pricing from its reimbursement terms at any time during the more than

seven-year Class Period.  Such a wide-ranging survey does not "offer a reasonable and workable plan."  *In re Asacol Antitrust Litig.*, 907 F.3d at 58.

**Whether the "health plan" has a "GER".**  Even for those potential class members whose contracts used U&C pricing as part of a reimbursement formula, many still could not have suffered any injury from inflated U&C prices.  As discussed above, it is commonplace for contracts between PBMs and payors to include generic effective rate guarantees ("GERs"), which guarantee the payor a discount in the aggregate price, no matter what the reported U&C prices may be for individual transactions.  *See* DX 16*, Declaration of Barbara Townsley ("Townsley Decl.") ¶¶ 5-10; Sekula Rep. ¶¶ 10, 18.  In other words, the amount the "health plan" will pay in the aggregate is effectively capped in advance, regardless of what the U&C price was on individual claims.

For example, a GER may guarantee that a payor will receive an average discount of 70% off AWP for the payor's aggregate purchases of all included generic drugs during a given year.  *See* Townsley Decl. ¶ 16.  This guarantee does not mean that every individual purchase is priced at AWP minus 70%.  Rather, the payor's discount off AWP may be higher than 70% for some generic drug purchases and lower than 70% for other generic drug purchases.  *See id*. at ¶ 7.  In the aggregate, however, the PBM guarantees that the payor's average discount, for all of the individual purchases together, will be at least 70%.[26]  At the end of the year (or other guarantee period), if the payor paid more in the aggregate than the guaranteed discount, the PBM must



make a "reconciliation payment" that ensures the payor receives the benefit of the GER.  *See id.* at ¶¶ 7, 16; Sekula Rep. ¶ 15. That is, when the PBM's aggregate charges to a payor exceed the GER ███████████████████ the PBM pays back the excess amount.  *See* Townsley Decl. ¶¶ 7, 16.

The upshot of a GER is that a payor often is not injured by an inaccurate U&C price in any particular transaction, or for that matter in all transactions.  If, over the contract's guarantee period, inaccurate U&C prices inflated one or more individual transaction prices, the payor still paid the same amount overall through operation of the guarantee.  Any alleged "inflated" payments on individual transactions are zeroed out by the PBM's reconciliation payments to the plan to achieve the negotiated guaranteed discount.  *See id.* ¶¶ 8, 16; Sekula Rep. ¶ 19.



The prevalence of GERs means that determining whether any given health plan was injured by allegedly inflated U&C prices will require a complicated, individualized inquiry of the health

plan's contracts with its PBM and the history of the transaction and reconciliation payments back and forth between the health plan and the PBM over the life of the guarantee.  The finder of fact will have to determine (a) whether each health plan's contract contains a GER, (b) the period of time in which the GER was in effect, (c) the specified generic drugs to which the GER applied, (d) whether the health plans received reconciliation payments, and (e) whether such reconciliation payments had the effect of offsetting (and if so, to what amount) the alleged overcharges to the health plan because HSP prices were not reported as U&C prices.  This analysis will differ for every health plan and will cause individualized issues to predominate.

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████

This complexity defeats class certification.  "[T]his is not a case in which a very small absolute number of class members might be picked off in a manageable, individualized process at or before trial.  Rather, this is a case in which any class member may be uninjured . . . . The need to identify those individuals will predominate and render an adjudication unmanageable." *Asacol*, 907 F.3d at 53–54.

**D.  Plaintiffs Do Not Demonstrate that Damages Are Both Capable of Measurement on a Classwide Basis and Tied to Their Theory of Liability.**

Plaintiffs recognize that they must affirmatively demonstrate that "damages are both [1] 'capable of measurement on a classwide basis' and [2] tied to their theory of liability."  Pls.' Mem. at 41 (quoting *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013), and citing *Nexium*, 777 F.3d at 19).  Plaintiffs proffer a model created by the same expert on whom the *Asacol* plaintiffs unsuccessfully relied: Rena Conti, Ph.D.  *See Asacol*, 907 F.3d at 54.  Dr. Conti's model satisfies neither requirement for class damages.

**1.  Dr. Conti's model fails to show damages can be measured on a classwide basis.**

Plaintiffs claim Dr. Conti's model shows "that damages can be calculated on a class-wide basis using common proof and a standard methodology."  Pls.' Mem. at 39 (emphasis omitted). They say Dr. Conti's model "calculated [damages] as the difference between what the TPP actually paid for the HSP drugs and the HSP price."  *Id.* at 40 (emphasis added).  But that is not what Dr. Conti's model actually did.

Dr. Conti's model does not calculate the damages of *the proposed classes* at all.  *See* DX 3, Expert Report of Michael Salve, Ph.D. ("Salve Rep.") ¶¶ 22–25, 66–67.  She purports only to calculate the aggregate difference between (1) what the *PBMs* – who are not putative class members – paid for certain transactions involving HSP-eligible drugs and (2) what the *PBMs* would have paid for those transactions if the HSP price had been reported as the U&C price.  *See* Conti Rep. ¶¶ 63, 65, 70, 71 & n.69, 72 & n.73, 73 & n.76; Conti Dep. 152:23–153:3, 153:9–17. Dr. Conti did not attempt to calculate what the *"health plans"* who are putative class members paid, or would have paid, to the PBMs for those transactions.  *See* Barlag Rep. ¶ 130; Salve Rep. ¶¶ 22–24.  As Dr. Conti makes clear, there are meaningful differences between what the health plans paid and what the PBMs paid.  *See* Conti Rep. ¶ 51.  Those differences are "complicated"

49

and "vary depending on the drug or the drug's price," *id.*, and the TPP-PBM contracts, thus requiring individualized damages calculations, *see* Barlag Rep. ¶¶ 130-132.[27]

Even if one could assume (contrary to fact) that payments by ***PBMs*** were identical to payments by ***health plans*** for the transactions at issue, Dr. Conti's model suffers from at least two other fatal flaws.[28]  *First*, it assumes incorrectly that U&C prices were part of the applicable reimbursement formula for every transaction.  It assumes, in other words, that the PBMs were "overcharged" for HSP-eligible drugs whenever the PBM paid more than the HSP prices – even if the U&C price (whether accurate or not) had no effect on the PBM's price.  *See* Conti Dep. 176:11–21. ████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████

*Second*, in determining what portion of any "overpayment" would have been borne by the health plan, as opposed to the patient, Dr. Conti incorrectly assumes that the patient's share of each transaction was fixed – meaning the patient would pay the same amount for each transaction regardless of whether it was priced at HSP or at the reported U&C.  *See* Conti Dep. 103:8–104:7, 238:3–10; Barlag Rep. ¶ 154.  In fact, patients' shares vary depending on whether their health plans require them to pay a fixed "copay" amount for each transaction or a variable

---

[27] Plaintiffs cannot rely on Dr. Conti's statistical model to overcome the "inherent deficiency" in her damages analysis.  Salve Rep. ¶ 24.  Dr. Conti arbitrarily manufactures data, fails to account for data outliers, and uses variables without any meaningful relationship, among other fundamental errors.  *See id.* ¶¶ 26–33, 35–38, 46–48.  As a result, Dr. Conti's statistical model "is fatally flawed, and its results are misleading and unreliable." *Id.* ¶¶ 40.

[28] To the extent Plaintiffs may propose to overcome these flaws by gathering "unrebutted affidavits," Defendants "expressly state[] their intention to challenge any affidavits that might be gathered." *Asacol*, 907 F.3d at 52.

"coinsurance" percentage of the purchase price.  If the patient's share of the purchase price changes, the portion paid by the health plan also changes.  Dr. Conti's model does not offer a classwide method for distinguishing between transactions where the patient's share was fixed from those where it was variable, much less a classwide method for calculating the impact of the patient's variable share on the amount paid by the health plan.  *See* Conti Rep. ¶¶ 72 & n.73, 73 & n.76.  The only reliable method would require countless individualized inquiries.  *See* Barlag Rep. ¶ 155.

### 2.  Dr. Conti's model fails to tie damages to Plaintiffs' theories of liability.

Attempting to demonstrate that class damages are "tied to their theory of liability," Plaintiffs contend that Dr. Conti's model calculated the damages that "the *Nationwide Class* members suffered" "as a *result* of the alleged scheme."  Pls.' Mem. at 40, 41 (emphases added). Notably, Plaintiffs make no attempt to tie Dr. Conti's damages model to their proposed ***state*** classes; nor could they, as Dr. Conti's model is expressly limited to "the Nationwide Class." *E.g.*, Conti Rep. ¶¶ 10 & n.11, 62, 71, 81.  Because Dr. Conti's "model does not even attempt to" measure "those damages attributable to" the unjust enrichment and consumer protection act theories of liability underlying their proposed state classes, "it cannot possibly establish that damages are susceptible of measurement across th[ose] entire class[es] for purposes of Rule 23(b)(3)."  *Comcast*, 569 U.S. at 35.

As to the Nationwide Class, Dr. Conti does attempt to measure the damages attributable to the RICO theory of liability that underlies that proposed class.  *See* Conti Rep. ¶¶ 62, 71.  But her model fails because she does not – and cannot – show that CVS's reporting of a non-HSP U&C price is the ***but-for cause*** of the "overcharges" she has calculated.  The best she can muster is a conclusion that "Class members were *impacted* by the alleged conduct," Conti Rep. ¶ 82

(emphasis added), but RICO requires Plaintiffs to prove but-for and proximate causation, not mere "impact," *see Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 265–66 (1992). Plaintiffs cannot do so using Dr. Conti's damages model because it ignores (1) the contractual pricing formulas applicable to each transaction (i.e., whether U&C price even affected the transaction price, as discussed above) and (2) the GERs in the contracts between PBMs and many health plans in the class. As discussed above, because of these GERs, many putative class members would not have paid a penny less even if CVS had reported HSP prices as U&C prices. *See, e.g.*, Barlag Rep. ¶¶ 137–138; Sekula Rep. ¶¶ 18–19. ███████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

Like the model rejected in *Comcast*, Dr. Conti's model "identifies damages that are not the result of the wrong." *Comcast*, 569 U.S. at 37; *see also In re Rail Freight Fuel Surcharge Antitrust Litig.–MDL No. 1869, BNSF Ry. Co.*, 725 F.3d 244, 253 (D.C. Cir. 2013). Because her model would impermissibly hold Defendants "liable for damages beyond the injury they caused," Plaintiffs have "fail[ed] to meet the Rule 23(b)(3) requirement." *Nexium*, 777 F.3d at 18 (citing *Comcast*, 569 U.S. at 37).

    **E.**    **Whether Defendants Are Liable to the Class Depends on Defenses Unique to Certain Class Members.**

        **1.**    **Many putative class members are subject to arbitration agreements.**

Many putative class members have agreed to contractual arbitration clauses that cover each of the claims in this case. ██████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████



indicate that **thousands** of putative class members, and perhaps even a majority, have agreed to arbitrate rather than pursue claims before this Court. That defeats class certification because "threshold issues of arbitrability predominate over common merits questions." *Spotswood v. Hertz Corp.*, No. RDB-16-1200, 2019 WL 498822, at *11 (D. Md. Feb. 7, 2019). The prevalence of arbitration agreements "divides the class, leaving some susceptible to unique defenses and others impervious to them." *Id.*

If any proposed class is certified, Defendants will file motions seeking to arbitrate the claims of class members with arbitration agreements. *See Lozano v. AT & T Wireless Servs., Inc.*, 504 F.3d 718, 728 (9th Cir. 2007) ("The district court properly considered the effect of [the defendant]'s intent to seek to arbitrate the class action claims.").[29] Caremark's Motion Under the Federal Arbitration Act to Dismiss the Claims of Sheet Metal raises individualized arbitrability

---

[29] Defendants cannot move to enforce their arbitration rights against absent class members before a class is certified because putative class members are not yet parties to this litigation and the Court lacks jurisdiction over them. *See, e.g.*, *In re Titanium Dioxide Antitrust Litig.*, 962 F. Supp. 2d 840, 853 (D. Md. 2013). If a class is certified, Defendants will request leave to file motions to dismiss or to compel arbitration, as appropriate. Defendants will also pursue other alternative-dispute resolution rights, as Caremark did in this case with Sheet Metal. *See* DX 79, Caremark Dispute Resolution Letter (Oct. 31, 2018); DX 80, Sheet Metal Dispute Resolution Letter (Jan. 22, 2019); DX 81, Caremark Dispute Resolution Letter (Jan. 26, 2019); *see also, e.g.*, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

issues of the kind that will need to be resolved separately for each class member. *See* Dkt. Nos.

127.1, 127.2. Resolving Defendants' arbitration rights would require an individualized analysis

of thousands of contracts to determine which class members agreed to arbitrate and which of the

arbitration agreements covers the claims in this case. "This is precisely the type of class-

member-by-class-member and contract-by-contract inquiry that [*Lozano*] determined to be

predominant over any common questions of law or fact." *In re Titanium Dioxide Antitrust Litig.*,

962 F. Supp. 2d 840, 862 (D. Md. 2013); *see Lozano*, 504 F.3d at 728.

Analyzing Defendants' arbitration rights also will implicate complex questions of

equitable estoppel. ██████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████ nor is

Caremark a party to any potential class member's agreement with a PBM other than Caremark.

Nonetheless, both Caremark and CVS will seek to arbitrate many claims based on these

agreements because all of the class claims regarding U&C pricing are intertwined with PBM

contracts that may require arbitration. *See, e.g.*, *Ouadani v. TF Final Mile LLC*, 876 F.3d 31, 38

(1st Cir. 2017) ("Federal courts generally 'have been willing to estop a signatory from avoiding

arbitration with a nonsignatory when the issues the nonsignatory is seeking to resolve in

arbitration are intertwined with the agreement that the estopped party has signed.'" (emphasis

omitted) (quoting *InterGen N.V. v. Grina*, 344 F.3d 134, 145 (1st Cir. 2003))). Whether

equitable estoppel applies will present an individual question of state law that must be answered

for each class member based on varying factors, including the language of the class member's

particular arbitration agreement. *See, e.g.*, *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 631–

32 (2009) (equitable estoppel is a question of state law); *Hogan v. SPAR Grp., Inc.*, 914 F.3d 34

(1st Cir. 2019) (equitable estoppel depends on the language of the arbitration agreement); *Crawford Prof'l Drugs, Inc. v. CVS Caremark Corp.*, 748 F.3d 249 (5th Cir. 2014) (applying Arizona law and holding CVS could compel arbitration based on equitable estoppel and Caremark provider agreements); *Grand Wireless, Inc. v. Verizon Wireless, Inc.*, 748 F.3d 1 (1st Cir. 2014) (applying New York law and holding a non-signatory could compel arbitration with a signatory in a RICO case). The applicable state law will vary from contract to contract. *See* App. C: MedImpact Dispute Provision Variations, at 4 (ten different states across thirty-nine contracts); App. E: Caremark Dispute Provision Variations, at 6 (nineteen different states across forty-one contracts). The need for such a complex "state-by-state review" overwhelms any common issues and defeats predominance. *Lozano*, 504 F.3d at 728; *see also, e.g.*, *Spotswood*, 2019 WL 498822, at *11.

As one court cogently explained: "Although it is not clear how many putative class members signed arbitration agreements, the evidence currently before the Court supports an inference that a significant number did, and that a significant portion of this litigation would be devoted to discovering which class members signed such agreements and enforcing those agreements, rather than to the resolution of plaintiffs' legal claims – which themselves are complex." *Pablo v. ServiceMaster Glob. Holdings Inc.*, No. C 08-03894 SI, 2011 WL 3476473, at *2 (N.D. Cal. Aug. 9, 2011) (denying class certification).

## 2.  Individual statute of limitations issues will predominate.

Members of the proposed class had different knowledge about HSP pricing at different times. As discussed above, such knowledge will defeat many potential class members' claims altogether. For many others, the information potential class members or their agents learned, or should have learned – and when they learned or should have learned it – will present individualized statute of limitations defenses. These defenses also will vary depending on the

state law that applies to each claim.  Such an "individualized approach to the statute of

limitations defense" prevents Plaintiffs from showing "that common issues predominate."  *In re*

*Celexa & Lexapro Mktg. & Sales Practices Litig.*, 325 F.R.D. 529, 540 (D. Mass. 2017); *see also*

*Thorn v. Jefferson-Pilot Life Ins.*, 445 F.3d 311, 321–22 (4th Cir. 2006) (stating that plaintiffs

bear the burden of demonstrating "that resolution of the statute of limitations defense on its

merits may be accomplished on a class-wide basis").

Individualized inquiries regarding statutes of limitation will overwhelm any common

questions with regard to the proposed national RICO class.  Civil RICO claims have a four-year

statute of limitations beginning when the plaintiff discovers – or should have discovered – the

injury.  *See Rotella v. Wood*, 528 U.S. 549, 553 (2000); *see also Lares Grp., II v. Tobin*, 221 F.3d

41, 44 (1st Cir. 2000).  The Class PBMs and consultants hired by proposed class members

directly informed many health plans that HSP prices were not U&C prices years before Plaintiffs

filed suit in 2016.  Determining which proposed class members learned or should have learned

about the HSP program and when they learned or should have learned it cannot be determined on

a classwide basis.[30]  "[W]hen a class member should have known of the alleged

---

[30] In addition to the individual communications described in Section II.B.2, evidence
exists that at least some health plans *should* have learned that HSP prices were not U&C prices.
First, HSP received significant publicity, with publications across the country reporting on its
launch.  Second, as Plaintiffs' expert admits, health plans were perfectly capable of auditing
PBM calculations and comparing the U&C prices that they paid to the HSP price of $9.99.  Conti
Rep. ¶ 61.  Third, in early 2010, a coalition of labor unions called "Change to Win" initiated a
media storm over the HSP program by issuing a report on the subject and accusing CVS of
overcharging clients by not reporting HSP prices as its U&C prices.  *See* DX 11, Declaration of
Dan Parker ("Parker Decl.") ¶¶ 11–17.  News outlets reported the findings of this report
extensively and the allegations led to Congressional hearings in February of 2010.  *See United
States ex rel. Winkelman v. CVS Caremark Corp.*, 827 F.3d 201, 204 (1st Cir. 2016).

Referring to this 2010 publicity, the District of Massachusetts dismissed a False Claims
Act lawsuit against CVS under the statutory "public disclosure bar," and the First Circuit
affirmed the dismissal, noting the "outpouring of publicity" "left no doubt about CVS's

misrepresentations is an individual question given the . . . specific circumstances of the individual class members." *In re Light Cigarettes Mktg. Sales Practices Litig.*, 271 F.R.D. 402, 421 (D. Me. 2010).

The state consumer protection classes also must be scrutinized on an individual basis for statute of limitations purposes. Ohio's statute of limitations is two years. *See* Ohio Rev. Code Ann. § 1345.10(C) (West 2019). Nevada's is four years. Nev. Rev. Stat. Ann. § 11.190 (West 2017). New Jersey's is six. *See, e.g.*, *Kennedy v. Axa Equitable Life Ins.*, No. 06-6082 (RBK), 2007 WL 2688881, at *2 (D.N.J. Sept. 11, 2007). And Michigan's is either one or six. *See* Mich. Comp. Laws Ann. § 445.911(7) (West 2019) ("An action under this section shall not be brought more than 6 years after the occurrence . . . nor more than 1 year after the last payment . . . whichever period of time ends at a later date."). The States also have different criteria for when a claim accrues. Ohio "sets forth an absolute two-year statute of limitations" from when the alleged act occurred. *Cypher v. Bill Swad Leasing Co.*, 521 N.E.2d 1142, 1144 (Ohio Ct. App. 1987). But in Nevada, the action accrues when "the aggrieved party discovers, or by the exercise of due diligence should have discovered, the facts constituting the deceptive trade practice." Nev. Rev. Stat. Ann. § 11.190 2(d).

The unjust enrichment class faces a similar problem. The statute of limitations for unjust enrichment claims under District of Columbia law is three years. *See* D.C. Code Ann. § 12-301(8) (West 2019). In Indiana, it is six years. *See* Ind. Code Ann. § 34-11-2-7 (West 2019). And the accrual criteria also differ. In the District of Columbia, "the statute of limitations 'starts to run upon the occurrence of the wrongful act giving rise to a duty of restitution.'" *News World*

─────────────────────

insistence that its HSP prices should not be considered when calculating U&C prices." *Id.* at 212.

*Commc'ns, Inc. v. Thompsen*, 878 A.2d 1218, 1223 (D.C. 2005) (quoting *Congregation Yetev Lev D'Satmar, Inc. v. 26 Adar N.B. Corp.*, 192 A.D.2d 501, 503 (N.Y. App. Div. 1993)).  But in Indiana, "a cause of action accrues, and the statute of limitation begins to run, when a claimant knows or in exercise of ordinary diligence should have known of the injury." *Pflanz v. Foster*, 888 N.E.2d 756, 759 (Ind. 2008).

Defendants' evidence as to when each health plan (1) was allegedly harmed, (2) became aware of this alleged harm, and (3) reasonably should have been aware of this harm will require individualized inquiries that would predominate over any shared questions of fact.

## III.   PLAINTIFFS ARE NOT TYPICAL OR ADEQUATE.

To certify a class, this Court must find that "the claims or defenses of the representative parties are typical of the claims or defenses of the class," Fed. R. Civ. P. 23(a)(3), and that "the representative parties will fairly and adequately protect the interests of the class," Fed. R. Civ. P. 23(a)(4).  "The typicality requirement is designed to insure that the claims of the purported class representative are sufficiently similar to the claims of the class members, as a group, that prosecution of the class representative's case will benefit the entire class." *Van West v. Midland Nat'l Life Ins.*, 199 F.R.D. 448, 452 (D.R.I. 2001).  Similarly, the adequacy requirement is designed to ensure that "[a class] [representative] must be part of the class and possess the same interest and suffer the same injury as the class members." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 626 (1997) (internal quotation marks omitted).  A court should consider, among other things, "(1) whether there is a potential for conflict and (2) whether there is an assurance of vigorous prosecution of the action." *In re TJX Cos. Retail Sec. Breach Litig.*, 246 F.R.D. 389, 394 (D. Mass. 2007).

Named Plaintiffs fail the tests for both typicality and adequacy because, for each class, they differ from the rest of the class members in ways that will defeat their ability to function

effectively as class representatives.  *First*, Plaintiffs Sheet Metal and Indiana Carpenters had actual knowledge that Defendants were not submitting HSP prices as U&C prices, which threatens the merits of each of their claims and renders them poorly suited to represent the Class. *Second*, Plaintiffs only entered into contracts with the PBMs Caremark and ESI-Medco, not MedImpact or OptumRx.  Thus, they have no incentive to develop evidence to show that MedImpact or OptumRx was part of the alleged conspiracy, as class members who contracted with these PBMs would have to prove.  *Third*, Plaintiffs are also subject to unique defenses based on their status as express trusts.  *Fourth*, Plaintiffs lack even a basic familiarity with their claims and have already shown that they will not participate meaningfully in this litigation.

### A.   Sheet Metal Workers and Indiana Carpenters Had Actual Knowledge that HSP Prices Were Not Submitted as U&C Prices.

Named plaintiffs Sheet Metal and Indiana Carpenters were informed by June 2009 and April 2010, respectively, ██████████████████████████████████  *See, e.g.*, Tibus Email; Newman Email; *supra* C5.  Courts have denied certification in cases where the named plaintiffs were subject to similar unique defenses due to their knowledge of an alleged misrepresentation.  *See, e.g.*, *Steginsky v. Xcelera, Inc.*, No. 3:12-cv-188 (SRU), 2015 WL 1036985, at *7 (D. Conn. Mar. 10, 2015), *aff'd*, 658 F. App'x 5 (2d Cir. 2016) ("[I]t is clear that Steginsky's apparent lack of reliance will subject her to unique defenses that will 'unacceptably detract from the focus of the litigation to the detriment of absent class members.'" (quoting *In re Omnicom Grp., Inc. Sec. Litig.*, No. 02 Civ. 4483(RCC), 2007 WL 1280640, at *4 (S.D.N.Y. Apr. 30, 2007))).  Similarly, here, named Plaintiffs cannot adequately represent Class members who do not need to defend themselves against such evidence.  The unique defense of actual knowledge with regard to these named Plaintiffs renders them atypical and the action not suitable for class certification.

### B.     Plaintiffs Cannot Represent Health Plans that Contracted with OptumRx or MedImpact as Their PBMs.

Plaintiffs allege wrongdoing by four Class PBMs – Caremark, ESI/Medco, MedImpact, and OptumRx – but only contracted with two of them, Caremark and ESI/Medco.[31]  As discussed in Section I.A. above, the class claims depend on the terms of contracts between CVS and the individual PBMs, and between the PBMs and the individual potential class members. Though MedImpact and OptumRX (like ESI/Medco) are not defendants, the class members' claims still depend on proving they were part of the unlawful conspiracy.  The various PBM contracts differ, so proving a claim based on one PBM's contracts does not prove a claim as to another PBM.  In a similar circumstance, the Fourth Circuit reversed an order of class certification where the "claims of plaintiffs [we]re not typical of claims" of all class members, because the strength of the class members' claims varied based on the "different language" of their contracts.  *Broussard v. Meineke Disc. Muffler Shops, Inc.*, 155 F.3d 331, 340 (4th Cir. 1998).  *Broussard*'s reasoning is analogous to *Retirement Board of the Policemen's Annuity & Benefit Fund of Chicago v. Bank of New York Mellon,* 775 F.3d 154 (2d Cir. 2014), which considered a similar issue in the standing context.  In *Retirement Board*, the Second Circuit determined that an investor in a trust could not represent class members who invested in other trusts because, while the trusts were similar and the trustee was the same, the trustee's "alleged misconduct must be proved loan-by-loan and trust-by-trust." *Id.* at 162–63.

Typicality and adequacy are absent because Plaintiffs have no incentive to develop or present evidence that OptumRx's and MedImpact's contractual provisions concerning U&C

---

[31] Plaintiff Sheet Metal used Caremark as its PBM, *see, e.g.*, DX 26, SMW Fund 30(b)(6) Deposition ("SMW Dep.") 211:22–25, 212:1–7, and Plaintiffs Indiana Carpenters and Plumbers used ESI/Medco as their PBM, *see* DX 25, Plumbers 30(b)(6) Deposition ("Plumbers Dep.") 138:10–12.

pricing support the class members' claims, because that is not necessary for Plaintiffs themselves to recover.[32]  More broadly, Plaintiffs have no incentive to defend against any type of evidence that could uniquely undermine – or to develop evidence that could uniquely support – the claims of health plans who used MedImpact and OptumRx as PBMs.  "[T]he claims of a purported class representative are not typical if, in order to prove the claims of other class members, the representative must prove something different from what is necessary to prove his own claim." *Van West*, 199 F.R.D. at 452.  This follows from "[t]he purpose of the typicality requirement," which "is to ensure that the 'class representative's interests and incentives will be generally aligned with those of the class as a whole.'"  *MAZ Partners LP v. Shear*, No. 11-11049-PBS, 2016 WL 183519, at *4 (D. Mass. Jan. 14, 2016) (quoting *In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585, 599 (3d Cir. 2009)).

Plaintiffs in fact have every incentive to ***distance themselves*** from potential class members who contracted with MedImpact and OptumRx because of unfavorable evidence.



As a result, the "fortunes of the class representatives" could "rise or fall" without regard to the fortunes of the entire class.  *Cooper v. S. Co.*, 390 F.3d

---

[32] As discussed above, the language of Optum's definition of U&C, for example, differs markedly from Caremark's.

695, 713 (11th Cir. 2004) (internal quotation marks omitted), *overruled, in part, on other grounds by Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 457–58 (2006).

### C.     Named Plaintiffs Are Subject to Additional Unique Defenses.

All three named Plaintiffs are trusts suing in their own names.  As such, they are "subject to the unique defense of lack of capacity to sue" because "only a trustee has capacity to prosecute an action on behalf of a trust." *Williams v. Balcor Pension Inv'rs*, 150 F.R.D. 109, 116 (N.D. Ill. 1993); *see also Bank v. Elec. Payment Servs., Inc.*, No. CIV. A. 95-614-SLR, 1997 WL 811552, at *16 (D. Del. Dec. 30, 1997) (A plaintiff lacking "the authority to" bring "third party claims and causes of action . . . has not and cannot satisfy the typicality prerequisite in Rule 23(a)(3).").  Plaintiffs' "vulnerability to this unique defense disqualifies [them] from serving as . . . class representative[s]." *Williams*, 150 F.R.D. at 116.

It is well established that "traditional trusts such as the one[s] at issue here – as opposed to so-called 'business trusts,' which are a newer invention – were not considered distinct legal entities at common law, and hence cannot sue or be sued in their own name." *Doermer v. Oxford Fin. Grp., Ltd.*, 884 F.3d 643, 647 (7th Cir. 2018) (citing *Americold Realty Tr. v. ConAgra Foods, Inc.*, 136 S.Ct. 1012, 1016 (2016)).  "A trust is simply a collection of assets and liabilities . . . as such, [it] has no capacity to sue or be sued." 90A C.J.S. *Trusts* § 579.

This defense undoubtedly will preoccupy Plaintiffs because it could foreclose their claims.  A trust's lack of capacity can even require vacatur of a judgment after a jury verdict. *See Coverdell v. Mid-S. Farm Equip. Ass'n*, 335 F.2d 9, 14 (6th Cir. 1964).  The putative Plaintiffs' lack of legal capacity means their claims were nullities from the outset of the case, as CVS has warned Plaintiffs repeatedly.  Plaintiffs however refused to substitute their trustees as the named plaintiffs.  During discovery, CVS gathered evidence necessary to prove this dispositive defense against Plaintiffs. *See, e.g.*, DX 78, Indiana Carpenters' Resps. to CVS's 2d

Set of Reqs. for Admis. Nos. 23–26 (Feb. 4, 2019); Sheet Metal Dep. 42:2–14, 44:7–49:17, 50:3–51:7, 55:21–56:3, 57:15–24, 75:7–80:20; DX 35, ███████████████████ ████████

In addition, Plaintiffs are uniquely subject to the similar but distinct defense that they are not the real parties in interest.  Federal Rule of Civil Procedure 17(a)(1) requires actions to "be prosecuted in the name of the real party in interest" and specifies that the appropriate party is "a trustee of an express trust" (another name for a traditional trust like each of the Plaintiffs).  Fed. R. Civ. P. 17(a)(1), (E); *see, e.g.*, *Thomas D. Philipsborn Irrevocable Ins. Tr. v. Avon Capital, LLC*, No. 11 C 3274, 2013 WL 6068797, at *2 (N.D. Ill. Nov. 18, 2013); *Estate of Migliaccio v. Midland Nat'l Life Ins.*, 436 F. Supp. 2d 1095, 1100 (C.D. Cal. 2006).  "It is the trustee, not the trust itself, that is entitled to bring suit under Rule 17(a)(1)(E)."  Wright & Miller, 6A Federal Practice & Procedure ("Wright & Miller") § 1548.  To be sure, Rule 17(a)(3) provides a reasonable opportunity to substitute the correct party; but when, as here, "'the determination of the right party to bring the action was not difficult and when no excusable mistake had been made, then Rule 17(a)(3) is not applicable and the action should be dismissed.'"  *Id.* (quoting Wright & Miller § 1555).[33]  In any event, this unique defense prevents Plaintiffs, who lack capacity to sue, from serving as class representatives.  Even if Plaintiffs ultimately "carry [their] burden to prove that the filing of this case in [their] own name[s] was an honest mistake," they would still have "to substitute the trustee[s] as the real part[ies] in interest."  *Feist v. Consol. Freightways Corp.*, 100 F. Supp. 2d 273, 280 (E.D. Pa. 1999), *aff'd*, 216 F.3d 1075 (3d Cir.

---

[33] Here, naming improper Plaintiffs was not an excusable mistake.  CVS objected several times, but Plaintiffs made a calculated and tactical decision not to substitute their trustees as proper plaintiffs because they did not want to subject their trustees to (a) the obligation to preserve documents, or (b) the obligation to respond to document requests and other discovery requests from Defendants.

2000).  In that instance, the ***named Plaintiff trusts*** would not even be plaintiffs any more, much less could they be class representatives.  To the extent the ***trustees*** sought to be class representatives, they would have their own burdens to establish that they are adequate and typical class representatives.

### D.    Named Plaintiffs Lack Familiarity with the Basic Elements of Their Claims.

Courts in the First Circuit have held that a "lack of basic knowledge about [a] case renders [the plaintiff] inadequate to serve as a class representative."  *In re Sepracor Inc. Sec. Litig.*, 233 F.R.D. 52, 55 (D. Mass. 2005).  In *Carrier v. American Bankers Life Assurance Co. of Florida*, No. 05-CV-430, 2008 WL 312657 (D.N.H. Feb. 1, 2008), for instance, the court noted that named plaintiffs' "dependence on guidance from counsel" could provide evidence of their inadequacy.  *See id.* at *10.  Similarly, here, depositions of trustees testifying on behalf of Plaintiffs showed that "they have little if any understanding of their role, independent of counsel, as class representatives."  *Id.*

Plaintiff Indiana Carpenters lacks sufficient knowledge about the claims to represent the class adequately.  Its representative, William Nix, conceded that he is not aware of any facts suggesting that CVS overcharged the Fund or that Medco (the Fund's PBM) conspired with CVS or Caremark to overcharge the Fund – or, for that matter, any facts to support the Fund's lawsuit. DX 24, Indian Carpenters Welfare Fund 30(b)(6) Deposition ("Indian Carpenters Dep.") 105:14– 25, 106:1–16.  He does not know one way or the other whether the allegations in this lawsuit are true.  *Id*. at 106:17–25, 107:1–7.  He heard about the HSP program for the first time during a preparation session a week before his deposition, *Id.* at 84:9–25, and learned about the lawsuit from Fund counsel for about "15 seconds," *Id*. at 92:8–11.  Nix confirmed that a vote of the trustees is required to sue on behalf of the Fund, but did not recall such a vote ever occurring.  *Id.* at 38:17–25, 39:1–11.  As for the factual basis for the lawsuit, he stated: "I really don't – I don't

understand all of it.  I don't understand any of it, to be honest with you." *Id*. at 90:1–5.  He did

not know the basis for the claims against Caremark – and, in fact, did not even know what

Caremark is.  *Id*. at 91:18–25.

Plumbers' representative, Joseph Ohm, could not articulate the Fund's understanding of

the facts forming the basis of the lawsuit.  Plumbers Dep. 209:20–25, 210:1–13.  When asked

whether the allegations against CVS and Caremark could be false, he replied, "I don't know."

*Id*. at 215:12–25.

Plaintiffs assert that Sheet Metal's representative, Scott Parks, "demonstrated the Fund's

understanding of this case."  Pls.' Mem. at 26.  That is inaccurate.  When asked why Sheet Metal

claimed that it should receive HSP prices, Parks argued that Sheet Metal somehow was entitled

to "the best price available" in the entire industry on every single drug.  SMW Dep. 211:9–

13.  He admitted, however, that he could not point to a contractual provision, a representation by

Caremark, or a communication from the Fund's prescription benefits consultant stating as much,

████████████████████████████████████████████████  *Id.* at 217:19 –

218:13, 222:8–18, 226:1–4.  Rather, it was merely his "belief" or "hope" that Sheet Metal should

receive the "best price."  *Id.* at 223:3–5.  When asked to describe the factual basis for the lawsuit

against Caremark, Parks repeatedly answered that it is "in the complaint," *id.* at 278:15–279:15,

and testified that the Fund lacked "independent knowledge, apart from what lawyers had

communicated, of fraud by CVS" or "of any allegations that CVS or Caremark concealed Health

Savings Pass from [Sheet Metal]," *id.* at 360:13–20, 361:4–9.

All three named Plaintiffs fail the tests of typicality and adequacy.  The Court should

deny their motion for class certification.

**IV.     A CLASS ACTION IS NOT SUPERIOR TO OTHER METHODS.**

Rule 23(b)(3) also requires that a class action be superior to any other available method of adjudication.  The superiority requirement "is intended to permit class actions that would achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results."  *Van West*, 199 F.R.D. at 454 (internal quotation marks omitted).  To determine whether class treatment is superior, a court may consider (1) the interest of the class members in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation already commenced by or against class members; (3) the desirability of concentrating the litigation in a particular forum; and (4) difficulties likely to be encountered in managing a class action.  *See* Fed. R. Civ. P. 23(b)(3).

Many of the factors discussed above show that a class action is not a superior method of adjudicating the potential class members' claims.  Individualized proof would be required to establish what misrepresentations, if any, were made to each class member, whether and to what extent each class member relied on the alleged misrepresentations, and what damages each class member suffered.  Plaintiffs' attempt to certify a nationwide class and three multistate classes, each covering a different group of states and subject to multiple states' laws, only compounds these problems.  The burden is on plaintiffs to "demonstrate, through an 'extensive analysis'" that grouping is feasible.  *See Castano v. Am. Tobacco Co.*, 84 F.3d 734, 742 (5th Cir. 1996).  Plaintiffs have not met that burden.

Importantly, the putative class members are not individuals who lack the incentive or resources to bring their own claims.  They are "health plans," sophisticated entities that offer health insurance and benefits to many individuals in an extraordinarily complex, regulated environment.  These sophisticated companies are fully capable of bringing their own claims if

they think they were defrauded, and they are more likely to obtain full recovery through individual lawsuits.  Thus, denying certification would not deprive the class members of access to justice and would not defeat the policies of Rule 23.

### A.    Variations in State Law Preclude Certification.

Structuring jury instructions and verdict forms to account for substantial differences among the causes of action in the relevant states will be a time-consuming and daunting challenge.  Fundamental variations regarding what class members must prove amplify the complexity of the case and will lead to jury confusion.

### 1.    Variations in claims for unjust enrichment.

Plaintiffs' causes of action include materially different state-law unjust enrichment claims, but Plaintiffs make no adequate proposal regarding how jury instructions could be structured to account for these differences.  The proposed verdict form glosses over the significant distinctions in establishing unjust enrichment claims in each state.  Plaintiffs attach an exhibit that purports to be a survey of state unjust enrichment claims based on "extensive analysis," but for each state they generally include only a one-sentence statement of the elements drawn from a single case.  The exhibit does not include any analysis of the nuances of the claims in each state and does not explain precisely what must be proved.

For example, Plaintiffs cite a 2009 Illinois case that notes, "To state a cause of action based on a theory of unjust enrichment, a plaintiff must allege that the defendant has unjustly retained a benefit to the plaintiff's detriment, and that defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience." *Apollo Real Estate Inv. Fund, IV, L.P. v. Gelber*, 935 N.E. 2d 949, 962 (Ill. App. Ct. 2009).  This single sentence oversimplifies what Plaintiffs must establish under Illinois law.  A more recent Illinois decision list five essential elements: "(1) an enrichment, (2) an impoverishment, (3) a relation between the

enrichment and impoverishment, (4) the lack of justification and (5) the lack of a legal remedy." *Inca Materials, Inc. v. Indigo Constr. Servs., Inc.*, No. 1-14-1345, 2015 WL 6955213, at *10 (Ill. App. Ct. Nov. 10, 2015).  The fourth and fifth elements are missing from Plaintiffs' exhibit.

A closer look at the States' unjust enrichment laws reveals significant variations that make a class action unworkable.  For example, in New York, the "prohibition against quasi-contractual claims where a written contract exists applies not only to the parties that are in privity of contract, but also to noncontracting parties as well."  *Danica Plumbing & Heating LLC v. Amoco Constr. Corp.*, No. 8994/07, 2008 WL 498630, at *4 (N.Y. Sup. Ct. Feb. 6, 2008).  Similarly, under Arkansas law, "the doctrine of restitution or unjust enrichment is not available where there is a valid, legal, and binding contract."  *Charles Brooks Co. v. Georgia-Pac. Corp.*, No. 06-CV-1061, 2007 WL 1175051, at *5 (W.D. Ark. Apr. 19, 2007).  Indiana courts follow a similar approach.  *See Se. Fin. Credit Union v. Coll. Network, Inc.*, No. 115-cv-01507-LJM-TAB, 2016 WL 1187731, at *6 (S.D. Ind. Mar. 28, 2016) ("[I]n the fact of a contractual relationship, this implied-in-law theory cannot stand.").  Other jurisdictions, however, have conflicting case law as to whether an unjust enrichment claim may stand when there is an adequate remedy at law available.  *Compare In re Sears, Roebuck & Co. Tools Mktg. & Sales Practices Litig.*, No. 05C4742 et al., 2006 WL 3754823, at *3 (N.D. Ill. Dec. 18, 2006) ("It is well settled that a party cannot seek equitable relief when he has an adequate legal remedy.  Unjust enrichment, however, is a legal claim." (citations omitted)), *with Prignano v. Prignano*, 934 N.E.2d 89, 108 (Ill. App. Ct. 2010) (denying remedy under an unjust enrichment theory when a contract governs the relationships of the parties).  *See also Starko, Inc. v. Presbyterian Health Plan, Inc.*, 276 P.3d 252, 278 (N.M. Ct. App. 2011) ("'[U]njust enrichment constitutes an independent basis for recovery in a civil-law action, analytically and historically distinct from the

68

other two principal grounds for such liability, contract and tort.'" (quoting *Hydro Conduit Corp.*

*v. Kemble*, 793 P.2d 855, 860 (N.M. 1990)), *rev'd on other grounds*, 333 P.3d 947 (N.M. 2014);

*but see Abraham v. WPX Energy Prod., LLC*, 20 F. Supp. 3d 1244, 1276 (D.N.M. 2014)

(concluding that "under New Mexico law, the existence of a contract with a different party does

not automatically bar [an] unjust enrichment claim, but the plaintiff cannot pursue the unjust

enrichment claim unless there is something – bankruptcy, statutes – prohibiting the plaintiff from

pursuing the contract claim.").

As another example, states in the Unjust Enrichment Class differ regarding whether they

require a lack of justification for the enrichment, or simply an unjust retention of the benefit.  *See*

*Inca Materials, Inc.*, 2015 WL 6955213, at *10.  There are also different statutes of limitations

and accrual criteria.  The statute of limitations for unjust enrichment in the District of Columbia

is three years and "'starts to run upon the occurrence of the wrongful act giving rise to a duty of

restitution.'"  *News World Commc'ns, Inc. v. Thompsen*, 878 A.2d 1218, 1223 (D.C. 2005)

(quoting *Congregation Yetev Lev D'Satmar*, 192 A.D.2d at 503); *see* D.C. Code Ann. § 12-

301(8).  In Indiana, however, the statute of limitations is six years and begins to run "when a

claimant knows or in exercise of ordinary diligence should have known of the injury."  *Pflanz v.*

*Foster*, 888 N.E.2d 756, 759 (Ind. 2008); *see* Ind. Code Ann. § 34-11-2-7.

Courts have found that these types of variations in states' unjust enrichment claims defeat

the superiority element of Rule 23(b)(3) because they make a single class litigation

unmanageable.  *See, e.g.*, *Donachy v. Intrawest U.S. Holdings, Inc.*, No. 10-4038, 2012 WL

869007, at *10 (D.N.J. Mar. 14, 2012) ("Briefing the unjust enrichment and negligent

misrepresentation claims of [New York, Connecticut and New Jersey] has already exposed the

difficulty in finding common ground between various states' common law claims, given the

oftentimes subtle differences between the states."); *Vista Healthplan, Inc. v. Cephalon, Inc.*, No. 2:06-cv-1833, 2015 WL 3623005, at *34–35 (E.D. Pa. June 10, 2015) ("I find that the variations in state law [in proposed class that includes the District of Columbia, Hawaii, Iowa, New Mexico, New York, and West Virginia] also render class litigation unmanageable.  Other courts have reached similar conclusions regarding the manageability of proposed multi-state unjust enrichment classes."); *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1274 (11th Cir. 2009) ("In short, common questions will rarely, if ever, predominate [in] an unjust enrichment claim, the resolution of which turns on individualized facts."); *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 591 (9th Cir. 2012)("The elements necessary to establish a claim for unjust enrichment also vary materially from state to state.").  Plaintiffs do not explain how differences among unjust enrichment claims may be addressed in a manner that does not render a single trial unmanageable.

## 2. Variations in consumer protection statutes.

Plaintiffs also ignore extensive variations among state laws concerning consumer protection and unfair trade practices that make them unsuitable for class treatment.[34]  Plaintiffs claim that they have "excluded those states with elements that may be uncommon or might serve

---

[34] Plaintiffs' cited cases are distinguishable on multiple grounds.  For example, *Suchanek v. Sturm Foods*, 2018 U.S. Dist. LEXIS 213658 (S.D. Ill. July 3, 2018), involved fewer state laws than at issue in Plaintiffs' proposed classes.  *Waste Mgmt. Holdings, Inc. v. Mowbray*, 208 F.3d 288 (1st Cir. 2000), involved variations in state warranty laws, which do not relate to this matter.  The court in *Southern States Police Benevolent Association, Inc. v. First Choice Armor & Equipment, Inc.*, 241 F.R.D. 85 (D. Mass. 2007), also found that variations among state warranty law did not defeat the predominance of common legal issues but concluded that certification of a subclass asserting violations of state consumer protection laws was not warranted because variances in substantive perquisites of such claims rendered certification unmanageable.  In addition, several of the cases evaluated class certification requirements in a settlement context and thus the court "need not inquire whether the case, if tried, would present intractable management problems ... for the proposal is that there be no trial."  *In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 231, 247 (D. Del. 2002), *aff'd*, 391 F.3d 516 (3d Cir. 2004) (alteration in original) (internal quotation marks omitted).

as an impediment for certification.  For example, Plaintiffs excluded those consumer protection statutes requiring reliance."  Pls.' Mem. at 37.  That is not accurate.  The Class still includes a claim for fraud under California's Unfair Competition Law (UCL), which has four elements, including that "Defendant's alleged misrepresentations:(1) *were relied upon* by named Plaintiffs."  *Vasic v. PatentHealth, L.L.C.*, 171 F. Supp. 3d 1034, 1043 (S.D. Cal. 2016) (emphasis added).  Reliance is also required under California's Consumers Legal Remedies Act (CLRA).  *See Cohen v. DIRECTV, Inc.*, 101 Cal. Rptr. 3d 37, 47–48 (2009) ("The trial court correctly ruled that actual reliance must be established for an award of damages under the CLRA."); *Gonzalez v. Proctor & Gamble Co.*, 247 F.R.D. 616, 624 (S.D. Cal. 2007) ("Plaintiff, relying on *Vasquez*, argues that CLRA claims are subject to class wide proof of liability and reliance without a need for individualized proof.  As previously discussed, however, *Vasquez* and its progeny only permit an inference of common reliance when the allegations demonstrate that a single, material misrepresentation was directly made to each class member.").  Plaintiffs do not account for the reliance requirement, which differs among the states, and which Plaintiffs themselves admit *"might serve as an impediment for certification."*  Pls.' Mem. at 37 (emphasis added).

There are additional significant differences among the states' statutes:

- *Statutes of limitations.* Plaintiffs do not account for variations in the statutes of limitations among the states in the Consumer Protection Classes.  For example, in Massachusetts the limitations period for a consumer protection claim is four years from discovery, Mass. Gen. Laws Ch. 260, § 5A, and in New Jersey it is six years from accrual, N.J. Stat. Ann. § 2A:14-1.

- *Definition of "consumers."*  In some of the states in the Consumer Protection classes, like Massachusetts and Michigan, TPPs are not protected consumers.  *See In re Lidoderm Antitrust Litig.*, 103 F. Supp. 3d 1155, 1164 (N.D. Cal. 2015) ("Indirect purchasers who are engaged in 'trade or commerce' cannot bring claims under section 11 of the Massachusetts CPA," thus health plans that "did not engage in the transactions for its own 'purely personal reasons' but instead

71

acted in its business interests of providing health care coverage for its members" were unable to pursue claims.); *Zine v. Chrysler Corp.*, 600 N.W.2d 384, 393 (Mich. Ct. App. 1999) ("[I]f an item is purchased primarily for business or commercial rather than personal purposes, the MCPA does not supply protection.").

- **Scienter.** The state statutes differ regarding whether scienter is required. While Plaintiffs note that they excluded those states with statutes "applying subjective standards for deception," the New Jersey statute requires knowledge and intent for omissions. N.J. Stat. Ann. § 56:8-2; *see Mazza*, 666 F.3d at 591 ("We conclude that these are not trivial or wholly immaterial differences. In cases where a defendant acted without scienter, a scienter requirement will spell the difference between the success and failure of a claim. In cases where a plaintiff did not rely on an alleged misrepresentation, the reliance requirement will spell the difference between the success and failure of the claim.")

Courts have denied certification when plaintiffs sought to lump different states' consumer protection laws together into a single class. In *In re Ford Motor Co. Ignition Switch Products Liability Litigation*, 194 F.R.D. 484 (D.N.J. 2000), the court noted differences such as privity requirements, what constitutes actionable conduct, and the definition of protected "consumers" among consumer protection statutes in New Jersey, California, and other states, concluding that "common legal issues do not predominate." *Id.* at 489–90 (internal quotation marks omitted). Other courts have reached similar conclusions. *See Lyon v. Caterpillar, Inc.*, 194 F.R.D. 206, 219 (E.D. Pa. 2000) (state consumer protection acts, including those in New Jersey, California, and Massachusetts, "vary on a range of fundamental issues," including prohibited conduct, scienter, and availability of class actions); *S. States Police Benevolent Ass'n v. First Choice Armor & Equip., Inc.*, 241 F.R.D. 85, 93 (D. Mass 2007) (denying certification of subclass of individuals under the consumer protection statutes of eight states, including California, Florida, Massachusetts, New York, and Washington, because "variances in the substantive prerequisites of such claims" made the subclass  "unmanageable and contrary to the fair and efficient adjudication of th[e] matter"); *Mazza*, 666 F.3d at 591 (vacating certification order after

72

examining the differing elements – such as scienter and reliance – of certain state consumer

protection statutes, including California, Florida, and New York); *In re Celexa & Lexapro Mktg.*

*& Sales Practices Litig.*, 291 F.R.D. 13, 19 (D. Mass. 2013) ("Courts have been particularly

unwilling to certify classes under the laws of multiple states in cases involving state consumer-

protection laws on the grounds that those laws vary widely state to state and courts must respect

these differences rather than apply one state's law to sales in other states with different rules."

(internal quotation marks omitted)).

Plaintiffs do not explain how the jury instructions or verdict form could be written to

account for the substantial differences in unjust enrichment law and consumer protection statutes

in the relevant states. Their proposed verdict forms do not define or differentiate between crucial

terms, such as "unfair act or practice" and "deceptive act or practice." Plaintiffs simply proclaim

that "[j]ury instructions will elucidate commonly defined terms and otherwise guide the fact-

finder through the required elements," Pls.' Mem. at 38, providing no specifics on how jury

instructions will do this when crucial terms vary state by state. Plaintiff "should not expect the

court to ferret through, disseminate, and craft manageable schemes from these . . . [jury

instructions] when that burden clearly rests with . . . [plaintiff]." *Lyon*, 194 F.R.D. at 206

(alterations in original) (internal quotation marks omitted).

### B. Class Members Are Sophisticated Parties Capable of Bringing Their Own Claims.

In determining whether to certify a class, courts will consider "the financial resources of

class members" and "the ability of claimants to institute individual lawsuits." *Primavera*

*Familienstiftung v. Askin*, 178 F.R.D. 405, 410 (S.D.N.Y. 1998); *see also Gries v. Standard*

*Ready Mix Concrete, L.L.C.*, 252 F.R.D. 479, 486–87 (N.D. Iowa 2008) (when assessing

numerosity "a court may also consider the financial resources of the potential class members

with regard to their ability to institute individual lawsuits.").  Courts therefore have denied

certification where potential class members are sophisticated, well-funded parties – like the

"health plans" or "TPPs" in this case.  *See In re Actiq Sales & Mktg. Practices Litig.*, 307 F.R.D.

150, 172 (E.D. Pa. 2015) ("***TPPs are sophisticated institutional entities*** with an interest in

controlling litigation when relatively large amounts of money are at stake." (emphasis added));

*see also Block v. First Blood Assocs.*, 125 F.R.D. 39, 43 (S.D.N.Y. 1989) ("The putative class

members in this action are easily identifiable and have the financial resources and stake in the

partnership which would make joinder practicable."); *Kerns v. Stover*, No. 11-6099-CV-SJ-HFS,

2013 WL 12290249, at *2 (W.D. Mo. Jan. 7, 2013) ("Finally, not only are monetary damage

amounts substantial but also the putative class members are sophisticated, further supporting the

conclusion that individual actions or joinder is feasible.").

    Here, there is no evidence that the cost of individual litigation is prohibitive to members

of the Class.  They are sophisticated entities that offer health benefits to their employees,

insureds, and members; contract with PBMs to administer those benefits; and often retain

consultants and attorneys to advise them on the process.  Some are among the nation's largest

insurance companies.  "Many TPPs . . . are well-heeled corporations (Aetna, Cigna, Blue

Cross/Blue Shield companies) able to defend their interests if they believe they have been

defrauded."  *In re Pharm. Indus. Average Wholesale Price Litig.*, 230 F.R.D. 61, 95 (D. Mass.

2005).  Those three TPPs – Aetna, Cigna, and Blue Cross/Blue Shield – are putative class

members here, too, even though all three knew that HSP prices were not U&C prices (*see supra*

C.4).  The individual class members' alleged monetary damages are substantial: Plaintiffs' expert

estimates damages of $45,643 for Plumbers, $189,968 for Sheet Metal, and $138,174 for Indiana

Carpenters.  Conti Report ¶ 77.  Because members of the Class have sufficient resources and

incentives to bring individual lawsuits, principles of access to justice and protection for weaker claimants do not support class certification here.

In fact, Class members are better served by filing individual lawsuits because the proposed Consumer Protection and Unjust Enrichment sub-classes would provide only partial recoveries for many health plans.  The state sub-classes only cover drug purchases in a small number of specified states, leaving Class members uncompensated for their purchases in scores of other states.  The Class members would have to file individual lawsuits to recover damages for purchases in the jurisdictions not covered here.

The possibility that class members would file individual lawsuits is not theoretical. Plaintiffs' Proposed Special Verdict Forms for the Consumer Protection Classes (Appendix D) and Proposed Special Verdict Form for Unjust Enrichment (Appendix F) state that "the absence of any claim or state from the suggested classes is not intended to constitute a waiver of any claims currently, or in the future, brought in this action."  Pls.' Mem., Apps. D, F.  Certifying a class that provides partial damages and spawns a host of individual claims pursuing full recovery would be inconsistent with the purpose of a class action device, which is to "achieve economies of time, effort, and expense."  *Van West*, 199 F.R.D. at 454.

A class action would not contribute to the fair and efficient resolution of the claims.  On the contrary, it would only superimpose difficult management problems upon claims that require individualized proof.  All of this would serve little purpose, as the supposed beneficiaries of the class action are sophisticated parties who are perfectly capable of bringing their own lawsuits and would have to do so anyway to achieve full recovery.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court deny Plaintiffs'

Motion for Class Certification in its entirety.

DATED: July 17, 2019                    Respectfully submitted,


By: /s/ *Robert C. Corrente*

Robert C. Corrente (RI Bar No. 2632)
WHELAN, CORRENTE & FLANDERS LLP
100 Westminster Street, Suite 710
Providence, RI 02903
Telephone: (401) 270-4500
Facsimile: (401) 270-3760
rcorrente@whelancorrente.com

Enu Mainigi (*Pro Hac Vice*)
Craig D. Singer (*Pro Hac Vice*)
William T. Burke (*Pro Hac Vice*)
Grant A. Geyerman (*Pro Hac Vice*)
Kathryn E. Hoover (*Pro Hac Vice*)
WILLIAMS & CONNOLLY LLP
725 Twelfth St., N.W.
Washington, DC 20005
Telephone: (202) 434-5000
Facsimile: (202) 434-5029
emainigi@wc.com
csinger@wc.com
wburke@wc.com
ggeyerman@wc.com
khoover@wc.com

*Attorneys for CVS Pharmacy, Inc. and Caremark, L.L.C.*

## CERTIFICATE OF SERVICE

I hereby certify that on July 17, 2019, **DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR OBJECTION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** was filed electronically and is available for viewing and downloading from ECF.


DATED: July 17, 2019                    By: _/s/ Grant A. Geyerman_